**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DONALD J. CULLOTTA, an individual, ) | |
| ) | Case No.: |
| Plaintiff, ) | |
| v. ) | Judge: |
| ) | |
| UNITED SURGICAL PARTNERS ) | Magistrate Judge: |
| INTERNATIONAL, INC., a Texas corporation; and ) | |
| CATHERINE WEAVER, an individual, ) | |
| ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

**VERIFIED COMPLAINT**

NOW COMES the Plaintiff, DONALD J. CULLOTTA ("CULLOTTA"), an individual,

by and through his attorneys, the Law Offices of Schirott, Luetkehans & Garner, LLC, for his

Complaint against the Defendants, UNITED SURGICAL PARTNERS INTERNATIONAL, INC.

("USPI"), a Texas corporation, and CATHERINE WEAVER, an individual, and in support thereof

states and alleges as follows:

**NATURE OF THE ACTION**

1.     This is a federal-question and diversity action involving statutory claims under the

Americans with Disabilities Act of 1990, 42 U.S.C. 12101, *et seq.*; the Family and Medical Leave

Act, 29 U.S.C. §§ 2611, *et seq.*; the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*; the Age

Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*; and common law claims under

Illinois law. CULLOTTA was discharged from his position(s) as Director of Information

Technology and Director of Facilities Management at USPI on March 29, 2018. CULLOTTA was

subjected to various retaliatory actions and discharged in retaliation for (i) reporting dangerous

and unsafe conditions at surgical facilities operated by USPI, and, (ii) exercising his rights under

the Family Medical Leave Act. CULLOTTA also alleges a claim for retaliatory discharge under

1

Illinois common law and a statutory whistleblower claim under the Illinois Whistleblower Act, 740 ILCS 174/1, *et seq.*

## PARTIES

2.    Plaintiff, CULLOTTA, is an individual that resides at 24423 Champion Drive, Plainfield, Illinois 60585, and has always been a resident of said address relevant to this action.

3.    Defendant, USPI, is a Texas corporation with its principal place of business located at 15305 Dallas Parkway, Suite 1600, Addison, Texas 75001.

4.    Defendant, CATHERINE WEAVER "(WEAVER"), on information and belief, is a resident of Indiana, and has always been a resident of Indiana relevant to this action.

## JURISDICTION AND VENUE

5.    The Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1367. The Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because CULLOTTA asserts claims that arise under the laws of the United States, namely, the Americans with Disabilities Act of 1990, 42 U.S.C. 12101, *et seq.*; the Family and Medical Leave Act, 29 U.S.C. §§ 2611, *et seq.*; the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*; and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* The Court has supplemental jurisdiction over CULLOTTA'S state-law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to CULLOTTA'S federal-question claims that they form part of the same case or controversy.

6.    The Court also has subject matter jurisdiction in this action pursuant to 28 U.S.C. §1332(a)(1) because CULLOTTA and Defendants are citizens of different States and there is more than $75,000 in controversy. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2), as a substantial part of the events giving rise to CULLOTTA'S claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

7.    CULLOTTA began working for Same Day Surgery Network ("SDSN") in or about 1999, where he was employed as the Director of Information Technology ("IT").

8.    On information and belief, USPI acquired SDSN in 2004, and CULLOTTA stayed with USPI; employed in his same position within USPI as the Director of IT.

9.    In addition to being employed as the Director of IT, CULLOTTA thereafter began assisting USPI in an operations and buildings management role with various USPI facility projects around the Chicagoland area in USPI's Chicago Market.

10.    In or around 2007, CULLOTTA began being treated for symptoms related to post-traumatic stress disorder ("PTSD"), depression, anxiety, and disassociation[1].

11.    On or about December 2, 2008, CULLOTTA was officially given the title of Director of Facilities Management for USPI'S Chicago Market (in addition to CULLOTTA'S other role as Director of IT) by Nancy Franke (then Market President of USPI'S Chicago Market), whereby CULLOTTA received a pay increase, effective January 1, 2009. *See* December 2, 2008 USPI Personnel Action Form, marked as Exhibit A, attached hereto and made a part hereof.

12.    CULLOTTA's job duties as Director of IT and Director of Facilities Management for USPI'S Chicago Market included, among other duties, (i) managing the computer network for USPI'S then seven (7) Chicagoland facilities:

**(1) Same Day Surgery River North ("River North")**, 1 E Erie, Ste 300, Chicago, IL 60611;
**(2) North Shore Surgical Center ("North Shore")**, 3725 W Touhy Ave, Ste 401, Lincolnwood, IL 60712;
**(3) Hinsdale Surgical Center ("Hinsdale")**, 10 Salt Creek Lane, Hinsdale, IL 60521;
**(4) 25 East Same Day Surgery ("25 E Washington")**, 25 E Washington St #300, Chicago, IL 60602;
**(5) Silver Cross Surgery Center ("Silver Cross")**, 1003 Pawlak Parkway, New Lenox, IL 60451;

---

[1] Dissociative disorders involve problems with memory, identity, emotion, perception, behavior, and sense of self. Dissociative symptoms can potentially disrupt every area of mental functioning. Examples of dissociative symptoms include the experience of detachment or feeling as if one is outside of one's body, and loss of memory or amnesia. Philip Wang, M.D., Dr. P.H. *What Are Dissociative Disorders?*, The American Psychiatric Association, 2018, www.psychiatry.org/patients-families/dissociative-disorders/what-are-dissociative-disorders.

**(6) 6 Corners Same Day Surgery Center ("6 Corners")**, 4211 N Cicero Ave, Chicago, IL 60641; and
**(7) Same Day Surgery Elmwood Park ("Elmwood Park")**, 1614 Harlem Ave, Elmwood Park, IL 60707.

(hereinafter referred to collectively as the "Facilities"); (ii) troubleshooting server problems for USPI employees; (iii) managing project rollouts, project management, and IT issues; (iv) assessing issues identified by Facility Administrators, and once an assessment was completed, report to the Market President for determination on next steps; and (v) working with the Illinois Department of Public Health ("IDPH") and the Joint Commission[2] regarding structural and life safety issues related to the Facilities. CULLOTTA's primary work location was 1 E Erie, Suite 333, Chicago, IL 60611.

13. On January 27, 2009, CULLOTTA received a Performance Evaluation from CULLOTTA'S then supervisor, Nancy Franke ("Franke"). In said evaluation, Franke listed all projects CULLOTTA had been involved with in 2008 and concluded that CULLOTTA was "clearly a valuable asset to [the Chicago] market." The Performance Evaluation came with a pay increase of 2.5%. *See* January 27, 2009 USPI Personnel Action Form, marked as Group Exhibit B, attached hereto and made a part hereof.

14. On or about December 16, 2009, Franke sent an email to Mark Garvin, USPI'S Chief Operating Officer, stating:

> "Shortly after I assumed this position (July, 08), my facilities were plagued by a myriad of building management issues; serious HVAC issues at River North/other; our very old Lincolnwood [Northshore] site which was in total disrepair, etc. At that point in January [2009], I asked Don to assume additional responsibility for facilities management in addition to his current IT responsibilities (Director, IT/Facilities Management). He has done a phenomenal job, often working late into the night and weekends at a significant cost savings to the facilities/region. […] In summary I would ask your approval to accrue 2010 bonus (not to exceed 15%) for Don from my corporate account and bonus him in the amount of $6k for 2009."

---

[2] The Joint Commission is a United States-based nonprofit tax-exempt 501 organization that accredits more than 22,000 health care organizations and programs in the United States. Most U.S. state governments recognize Joint Commission accreditation as a condition of licensure for the receipt of Medicaid and Medicare reimbursements. The Joint Commission is based in the Chicago suburb of Oakbrook Terrace, Illinois. https://www.jointcommission.org.

*See* December 16, 2009 email from Franke to Garvin, marked as Exhibit C, attached hereto and made a part hereof.

15.     During the period covering 2009-2018, there were numerous life safety and IT issues with the Facilities; however, CULLOTTA was able to, due to his diligence, help USPI keep the Facilities operating with minimal closure times or replacement of mechanical equipment, and was able to help cut costs at the Facilities. *See* 2009 Annual Review – Don Cullotta, marked as Exhibit D, attached hereto and made a part hereof.

16.     During the period covering 2009-2018, CULLOTTA spent many additional hours beyond his regular Monday through Friday, 9AM—5PM, and worked long nights, weekends, and holidays for USPI, as requested by CULLOTTA'S immediate supervisor(s) at the time.  *See* Exhibit C.

17.     CULLOTTA received very favorable evaluations from his immediate supervisors during the period covering 2009-2018, during which USPI employed seven different Regional/Senior Vice Presidents of the Chicago Market: (1) Wes Chick; (2) Luanne Brown; (3) Debbie Kelly; (4) Nancy Franke; (5) Dennis Zamojski; (6) Bill Garrison; and (7) WEAVER.

18.     On information and belief, during the period covering 2009-2018, USPI also employed four different Market Presidents of the Chicago Market, which were the immediate supervisors of the Regional/SVPs listed *supra*: (1) Mark Garvin; (2) Andy Johnston; (3) Corey Ridgway; and (4) Chris Hartshorn.

19.     At all times relevant to this action, the Facilities referenced *supra* were considered ambulatory surgical centers ("ASC") under the United States Code of Federal Regulations ("CFR"), Title 42 (Centers For Medicare & Medicaid Services, Department Of Health And Human

Services), Subchapter B (Medicare Program), Part 416 (Ambulatory Surgical Services).  *See* 42 CFR 416, *et seq.*

20.      An ASC is any institution or building devoted primarily to the maintenance and operation of facilities for the performance of surgical procedures, as evidenced by use of the facilities by physicians, podiatrists, or dentists in the performance of surgical procedures that constitutes more than 50 percent of the activities at that location.[3]

21.      An ASC must be certified and approved to enter into a written agreement with the Centers for Medicare & Medicaid Services ("CMS")[4]. Participation as an ASC is limited to any distinct entity that operates exclusively for the purpose of providing surgical services to patients not requiring hospitalization and in which the expected duration of services would not exceed 24 hours following an admission. An unanticipated medical circumstance may arise that would require an ASC patient to stay in the ASC longer than 24 hours, but such situations should be rare.

22.      Because the USPI Facilities referenced *supra* are considered ASCs under 42 CFR 416, they are required to be in compliance with the Federal requirements set forth in the Medicare Conditions for Coverage in order to receive Medicare/Medicaid payment(s) and are therefore subject to intermittent and unannounced surveys as performed by the IDPH.  The goal of an ASC

---

[3] "Ambulatory Surgical Treatment Centers." Ambulatory Surgical Treatment Centers | IDPH, www.dph.illinois.gov/topics-services/health-care-regulation/facilities/ambulatory-surgical-treatment-centers.

[4] The Centers for Medicare & Medicaid Services (CMS), previously known as the Health Care Financing Administration (HCFA), is a federal agency within the United States Department of Health and Human Services (HHS) that administers the Medicare program and works in partnership with state governments to administer Medicaid, the Children's Health Insurance Program (CHIP), and health insurance portability standards. In addition to these programs, CMS has other responsibilities, including the administrative simplification standards from the Health Insurance Portability and Accountability Act of 1996 (HIPAA), quality standards in long-term care facilities (more commonly referred to as nursing homes) through its survey and certification process, clinical laboratory quality standards under the Clinical Laboratory Improvement Amendments, and oversight of HealthCare.gov. "Centers for Medicare and Medicaid Services." Wikipedia, Wikimedia Foundation, 15 Sept. 2019, www.wikipedia.org/wiki/Centers_for_Medicare_and_Medicaid_Services.

survey is to determine if the ASC is in compliance with the definition of an ASC, ASC general conditions and requirements, and the conditions for coverage at 42 CFR 416 Subparts A—C. Certification of ASC compliance with the regulatory requirements is accomplished through observations, interviews, and document/record reviews. The survey process focuses on an ASC's delivery of patient care, including its organizational functions and processes for the provision of care. The ASC survey is the means used to assess compliance with Federal health, safety, and quality standards that will assure that patients receive safe, quality care, and services. *See* 42 CFR 416, State Operations Manual Appendix L - Guidance for Surveyors: Ambulatory Surgical Centers, marked as Exhibit E, attached hereto and made a part hereof.

23.     The Medicare Conditions of Participation (CoPs), Requirements for Skilled Nursing Facilities (SNFs) and Nursing Facilities (NFs), and Conditions for Coverage (CfCs) are sets of requirements for acceptable quality in the operation of health care entities. There is a set of Conditions, or Requirements for SNFs and NFs, for each type of provider or supplier subject to certification. In addition to each Condition, or Requirement for SNFs and NFs, there is a group of related quality standards, with the Condition or Requirement expressed in a summary lead sentence or paragraph characterizing the quality or result of operations to which all the subsidiary standards are directed. Because many Medicare providers and suppliers also participate in the Medicaid program and Federal procedures must also be followed when surveying and certifying providers that only participate in the Medicaid program, these procedures generally apply to both programs. *See* Exhibit E.

24.     The IDPH determines whether and how each standard is met via a survey conducted by qualified health professionals. Covered topics include but are not limited to (i) requirements for the ASC's governing body and management; (ii) the provision of surgical services; (iii) patient

rights; infection control; and (iv) patient admission, assessment, and discharge. While an institution may fail to comply with one or more of the subsidiary standards during any given survey, it cannot participate in Medicare unless it meets each and every Condition or attains substantial compliance with requirements for SNFs and NFs. Many Condition or Requirement summaries are identical to statements of the statute. The essence of what the IDPH certifies to CMS is a finding of whether an institution meets each of the CoPs or substantially meets each requirement for SNFs and NFs applicable to it, and whether each supplier of services meets each CfC applicable to it. *See* Exhibit E.

25. A full or standard survey will be conducted if the purpose of the survey is for initial certification, recertification, or validation of an accreditation organization survey. Surveys in response to a complaint or multiple complaints, or as a revisit to see if a previously cited problem has been corrected, will be focused on the CfCs related to the complaint or on the CfC for which deficiencies were previously identified. This does not preclude the scope of a complaint or revisit survey being expanded, if surveyors observe deficient practices related to other CfCs while on site. *See* Exhibit E. §§5100.1 and 5200.1

26. The IDPH prepares its certification for the CMS Regional Office, sends the institution a "Statement of Deficiencies," Form CMS-2567. The institution is then given 10 calendar days in which to respond with a Plan of Correction (PoC) for each cited deficiency and enters this response on the form containing the statement of deficiencies. If the institution has not come into compliance with all Conditions or Requirements for SNFs and NFs within the time period accepted as reasonable, the IDPH certifies noncompliance notwithstanding a PoC. *See* Exhibit E.

27.     The IDPH's finding constitutes a final determination (except in the case of a State-operated Medicaid-only NF or a NF subject to a validation survey or a review by CMS when CMS' decision is binding), when a Medicaid-only facility is noncompliant.  The State Medicaid Agency must undertake either an action to terminate the non-complying facility's Medicaid participation or, if a NF, apply one or more of the remedies specified in §1919 of the Social Security Act, or it may do both.  *See* Exhibit E.

28.     On or about December 16, 2015, the IDPH performed a recertification survey of the 25 E Washington Facility.  In the course of IDPH'S inspection, the IDPH determined that the 25 E Washington Facility was not in compliance with 42 CFR 416, which as discussed *supra* contains the health and safety standards that all ASCs must meet.  Specifically, the IDPH determined that, *inter alia*, the 25 E Washington Facility failed to maintain an infection control program that minimized the risk of infections and communicable diseases, pursuant to 42 CFR 416.51 (Infection Control), because it failed to ensure appropriate disposal of partially used or contaminated surgical supplies—for instance, staff members dropped rolls of surgical gauze on the ground and in trash bins and then put said surgical gauze back into use. Additionally, the IDPH determined that the 25 E Washington Facility failed to ensure all staff and physicians adhered to Facility policy on surgical attire and failed to keep certain drugs and medications properly locked away in storage.  Moreover, the IDPH determined that the 25 E Washington Facility failed to have working fire alarms and fire sprinkler systems, had deficient firewalls, and had blocked/deficient egress routes in the event of a fire.  *See* December 16, 2015 IDPH Survey Report, marked as Exhibit F, attached hereto and made a part hereof.

29.     Due to the number, variety, and severity of the life safety deficiencies observed during the December 16, 2015 survey walk-through, USPI stated in its Plan of Correction

submitted to the IDPH after the December 16, 2015 survey walk-through that the 25 E Washington Facility would employ the use of a *fire watch*."[5] *See* Exhibit F.

30.     However, a fire watch was never employed at the 25 E Washington Facility.

31.     In or about September 2017, USPI began planning a renovation of the 25 E Washington Facility that would, *inter alia*, revamp the patient waiting room, increase space and add equipment for spinal procedures, and increase space for physical processing of contaminated equipment and sterilization procedures.  *See* September 14, 2017 email from Katie Carlson to Bill Garrison, marked as Exhibit G, attached hereto and made a part hereof.

32.     In or about September 2017, USPI also began planning a renovation of the Hinsdale Facility that would allow USPI to perform gastrointestinal ("GI") medical procedures at that Facility.  The renovation plan included converting a storage room into an operating room.  *See* Hinsdale GI Emails, marked as Group Exhibit H, attached hereto and made a part hereof.

33.     However, USPI did not want to get IDPH involved and wanted to attempt to operate the GI room without adjustments for the proper pressure and ventilation considerations as such considerations would mean less operations being performed and less money coming into the Facility, as shown in an email sent by the Administrator of the Hinsdale Facility, Brenna Fazio ("Fazio"), to Julia Hensley, RN, a Development Project Director for USPI, which stated:

> "I wanted to seek your guidance in the GI project we are doing here at Hinsdale. We had a call with the architect and construction company last week and had a concern and/or question about the involvement of IDPH.  Currently we have a documented procedure room on our plans and adjacent to that a storage room that we would turn into the scope cleaning room.  The question is would we need to notify and get approval from IDPH to turn the 'storage' room into the scope room?

---

[5] According to the National Fire Protection Association ("NFPA"), a *fire watch* is the assignment of a person or persons to an area for the express purpose of notifying the fire department and building occupants of an emergency; preventing a fire from occurring; extinguishing fires; or protecting the public from fire or life safety dangers. A fire watch should consist of trained personnel who continuously patrol the affected area. Ready access to fire extinguishers and the ability to promptly notify the fire department are essential functions. While patrolling, the person should not only be looking for fire, but making sure that the other fire protection features of the building such as egress routes and alarm systems are available and functioning properly. *See* NFPA 101-3.3.91 and NFPA 1-A-13.3.3.6.5.2(4)(b).

Obviously if we need to involve the state it would turn an 8-week project into a 4-5-month project. Please let me know your thoughts and how we should proceed."

*See* Group Exhibit H.

33.     In the course of CULLOTTA's responsibilities as Director of Facilities Management, CULLOTTA became aware of certain life safety hazards and deficiencies at the Facilities which presented immediate risks to the public, as well as the patients and staff of the Facilities.

34.     At all times that CULLOTTA served as Director of IT and Director of Facilities Management of USPI'S Chicago Market, USPI maintained specific employment policies, rules, and procedures that applied to employment at USPI. *See* Employee Handbook, marked as Exhibit I, attached hereto and made a part hereof. At all times relevant to this action, a certain USPI policy indicated that each employee should report any problems they saw ("*See it, say it, fix it,*"). *See* Compliance Flyer, marked as Exhibit J, attached hereto and made a part hereof.

35.     Thereafter, CULLOTTA brought certain life safety and fire safety deficiencies related to the 25 E Washington Facility's HVAC pressure deficiencies, deficiencies related to the sterilization of operating rooms, numerous fire safety issues, lack of fire testing logs, and other critical facility functions related thereto, etc. to the attention of each Facility's Administrators, as well as the Chicago Market Regional Vice President and Market President.

36.     In addition to the life safety concerns related to the 25 E Washington Facility, in December 2017, CULLOTTA was shown an email by Fazio in which a doctor at the Hinsdale facility, Scott E. Glaser, M.D., DABIPP ("Dr. Glaser"), was threatening to leave the Hinsdale

facility and take his patients with him, if USPI did not provide Dr. Glaser with a mobile C-Arm[6] medical imaging device to allegedly use for humanitarian work in third world countries.

37.    On January 2, 2018, CULLOTTA sent an email to his supervisor, William Garrison, about safety conditions at the Silver Cross Facility; specifically, about fire and flood hazards, and the possibility of bacteria infected surgical instruments from improper pressure and humidity conditions. *See* January 2, 2018 email from Cullotta to Garrison, marked as Group Exhibit K, attached hereto and made a part hereof.

38.    On January 2, 2018, Garrison responded back to CULLOTTA stating, "Thanks Don. This is concerning. If you haven't already, please give Maria Mitchell a call to coordinate next steps." *See* January 2, 2018 email from Garrison to Cullotta, marked as Exhibit L, attached hereto and made a part hereof. (Maria Mitchell was formally a regional vice president of USPI based out of Columbus, Ohio; and on information and belief, during the relevant time mentioned above, Ms. Mitchell was the acting administrator of USPI'S Silver Cross Facility/serving as a consultant for USPI).

39.    However, these issues were never addressed by USPI; and the Silver Cross Facility was occupied by employees and patients despite the unsafe environment, infection control deficiencies, and life safety deficiencies, which posed a risk to the health and safety of Silver Cross Facility employees and patients alike, as well as to the general public.

40.    On or about January 4, 2018, USPI began renovating the 25 E Washington Facility, which involved stopping the performance of surgical procedures and operations at that Facility.

---

[6] A "C-Arm" is a mobile medical imaging device that is based on X-ray technology and can be used flexibly in various operating rooms within a clinic. The name is derived from the C-shaped arm used to connect the X-ray source and X-ray detector to one another. Herzmann, Martin. "What Is a Mobile C-Arm?" Pressemitteilung, Ziehm Imaging, 2019, www.ziehm.com/fileadmin/user_upload/en_us/company/press/What_is_a_mobile_c_arm.pdf. A "C-Arm" can typically cost anywhere from $30,000 used to over $200,000 for a brand new, top of the line model. Sharrock, Chris. "C-Arm Cost Price Guide." Block Imaging, 11 June 2019, www.info.blockimaging.com/c-arm-cost-price-guide.

41.     On or about January 4, 2018, the Joint Commission inspected the 25 E Washington Facility and cited the Facility for deficiencies related to its HVAC and air flow/pressure systems in sterile areas and operating rooms, as well as fire hazards related to deficient/nonfunctional fire safety systems.

42.     On January 29, 2018, CULLOTTA sent an email to Chicago Market President, Corey Ridgway, that also attached a memorandum explaining the status of the HVAC and fire hazard risks at the 25 E Washington Facility.  *See* January 29, 2018 Email and Memorandum from CULLOTTA to Ridgway, marked as Group Exhibit M, attached hereto and made a part hereof.

43.     Despite calling out the issues facing the 25 E Washington Facility, Ridgway did not respond to the January 29, 2018 Email and Memorandum from CULLOTTA to Ridgway.

44.     On February 11, 2018, after receiving no response from Ridgway, CULLOTTA emailed WEAVER and attached the memo explaining the status of the HVAC and fire hazard risks at the 25 E Washington Facility.  *See* February 11, 2018 Email from CULLOTTA to WEAVER, marked as Exhibit N, attached hereto and made a part hereof.  *See* Ex. M (Memo).

45.     After renovation work was completed at the 25 E Washington Facility, the City of Chicago granted an occupancy permit for employees to return to work but not for the 25 E Washington Facility to resume full operation for performing surgeries; however, USPI resumed performing surgeries and operations at the 25 E Washington Facility despite the HVAC and fire hazard risks at the 25 E Washington Facility, and despite CULLOTTA'S cautions.

46.     On or about February 16, 2018, CULLOTTA'S immediate supervisor, Bill Garrison, was officially terminated by USPI.

47.     On information and belief, sometime between February 16, 2018 and March 1, 2018, WEAVER assumed the role of President of USPI'S Chicago Market, in addition to her other role with USPI as a Senior Vice President.

48.     On or about February 18, 2019, CULLOTTA went to the Hinsdale Facility to wire phone lines for the Hinsdale Facility. Upon arriving at the Hinsdale Facility, CULLOTTA noticed that the front door was not closed and locked, but rather, a piece of the rubber weather seal on the bottom of the automatic door was loose and caused the automatic door to open and close over and over again. After wiring the phones at the Hinsdale Facility, CULLOTTA inspected the Hinsdale Facility and observed, *inter alia*, that certain sterilization areas were open to the public and unlocked (and therefore not in compliance with relevant life safety regulations); large quantities of anesthesia drugs and medications were improperly out in the open and unprotected; and bags of dangerous used medical supplies, medications, and medical waste were being improperly stored in storage closets. *See* Hinsdale Facility Photos from February 2018, marked as Exhibit O, attached hereto and made a part hereof.

49.     After making these observations, CULLOTTA sent an email to the Administrator of the Hinsdale Facility, Brenna Fazio. *See* February 18, 2018 Email from CULLOTTA to Fazio, marked as Exhibit P, attached hereto and made a part hereof.

50.     On February 21, 2018, certain USPI employees, including CULLOTTA, WEAVER, and the Market President of USPI'S Midwest Region, Chris Hartshorn ("Hartshorn"), were part of a conference call to discuss the Hinsdale facility's plan to build the GI room, where WEAVER and Hartshorn also discussed providing the C-Arm device to Dr. Glaser. *See* February 21, 2018 Calendar Invite for Phone Call, marked as Exhibit Q, attached hereto and made a part hereof.

51. During that call, CULLOTTA indicated that providing the C-Arm device to Dr. Glaser as a way to prevent Dr. Glaser from leaving the facility and taking business with him might potentially be a violation of the federal Anti-Kickback Statute, 42 USC 1320-7b.

52. While CULLOTTA'S comments were acknowledged, Hartshorn indicated to CULLOTTA and others that despite realizing the situation potentially was a violation of the anti-kickback statute, Hartshorn was inclined to give Dr. Glaser what he needed to keep his cases at the Hinsdale Facility.

53. On or about March 1, 2018, WEAVER had a meeting with CULLOTTA and others about the Chicago Market and the role of all employees operating therein. At that meeting, which was CULLOTTA'S first in-person conversation with WEAVER, WEAVER stated to CULLOTTA that, "No one knows what you [CULLOTTA] do around here," and proceeded to personally and directly attack CULLOTTA verbally, questioning his job duties at USPI, and insinuating that there was personal animosity towards CULLOTTA by WEAVER. When CULLOTTA indicated that it felt like WEAVER had minimized the last eighteen (18) years of CULLOTTA'S life and that WEAVER'S manner and tone were very aggressive in their meeting, WEAVER stated: "That's how I roll, Don."

54. The next day, on March 2, 2018, CULLOTTA had a severe episode involving his PTSD, depression, anxiety, and disassociation directly related to his meeting with WEAVER; and CULLOTTA was told at that time by his psychiatrist, Brendan J. Beresford, MD ("Dr. Beresford"), to take a leave from work and intensify psychiatric treatment. Thereafter, Dr. Beresford made changes to CULLOTTA'S treatment and medication.

55. CULLOTTA continued to work at USPI through this time, however.

56.     On March 8, 2018 CULLOTTA was pulled off his role as Director of Facilities Management for the Silver Cross Facility. *See* March 8, 2018 Email from WEAVER to CULLOTTA and March 9, 2018 Personnel Action Form, marked as Group Exhibit R, attached hereto and made a part hereof.

57.     On or about March 9, 2018, in response and in reaction to CULLOTTA'S March 1, 2018 meeting with WEAVER, in which WEAVER personally attacked CULLOTTA, CULLOTTA sent WEAVER an email outlining problems with the 25 E Washington and Silver Cross Facilities, in attempts to again bring these issues to WEAVERS' attention, and in an attempt to assist USPI in its formulation of an official plan(s) of correction to address all said issues stated by IDPH and the Joint Commission. *See* March 9, 2018 Email from CULLOTTA to WEAVER, marked as Exhibit S, attached hereto and made a part hereof.

58.     In response, on or about March 12, 2018, WEAVER told CULLOTTA via a phone call to stop writing emails and to call WEAVER if CULLOTTA felt the need to say anything regarding the issues, problems, and/or the deficiencies with the Facilities, because the March 9, 2019 Email from CULLOTTA to WEAVER had to be sent to USPI'S legal counsel.

59.     On or about March 12, 2018, WEAVER conducted an annual performance review with CULLOTTA and other employees.

60.     On or about March 12, 2018, CULLOTTA received his Annual Review and received high evaluation ratings; including that "[CULLOTTA] performed well in 2017," and "[CULLOTTA] consistently provides leadership," and "[CULLOTTA] shows great ownership of issues in his role and frequently goes above and beyond." CULLOTTA was also given a merit increase of 2.5% in his base salary and a bonus of 14%. *See* 2017 Annual Review and 2018 Compensation Summary, marked as Group Exhibit T, attached hereto and made a part hereof.

61.     Subsequently thereafter, CULLOTTA began to notice that WEAVER had removed CULLOTTA from email correspondences with the 25 E Washington Facility Administrator and vendors related to certain projects associated with the 25 E Washington Facility and began preventing CULLOTTA from doing his job as Director of Facilities Management at the 25 E Washington Facility.

62.     Despite CULLOTTA'S cautions, USPI was still knowingly operating the 25 E Washington Facility despite severe fire and life safety deficiencies. Further, despite the City of Chicago only granting the 25 E Washington Facility a certificate of occupancy for employees to work, and not granting the 25 E Washington Facility full operation for performing surgeries, USPI was performing surgeries at the 25 E Washington Facility.

63.     On March 15, 2018, with CULLOTTA'S mental condition worsening from the stresses of WEAVER'S actions and the fear of something bad happening to Facility patients and staff and the general public due to the severe fire and life safety deficiencies that existed at the Facilities, CULLOTTA made an informal request for FMLA Leave to Trish Goodwin, in USPI'S HR Department.  See March 15, 2018 Email from Cullotta to Goodwin, marked as Exhibit U, attached hereto and made a part hereof.

64.     On or about March 15, 2018, when it became clear to CULLOTTA that USPI and WEAVER would not do anything about the problems related to the 25 E Washington Facility, CULLOTTA called the IDPH Central Complaint Registry Hotline (800-252-4343), anonymously, and reported that USPI was going to continue operating the Facilities despite the problems, posing fire hazards and health and safety risks to the Facility's patients and staff.

65.     On or about March 16, 2018, CULLOTTA also formally made a Complaint to the IDPH about, *inter alia*, the Hinsdale facility's improper storage of used medical supplies and

medical waste and the anesthesia medication and drugs being left out in the open. *See* Hinsdale Complaint to IDPH, marked as Exhibit V, attached hereto and made a part hereof.

66.     On March 21, 2018, CULLOTTA was officially demoted to only IT Director, whereby CULLOTTA was no longer Director of Facilities Management. However, CULLOTTA never received notification of such demotion; and in fact, did not learn of this demotion until March 29, 2018, the day he was terminated by USPI.

67.     On March 23, 2018, WEAVER invited CULLOTTA to a meeting with WEAVER and Hartshorn that was to take place on March 29, 2018; and where WEAVER indicated in the email that Hartshorn "would like to address the email matters with [CULLOTTA]." *See* March 23, 2018 email from WEAVER to CULLOTTA, marked as Exhibit W, attached hereto and made a part hereof.

68.     On March 25, 2018 WEAVER sent an email to CULLOTTA asking that CULLOTTA compile a list of all matters related to the Facilities that CULLOTTA oversaw. In this email, WEAVER also asked that CULLOTTA draft a "defined job scope" for his position with USPI. *See* March 25, 2018 email from Weaver to Cullotta, marked as Exhibit X, attached hereto and made a part hereof.

69.     On March 26, 2018, and after eleven (11) days of informally attempting to request leave, CULLOTTA formally requested leave under federal, state, and/or company leave entitlements, and was given Leave # VDJD18F2, which was approved for the period of time of March 26, 2018 through September 21, 2018. *See* Letter from USPI'S Leave Administration to Cullotta, marked as Exhibit Y, attached hereto and made a part hereof.

70.     On March 28, 2018, CULLOTTA sent WEAVER an email in response to the March 25, 2018 email from WEAVER to CULLOTTA, which listed all matters related to the Facilities

and included a defined job scope for the Director of IT/Director of Facilities Management position that CULLOTTA had assumed since 2009. In that email, CULLOTTA also mentioned the life safety and infection control problems of the Facilities. *See* March 28, 2018 email from CULLOTTA to WEAVER, marked as Exhibit Z, attached hereto and made a part hereof.

71.     On March 28, 2018, and in furtherance of his FMLA leave, CULLOTTA submitted his Certification of Health Care Provider for Employee's Serious Health Care Condition ("FMLA Application") to USPI via an email to Lidia Szajnowski, USPI'S acting office manager for the Chicago Market. *See* March 28, 2018 Email from Cullotta to Szajnowski, marked as Exhibit AA, attached hereto and made a part hereof. *See* FMLA Application, marked as Exhibit BB, attached hereto and made a part hereof.

72.     On March 28, 2019, CULLOTTA called WEAVER to inform her of CULLOTTA taking FMLA leave. During this call, WEAVER reminded CULLOTTA to come into the office for a meeting with WEAVER and Hartshorn the next day. CULLOTTA advised WEAVER of his FMLA leave, but WEAVER again commanded that CULLOTTA come into the office for the meeting, whereby CULLOTTA reluctantly agreed.

73.     On March 28, 2018, CULLOTTA sent an email to Ann Shimek, then USPI'S Senior Vice President of Clinical Operations, regarding the life safety issues plaguing the 25 E Washington Facility, the Silver Cross Facility, as well as the lack of response from WEAVER and Hartshorn in relation thereto. *See* March 28, 2018 Email from CULLOTTA to Shimek, marked as Group Exhibit CC, attached hereto and made a part hereof.

74.     On March 29, 2018, before his meeting with WEAVER and Hartshorn, CULLOTTA sent an email to Hartshorn regarding the life safety issues plaguing the 25 E

Washington Facility. *See* March 29, 2018 Email from CULLOTTA to Hartshorn, marked as Exhibit DD, attached hereto and made a part hereof.

75.     Later in the day on March 29, 2018, CULLOTTA met with WEAVER and Hartshorn and was informed that CULLOTTA would be terminated by USPI.

76.     During that meeting, a severance package agreement was presented to CULLOTTA of <u>Forty Thousand and 00/100 Dollars</u> ($40,000.00) over eighteen (18) weeks. During that meeting, CULLOTTA was informed that if he did not sign the severance package agreement in seven (7) days, it would be revoked/voided. WEAVER and Hartshorn attempted to convince CULLOTTA to sign the severance package agreement on the spot, saying that it was a good deal. However, CULLOTTA refused and did not sign the severance package agreement.

77.     On or about April 1, 2018, Hartshorn called CULLOTTA and asked CULLOTTA if he had considered signing the severance package agreement, to which CULLOTTA informed Hartshorn that CULLOTTA did not wish to sign the severance package agreement.

78.     On April 15, 2018, CULLOTTA was officially terminated by USPI. See Personnel Action Form, marked as Exhibit EE, attached hereto and made a part hereof.

79.     Thereafter, CULLOTTA received his last paycheck from USPI on or about April 15, 2018. However, this last paycheck did not compensate CULLOTTA for any paid time off, sick time, or vacation time that CULLOTTA had accrued and earned while employed at USPI.

80.     On or about December 19, 2018, CULLOTTA filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") as EEOC Claim Number: 440-2018-08379C. *See* CULLOTTA EEOC Charge, marked as Exhibit FF, attached hereto and made a part hereof.

81.     After more than 180 days had passed from the day CULLOTTA filed his EEOC charge without any kind of outcome from the EEOC, the EEOC was required to issue a Right to Sue Letter to CULLOTTA upon CULLOTTA'S request.  *See* 29 CFR § 1601.28.

82.     CULLOTTA requested a Right to Sue Letter from the EEOC on June 25, 2019, through his attorney.  *See* Request for Right to Sue Letter, marked as Exhibit GG, attached hereto and made a part hereof.

83.     On July 3, 2019, the EEOC issued a Notice of Right to Sue to CULLOTTA.  *See* Notice of Right to Sue, marked as Exhibit HH, attached hereto and made a part hereof.

84.     Pursuant the Notice of Right to Sue and pursuant to the Americans with Disabilities Act, claimants must file their lawsuit in a federal or state court within 90 days of receipt of the EEOC Notice of Right to Sue.  *See* Exhibit HH; *See* 42 U.S.C. § 12117(a).

85.     CULLOTTA received the Notice of Right to Sue on July 8, 2019.

86.     This Complaint has been timely filed within 90 days receipt of the Notice of Right to Sue.

## COUNT I
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

NOW COMES the Plaintiff, DONALD J. CULLOTTA, by and through his attorneys, The Law Offices of Schirott, Luetkehans & Garner, LLC, for his Complaint against the Defendants, UNITED SURGICAL PARTNERS INTERNATIONAL, INC. ("USPI") and CATHERINE WEAVER for a violation of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, *et seq*., and in support thereof states and alleges as follows:

1-86.   CULLOTTA restates and realleges paragraphs one (1) through eighty-six (86) as though fully set forth herein.

87.     The ADA prohibits employers from discriminating against qualified individuals because of a disability "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *See* 42 U.S.C. § 12112.

88.     CULLOTTA is disabled within the meaning of the ADA because: (1) he has physical or mental impairments[7] that substantially limit one or more major life activities[8]; (2) he has a record of such impairments; and (3) he was regarded by USPI as having such impairments because USPI knew CULLOTTA had such impairments once CULLOTTA had informed USPI via his request for FMLA leave on March 15, 2018.  *See* 42 U.S.C.S. § 12102(1).

89.     CULLOTTA'S impairments substantially compromise CULLOTTA'S ability to function in certain life activities (including but not limited to learning, reading, concentrating, speaking, and cognitive thinking) and sometimes cause CULLOTTA to be in an extremely fragile mental and physical state.  CULLOTTA'S impairments are severe and render CULLOTTA unable to function as a normal person. CULLOTTA'S impairments sometimes impact his ability to care for himself and his ability to work; which creates a significant barrier to his employment generally.

90.     CULLOTTA has an extensive record of mental impairment.

---

[7] CULLOTTA has been treated for, *inter alia*, post-traumatic stress disorder ("PTSD"), dissociation, anxiety, and depression. The definition of disability under the ADA shall be construed in favor of broad coverage of individuals under the ADA, to the maximum extent permitted by the terms of the ADA. *See* 42 U.S.C.S. § 12102(4)(A). An impairment that is episodic is still a disability if it substantially limits a major life activity when active. *See* 42 U.S.C.S. § 12102(4)(D).

[8] "Major life activities" include, but are not limited to, caring for oneself, performing manual tasks, sleeping, speaking, learning, reading, concentrating, thinking, communicating, and working. *See* 42 U.S.C.S. § 12102(2)(A). The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008; and an impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability. *See* 42 U.S.C.S. §§ 12102(4)(B) and (C).

91.     Despite his treatment for PTSD, depression, anxiety, and disassociation, however, CULLOTTA was fully qualified to perform the essential functions of his job with reasonable accommodation.

92.     Additionally, CULLOTTA was meeting his employer's legitimate expectations, because even after being treated with PTSD, depression, anxiety, and disassociation in 2008, CULLOTTA had received good performance evaluations during the period covering 2009-2018 and was even given the highest evaluation CULLOTTA had ever received from USPI on March 16, 2018, right before he was terminated.  *See* Exhibit T.

93.     USPI is a covered employer to which the ADA applies.

94.     USPI was aware of CULLOTTA'S disability as early as March 15, 2018 but certainly on March 26, 2018.  *See* Exhibits U and Z.

95.     Once an employee notifies his employer that he is disabled, "at that point, an employer's liability is triggered for failure to provide accommodations." *Curtis v. Costco Wholesale Corp.*, No. 13 C 3432, 2014 U.S. Dist. LEXIS 134182, at *22 (N.D. Ill. Sep. 24, 2014).

96.     USPI failed to reasonably accommodate CULLOTTA'S disability when instead of allowing CULLOTTA to work with FMLA leave, it terminated his employment.

97.     CULLOTTA suffered from an adverse employment decision because of his disability when he was demoted and ultimately terminated by USPI within approximately two weeks of disclosing his disability to USPI.

97.     Similarly situated employees without a disability were treated more favorably at USPI by USPI and WEAVER during the relevant time period.

98.     USPI'S stated reason for terminating CULLOTTA—that there were no other Directors of Facilities Management elsewhere in USPI'S other U.S. Markets—was a pretext for

discrimination, as CULLOTTA worked as a Director of Facilities Management for approximately ten (10) years for USPI prior to being terminated.

99.     USPI'S termination and disqualification of CULLOTTA on the basis of his disability and USPI'S failure to make an individualized assessment to determine whether CULLOTTA could be employed or whether a reasonable accommodation would enable him to remain employed by USPI violated the ADA.

100.     As a result of USPI'S actions, CULLOTTA has suffered and will continue to suffer both economic and non-economic harm.

Wherefore, Plaintiff, DONALD J. CULLOTTA, respectfully requests that judgment be entered against Defendants, UNITED SURGICAL PARTNERS INTERNATIONAL and CATHERINE WEAVER, and that this Honorable Court award him the following relief:

A.     Reinstatement to his previous position, or an equivalent position, with the same seniority status he would have had but for Defendants' violation of the Act;
B.     Back pay in an amount to be determined at trial;
C.     In the event reinstatement is not granted, front pay;
D.     Compensatory and consequential damages, including for emotional distress;
E.     Punitive damages;
F.     Pre-judgment and post-judgment interest at the highest lawful rate;
G.     Attorneys' fees and costs of this action;
H.     Expert witness costs; and
I.     Any such further relief as this Honorable Court finds reasonable.

## COUNT II
## VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT

NOW COMES the Plaintiff, DONALD J. CULLOTTA, by and through his attorneys, The Law Offices of Schirott, Luetkehans & Garner, LLC, for his Complaint against the Defendants, CATHERINE WEAVER ("WEAVER") and UNITED SURGICAL PARTNERS INTERNATIONAL, INC. ("USPI") for a violation of the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. § 2611, *et seq.*, and in support thereof states and alleges as follows:

1-100.   CULLOTTA restates and realleges paragraphs one (1) through one hundred (100) as though fully set forth herein.

101.   The FMLA allows an eligible employee with a serious health condition that renders the employee unable to perform his or her position to take twelve workweeks of leave during each twelve-month period.  *See* 29 U.S.C. § 2612(a)(1)(D).

102.   USPI qualifies as an "employer" as that term is defined in the FMLA because (i) USPI is engaged in commerce or in any industry or activity affecting commerce, and (ii) USPI employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.  *See* 29 U.S.C. § 2611(4).

103.   CULLOTTA is an "eligible employee" as that term is defined in the FMLA because CULLOTTA worked for USPI for at least (i) 12 months, and (ii) 1,250 hours of service with USPI during the previous 12-month period before he was terminated on March 29, 2018.  *See* 29 U.S.C. § 2611(2).

104.   CULLOTTA had an "entitlement to leave" (*i.e.,* eligible for FMLA protections) as defined in the FMLA, because of a serious health condition that made CULLOTTA unable to perform the functions of his position with USPI. *See* 29 U.S.C. § 2612(1)(D).

105.   CULLOTTA properly requested leave from USPI on March 15, 2018. This Request for Leave was supported by a certification issued by CULLOTTA'S health care provider; certification which was provided to USPI in a timely manner and which was sufficient pursuant to 29 U.S.C. § 2613(b).  *See* Exhibits U and Z.

106.   CULLOTTA provided sufficient notice of his intent to take leave by sending emails to certain personnel in USPI'S HR Department, and specifically requesting March 29, 2018 off the day before on March 28, 2018.

107.    CULLOTTA was granted leave on March 26, 2018 (for the period of March 26, 2018 until September 21, 2018) and was given notice by USPI on March 30, 2018. *See* Exhibit Z.

108.    CULLOTTA was entitled to take leave under FMLA due to CULLOTTA being eligible for FMLA protections based on his disability and for giving proper notice to USPI of his request, and because USPI approved CULLOTTA's request.

109.    Additionally, CULLOTTA was entitled to restoration to his position or an equivalent position as described in the FMLA pursuant to 29 U.S.C. § 2614(a) upon his return from his FMLA leave. *See* 29 U.S.C. § 2614(a).

110.    However, USPI interfered with, restrained, and/or denied the exercise of or the attempt to exercise, a fundamental right provided to CULLOTTA under the FMLA by requiring CULLOTTA to come to a meeting on a day he requested off in order to terminate CULLOTTA'S employment; and by terminating CULLOTTA while he was on FMLA leave.  *See* 29 U.S.C. § 2615(a)(1).

111.    By terminating CULLOTTA on March 29, 2018, USPI denied CULLOTTA restoration to the same or equivalent position as prescribed in FMLA. *See* 29 U.S.C. § 2614(1).

112.    Further, by terminating CULLOTTA on March 29, 2018, USPI unlawfully discriminated against CULLOTTA pursuant to the FMLA. *See* 29 U.S.C. § 2615(a)(2).

113.    Lastly, by terminating CULLOTTA on March 29, 2018, after CULLOTTA formally filed a complaint with the IDPH on or about March 16, 2018, USPI also unlawfully interfered with proceedings or inquiries pursuant to 29 U.S.C. § 2615(b)(1) and (2).  *See* 29 U.S.C. § 2615(b).

114.    As the result of CULLOTTA's termination, CULLOTTA has incurred, and is now incurring, and will continue to incur a loss in wages, salary, employment benefits, and other

compensation denied or lost to CULLOTTA by reason of the violation within the meaning of the FMLA, 29 U.S.C. § 2617(a), in an amount to be proved at trial. These costs include, but are not limited to, lost wages and medical expenses during CULLOTTA's leave of absence, back pay from the effective date of termination, lost medical expenses from the date of termination, and lost employment benefits from the date of termination, the loss of front pay as of the date of this complaint, and any interest on the amount thereon as provided in the FMLA, 29 U.S.C. § 2617. The costs also include attorneys' fees and court costs.

WHEREFORE, Plaintiff, DONALD J. CULLOTTA, respectfully requests that judgment be entered against Defendants, UNITED SURGICAL PARTNERS INTERNATIONAL and CATHERINE WEAVER, and that this Honorable Court award him the following relief:

A. Reinstatement to his previous position, or an equivalent position, with the same seniority status he would have had but for Defendants' violation of the Act;
B. Back pay in an amount to be determined at trial;
C. In the event reinstatement is not granted, front pay;
D. Compensatory and consequential damages, including for emotional distress;
E. Punitive damages;
F. Pre-judgment and post-judgment interest at the highest lawful rate;
G. Attorneys' fees and costs of this action;
H. Expert witness costs; and
I. Any such further relief as this Honorable Court finds reasonable.

## COUNT III
## COMMON LAW RETALIATORY DISCHARGE

NOW COMES the Plaintiff, DONALD J. CULLOTTA, by and through his attorneys, The Law Offices of Schirott, Luetkehans & Garner, LLC, for his Complaint against the Defendants, UNITED SURGICAL PARTNERS INTERNATIONAL, INC. ("USPI") and CATHERINE WEAVER, for Retaliatory Discharge, and in support thereof states and alleges as follows:

1-114. CULLOTTA restates and realleges paragraphs one (1) through one hundred fourteen (114) as though fully set forth herein.

115.    Illinois has a clearly mandated public policy in favor of preventing dangerous or unsafe conditions at healthcare facilities and reporting dangerous or unsafe conditions as set forth in (i) 42 CFR 416/ *et seq*., (ii) the Alternative Health Care Delivery Act, 210 ILCS 3/ *et seq.*, and (iii) the Ambulatory Surgical Treatment Center Act, 201 ILCS 5/ *et seq*., which at all times herein applied to USPI and USPI'S Chicagoland Facilities.

116.    The United States has a clearly mandated public policy in favor of permitting eligible employees of covered employers to take unpaid, job-protected leave for specified family and medical reasons with continuation of employment benefits under the same terms and conditions as if the employee had not taken leave as set forth in the FMLA. *See* 29 U.S.C. § 2611.

117.    CULLOTTA filed a Complaint with the IDPH regarding certain dangerous/unsafe conditions that existed at USPI'S Hinsdale facility on or about March 16, 2018.  *See* Exhibit V.

118.    Additionally, CULLOTTA was granted FMLA leave by USPI on March 26, 2018.

119.    CULLOTTA was terminated by USPI on March 29, 2018.

120.    USPI discharged CULLOTTA in retaliation for activities in support of the public policies in favor of reporting dangerous or unsafe conditions at public health facilities, and/or for exercising his rights under the FMLA (*See* Count II, *supra*).

121.    USPI'S act of discharging CULLOTTA in retaliation for his activities violates the clearly mandated public policies in favor of reporting dangerous or unsafe conditions at public health facilities, and/or for employees exercising their rights under the FMLA.

122.    Thus, USPI has unlawfully violated the FMLA.

123.    CULLOTTA has suffered a loss of income and significant emotional distress as a result of USPI'S retaliatory acts.

WHEREFORE, Plaintiff, DONALD J. CULLOTTA, respectfully requests that judgment be entered against Defendants, UNITED SURGICAL PARTNERS INTERNATIONAL and CATHERINE WEAVER, and that this Honorable Court award him the following relief:

A.   Reinstatement to his previous position, or an equivalent position, with the same seniority status he would have had but for Defendants' violation of the Act;
B.   Back pay in an amount to be determined at trial;
C.   In the event reinstatement is not granted, front pay;
D.   Compensatory and consequential damages, including for emotional distress;
E.   Punitive damages;
F.   Pre-judgment and post-judgment interest at the highest lawful rate;
G.   Attorneys' fees and costs of this action;
H.   Expert witness costs; and
I.   Any such further relief as this Honorable Court finds reasonable.

## COUNT IV
## <u>VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT</u>

NOW COMES the Plaintiff, DONALD J. CULLOTTA, by and through his attorneys, The Law Offices of Schirott, Luetkehans & Garner, LLC, for his Complaint against the Defendants, CATHERINE WEAVER ("WEAVER") and UNITED SURGICAL PARTNERS INTERNATIONAL, INC. ("USPI") for a violation of the Illinois Whistleblower Act (the "Whistleblower Act"), 740 ILCS 174 *et seq*., and in support thereof states and alleges as follows:

1-123.   CULLOTTA restates and realleges paragraphs one (1) through one hundred twenty-three (123) as though fully set forth herein.

124.   The Whistleblower Act prohibits an employer from retaliating against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State of federal law, rule, or regulation.  *See* 740 ILCS 174/15.

125. WEAVER was acting within the scope of her express or implied authority on behalf of the USPI when committing the acts described herein and is therefore an "employer" as defined by the Whistleblower Act. *See* 740 ILCS 174/5.

126. As a corporation, USPI is an "employer" as defined by the Whistleblower Act. *See* 740 ILCS 174/5.

127. CULLOTTA is individual who was always employed on a full-time basis by USPI relevant hereto, and thus is an "Employee" under the Whistleblower Act. *See* 740 ILCS 174/5.

128. WEAVER and USPI violated the Whistleblower Act by retaliating against CULLOTTA in numerous ways after CULLOTTA disclosed information about USPI'S practices to the IDHR, which CULLOTTA had reasonable cause to believe disclosed a violation of, *inter alia*, (i) 42 CFR 416/ *et seq*., (ii) the Alternative Health Care Delivery Act, 210 ILCS 3/ *et seq.*, and (iii) the Ambulatory Surgical Treatment Center Act, 201 ILCS 5/ *et seq*., which at all times herein applied to USPI and USPI'S Chicagoland Facilities.

129. The retaliation against CULLOTTA included, but was not limited to, demoting CULLOTTA from his position as Director of Facilities Management, and ultimately terminating CULLOTTA'S employment from USPI on March 29, 2018.

130. CULLOTTA has suffered emotional distress, loss of pay, loss of reputation, and other damages as a result of WEAVER'S and USPI' acts.

WHEREFORE, Plaintiff, DONALD J. CULLOTTA, respectfully requests that judgment be entered against Defendants, UNITED SURGICAL PARTNERS INTERNATIONAL and CATHERINE WEAVER, and that this Honorable Court award him the following relief:

A. Reinstatement to his previous position, or an equivalent position, with the same seniority status he would have had but for Defendants' violation of the Act;
B. Back pay in an amount to be determined at trial;
C. In the event reinstatement is not granted, front pay;

D.   Compensatory and consequential damages, including for emotional distress;
E.   Punitive damages;
F.   Pre-judgment and post-judgment interest at the highest lawful rate;
G.   Attorneys' fees and costs of this action;
H.   Expert witness costs; and
I.   Any such further relief as this Honorable Court finds reasonable.

**COUNT V**
**COMMON LAW INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

NOW COMES the Plaintiff, DONALD J. CULLOTTA, by and through his attorneys, The Law Offices of Schirott, Luetkehans & Garner, LLC, for his Complaint against the Defendants, CATHERINE WEAVER ("WEAVER") and UNITED SURGICAL PARTNERS INTERNATIONAL, INC. ("USPI") for an intentional infliction of emotional distress and in support thereof states and alleges as follows:

1-130.   CULLOTTA restates and realleges paragraphs one (1) through one hundred thirty (130) as though fully set forth herein.

131.   USPI'S conduct in terminating CULLOTTA in retaliation for activities in support of the public policies in favor of reporting dangerous or unsafe conditions at public health facilities, and/or for exercising his rights under the FMLA is truly extreme and outrageous and goes beyond all possible bounds of decency.

132.   Additionally, WEAVER'S act of making CULLOTTA come into a meeting with WEAVER three (3) days into CULLOTTA'S FMLA leave for the sole purpose of terminating CULLOTTA'S employment from USPI was also truly extreme and outrageous and goes beyond all possible bounds of decency.

133.   USPI and WEAVER either intended that its/her conduct would inflict severe emotional distress or knew that there was at least a high probability that its/her conduct would cause severe emotional distress when it/she terminated CULLOTTA.

134.    USPI'S and WEAVER'S conduct did in fact cause severe emotional distress to CULLOTTA, as CULLOTTA has been hospitalized on multiple occasions since CULLOTTA was terminated by USPI, and at times has attempted to commit suicide.

135.    A defendant in a tort case "must take his plaintiff as he finds [him], even if [he] is more susceptible to injury than the average person." *Zurba v. United States,* 247 F. Supp. 2d 951, 962 (N.D. Ill. 2001); *Reed v. Union Pacific Railroad Co.,* 185 F.3d 712, 717 (7th Cir. 1999); *Colonial Inn Motor Lodge, Inc. v. Gay,* 288 Ill. App. 3d 32, 45, 680 N.E.2d 407, 416 (1997).

WHEREFORE, Plaintiff, DONALD J. CULLOTTA, respectfully requests that judgment be entered against Defendants, UNITED SURGICAL PARTNERS INTERNATIONAL and CATHERINE WEAVER, and that this Honorable Court award him the following relief:

A.    Reinstatement to his previous position, or an equivalent position, with the same seniority status he would have had but for Defendants' violation of the Act;
B.    Back pay in an amount to be determined at trial;
C.    In the event reinstatement is not granted, front pay;
D.    Compensatory and consequential damages, including for emotional distress;
E.    Punitive damages;
F.    Pre-judgment and post-judgment interest at the highest lawful rate;
G.    Attorneys' fees and costs of this action;
H.    Expert witness costs; and
I.    Any such further relief as this Honorable Court finds reasonable.

## COUNT VIII
## VIOLATION OF THE FAIR LABOR STANDARDS ACT

NOW COMES the Plaintiff, DONALD J. CULLOTTA, by and through his attorneys, The Law Offices of Schirott, Luetkehans & Garner, LLC, for his Complaint against the Defendants, CATHERINE WEAVER ("WEAVER") and UNITED SURGICAL PARTNERS INTERNATIONAL, INC. ("USPI") for Violation of the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3) (the "FLSA"), and in support thereof states and alleges as follows:

1-135.  CULLOTTA restates and realleges paragraphs one (1) through one hundred thirty-five (135) as though fully set forth herein.

136.  Under the FLSA, it is unlawful for an employer to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to 29 USCS §§ 201 et seq.  See 29 U.S.C. § 215(a)(3).

137.  The FLSA applied to CULLOTTA'S employment with USPI at all times relevant herein.

138.  USPI is an "enterprise" as defined by the FLSA, 29 U.S.C. § 203(r)(1), engaged in commerce within the meaning of the FLSA, § 203(b), (s)(1), and is an "employer" as defined by the FLSA, § 203(d).  *See* 29 U.S.C. § 203.

138.  CULLOTTA is an "employee" as defined by the FLSA.  *See* 29 U.S.C. § 203(e).

140.  CULLOTTA engaged in a statutorily protected activity when he formally complained of the Hinsdale Facility to the IDPH on or about March 16, 2018.  *See* Exhibit V.

141.  CULLOTTA suffered an adverse employment action when he was terminated by USPI on March 29, 2018.

142.  Retaliation was a motivating factor in USPI'S decision to terminate CULLOTTA.

143.  Defendants' willful termination of CULLOTTA violates the FLSA. *See* 29 U.S.C. § 215(a)(3).

145.  As a direct and proximate result of this unlawful practice, CULLOTTA suffered and continues to suffer wage loss and is therefore entitled to recover unpaid wages, liquidated damages or prejudgment interest, attorneys' fees and costs, and such other legal and equitable relief as the Court deems just and proper.

146.    Thereafter, CULLOTTA received his last paycheck from USPI on or about April 15, 2018.  However, this last paycheck did not compensate CULLOTTA for any paid time off, sick time, or vacation time that CULLOTTA had accrued and earned while employed at USPI.

WHEREFORE, Plaintiff, DONALD J. CULLOTTA, respectfully requests that judgment be entered against Defendants, UNITED SURGICAL PARTNERS INTERNATIONAL and CATHERINE WEAVER, and that this Honorable Court award him the following relief:

A.    Reinstatement to his previous position, or an equivalent position, with the same seniority status he would have had but for Defendants' violation of the Act;
B.    Back pay in an amount to be determined at trial;
C.    In the event reinstatement is not granted, front pay;
D.    Compensatory and consequential damages, including for emotional distress;
E.    Punitive damages;
F.    Pre-judgment and post-judgment interest at the highest lawful rate;
G.    Attorneys' fees and costs of this action;
H.    Expert witness costs; and
I.    Any such further relief as this Honorable Court finds reasonable.

**COUNT IV**
**VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT**

NOW COMES the Plaintiff, DONALD J. CULLOTTA, by and through his attorneys, the Law Offices of Schirott, Luetkehans & Garner, LLC, for his Complaint against the Defendants, CATHERINE WEAVER ("WEAVER") and UNITED SURGICAL PARTNERS INTERNATIONAL, INC. ("USPI") for Violation of Age Discrimination in Employment Act (the "ADEA"), 29 U.S.C. § 623(d), and in support thereof states and alleges as follows:

1-146.  CULLOTTA restates and realleges paragraphs one (1) through one hundred forty-six (146) as though fully set forth herein.

147.    The ADEA applied to CULLOTTA'S employment with USPI at all times relevant herein.

148.    CULLOTTA was over 40 years of age at the time he was terminated by USPI.

149.    Thus, CULLOTTA was a protected class under the ADEA.

150.    CULLOTTA suffered an adverse employment action when he was terminated by USPI.

151.     CULLOTTA was qualified for his position as Director of IT and Director of Facilities Management at the time he was terminated by USPI.

152.     CULLOTTA was treated less favorably than others not in the protected class.

153.     USPI took a subsequent materially adverse action against CULLOTTA when it terminated his employment.

154.     A causal connection exists between the protected activity and the adverse action, because USPI hired someone else to replace CULLOTTA after it terminated CULLOTTA, and the person USPI hired to replace CULLOTTA was younger than CULLOTTA.

155.     An ADEA plaintiff is not required to show that age was sole motivating factor in employment decision, but only that age was one reason and was factor that made difference. *Cockrell v. Boise Cascade Corp.,* 781 F.2d 173, 39 Empl. Prac. Dec. (CCH) P35809, 39 Fair Empl. Prac. Cas. (BNA) 1201 (10th Cir. 1986).

WHEREFORE, Plaintiff, DONALD J. CULLOTTA, respectfully requests that judgment be entered against Defendants, UNITED SURGICAL PARTNERS INTERNATIONAL and CATHERINE WEAVER, and that this Honorable Court award him the following relief:

A.     Reinstatement to his previous position, or an equivalent position, with the same seniority status he would have had but for Defendants' violation of the Act;
B.     Back pay in an amount to be determined at trial;
C.     In the event reinstatement is not granted, front pay;
D.     Compensatory and consequential damages, including for emotional distress;
E.     Punitive damages;
F.     Pre-judgment and post-judgment interest at the highest lawful rate;
G.     Attorneys' fees and costs of this action;
H.     Expert witness costs; and
I.     Any such further relief as this Honorable Court finds reasonable.

**Jury Demand**

CULLOTTA requests a trial by jury on all counts of this Complaint.

Respectfully submitted,
DONALD J. CULLOTTA

By:      /s/ Phillip A. Luetkehans
One of his Attorneys

Law Offices of Schirott, Luetkehans & Garner, LLC
Matthew R. Custardo (ARDC #: 06329579)
Phillip A. Luetkehans (ARDC #: 06198315)
Brian J. Armstrong (ARDC #: 06236639)
105 East Irving Park Road
Itasca, IL 60143-2117
Tel.: (630) 773-8500 | Fax: (630) 773-1006
mcustardo@slg-atty.com
pluetkehans@slg-atty.com
barmstrong@slg-atty.com

## VERIFICATION

I, Donald J. Cullotta, am a Plaintiff in this action. I have read the foregoing Verified Complaint and am familiar with its contents. I declare under penalty of perjury under the laws of the United States that all of the factual statements contained in the foregoing Verified Complaint are true and accurate to the best of my belief and is based upon personal knowledge, except where expressly indicated otherwise.

DONALD J. CULLOTTA

Law Offices of Schirott, Luetkehans & Garner, LLC
Matthew R. Custardo (ARDC #: 06329579)
Phillip A. Luetkehans (ARDC #: 06198315)
105 East Irving Park Road
Itasca, IL 60143-2117
Tel.: (630) 773-8500 | Fax: (630) 773-1006
mcustardo@slg-atty.com
pluetkehans@slg-atty.com

37

**EXHIBIT A**

 **United Surgical Partners**
I N T E R N A T I O N A L

# PERSONNEL ACTION FORM

Date: _____  Effective Date: _____
Employee Name: _Don Cullata_  SSN: _____

Employee Type: ☑ Full time ☐ Part time ☐ PRN ☐ Temporary

### New Hire Information
Address: _____  Department: _____

Position / Title: _____  Rate of pay: _____

### Information Change

| Information | From | To | Documentation attached? |
|---|---|---|---|
| Name | | | ☐ Yes ☐ No |
| Address | | | |
| Position/Title | _Director IT_ | _Director IT (Hardware Dept)_ | |
| Department | | | |
| Rate of pay | _$5,678_ | _$7,842_ | 3,747 6733 |
| Transfer | | | |
| Other (specify) | _merit adjustment_ | | 42,803 |

### Separation

☐ Voluntary  ☐ Involuntary ☐ Layoff  ☐ Restructuring ☐ Transfer

Explanation: _____

Eligible for rehire: ☐ Yes  ☐ No
☐ Exit interview completed

**Company Property returned:**
☐ Office keys  ☐ Pager
☐ Access badge / ID  ☐ Other _____
☐ Laptop  ☐ Other _____
☐ Blackberry  ☐ Other _____

*Authorized signature required for all actions.*

Authorized Signature: _Nancy Franks_  Title: _United Pres_ Date: _____
Authorized Signature: _____  Title: _____  Date: _____

**Payroll and Benefits Coordinator use only**

___ Documentation received       ___ Final paycheck issued   ___ Cobra information
___ PTO Payout complete          ___ Termed in payroll system  ___ 401(k) information
___ ESPP Refund complete         ___ Termed in TPA systems (insurance, 401(k))
Signature of payroll and benefits coordinator: _____

*Forward to payroll and benefits coordinate for employee personnel file*

USPI FORM
PAB 308 – FORM – Personnel Action Form       Revised 10/20/04


EXHIBIT
A

**EXHIBIT B**

 **United Surgical Partners**
I N T E R N A T I O N A L

# PERSONNEL ACTION FORM

Date: 1/27/09

Effective Date: 1/1/09

Employee Name: Don Cullotta          SSN: _____

Employee Type: ☒ Full time ☐ Part time ☐ PRN          ☐ Temporary
Pay Type:          ☒ Salaried          ☐ Hourly

---

### New Hire Information

Address: One East Erie          Department: _____

Position / Title: Director II / Facilities          Rate of pay: ___ per

---

### Information Change

| Information | From | To | Documentation attached? |
|---|---|---|---|
| Name | | | ☐ Yes ☐ No |
| Address | | | |
| Position/Title | | | |
| Department | | | |
| Rate of pay | 89 042 Annually | 91,268 (2.5%) | |
| Transfer | | | |
| Other (specify) | | | |

---

### Separation

☐ Voluntary   ☐ Involuntary ☐ Layoff   ☐ Restructuring ☐ Transfer

Explanation: _____

_____

_____

Eligible for rehire: ☐ Yes          ☐ No
☐ Exit interview completed

**Company Property returned:**
☐ Office keys          ☐ Pager
☐ Access badge / ID          ☐ Other
☐ Laptop          ☐ Other _____
☐ Blackberry          ☐ Other _____

*Authorized signature required for all actions.*

**Authorized Signature:** _____ Title: _____ Date: _____
**Authorized Signature:** _____ Title: _____ Date: _____

---

*Payroll and Benefits Coordinator use only*

___ Documentation received          ___ Final paycheck issued          ___ Cobra information
___ PTO Payout complete          ___ Termed in payroll system          ___ 401(k) information
___ ESPP Refund complete          ___ Termed in TPA systems (insurance, 401(k)
Signature of payroll and benefits coordinator: _____

*Forward to payroll and benefits coordinate for employee personnel file*

USPI FORM
PAB 308 -- FORM -- Personnel Action Form          Revised 3/8/05



**EXHIBIT**
**B**

January 27, 2009

Performance Evaluation
Don Cullotta
Director, IT/Facilities Management

Don has been employed by Same Day Surgery and then USPI for the last nine years and while his primary position has been to support Information Technology in the Chicago Market, he has also been instrumental in lending a hand in various other facility project needs such as cosmetic and minor repair of damage; most recently in assisting with a significant HVAC issue at the River North Facility.

As a result of the ongoing facility needs in this market and the capabilities exhibited by Don over time, he was given formal responsibility for assessing the issues identified by the facility Administrators; once assessment completed, reported to Market President for determination on next steps. This formal role has provided the Administrators the assist they need in terms of keeping their focus on patient care and assisting me to get to a quicker solution to the problems at hand.

Recent issues/projects Don has been involved with include:

Howard Street location; previous location of previous facility (Lincolnwood)
This vacated site has had significant age and weather related issues; frozen pipes, facility broken in to; window repairs required; meeting with plumbers, etc. to keep safe until the lease has ended or building sublet.

North Shore location; (previous Lincolnwood facility); has assisted Administrator to manage through several building related issues including clean up of bust frozen pipes, etc.; is being trained to provide offsite monitoring which will save cost of outside vendor to perform.

River North location; ongoing HVAC issues for the last six (6) months which again were being managed or attempting to be managed by the Administrator who was unable to give it the time it needed and additionally took her away from the day to day patient care responsibilities which are first priority. These issues are far from being resolved and require several hours a week from Don as he coordinates work between the facility and the contractor hired to find the solution; fix is still a long way from being resolved.

Hinsdale: replacement of server (10+ years old); identification of significant cost saving related to phone lines/usage.

General-all the duties he maintains related to upkeep and repair of IT equipment, both old and determination of replacement; proactive approach rather than crisis management which serves as a more efficient means of running the operation.

In summary, Don plays an active role in maintaining the day to day operations in terms of maintaining equipment and acting in a consulting role for the administrators and actually doing work that the facility would have to sub out at a much greater cost. He is clearly a valuable asset to this market.

**Goals and Objectives**

**Facilities**

- Assess facility needs @ each center; provide written summary of findings and recommendations to Market President.
  25E no later than
  EP   "   "   "
  NS
  RN
- Review maintenance contracts and determine scope/opportunity; provide written summary of findings and recommendations to Market President; No later than
- Facilitate discussions/work of Contractor and other vendors towards Resolution of River North HVAC issues.

**IT**

- Replace and relocate Hinsdale Server by 2.31.09
- Purchase/replace Hinsdale computers as defined by need of Administrator; purpose of which is to improve performance and efficiency
- Replace Telco vendor @ Hinsdale to reduce monthly costs; estimated to be an annual savings of $5K; no later than 3.1.09
- Coordinate the roll out of _____ as directed by corporate IT
- Replace current failing phone systems at River North, Hinsdale and the Chicago office.

**Other**

- Maintain awareness of the perception of condescension in dealing with others.
- Work with Administrators to develop mutual agreement re: expectations of Timely communications so as to avoid conflict.

**EXHIBIT C**

Page 1 of 2

**Franke, Nancy**

**From:** Garvin, Mark

**Sent:** Wednesday, December 16, 2009 3:16 PM

**To:** Franke, Nancy

**Cc:** Pate, Matt; Lin, Grace

**Subject:** Re: Corporate eFax message from "3122740167" - 1 page(s)

Approved

**From:** Franke, Nancy
**To:** Garvin, Mark
**Cc:** Pate, Matt; Lin, Grace
**Sent:** Wed Dec 16 15:12:32 2009
**Subject:** FW: Corporate eFax message from "3122740167" - 1 page(s)

Mark,
I just completed my G&A meeting with Grace and Matt and I advised them of my discussion with you re: the wish to bonus Don Cullotta from my corporate account.
They will need your approval for this.

To recapture the points of our discussion:

Don is an employee of the CBO (Director, IT) and his salary is expensed to the facilities.
Shortly after I assumed this position (July, 08), my facilities were plagued by a myriad of building management issues; serious HVAC issues at River North/other; our very old Lincolnwood site which was in total disrepair, etc. At that point in January, I asked Don to assume additional responsibility for facilities management in addition to his current IT responsibilities (Director, IT/Facilities Management). He has done a phenomenal job, often working late into the night and weekends at a significant cost savings to the facilities/region. To this point, I requested your approval to provide Don a "bonus letter" with a maximum bonus opportunity not to exceed 15%; payable from my corporate account for 2010 but also to be able to bonus him for 2009 (not to exceed 10%). Matt has appropriately asked me to provide him with an exact $ amt. as it has not been budgeted. As a matter of discussion, I informed you that when I first joined USPI, Don came to me to tell me he had a "bonus letter" but had not been receiving bonus in accordance with his letter (attached); stated he brought it to my predecessor but it was not resolved.

**In summary I would ask your approval to accrue 2010 bonus (not to exceed 15%) for Don from my corporate account and bonus him in the amount of $6K for 2009**

Thanks

**From:** eFax Corporate [mailto:message@inbound.efax.com]
**Sent:** Wednesday, December 16, 2009 2:49 PM

9/15/2010



EXHIBIT
C

EXHIBIT D

*BTs-taxes* RN phones → CBO . Nov 12-15K
" prev monthly avg . 1K dec in
CBO " " " 500k. expense.
No increase in CBO .

2009 Annual Review – Don Cullotta

In 2009 many goals were set for me by Nancy Franke, Dallas and myself. I am proud to
say I believe I have met and exceeded all expectations throughout the year and continue
to do so. Listed below are goals and accomplishments for 2009 as well as current goals
for 2010. These goals are for both Facility and IT.

- **Research, bid and install new phone systems in the Chicago area**
  25E, River North and Hinsdale have had the old and failing systems removed and
  new Shoretel systems put in place without interruption. Wiring was performed by me
  in 2 locations which saved over $3000, the project reduced downtime of 15 year old
  systems and provided ease of repair in case of failure.

- **Circuits and Phone Services**
  All circuits and phone services were re-negotiated and brought under one vendor. By
  doing this we have saved thousands at each center being under a blanket plan with
  firstcomm. It has also been easier to manage accounts and get service. During this
  time we have seen only one outage which was during an AT&T change.

- **Document shedding, destruction and recording**          *Δ · Iron Mtn ·*
  During the year of 2009 I was able to move each of the centers to "shred-it" with a   *Regional Disc .*
  company wide discount. All the centers now use the same vendor at much less cost   *✓ savings*
  then Iron Mountain with better service.

- **Genesis Transcription**
  In 2009 it was decided to change transcription services. This was no easy task as it   *Hinsdale.*
  meant physically touching over 67 computers, working with a 3rd party vendor,
  troubleshooting bugs and training users. Throughout the year I was successful in
  helping find and eliminate all errors and bugs for both doctors and staff.

- **River North HVAC**
  During 2009 I was able to turn a completely failing unit into a 100% reliable system.   *31K project*
  With much work and numerous evening and weekend hours we were able to avoid   *3k supplies/*
  spending over $275,000 and guaranteed down-time. A great deal of time was spent   *helper*
  managing the system from home while repairs and maintenance was performed
  throughout the year. It is no longer needed as the system now is working without
  constant watch.

- **AMS Mechanical**
  As part of my goals to consolidate as many vendors as I could. AMS mechanical was
  brought on-board as a preferred vendor. Since then we have had great success battling
  all issues and controlling services calls to a minimum. To date we have cut the costs
  at River North alone by 65% saving thousands by lessening and overseeing the calls
  correctly.



- **Hinsdale Building Management**

In 2009 an audit was done by me which uncovered many procedures which were not being performed correctly within the building management. Numerous statements were found which did not make any sense and services were stopped. Steps were taken to monitor these statements more closely along with moving services away from the building. A water softening contract was put in place which halted the building from over charging us and all HVAC repairs were done by the HVAC vendor. Within months of this audit most of the management at CBRE had been fired and resigned.

- **Economic Downtime Solutions**

As well as meeting all my goals in my part of the Economic Downtime Solution I exceeded this by performing many electrical, plumbing, carpentry and general repairs at each center myself. Including removal and installation of surgical equipment. Within the year I estimate a savings of thousands grossing tens of thousands into this year.

Throughout the year I have assisted every admin in struggles they have had in many facility areas which could have resulted in case loss. An example is the leaking into the 2nd floor on 1 East Erie. After numerous failed attempts by the building and the center I took lead, recruited my own Plumbers (abbott) and was able to find and repair the problem. I have taken lead and performed any and all work myself wherever possible. Regardless of what it is and as long as I can accomplish it safely and within state regs.

*2010 IT and Facility Goals*

During this year I have already continued to decrease spending by performing many repairs and installations myself. Examples include removing OR sterilizers, installing new $90,000 units as well as changing receptacle outlets and electrical work. Numerous HVAC work I continue to perform as well as provide solutions which have saved over $16,000 at Hinsdale alone. Wiring, electrical and now center-wide paint projects are underway which will save an estimated $31,000 when complete. In Summary I will continue to serve the Chicago market in anyway I can and help bring more structure and stability in both IT and Facility management.

Don Cullotta
*Director of IT & Facilities Management*
*Chicago Market*

EXHIBIT E

# State Operations Manual
## Appendix L - Guidance for Surveyors:  Ambulatory Surgical Centers

**Table of Contents**
*(Rev. 137, 04-01-15)*

**Transmittals for Appendix L**

**Part I - Ambulatory Surgical Center Survey Protocol**

Introduction

Regulatory and Policy References

Tasks in the Survey Protocol

Task 1 – Off-Site Survey Preparation
Task 2 – Entrance Activities
Task 3 – Information Gathering/Investigation
Task 4 – Preliminary Decision Making and Analysis of Findings
Task 5 – Exit Conference
Task 6 – Post-Survey Activities

**Part II - General Provisions and Definitions; General Conditions and Requirements**

§416.2 - Definitions
§416.25 Basic Requirements

Specific Conditions for Coverage

§416.40  Condition for Coverage:  Compliance With State Licensure Law
§416.41  Condition for Coverage:  Governing Body and Management
§416.42  Condition for Coverage:  Surgical Services
§416.43  Condition for Coverage:  Quality Assessment and Performance Improvement
§416.44  Conditions for Coverage:  Environment
§416.45  Condition for Coverage:  Medical Staff
§416.46  Condition for Coverage:  Nursing Service
§416.47  Condition for Coverage:  Medical Records
§416.48  Condition for Coverage:  Pharmaceutical Services
§416.49  Condition for Coverage:  Laboratory and Radiologic Services
§416.50  Condition:  Patient Rights
§416.51  Condition:  Infection Control
§416.52  Condition:  Patient Admission, Assessment and Discharge

## Ambulatory Surgical Center Survey Protocol

## Introduction
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

Ambulatory Surgical Centers (ASCs) are required to be in compliance with the Federal requirements set forth in the Medicare Conditions for Coverage (CfC) in order to receive Medicare/Medicaid payment. The goal of an ambulatory surgical center (ASC) survey is to determine if the ASC is in compliance with the definition of an ASC, ASC general conditions and requirements, and the conditions for coverage (CfCs) at 42 CFR 416 Subparts A through C.

Certification of ASC compliance with the regulatory requirements is accomplished through observations, interviews, and document/record reviews. The survey process focuses on an ASC's delivery of patient care, including its organizational functions and processes for the provision of care. The ASC survey is the means used to assess compliance with Federal health, safety, and quality standards that will assure that patients receive safe, quality care, and services.

## Regulatory and Policy References

- The Medicare definition of an ASC is found at 42 CFR 416.2 Subpart A.

- General conditions and requirements for Medicare-participating ASCs are found at 42 CFR 416 Subpart B

- The CfCs for ASCs are located at 42 CFR 416 Subpart C.

- Survey authority and compliance regulations can be found at 42 CFR 416 Subpart B and at 42 CFR Part 488 Subpart A.

- Should an individual or entity (ASC) refuse to allow immediate access upon reasonable request to either a State Agency (SA) or CMS surveyor, the Department of Health and Human Services Office of Inspector General (OIG) may exclude the ASC from participation in all Federal healthcare programs in accordance with 42 CFR 1001.1301. If a surveyor intends to make a request for immediate access with the threat of possible exclusion for non-compliance, the SA must first contact the CMS Regional Office, which must then contact the OIG Administrative and Civil Remedies Branch at 202-619-1306.

- The CMS State Operations Manual (SOM) provides CMS policy regarding survey and certification activities.

All ASC surveys are unannounced. Do not provide the ASC with advance notice of the survey.

## Tasks in the Survey Protocol

The tasks included in a survey protocol for an ASC are:

Task 1          Off-Site Survey Preparation;
Task 2          Entrance Activities;
Task 3          Information Gathering/Investigation;
Task 4          Preliminary Decision-Making and Analysis of Findings;
Task 5          Exit Conference; and
Task 6          Post-Survey Activities.

# Task 1 – Off-Site Preparation

### General Objectives

The objectives of this task are to determine the size and composition of the survey team and to analyze information about the provider/supplier in order to identify areas of potential focus during the survey.  Review of information about the ASC allows the SA (or RO for Federal teams) to develop a preliminary survey plan.

A full or standard survey will be conducted if the purpose of the survey is for initial certification, recertification, or validation of an accreditation organization survey. Surveys in response to a complaint or multiple complaints, or as a revisit to see if a previously cited problem has been corrected, will be focused on the CfCs related to the complaint or on the CfC for which deficiencies were previously identified.  This does not preclude the scope of a complaint or revisit survey being expanded, if surveyors observe deficient practices related to other CfCs while on site.  (See State Operations Manual, §§5100.1 and 5200.1.)

### Types of Surveys

**Standard or Full surveys:**  Initial certification, recertification, and representative sample validation surveys require assessment of the ASC's compliance with all Conditions for Coverage, including the Life Safety Code standards.

- Initial surveys are conducted when an ASC first seeks to participate in the Medicare program.

- Recertification surveys are required to reconfirm at periodic intervals the ASC's ongoing compliance.

- Representative sample validation surveys are conducted to support CMS' oversight of national accreditation organizations (AO) whose ASC programs have been recognized by CMS as suitable for deeming an accredited ASC as meeting the Medicare CfCs.  CMS selects the ASCs for this type of validation survey, and

the SA must complete its survey no later than 60 days after the AO's survey. Although the primary purpose of the survey is to validate the AO's oversight, if substantial noncompliance is found by the SA and the RO concurs, the RO initiates appropriate enforcement action. SAs may only survey a deemed ASC when authorized to do so by the CMS Regional Office.

**Complaint, Substantial Allegation Validation, or On-site Revisit Surveys:** Generally, these types of survey are more narrowly focused than a full standard survey.

- A complaint is an allegation of noncompliance with Medicare health and safety standards. The purpose of a complaint survey is to determine the validity of the allegation and assess the current compliance of the ASC with those CfCs that are relevant to the substance of the allegation that triggered the survey.

- The purpose of the on-site revisit survey is to determine the ASC's current compliance with CfC requirements that the ASC was previously cited for noncompliance.

- The second type of validation survey is the substantial allegation validation. A complaint that alleges substantial noncompliance on the part of a deemed ASC with the Medicare health and safety standards may result in RO direction to the SA to conduct a substantial allegation validation survey. The SA uses the same methodology as for a complaint survey of a non-deemed ASC. The CMS Regional Office must authorize the State Survey Agency to conduct a substantial allegation validation survey and will specify the CfCs to be assessed.

Generally, complaints received by the SA or CMS concern specific cases or incidents that occurred in the past. However, CMS evaluates ASCs only for their current compliance or noncompliance at the time of the survey. Nevertheless, if an investigation of a complaint substantiates a violation in the past of one or more of the CfC requirements, and there is no evidence that the ASC subsequently implemented effective corrective action, then the findings substantiating the violation are documented on the Form CMS- 2567, Statement of Deficiencies and Plan of Correction as evidence of current noncompliance. On the other hand, if an allegation of a violation is substantiated, but the ASC subsequently implemented effective corrective action and the survey reveals no current noncompliant practices, then the ASC is in current compliance and is not cited for a deficiency based on the past noncompliance.

A revisit survey will focus on assessing the ASC's current compliance with the CfCs where deficiencies were cited on the previous survey. The SA must receive an acceptable plan of correction from the ASC before it conducts a revisit survey.

**Survey Team Size and Composition**

The SA (or the CMS RO for Federal teams) decides the composition and size of the team. In general, a survey team for a standard, i.e., full, survey should include two health standards surveyors and one Life Safety Code (LSC) surveyor, who are on-site for 2

days, but individual circumstances may call for a smaller or larger team, or a shorter or longer period of time on-site. The following factors are considered when determining survey team size and the scheduled length of the survey:

- Size of the ASC, based on its number of operating or procedure rooms (ORs), hours of operation, and/or available information about its average monthly volume of cases;

- Complexity of services offered, e.g., a single type of surgical service, such as eye surgery, or multiple types, such as eye surgery, orthopedic surgery, endoscopies and gynecological procedures;

- Whether the ASC has an historical pattern of serious deficiencies or complaints; and

- Whether new surveyors are to accompany the team as part of their training.

For a complaint or on-site revisit survey, only one surveyor will usually be needed and should be chosen based on their knowledge of the CfC(s) that will be reviewed during the survey.

The ASC surveyors must have the necessary training and experience to conduct a survey. Completion of the Principles of Documentation Training Course is required. Completion of the Basic Ambulatory Surgery Survey Course is required for all health standards surveyors, unless such training has not been offered by CMS in the previous 2 years. All Life Safety Code (LSC) surveys must be conducted by surveyors who have completed the Basic LSC Surveyor Course. All ASC survey teams must include at least one RN with hospital or ASC survey experience who has the expertise needed to determine if the facility is in compliance with the Conditions for Coverage. New surveyors may accompany the team prior to completing the required training.

**Team Coordinator**

The SA (or the RO) usually designates a Team Coordinator when the survey team consists of more than one surveyor. The Team Coordinator will be responsible for assuring that all survey preparation and survey activities are completed within the specified time frames and in a manner consistent with this protocol. Responsibilities of the Team Coordinator include:

- Acting as spokesperson to the ASC for the team;

- Conducting the entrance and exit conferences,

- Providing other on-going feedback, as appropriate, to ASC leadership on the status of the survey.

- Assigning team members specific survey tasks;

- Facilitating time management;

- Encouraging ongoing communication among team members;

- Evaluating team progress in completing the survey and coordinating team meetings; and

- Coordinating the preparation of the Form CMS-2567, Statement of Deficiencies and Plan of Correction, as well as all other reports/documentation required by CMS.

**Assembling Background Information**

Surveyors must prepare for the survey offsite, in order to make efficient use of the time onsite at the ASC. If the survey involves more than one surveyor, the Team Coordinator will arrange an offsite preparation meeting. If necessary, this meeting may be by conference call rather than in person. The type of background material to be gathered from the SA's files and/or CMS data bases includes:

- Basic characteristics of the ASC, including the facility's ownership, hours of operation, size, and types of surgical services offered. The most recent Form CMS-377 "Ambulatory Surgical Center Request for Initial Certification or Update of Certification Information in the Medicare Program", shows what the ASC indicates are the services it offers, but this form may be out of date. Other sources of information may include the SA's licensure file;

- Any additional information publicly available about the ASC, e.g., from its Web site, media reports, etc.;

- Any available information on the physical layout of the ASC;

- Whether any Life Safety Code waivers have been issued and are still in effect;

- Survey history and results of previous Federal and State surveys. In the case of a complaint survey, information on whether there were similar complaints investigated in the past; and

- Directions to the ASC.

During the meeting, the team discusses:

- Any significant information identified from the background information assembled;

- Whether there are CfCs requiring particular attention:

  - In the case of a complaint survey, the SA or the RO (in the case of a deemed ASC) identifies in advance of the onsite investigation which CfCs will be surveyed for compliance;

  - In the case of an on-site revisit survey, surveyors will focus on the ASC's current compliance with those CfCs where deficiencies were cited on the most recent Form CMS-2567. Surveyors also review the ASC's plan of correction and will look for evidence while onsite that the plan was implemented. (However, surveyors may not assume that implementation of the plan always means that the ASC is in substantial compliance with the CfC. It is possible that a plan of correction may be implemented, but is not sufficient to bring the ASC into compliance.);

- Preliminary team member assignments;

- Any questions the team has about how they will evaluate the CfCs;

- Date, location, and time team members will meet to enter the facility;

- When daily team meetings will take place if needed; and

- The anticipated date and time of the Exit Conference.

For surveys involving only one surveyor, that surveyor also needs to gather background information and plan the strategy for the survey prior to arriving on-site.

**NOTE:    Conduct ASC surveys during the ASC's normal business hours.  All surveys are unannounced.  Do not provide the ASC with advance notice of the survey.**

**Resources**

The following resources are useful to bring on surveys:

- Appendix L – Guidance for Surveyors: Ambulatory Surgical Centers in the SOM;

- Appendix I – Survey Procedures and Interpretive Guidelines for Life Safety Code Surveys in the SOM;

- Appendix Q - Immediate Jeopardy in the SOM;

- Several copies of the regulatory language at 42 CFR 1001.130 regarding the

consequences of failure to permit the survey team access to the facility;

- For deemed accredited facilities, Exhibit 37, Model Letter Announcing Validation Survey of Accredited/Deemed Provider/Supplier, and Exhibit 287, Authorization by Deemed Provider/Supplier Selected for Accreditation Organization Validation Survey.

## Task 2 – Entrance Activities

### General Objectives

The objectives of this task are to explain the survey process to the ASC staff and obtain the information needed to conduct the survey.

### General Procedures

### Arrival

The entire survey team should enter the ASC together. Upon arrival, surveyors must present their identification. If the ASC denies entrance to the facility or otherwise tries to limit required survey activities, explain the requirements under 42 CFR 1001.1301 and present a hard copy of the regulatory citation. Explain that failure of the ASC to allow access for an onsite survey could lead to exclusion of the ASC from Medicare.

If surveyors encounter any problems onsite, they should feel free to contact their SA manager or the RO for guidance. For instance, if ASC staff will not let a surveyor into the facility even after they're informed of the possible sanctions that can be imposed for restricting access to their facility, a call to the SA or RO would be appropriate.

Because the survey is unannounced, surveyors should anticipate that in some ASCs, e.g., a small ASC with one physician owner who performs all the ASC's procedures, the ASC's leadership may at the time of entrance by the survey team already be involved in a procedure and unavailable. If there would be a prolonged wait for the ASC's leadership, e.g., a wait exceeding 15 minutes, the team should conduct the entrance conference with available ASC senior staff; a separate brief discussion can be held at a later mutually convenient time with the ASC's leadership.

The Team Coordinator (or the single surveyor for complaint or revisit surveys) will announce to the ASC's Administrator, or whoever is in charge, that a survey is being conducted. If the Administrator (or person in charge) is not onsite or available, the Team Coordinator asks that the Administrator or person in charge be notified that a Federal survey is being conducted. Do not delay the survey because the Administrator is not available.

### Entrance Conference

The entrance conference sets the tone for the entire survey. Surveyors must be prepared and courteous, and make requests, not demands. The entrance conference should be informative, concise, and brief.

During the entrance conference, the Team Coordinator or single surveyor:

- Explains the purpose and scope of the survey (initial certification or recertification; complaint investigation; validation; revisit);

- In the case of a validation survey – either representative sample or substantial allegation (complaint) - of a deemed ASC, presents the letter explaining the survey and has the Administrator sign the authorization for the survey
  (Exhibit 287)

- Briefly describes the survey process;

- Introduces the survey team members, including any additional surveyors who may join the team at a later time, and discusses in general what the surveyors will do and the various documents they may request;

- Clarifies that all areas of the ASC, including the OR(s) or procedure rooms may be surveyed, but emphasizes that the survey team will not interfere with the provision of patient care and will take all standard precautions to avoid any infection control breaches; patients will be asked if they object to having their surgery observed;

- Explains that all interviews will be conducted privately with patients, staff, or visitors, unless requested otherwise by the interviewee;

- Discusses how the facility will provide the surveyors in a timely manner photocopies of material, records, and other information as needed;

- Obtains the names, locations, and telephone numbers of key ASC staff and their responsibilities;

- Discusses the appropriate time, location, and possible attendees of any meetings to be held during the survey; and

- Proposes a preliminary date and time for the exit conference.

During the entrance conference, the Team Coordinator arranges with the ASC Administrator or available administrative supervisory staff in his/her absence, to obtain the following:

- A list of all surgeries scheduled for that day (and the next if a 2-day survey); the list should include each patient's name, age, type of surgical procedure scheduled or performed, and the physician performing the procedure. The Team Coordinator indicates that one surveyor will be following the progression of at least one patient from initial registration through to discharge from the ASC (or at least through the initial period in the recovery room), so it is essential that information on these cases be provided as soon as possible, including the expected time between registration and discharge.

- A list of:

  - All surgeries from the past 6 months. In the case of a complaint survey concerning a surgery that took place further in the past, be sure to request a list that includes the month of the complaint case; and

  - All cases in the past year, if any, where the patient was transferred from the ASC to a hospital or where the patient died;

  The list should include each patient's name, age, type of surgical procedure scheduled or performed, and the name of the physician performing the procedure. The Coordinator explains to the ASC that, in order to complete the survey within the allotted time, it is important the survey team is given this information as soon as possible. The ASC should begin compiling this list as soon as the entrance conference concludes. Generally an ASC should be able to provide this information within 1 to 2 hours of the request.

- A location (e.g., conference room, an office not in use) where the survey team may meet privately during the survey, and also conduct record reviews, interviews, etc.;

- A telephone, preferably in the team meeting location;

- A list including the names of the Director of Nursing, active Medical Staff, Allied Health professionals, and all other staff providing patient care;

- A copy of the facility's organizational chart;

- Selected ASC written policies and procedures;

- Selected ASC personnel records;

- Written documentation related to the ASC's infection control program and its program for ongoing self-assessment of quality;

- A list of contracted services; and

- A copy of the facility's floor plan.

For initial or recertification surveys, arrange an interview with the administrative staff member who will be providing information enabling the survey team to complete the Form CMS-377, Ambulatory Surgical Center Request for Initial Certification or Update of Certification in the Medicare Program. Note that for recertification surveys, the ASC's management is not required to sign this form, since certification is ongoing and there is no requirement for the ASC to request recertification.

## Task 3 – Information Gathering/Investigation

## General Objective

The objective of this task is to determine the ASC's compliance with the CfCs through observations, interviews, and document review.

**During the Survey**

- Surveyors should always maintain a professional and calm demeanor;

- The SA and surveyors have discretion whether to allow, or to refuse to allow, facility personnel to accompany the surveyors during a survey. However, maintaining open and ongoing dialogue with the facility staff throughout the survey process generally enhances the efficiency and effectiveness of the survey. Surveyors should make a decision whether to allow facility personnel to accompany them based on the circumstances at the time of the survey;

- Surveyors need to respect patient privacy and maintain patient confidentiality at all times during the survey;

- Surveyors are not permitted to conduct clinical examinations or provide clinical services to any of the ASC's patients. Surveyors may direct the attention of the ASC staff to address an immediate and significant concern affecting a patient's care. All significant issues or significant adverse events, particularly those that a surveyor believes may constitute an immediate jeopardy, must also be brought to the Team Coordinator's attention immediately. Immediate jeopardy is defined as a situation in which the ASC's noncompliance with one or more CfCs has caused, or is likely to cause, serious injury, harm, impairment or death to a patient. If the Team Coordinator agrees that there is an immediate jeopardy situation, the team will follow the guidance in Appendix Q of the State Operations Manual.

- Informal conferences with facility staff may be held in order to inform them of preliminary survey findings. This affords facility staff the opportunity to present additional information or to offer explanations concerning identified issues;

- The survey team should meet at least daily in order to assess the status of the survey, progress of completion of assigned tasks, and areas of concern, as well as to identify areas for additional investigation. If areas of concern are identified in the discussion, the team should coordinate efforts to obtain additional information. Additional team meetings can be called at any time during the survey to discuss crucial problems or issues; and

- Surveyors should maintain their role as representatives of a regulatory agency. Although non-consultative information may be provided to the ASC upon request,

the surveyor is not a consultant and may not provide consulting services to the ASC.

## Observations

Observations provide direct knowledge of the ASC's practices, which the surveyor must compare to the regulatory requirements in order to determine whether the ASC is in compliance with the requirements. The interpretive guidelines for each of the CfCs provide detailed guidance as to what the regulations require, as well as tips for surveyor activities to determine compliance.

### Case Observation

The Team Coordinator should make it a priority at the beginning of the survey to select one or more surgical cases scheduled for observation during the survey. To form a more accurate picture of the ASC's routine practices, it is preferable to observe a case on the first day of the survey. ASC patients remain in the ASC up to a maximum of 24 hours; therefore, following individual cases from start to recovery or discharge is an effective tool for assessing the ASC's compliance with the CfCs. The number of cases selected will depend on the size of the team, the scheduled length of the survey, and the expected duration of the surgical case. Depending on the timing of the case selected, a surveyor may begin a case observation immediately.

The surveyor could follow the patient from pre-operative preparation and assessment to discharge (but at least through post-anesthesia recovery). For larger ASCs, i.e., those with more than 2 ORs or procedure rooms, or for multi-specialty ASCs, surveyors should consider following two cases.

In selecting cases to follow, surveyors should choose more complex cases, based on the type of procedure or patient age or patient co-morbidities. It may also be useful to avoid selecting cases where surveyors anticipate that patient modesty concerns may make it harder to obtain the patient's consent. As a general practice, to make efficient use of onsite time, surveyors should not select cases where the operative time is expected to exceed 90 minutes. Surveyors may opt not to observe the whole surgery from start to finish; however, in such cases they must assure they are in the OR when the patient is brought in, in order to observe the start of the surgery, and they must return to the OR before the case concludes. It may be useful for a surveyor to remain in the OR after the patient leaves, in order to observe how the OR is cleaned and prepped for the next case. In such cases the team should arrange for another surveyor to pick up the observation of the patient's care after the first surveyor leaves the OR.

In following the case(s) surveyors will look for evidence of compliance related to the various CfC requirements, e.g., infection control, physical environment, medication administration, assessment of anesthesia and procedure risk as well as the required pre-operative update assessment of changes from the history and physical, provision of surgical and anesthesia services, post-surgical assessment, recovery from surgery and anesthesia, and discharge orders.

**ASC Tour**

The tour may be accomplished before case observation, or surveyors who are not following a case may tour the ASC while the ASC staff is assembling the information requested during the entrance conference.  The purpose of the tour is to get an overview of the whole ASC and to begin making findings about its compliance with the Cf C governing an ASC's environment, 42 CFR 416.44.  The amount of time spent on the tour will depend on the size of the ASC, e.g., the number of ORs/procedure rooms, recovery rooms, etc.  For revisit surveys, a tour of the whole facility is generally not necessary.

**Observation Methods**

When making observations, surveyors attend to the following; specific areas or activities to observe are discussed in the guidance for each CfC requirement.

- Building structure and layout, general appearance of cleanliness, odors;

- Staff-patient interactions, both clinical and non-clinical.  For example, what happens to patients from the time they arrive at the ASC until the time they leave?  Are their privacy and other rights protected?  Is care provided by appropriate, qualified staff?  Is patient identity verified by each staff member before care is provided?; and

- Other staff activities.  For example, how do staff protect the confidentiality of medical records?  Are infection control precautions observed?  Are staff aware of regulatory requirements pertinent to their activities?

A surveyor must take detailed notes of all observations, identifying the regulatory standard(s) to which the observations relate to.  For example, one set of observations might support findings related to multiple standards, or some surveyors may find it convenient to use interpretive guidance "tag" numbers as a convenient shortcut for identifying the applicable standards.  When such tags are used, the surveyor must always recall that tags are just a filing/sorting device, and that the regulatory authority is always based on the specific regulatory language.  With the approval of the SA, surveyors should also feel free to use templates or worksheets that will help record their survey findings.

Surveyors must attempt to obtain verification of the factual accuracy of their observations by the patient, family, facility staff, other team member(s), or by another means, as appropriate.  For example, when finding an outdated medication on the anesthesia cart, surveyors can ask the ASC staff member who has responsibility for anesthesia to verify the drug's expiration date.

Surveyors must first obtain the permission of the patient or the patient's representative in order to observe the delivery of care to that patient.  The privacy and dignity of the patient must always be respected, along with the patient's right to refuse to allow the surveyor to observe his/her care.  For observation of a surgical case, the patient's consent to the surveyor's observation must be included/added to the patient's informed consent. It is at the surveyor's discretion whether he or she prefers ASC staff to first approach a

patient about the possible observation of his or her procedure, or whether the surveyor approaches the patient directly to seek permission. In all cases, the surveyor must speak directly with the patient to obtain consent.

The surveyor is not required to obtain the consent of the operating physician prior to observing a surgical procedure. The surveyor may observe any and all cases and activities upon request as needed in order to assess compliance with the Medicare ASC CfCs. An ASC may not condition a surveyor's ability to observe patient care by, for example, requiring a surveyor to sign any written documents or to present proof of vaccinations. The surveyor, however, must ensure that his/her observation protects patient safety and does not interfere with the operating physician or the surgical procedure.

If a facility denies a surveyor access to ASC activities which must be evaluated to determine compliance with the Medicare ASC CfCs, then the facility has failed to provide evidence of compliance and must be cited accordingly. In addition, the ASC may be subject to exclusion from participation in all Federal healthcare programs in accordance with 42 CFR 1001.1301. See "Regulatory and Policy References" section in this Appendix.

For each observation, the surveyor should document:

- The date and time of the observation(s);

- Location within the ASC;

- Patient and staff identifiers. A key containing identifiable information for patients must be kept on a separate identifier list. The ASC/surveyor may not use medical record numbers, Social Security numbers, or billing record numbers to identify patients, or the names or position numbers to identify staff members;

- Individuals present during the observation;

- Activity/area being observed (e.g., observation of sterile technique in the operating room, operative instrument cleaning and sterilization, recovery room care, etc).

**Use of Infection Control Tool**

CMS has developed, with the assistance of the Centers for Disease Control and Prevention (CDC), a comprehensive survey tool to assist surveyors in evaluating the infection control practices of an ASC. The tool may be found at Exhibit 351 of the State Operations Manual. One surveyor must be assigned to complete this tool during the survey, but all surveyors should be alert to breaches of standard infection control practices and share such observations with the surveyor completing the tool. The tool utilizes a combination of direct observations and interviews in order to document the ASC's infection control practices.

## Document Review

ASCs maintain a variety of documents that provide evidence of their compliance/non-compliance with the regulations. Review of documents is a key component of the survey; however, it is important to note that the review must always be supplemented by surveyor observations and interviews. In particular, it is never sufficient to determine compliance by merely verifying that an ASC has an appropriate written policy and procedure in place. Surveyors must use a variety of means, including review of other documents, such as patient medical records, personnel files, maintenance records, etc., to confirm that the ASC actually follows its policies and procedures in its daily operations. Documents reviewed may be both written and electronic and include the following:

- Medical records (see discussion below);

- Personnel files to determine if staff members have the appropriate educational requirements and training, and are licensed and credentialed, if required. The ASC must comply with all CMS requirements and State law as well as follow its own written policies for medical staff privileging and credentialing;

- Maintenance records to determine if equipment is periodically examined and to determine whether the equipment is in good working order and whether environmental and sanitary requirements have been met;

- Policy and procedure manuals. When reviewing policy and procedure manuals, verify with the ASC's leadership that the manuals are current; and

- Contracts and transfer agreements. Review to verify these are current.

**Photocopies**

Surveyors must photocopy all documents needed to support deficiency findings. The surveyor requires access to a photocopier in the ASC in order to make these photocopies. Generally surveyors must not rely upon ASC staff to make copies for them. However, if the ASC insists that one of its staff must operate the copier, then a surveyor must observe the copying process, in order to assure that changes or omissions do not occur. If requested by the ASC, the surveyor will make an extra copy of the photocopied items for the ASC's benefit. All photocopies must be dated and timed by the surveyor to reflect when they were photocopied. They must be properly identified, as appropriate, e.g., "ASC Recovery Room Policy – 10-25-07 or "Facility Surgical Instrument Sterilization Policy – 10-25-07, or "Patient #3 Preoperative Anesthesia Assessment - 10-25-07."

## Medical Record Review

**Closed Record Sample Size and Selection**

After the ASC provides a log or some other record of closed cases from the past six months, the team/surveyor will select a sample of the medical records for these cases to review.

## Sampling for Initial Surveys, Recertification Surveys, or Representative Sample Validation Surveys

For recertification and representative sample validation surveys, the sample selected must represent a cross section of the cases performed at the ASC (i.e., different surgical specialties, types of surgery, surgical cases using different types of anesthesia, different physicians, post-op infection, unplanned post-operative transfer, etc.)  The sample must include Medicare beneficiaries as well as other patients.  All deaths and transfers to hospitals should be included.  At a minimum, the surveyor selects at least 20 records for a facility with a monthly case volume exceeding 50.  For lower volume ASCs, the surveyor selects at least 10 records.   The sample size may be expanded as needed in order to determine compliance with the ASC CfCs, at the Team Coordinator's discretion.

Initial survey closed record sample sizes should be chosen at the Team Coordinator's discretion, since the volume of closed cases may be small.  The Team Coordinator determines if there are enough patients on the current surgical schedule and patient records (i.e., open and closed) for surveyors to determine whether the ASC can demonstrate compliance with all CfCs for each specialty performed in the ASC.

### Sampling for Complaint Surveys

CMS always assesses an ASC for its current compliance with the CfCs.  Thus, it is not sufficient to look only at the medical record for the complaint case in conducting a complaint investigation.  The surveyor must determine whether at the time of the survey the ASC is in compliance with the CfCs selected for evaluation.  If evidence of noncompliance is found to have occurred in the past and the systems and processes that led to the noncompliance remain unchanged at the time of the survey, this will be treated as continuing current noncompliance.

The RO (for deemed ASCs) or the SA (for non-deemed ASCs) will determine in advance of the survey which CfCs the surveyors will be evaluating in relation to the complaint.  Selection of the CfCs will be determined based on the nature of the allegation(s) explicitly stated or implied by the complaint – i.e., an allegation of transmission of an infectious disease will require review of the infection control CfC, and probably also of the governing body CfC, while an allegation by a hospital that it received an emergency transfer of a patient who had suffered a surgical complication that called into question the safety and competence of the ASC would necessitate reviewing multiple CfCs, including surgical services, medical staff, and governing body, at a minimum.

It will be necessary to review several closed records.  The selection of the sample to review will be dependent, in part, on the complaint allegations.  Depending on the CfCs to be surveyed for a complaint, it may also be necessary to observe an open case.  If the complaint concerns infection control, for example, following a case will provide a good

opportunity to observe infection control practices throughout the ASC. On the other hand, if the complaint concerns a failure to assess patients preoperatively for risk, it would be more appropriate to look at a sample of closed records for the documentation of the assessments, as well as to observe portions of several open cases, as the patients move from registration into the OR or procedure room, to observe the pre-operative assessments.

A revisit survey may or may not require review of open or closed cases, depending on the specific standards and conditions being re-evaluated.

The surveyor must assign a unique identifier to each patient case observed/reviewed during the survey. A key containing identifiable information for patients must be kept on a separate identifier list. Do not use medical record numbers, Social Security numbers, or billing record numbers to identify the patients or names or positions for staff.

Once the medical records are available, surveyors can begin reviewing each record for evidence of compliance/noncompliance. The interpretive guidelines for the specific regulatory standards can be used if that is their primary assignment.

In reviewing the record surveyors should confirm whether it contains items required by various CfCs, including but not limited to:

- A comprehensive medical history and physical assessment completed not more than 30 days before the date of the surgery;
- Pre-surgical assessments – update of the H&P upon admission, and assessment for the risk of the procedure and anesthesia;
- Documentation of properly executed informed patient consent;
- Findings and techniques of the operation, including complications, allergies or adverse drug reactions that occurred;
- Orders signed by the physician for all drugs and biologicals administered to the patient;
- Documentation of adverse drug reactions, if any;
- Documentation of the post-surgical assessment of the patient, including for recovery from anesthesia;
- Documentation of reason for transfer to a hospital, if applicable;
- Discharge notes, including documentation of post-surgical needs; and
- Discharge order, signed by the operating physician.

## Interviews

Interviews provide another method to collect information, and to verify and validate information obtained through observations, record review and review of other documents. Informal interviews are conducted throughout the duration of the survey. The information obtained from interviews may be used to determine what additional observations, interviews, and record reviews are necessary. When conducting interviews:

- Prepare detailed notes of each interview conducted. Document the interview date, time, and location, the full name and title of the person interviewed, and key points made and topics discussed. To the extent possible, document quotes from the interviewee.

- Interviews with facility staff should be brief and to the point.

- Interviews should be used to determine whether staff is aware of and understand what they need to do for the ASC to comply with regulatory requirements, as well as the ASC's formal policies and procedures. It is not necessary for staff to be able to cite specific Medicare regulations, but they should be able to describe what they do in a way that allows surveyors to determine compliance with the regulations.

- Be sure to interview staff having responsibilities related to each of the CfCs being surveyed.

- Use open-ended questions whenever possible to elicit staff knowledge rather than questions that lead the staff member to certain responses. For example, to determine if a staff member is aware of building emergency procedures, and his/her role in such events, simply ask, "If you smelled smoke, what would you do?" Do not ask, "Does this ASC have policies and procedures to address emergencies?" Likewise, ask, "Can you describe what typically happens in the OR before surgery begins?" Do not ask, "Does this ASC employ a standard 'time-out' procedure before beginning surgery?"

- Surveyors must always introduce themselves and ask patients or their representatives for permission to interview them. Surveyors must be sensitive when selecting patients for interview; for example, if a patient in recovery appears to still be feeling the effects of the anesthesia, an interview request should not be made. The same holds if a patient appears to be experiencing significant pain or anxiety. The privacy, dignity and well-being of the patient must always be respected, along with the patient's right to refuse to allow the surveyor to conduct an interview.

- Patient interview questions should focus on factual matters about which the patient is likely to have information. For example, ask "Did the doctor discuss your surgery with you today? What information did the doctor discuss with you about the surgery?" "Did you notice whether people washed their hands or used a cleaning gel before providing care to you?"

- Problems or concerns identified during a patient or family interview must be addressed in the staff interviews to validate the patient's perception, or to gather additional information.

- Validate as much of the information collected via interviews as possible by asking the same question of several staff or patients, or by integrating interview responses with related surveyor observations or record review findings.

- If necessary, telephone interviews may be conducted for closed cases; however, in-person interviews are preferred.

## Task 4 – Preliminary Decision Making and Analysis of Findings

### General Objectives

The general objectives of this task are to integrate findings, review and analyze all information collected from observations, interviews, and record reviews. The team's or surveyor's preliminary decision-making and analysis of findings assist in preparing the exit conference report.

### Preparation

Prior to beginning this task, each surveyor must review his/her notes and completed worksheets related to observations and interviews, as well as the documents he/she has photocopied. The surveyor must be confident that he/she has everything needed to support his/her presentation of findings to the team, and to the SA manager when preparing a formal survey report.

### Discussion Meeting

At this meeting, the surveyors share their findings, evaluate the evidence, and make team decisions regarding compliance with each requirement. For initial, recertification, and validation surveys, the Team should proceed sequentially through the regulatory requirements for each CfC; for complaint surveys they should proceed to review each CfC selected for investigation. The team must reach a consensus on all findings of noncompliance. Decisions about deficiencies must be team decisions, with each member having input. The team must document the evidence that supports each finding of noncompliance. Any additional documentation or evidence needed to support identified noncompliance must be gathered prior to exiting the facility.

All noted noncompliance must be cited as a deficiency, even when corrected onsite during the survey.

When a noncompliant practice is determined to have taken place prior to the survey, this would be considered evidence of current non-compliance, **unless** there is documentation that the ASC identified the problem prior to the survey and implemented effective corrective action. In evaluating whether the ASC is currently in compliance, the survey team must consider:

- What corrective action the facility implemented;

- Whether the corrective action was sufficient to  address the underlying, systemic causes of the deficiency;

- Whether the corrective action was evaluated for its effectiveness to sustain long-term compliance; and

- Whether there are any other findings from the survey indicating current non-compliance.

If the deficient practice is identified and corrected by the ASC prior to the survey and there is no other evidence of current non-compliance, do not cite noncompliance.

In the case of a revisit survey, the surveyor's task is to determine current compliance with the regulatory requirements that were cited during the previous survey and ensure that the implementation of the written plan of correction submitted by the ASC and accepted by the SA was effective in maintaining long term compliance.  The surveyor should conduct observations, document reviews and interviews to confirm current compliance with the CfC(s) addressed by the plan of correction.

**Integrating Findings**

The survey team integrates the findings derived from document review, observations, and interviews that pertain to each CfC surveyed, in order to make a determination of whether there is evidence of compliance/non-compliance.

**Determining the Citation Level of Deficiencies**

Citing noncompliance at the appropriate level, i.e., standard- or condition-level, is critical to the integrity of the survey process.

The regulations at 42 CFR 488.26 state, "The decision as to whether there is compliance with a particular requirement, condition of participation, or condition for coverage depends upon the manner and degree to which the provider or supplier satisfies the various standards within each condition."  When noncompliance with a particular standard within the Conditions for Coverage is noted, the determination of whether the lack of compliance is at the Standard or Condition level depends upon the nature of the noncompliance – i.e., how serious is the deficiency in terms of its potential or actual harm to patients -  and extent of noncompliance – i.e., is there noncompliance with the CfC stem statement, or how many different regulatory requirements within a CfC are being cited for noncompliance, or  how frequent was a given noncompliant practice, etc.  One instance of noncompliance with a standard that poses a serious threat to patient health and safety is sufficient to find condition-level noncompliance.  Likewise, when an ASC has multiple standard-level deficiencies in a CfC, this may add up to pervasive non-compliance and could be sufficient to find condition-level noncompliance.

Determinations of citation level for complaint surveys follow the same process that is applied to full surveys; the only difference is that the complaint survey itself is generally limited to the CfCs implicated in the complaint.

**Gathering Additional Information**

If it is determined that the survey team needs additional information to determine facility compliance or noncompliance, the Team Coordinator determines the best way to gather such information.

# Task 5 - Exit Conference

**General Objective**

The general objective of this task is to inform the ASC management of the team's preliminary findings.

**Prior to the Exit Conference**

- The Team Coordinator is responsible for organizing the exit conference, including who will have a speaking role.

- The health and Life Safety Code (LSC) surveyors/survey teams must have one joint exit conference if they are exiting at the same time; otherwise they may conduct separate exit conferences.

- If the team feels it may encounter a problem during the exit conference, the Team Coordinator should contact the SA manager in advance to discuss the potential problems and appropriate methods to handle them.

**Discontinuation of an Exit Conference**

CMS' general policy is to conduct an exit conference at the conclusion of all types of surveys. However, there are some comparatively rare situations that justify refusal to conduct or continue an exit conference. For example:

- If the ASC is represented by an attorney (all participants in the exit conference, both surveyor team members and ASC staff, must identify themselves prior to beginning the exit conference), surveyors may refuse to conduct the conference if the attorney attempts to turn it into an evidentiary hearing; or

- If the ASC staff /administration create an environment that is hostile, intimidating, or inconsistent with the informal and preliminary nature of an exit conference, surveyors may refuse to conduct or continue the conference. Under such circumstances, it is suggested that the Team Coordinator stop the exit conference and call the SA for further direction.

**Recording the Exit Conference**

If the facility wishes to audio tape the conference, it must provide two tapes and tape

recorders, recording the meeting simultaneously. The Team Coordinator should select one of the tapes at the conclusion of the exit conference to take back to the SA. Videotaping is also permitted, if the survey team agrees to this, and a copy is provided at the conclusion of the conference. The survey team is under no obligation to consent to videotaping and is not required to offer a reason if it refuses to permit videotaping.

**General Principles**

The following general principles apply when conducting an exit conference:

- The ASC management determines which ASC staff will attend the exit conference;

- The identity of individual patients or staff members must not be revealed by the survey team when discussing the survey results. Identity includes not just the name of an individual patient or staff member, but also includes any reference or characterization by which identity may be deduced; and

- Because of the information gathering activities the survey team has already engaged in, in most instances members of the ASC's staff should generally be aware prior to the exit conference of the areas, if any, where the survey team has concerns. Accordingly, there should be few cases where the ASC has not already had the opportunity prior to the exit conference to present additional information that might be relevant to the survey team's findings. The exit conference is not the correct setting for further information-gathering activities.

**Exit Conference Sequence of Events**

**Introductory Remarks:**

- Thank everyone for their cooperation during the survey;

- Reintroduce all surveyors who participated in the survey, even if they are no longer in the facility;

- Briefly reiterate what was the reason for the survey (i.e., initial, recertification, validation, or complaint); and

- Explain how the team will conduct the exit conference and any ground rules:

  - The exit conference is an informal meeting for surveyors to summarize their preliminary findings;

  - Brief comments on the findings may be made by the ASC, but will not be debated; and

  - Whether comments will be permitted in the middle of a surveyor's

presentation or only after the presentation has concluded.

**Presentation of Findings**

- Do not refer to any specific ASPEN software data tag numbers when describing deficiency findings. In the process of writing up the findings the SA will finalize just which tags/regulatory text to cite for each finding, so it would be premature to make such statements during the exit conference.

- Present the findings of noncompliance, explaining why the findings indicate noncompliance with the regulatory requirement. If the ASC asks for the pertinent regulatory reference, provide the citation for the applicable CfC.

- Do not make any general characterizations about the survey results (e.g., "Overall the facility is very good." or "In general the facility is in compliance with Medicare requirements.") Stick to presenting the specific factual findings.

- Do not make any statements about whether the findings represent condition-level or standard-level deficiencies. Avoid statements such as, "the condition was not met" or "the standard was not met." It is better to state "the requirement related to XXX is not met."

- If an immediate jeopardy situation was identified during the team discussion that the team had not previously discussed with the ASC's management, explain the significance and need for immediate correction. Follow instructions in <u>Appendix Q</u>, <u>Guidelines for Determining Immediate Jeopardy</u>.

- Do not rank findings. Treat requirements as equal as possible.

- Be certain that all deficiency findings are discussed at the exit conference.

**Closure**

- Indicate the official survey findings are presented in writing to the ASC via the Form CMS-2567, Statement of Deficiencies and Plan of Correction, which will be prepared and mailed to the ASC within 10 working days. It documents either that no deficiencies were found, or the specific deficiencies found, relating each to the applicable regulatory requirement. There will also be a letter communicating whether or not CMS will be taking enforcement action as a result of the survey's findings.

- The ASC's plan of correction (POC) and time frames for implementation of corrective actions are incorporated into the Form CMS-2567 and returned to the SA. Explain that the Form CMS-2567 is the document disclosed to the public about the facility's deficiencies and what is being done to remedy those (Form CMS-2567 with POC). The Form CMS-2567 is made public no later than 90 calendar days following completion of the survey.

- If any deficiencies have been identified, inform the ASC that a written plan of correction must be submitted to the survey agency within 10 calendar days following receipt of the written statement of deficiencies.

- Explain that, if a POC is required, the ASC will have the following three options:

  - Accept the deficiencies stated on Form CMS-2567 and submit a PoC;

  - Record objections to the cited deficiencies on Form CMS-2567 **and** submit a PoC; or

  - Record objections to cited deficiencies on Form CMS-2567, do not submit a PoC, but submit written arguments and documented evidence that the deficiencies are invalid.

    - CMS will consider objections and accompanying documentation that attempt to refute the factual accuracy of the survey findings, but will not entertain objections to CMS's judgment of the level, extent, scope or severity of a deficiency. CMS reviews additional documentation submitted by provider making an objection and, if the added evidence is convincing, will remove the deficiency.

    - If CMS disagrees with the ASC's objections, the ASC must submit an acceptable POC. Failure to submit an acceptable PoC or failure to correct a deficiency may result in termination of the ASC's supplier agreement in accordance with 42 CFR 488.28(a), and 416.35(b).

Explain that an acceptable plan of correction must contain the following:

- Action that will be taken to correct each specific deficiency cited;

- Description of how the actions will improve the processes that led to the deficiency cited;

- The procedure for implementing the corrective actions;

- A completion date for correction of each deficiency cited;

- Monitoring and tracking procedures to ensure the POC is effective in bringing the ASC into compliance, and that the ASC remains in compliance with the regulatory requirements;

- The title of the person responsible for implementing the acceptable plan of correction; and

- The administrator's signature and the date signed on Page 1 of the Form CMS-

2567.

Indicate that the POC will be reviewed by the SA, or in some cases, the RO, to determine whether it is acceptable. If a POC is determined not to be acceptable, it will be returned to the ASC for revision.

State that in some cases, the SA will make an unannounced revisit survey to determine whether the ASC has come into compliance.

If the exit conference was audio- or videotaped, obtain a copy of the tape before exiting the facility.

All team members should leave the facility together immediately following the exit conference. If the facility staff provides further information for review, the team coordinator determines the best way to review the additional information. It is usually prudent for at least two individuals to remain if all of the team members do not leave at the same time.

## Task 6 – Post Survey Activities

### General Objective

The general objective of this task is to complete the survey and certification requirements, in accordance with the regulations found at 42 CFR Part 488.

### General Procedures

Each SA and RO must follow the instructions in the SOM including:

- Timelines for completing each step of the process;

- Responsibilities for completing the Form CMS 2567, "Statement of Deficiencies," following the "Principles of Documentation;"

- Notification to the ASC regarding survey results;

- Additional survey activities based on the survey results (e.g., revisit, forwarding documents to the RO for further action/direction, such as concurrence with findings for deemed ASCs, authorization of a full survey for deemed ASCs with condition-level deficiencies); and

- Compilation of documents for the supplier's file.

### Survey Package

The Team Coordinator will assign responsibilities for completion of the various elements of the survey package.

**Statement of Deficiencies Report & Plan of Correction**

The Statement of Deficiencies Report and Plan of Correction (Form CMS-2567) is the official document that communicates the determination of compliance or noncompliance with Federal requirements. Also, it is the form that the ASC will use to submit a plan to achieve compliance. Form CMS-2567 is an official record and is available to the public on request.

Indicate on Form CMS-2567 whether any deficiency constitutes <u>immediate jeopardy</u> to the individual's health and safety.

Write each deficiency statement in terms specific enough to allow a reasonably knowledgeable person to understand what regulatory requirements were not met. The consequence for incorrectly or unclearly documenting deficiencies can be the inability of CMS to take needed enforcement action.

Refrain from making clinical judgments. Instead, focus on the ASC's policies and procedures, as well as how they were or were not implemented by the ASC's medical and other staff.

After you complete Form CMS-2567 in ASPEN, submit it to your supervisor for review. If, after reviewing the form, your supervisor approves what you have documented, you will begin working on the remainder of the survey package. If your supervisor does not approve the form, then you will make any requested changes.

**Other Survey Package Documentation**
Complete the following documentation in hard copy. For complaint investigations, attach these materials to the corresponding complaint in the Aspen Complaint Tracking System:

- Description of sample selection;

- Summary listing of sample cases;

- Summary of interviews;

- Complaint investigation narrative;

- Form CMS-378E Ambulatory Surgical Center Crucial Data Extract

- For all surveys with a Life Safety Code component, Form CMS-2786U Fire Safety Survey Report; and

- Form CMS-670, Survey Team Composition and Workload Report

# Part II

## General Provisions and Definitions;
## General Conditions and Requirements

## Interpretive Guidelines

### Q-0001
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

### §416.25 Basic Requirements

**Participation as an ASC is limited to facilities that –**

> **(a) Meet the definition in §416.2; and**

> **(b) Have in effect an agreement obtained in accordance with this Subpart.**

**Interpretive Guidelines:  §416.25**

An ASC must satisfy all the elements of the definition of an ASC and have in effect an agreement to participate as an ASC in order to satisfy the basic Medicare ASC requirements.

### Q-0002
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

### §416.2  Definitions

**As used in this part:**

**Ambulatory surgical center or ASC means any distinct entity that operates exclusively for the purpose of providing surgical services to patients not requiring hospitalization and in which the expected duration of services would not exceed 24 hours following an admission.  The entity must have an agreement with CMS to participate in Medicare as an ASC and must meet the conditions set forth in Subpart B and C of this part.**

Interpretive Guidelines:  §416.2

According to the definition of an Ambulatory Surgical Center, or ASC, its key characteristics are that it:

- Is a distinct entity;

- Operates exclusively for the provision of surgical services to patients not requiring hospitalization, with the ASC's services expected not to exceed 24 hours in duration following an admission;

- Has an agreement with Medicare to participate as an ASC; and

- Complies with the Conditions for Coverage (CfCs) in Subparts B and C, i.e., 42 CFR 416.25-52.

**Distinct Entity**

An ASC satisfies the criterion of being a "distinct" entity when it is wholly separate and clearly distinguishable from any other healthcare facility or office-based physician practice. The ASC is not required to be housed in a separate building from other healthcare facilities or physician practices, but, in accordance with National Fire Protection Association (NFPA) Life Safety Code requirements (incorporated by cross-reference at §416.44(b)), it must be separated from other facilities or operations within the same building by walls with at least a one-hour separation. If there are State licensure requirements for more permanent separations, the ASC must comply with the more stringent requirement.

An ASC does not have to be completely separate and distinct physically from another entity, if, and only if, it is temporally distinct. In other words, the same physical premises may be used by the ASC and other entities, so long as they are separated in their usage by time. For example:

- **Adjacent physician office:** Some ASCs may be adjacent to the office(s) of the physicians who practice in the ASC. Where permitted under State law**, CMS permits certain common, non-clinical spaces,** such as a reception area, waiting room, or restrooms to be shared between an ASC and another entity, as long as they are never used by more than one of the entities at any given time, and as long as this practice does not conflict with State licensure or other State law requirements. In other words, if a physician owns an ASC that is located adjacent to the physician's office, the physician's office may, for example, use the same waiting area, as long as the physician's office is closed while the ASC is open and vice-versa. **The common space may not be used during concurrent or overlapping hours of operation of the ASC and the physician office**. Furthermore, care must be taken when such an arrangement is in use to ensure that the ASC's medical and administrative records are physically separate. During the hours that the ASC is closed, its records must be secure and not accessible by non-ASC personnel.

  Permitting use of common, non-clinical space by distinct entities separated temporally does not mean that the ASC is relieved of the obligation to comply with the NFPA Life Safety Code standards for ASCs, in accordance with

§416.44(b), that require, among other things, a one-hour separation around all physical space that is used by the ASC and fire alarms in the ASC.

It is not permissible for an ASC during its hours of operation to "rent out" or otherwise make available an OR or procedure room, or other clinical space, to another provider or supplier, including a physician with an adjacent office.

- **Facilities with Diagnostic Imaging and Surgery Capability:** Some facilities are equipped to perform both ambulatory surgeries and diagnostic imaging. However, Medicare regulations do not recognize a non-hospital institutional healthcare entity that performs both types of services, and actually requires an ASC to operate exclusively for the purpose of providing surgical services. However, the Medicare Independent Diagnostic Testing Facility (IDTF) payment regulations at 42 CFR 410.33(g) prohibit IDTFs that are not hospital-based or mobile from sharing a practice location with another Medicare-enrolled individual or organization. As a result, ASCs may not share space, even when temporally separated, with a Medicare-participating IDTF.

  **NOTE: Certain radiology services integral to surgical procedures may be provided when the facility is operating as an ASC.**

- **Separately Certified ASCs Sharing Space:** Where permitted under State law, several different ASCs, including ones that participate in Medicare and ones that do not, may use the same physical space, including the same operating rooms, **so long as they are temporally distinct,** i.e., they do not have concurrent or overlapping hours of operation. However, an ASC and a hospital or CAH outpatient surgery department, including a provider-based department that is either on or off the hospital's or CAH's main campus, may not share the same physical space, since the regulations at 42 CFR 413.65(d)(4) require that the provider-based department be held out to the public as a part of the main hospital, and that patients entering the provider-based facility are aware that they are entering the hospital.

  Each of the different ASCs that utilize the same space is separately and individually responsible for compliance with all ASC Conditions for Coverage (CfCs). So, for example, each ASC must have its own policies and procedures and its own medical records. Likewise, although there is no prohibition against each ASC using the same nursing and other staff under an arrangement with the employer of the staff, each is nevertheless required to separately comply with all requirements governing the utilization of staff in the ASC.

  At the same time, each Medicare-certified ASC that shares the same space as another Medicare-certified ASC should be aware, when entering into such an arrangement, that identification of certain deficient practices may result in citation of deficiencies for all ASCs occupying the same premises. For example, building features that violate the Life Safety Code would not vary according to which ASC happened to be operating on the premises at the time of a survey, and all ASCs at that location would be cited for the deficiency.

If there are multiple ASCs utilizing the same space, but at different times, it may be prudent to consider organizing recertification surveys in order to use the time on-site to conduct multiple surveys allowing assessment of each ASC that utilizes the space.

**Exclusive Provision of Limited Surgical Services**

The ASC must offer only surgical services. Separate ancillary services that are integral to the surgical services, i.e., those furnished immediately before, during or immediately after a surgical procedure, may be provided. The ASC may not, however, offer services unrelated to the surgeries it performs.

What constitutes "surgery"?

For the purposes of determining compliance with the ASC definition, CMS relies, with minor modification, upon the definition of surgery developed by the American College of Surgeons (**www.facs.org/fellows_info/statements/st-11.html**.) Accordingly, the following definition is used to determine whether or not a procedure constitutes surgery:

Surgery is performed for the purpose of structurally altering the human body by the incision or destruction of tissues and is part of the practice of medicine. Surgery also is the diagnostic or therapeutic treatment of conditions or disease processes by any instruments causing localized alteration or transposition of live human tissue which include lasers, ultrasound, ionizing radiation, scalpels, probes, and needles. The tissue can be cut, burned, vaporized, frozen, sutured, probed, or manipulated by closed reductions for major dislocations or fractures, or otherwise altered by mechanical, thermal, light-based, electromagnetic, or chemical means. Injection of diagnostic or therapeutic substances into body cavities, internal organs, joints, sensory organs, and the central nervous system, is also considered to be surgery. (This does not include the administration by nursing personnel of some injections, subcutaneous, intramuscular, and intravenous, when ordered by a physician.) All of these surgical procedures are invasive, including those that are performed with lasers, and the risks of any surgical procedure are not eliminated by using a light knife or laser in place of a metal knife, or scalpel.

An ASC is further limited to providing surgical services only to patients who do not require hospitalization after the surgery. Further, the ASC's surgical services must be ones that ordinarily would not take more than 24 hours, including not just the time for the surgical procedure but also pre-op preparation and recovery time, following the admission of an ASC patient. These limitations apply to all of the ASC's surgical services, not just to surgeries on Medicare beneficiaries who use the ASC.

- The term "hospitalization" means that a patient needs a supervised recovery period in a facility that provides hospital inpatient care. Whether a patient "requires" hospitalization after a surgical procedure is a function both of the characteristics of the patient and of the nature of the surgery. In other words, an ASC might be an appropriate setting for a particular surgical procedure for

patients under the age of 65 without significant co-morbidities, but might be a very risky, inappropriate setting for that same procedure when performed on a 75-year old patient with significant co-morbidities. ASCs must consider patient-specific characteristics that might make hospitalization more likely to be required when determining their criteria for patient selection.

Any surgery for which a patient must be routinely transferred to a hospital after the surgery is not appropriate for the ASC setting.

Some States permit the operation of "recovery centers" that are neither Medicare-certified healthcare facilities nor licensed hospitals, but which provide post-operative care to non-Medicare ASC patients. If such recovery centers would be considered hospitals if they participated in the Medicare program, then it is doubtful that an ASC that transfers patients to such centers meets the Medicare definition of an ASC. However, surveyors are not expected to make determinations about the nature of such recovery centers. If a SA is concerned that a recovery center is providing hospital inpatient care, it should discuss this matter further with the CMS Regional Office.

- Expected duration of services. ASCs may not provide services that, under ordinary circumstances, would be expected to exceed 24 hours following an admission. Patients admitted to an ASC will be permitted to stay 23 hours and 59 minutes, starting from the time of admission (see 73 FR at 68714 (November 18, 2008)). The time calculation begins with the admission and ends with the discharge of the patient from the ASC after the surgical procedure. While the time of admission normally would be the time of registration or check-in of the patient at the ASC's reception area, for the purposes of compliance with this requirement ASCs may use the time when the patient moves from the waiting/reception area into another part of the ASC. This time must be documented in the patient's medical record. The discharge occurs when the physician has signed the discharge order and the patient has left the recovery room. Other starting or end points, e.g., time of administration of anesthesia, or time the patient leaves the OR, may not be used to calculate compliance with the 24-hour requirement.

This requirement applies to all ASC surgical services. For services to Medicare beneficiaries there are additional payment regulations that further limit the surgical services that Medicare will pay for. For example, payment regulations at §416.166(b) state, among other criteria, that Medicare will generally pay for surgical procedures for which standard medical practice dictates that the beneficiary would not typically require active medical monitoring and care after midnight of the day of the procedure. This more restrictive Medicare payment requirement is enforced through the claims payment and audit processes. The SA surveyors may not cite an ASC for failing to meet the definition of an ASC if instances of Medicare beneficiaries who remain in the ASC are identified, so long as they meet the 24-hour requirement.

Rare instances of patients whose length of stay in the ASC exceeds 24 hours do not

automatically mean that the ASC fails to meet the regulatory definition of an ASC and must be cited as out of compliance with this requirement. The regulatory language refers to surgical services whose "expected duration" does not exceed 24 hours. It is possible for an individual case to take longer than expected, due to unforeseen complications or other unforeseen circumstances. In such rare cases the ASC continues to be responsible for the care of the patient until the patient is stable and able to be discharged in accordance with the regulatory requirements governing discharge, as well as the ASC's policy. However, if an ASC has cases exceeding 24 hours more than occasionally, this might suggest that the facility is not in compliance with the definition of an ASC.

Cases that surveyors identify which exceed 24 hours must be reviewed further to determine whether the expected duration of services for the procedure in question, when performed on a patient with key clinical characteristics similar to those of the patient in the case, would routinely exceed 24 hours. Key clinical characteristics include, but are not limited to, age and co-morbidities. If the procedure is one that Medicare pays for in an ASC setting, then it can be assumed that the expected duration of services related to that procedure would not exceed 24 hours. If the procedure is not one that Medicare pays for in an ASC, then the ASC must provide evidence supporting its expectation that the services to the patient would not exceed 24 hours. Such evidence could include other cases in the ASC where similar patients (in terms of condition prior to surgery) undergoing the same procedure were discharged in 24 hours or less after admission.

In summary, exceeding the 24-hour time frame is expected to be a rare occurrence, and each rare occurrence is expected to be demonstrated to have been something which ordinarily could not have been foreseen. Not meeting this requirement constitutes condition-level noncompliance with §416.25. In addition, review of the cases that exceed the time frame may also reveal noncompliance with CfCs related to surgical services, patient admission and assessment, and quality assurance/performance improvement.

ASCs should be aware that, to the extent that patients remain within the ASC for 24 hours or longer, for purposes of Life Safety Code requirements the ASC would be considered a "healthcare" rather than an "ambulatory" occupancy under the NFPA Life Safety Code.

**Has a Medicare Supplier Agreement**

An entity cannot be an ASC, as that term is defined in Medicare's regulations, if it does not have an agreement to participate in Medicare as an ASC. Since ASCs are suppliers, the ASC agreement is a supplier agreement. Thus, while Medicare regulations recognize, for example, non-participating hospitals and will pay them for emergency services under certain circumstances, in the case of an ASC, the term "ASC" has a meaning exclusive to the entity's participation in the Medicare program. Applicants to participate as an ASC are not considered "ASCs" until they actually have a Medicare agreement in place.

In the case of a prospective ASC undergoing an initial survey to determine whether it

may be certified for Medicare participation, the SA may not conduct the survey until the Medicare Administrative Contractor/legacy Carrier has reviewed the ASC's Form 855B enrollment application and made a recommendation for approval of the ASC's participation in Medicare.

**Compliance with Subparts B and C**

Finally, an ASC must comply with each of the requirements found in Subparts B and C, i.e., the provisions found at 42 CFR 416.25 – 35 for Subpart B, and 42 CFR 416.40 – 52 for Subpart C.

Subpart B contains the supplier agreement requirements for an ASC. Enforcement of these provisions generally follows the same process as that outlined in SOM §3030. Although §3030 specifically addresses failures of providers to comply with the statutory provider agreement requirements, noncompliance of an ASC supplier with the provisions of Subpart B may be handled by CMS Regional Offices in the same way.

Subpart C contains the health and safety standards for ASCs, i.e., the Conditions for Coverage. State Survey Agencies survey ASCs for their compliance with the ASC definition and the CfCs. If an ASC has condition-level noncompliance with numerous CfCs, then condition-level noncompliance with §416.25 may also be cited.

**Survey Procedures: §416.2**

- Determine through interview and observation and consultation with the LSC surveyor whether the ASC facility is physically separated by at least a 1 hour separation from any other healthcare facility or physician office.

- Determine whether it is permissible under State licensure requirements for an ASC to share its physical space with another entity from which it is temporally separated. If sharing physical space that is temporally separate is not permitted under State law, then it is also not permitted under Medicare.

- Where permitted under State law, if the ASC shares common administrative space with an adjoining or contiguous physician's office or clinic, ask the ASC for evidence that use of this common space by the ASC and the other entity(ies) is not concurrent or overlapping in time. Look for signs or schedules that would confirm that the entities do not use the space at the same time.

- If an ASC complies with all other elements of the ASC definition but has permitted concurrent use by an adjacent physician's office or clinic of common administrative space, this would constitute a standard-level violation. However, co-mingling of services may also result in related deficiencies in the areas of medical records, patients' rights, medical staff, nursing staff, etc. that would be cited under the applicable CfCs, and which together might result in a condition-level violation of §416.25 and possibly the other CfCs.

- Where sharing of space by multiple healthcare entities is permitted under State law, determine through interview, observation and review of facility documents whether the ASC shares the same space, including clinical space, such as ORs, procedure rooms, recovery rooms, etc., with another entity.

  - If it does share space with other healthcare entities, ask the ASC for evidence that the two entities never operate concurrently or have overlapping hours. Look for signs or schedules that would confirm that the entities do not use the same space at the same time.

  - If there are multiple ASCs utilizing the same space and there are deficiencies that are common to more than one ASC, citations must be issued to each ASC.

  - If there is evidence that ASC and another entity that provides services other than surgery share the same space, including clinical space, concurrently or have overlapping hours of operation, this would constitute a condition-level violation of §416.25 because the ASC would not be a distinct entity and it would not be operating exclusively to provide surgical services. In addition, co-mingling of services may also result in related deficiencies in the areas of medical records, patients' rights, medical staff, nursing staff, etc. that would be cited under the applicable CfCs, and which together might result in additional condition-level violations.

  - If there is evidence that ASC and another entity that provides surgical services share the same space, including clinical space, concurrently or have overlapping hours of operation, this would constitute a standard-level violation. However, this co-mingling of services may also result in related deficiencies in the areas of medical records, patients' rights, medical staff, nursing staff, etc. that would be cited under the applicable CfCs, and which together might result in condition-level violation of §416.25 and possibly the other CfCs.

- Review all closed medical records in the survey sample to determine whether the time elapsed between the patient's admission or registration and discharge does not exceed 23 hours and 59 minutes. The calculation of the timeframe begins with the time documented in the medical record indicating when the patient moved from the reception or waiting area into another part of the ASC, if the ASC records this separate from the time of admission in the medical record.

- Determine whether the medical records note the patient's admission and discharge time.

- Observe whether the ASC correctly notes the time of admission for patients checking in and being discharged.

- For cases reviewed that exceed the permitted expected time frame, ask the ASC to provide documentation indicating why it was reasonable to have expected that the

time from admission to discharge would not exceed 24 hours.  Acceptable evidence could include, but is not limited to, documentation that the procedure is one that Medicare has previously paid the ASC for, or other cases in the ASC involving the same procedure on similar patients that did not exceed the timeframe.  ASCs may produce other evidence for surveyors to assess.  Surveyors are not expected to know all of the surgical procedures covered by Medicare in an ASC, although they may obtain more information about this if they choose at http://www.cms.hhs.gov/apps/ama/license.asp?file=/ascpayment/downloads/CMS _1404_FC_ASC_AddAA_BB_DD1_DD2_EE.zip  (This link requires a consent to use policies and then leads to a series of spreadsheets; the pertinent one is the ASC Addendum AA.)  It is the responsibility of the ASC to demonstrate that the procedure is covered by Medicare when performed in an ASC.

## Q-0020

**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.40  Condition for Coverage:  Compliance With State Licensure Law

**The ASC must comply with State licensure requirements.**

**Interpretive Guidelines:  §416.40**

State licensure requirements generally exist for both healthcare facilities and healthcare professionals.  States vary considerably in their licensure requirements for entities that meet the Medicare definition of an ASC.  Some States may not require separate licensure of these facilities, although all States require licensure of healthcare professionals providing services within the ASC.  Some States may require separate licensure for some, but not all ASCs within their State; for example, in some States, ASCs that are operated as part of a physician single or group private practice may not require separate licensure as a healthcare facility.  This condition requires that an ASC comply with whatever State licensure requirements are applicable to it.

In States where a separate facility license is required for a facility providing ambulatory surgical services, the ASC must have a current license that has not expired or been suspended or revoked.  The ASC must also be in compliance with the State licensure requirements.

Failure of the ASC to meet State licensure law may be cited when the State has made a determination of noncompliance and has also taken a final enforcement action as a result.  Citation of licensure deficiencies may represent an initial step rather than a final action or determination by the State licensure authority.  Additionally, the Federal survey of the ASC focuses on current compliance or non-compliance, not past noncompliance.  Thus, for example, evidence that an ASC had been assessed a civil monetary penalty by the State licensure authority in the previous year would not be grounds for citing the ASC for noncompliance with State licensure law, unless the State licensure authority indicates the

ASC remains noncompliant.

If as a result of a State citation of an ASC for deficiencies in its compliance with licensure requirements the ASC has ceased operations and no longer furnishes services, it would be considered to have voluntarily terminated its Medicare supplier agreement as of the last date on which it provided services to Medicare beneficiaries, in accordance with§416.35(a)(3). The SA must advise the RO of the ASC's cessation of business, and the RO will process a voluntary termination.

If at the time of the survey the ASC's State license has been revoked, suspended, or otherwise formally limited (e.g., admissions have been curtailed by the State), then the ASC is not in compliance with this condition and must be cited for a condition-level deficiency. Furthermore, survey of the rest of the CfCs cannot be completed, since the ASC is not providing surgical services to patients. The SA must advise the RO of such formal licensure enforcement actions and the RO will proceed with action to terminate the ASC supplier agreement, in accordance with standard termination procedures.

If the surveyor identifies a situation that suggests the ASC may not be in compliance with State licensure law, the information may be referred to the State licensure authority for follow-up.

While States vary as to the types of healthcare professionals that require licensure, all ASCs have physicians and nursing staff that require State licensure. It is the ASC's responsibility to verify that all ASC personnel who require a State license have a current license that has not expired or been suspended or revoked.

**Survey Procedures: §416.40**

- Determine prior to the survey whether a facility license is required for the ASC. If there is access to State licensure files, review the ASC's State licensure status. Otherwise, ask to see the ASC's license.

- Review the ASC's documentation of all personnel required to be licensed under State or local laws or regulations. Check that the ASC has evidence that all personnel requiring licensure have current licenses in good standing.

## Q-0040

## §416.41 Condition for Coverage: Governing Body and Management

**The ASC must have a governing body that assumes full legal responsibility for determining, implementing, and monitoring policies governing the ASC's total operation. The governing body has oversight and accountability for the quality assessment and performance improvement program, ensures that the facility policies and programs are administered so as to provide quality healthcare in a safe environment, and develops and maintains a disaster preparedness plan.**

**Interpretive Guidelines:  §416.41**

The ASC must have a designated governing body that exercises oversight for all ASC activities.  The governing body is responsible for establishing the ASC's policies, making sure that the policies are implemented, and monitoring internal compliance with the ASC's policies as well as assessing those policies periodically to determine whether they need revision.  The regulation particularly stresses the responsibility of the governing body for:

- direct oversight of the ASC's quality assessment and performance improvement (QAPI) program (see 72 FR 50472, August 31, 2007) and 73 FR 68714, November 18, 2008;
- the quality of the ASC's healthcare services;
- the safety of the ASC's environment; and
- development and maintenance of a disaster preparedness plan.

In the case of an ASC that has one owner, that individual constitutes the governing body.

Although the governing body may delegate day-to-day operational responsibilities to administrative, medical, or other personnel, the ASC's governing body retains the ultimate responsibility for the overall operations of the ASC and quality of its services. The regulation also emphasizes the governing body's responsibilities in the areas of QAPI and disaster preparedness.  Delegations of governing body authority should be documented in writing.

The governing body is responsible for creating a safe environment where ASC patients can receive quality healthcare services.  This means the governing body is not only responsible for adopting formal policies and procedures that govern all operations within the ASC, but also that it must take actions to ensure that these policies are implemented. Through its direct oversight and accountability for the ASC's QAPI program, it is expected that the ASC is better able to improve care being furnished to its patients.  (See 72 FR 51472, August 31, 2007.)  When QAPI citations are made related to 42 CFR 416.43, particularly Standard (e), the citation at 42 CFR 416.41should also be considered.

If condition-level deficiencies are cited related to multiple other ASC CfCs, with the result that the ASC does not provide quality healthcare or a safe environment, then it is also likely that the ASC is not complying with the governing body CfC.

**Survey Procedures:  §416.41**

- Ask the ASC for information about its governing body.  If there are questions about who constitutes the ASC's governing body, it may help to review the information the ASC reported in Section 6 of its CMS Form 855B application, identifying those individuals with ownership interest or managing control of the ASC.

- Ask the ASC how frequently the governing body meets and what are the typical

items on its meeting agendas.

- Has the governing body delegated operational responsibility to a manager?

- Ask for an organizational chart of the ASC management.  Ask who performs the following functions:

  - Human Resources;

  - Medical staff credentialing and granting of privileges;

  - Management of surgical services;

  - Management of nursing services;

  - Management of pharmaceutical services;

  - Management of laboratory (if applicable) and radiologic services;

  - Management of the ASC's physical plant;

  - Medical records maintenance;

  - Infection control;

  - Quality Assurance and Performance Improvement.

- Ask to see meeting minutes or other evidence that the ASC's policies and procedures have been formally adopted by the governing body.

- Ask to see meeting minutes or other evidence of how the governing body assures that its policies are implemented, and of how the governing body monitors internal compliance with and reassesses the ASC's policies.  For example, is there any evidence of data collected and submitted to the governing body related to specific ASC policies?

- Ask to see meeting minutes or other evidence of how the governing body exercises ongoing oversight of and accountability for the ASC's QA/PI program. See the discussion of §416.43 for more detail on the regulatory requirements related to QA/PI.

## Q-0041
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.41(a)  Standard:  Contract Services

**When services are provided through a contract with an outside resource, the ASC must assure that these services are provided in a safe and effective manner.**

**Interpretive Guidelines: §416.41(a)**

The ASCs may contract with third parties for provision of the ASC's services, including the ASC's environment. However, such a contract does not relieve the ASC's governing body from its responsibility to oversee the delivery of these ASC services. Given that many ASCs operate closely with a physician practice or clinic, or that some ASCs share space with other ASCs or other types of healthcare facilities operating at different times, use of a wide range of contract services may be common in ASCs. The ASC must assure that the contract services are provided safely and effectively. Contractor services must be included in the ASC's QAPI program.

For example:

- If the ASC contracts for cleaning of the ASC, including its ORs/procedures rooms, the ASC's governing body is still responsible for the sanitary condition of the ASC and must exercise oversight over its contractor to assure that standard sanitary practices are employed.

- If the ASC contracts for the provision of nursing services, the ASC remains responsible for assuring that all contract nurses are properly licensed and trained and oriented to perform their duties within the ASC. The ASC is responsible for the direction of nursing staff, regardless of whether they are employees or provided under contract.

- If the ASC contracts for provision of anesthesia services, the ASC remains responsible for reviewing the credentials of all anesthesiologists and anesthetists providing anesthesia services and granting them privileges to do so.

- If the ASC contracts (for example, with an associated adjacent physician practice) for provision of receptionist services, the ASC is responsible for assuring that such services are provided in a manner that complies with the patients' rights CfC requirements.

- If the ASC contracts for medical records services, it must ensure that the contractor meets all requirements of the medical records CfC.

**Survey Procedures: §416.41(a)**

- Ask the ASC for a complete list of its currently contracted services.

- Review the personnel files of contract personnel to determine, as applicable, their credentials, privileges, evidence of training, evidence of periodic evaluation, etc.

- If the ASC is one that shares space (temporally separated) with other entities, ask

the ASC whether it contracts or has some other formalized arrangement with any of those other entities for services when the ASC is in operation. If employees of an entity other than the ASC perform services while the ASC is in operation, and the ASC has no contract or other formal documentation of an arrangement with the other entity that governs the provision of such services, then the governing body fails to exercise its responsibility for the administration of the ASC's programs.

- Ask the ASC how it assesses the safety and effectiveness of the services provided by each contractor, including how contractor services are incorporated into its QA/PI program. Select several contractors from the list and ask for documentation of the most recent assessment of each by the ASC.

- Ask the ASC management what process it uses to correct deficiencies in contracted services. Ask if there are any cases where it has identified deficiencies and taken corrective action, and if so, ask to see documentation of these cases.

## Q-0042
*(Rev. 137, Issued: 04-01-15, Effective: 03-27-15, Implementation: 03-27-15)*

## §416.41(b)  Standard:  Hospitalization

*(1)* **The ASC must have an effective procedure for the immediate transfer, to a hospital, of patients requiring emergency medical care beyond the capabilities of the ASC.**

*(2)* **This hospital must be a local, Medicare participating hospital or a local, nonparticipating hospital that meets the requirements for payment for emergency services under §482.2 of this chapter.**

(3) **The ASC must –**

   i. **Have a written transfer agreement with a hospital that meets the requirements of paragraph (b)(2) of this section; or**

   ii. **Ensure that all physicians performing surgery in the ASC have admitting privileges at a hospital that meets the requirements of paragraph (b)(2) of this section.**

**Interpretive Guidelines:  §416.41(b)**

The ASC must be able to transfer a patient immediately to a local hospital when the patient experiences a medical emergency that the ASC is not capable of handling, or which requires emergency care extending well beyond the 24-hour time frame for ASC cases. (See §§416.44(c) and (d) for a discussion of the emergency care capabilities each ASC must have.)

**(1) Immediate Transfer Procedure**

An "effective procedure" for immediate emergency transfers includes:

- Written ASC policies and procedures that address the circumstances warranting emergency transfer, including who makes the transfer decision; the documentation that must accompany the transferred patient; and the procedure for accomplishing the transfer safely and expeditiously, *including communicating with the receiving hospital*. There must be evidence that staff are aware of and can implement the ASC's policy immediately upon the development of a medical emergency.

- Provision of emergency care and initial stabilizing treatment within the ASC's capabilities until the patient is transferred. (See §§416.44(c) and (d).)

- Arrangement for immediate emergency transport of the patient. (It is acceptable if the ASC contacts the ambulance service via 911 to arrange emergency transport, unless State licensure requires additional arrangements, *but the ASC is still responsible for communicating with the receiving hospital to facilitate the transfer*.)

**(2) Transfer to a local hospital**

The ASC is required to transfer patients who require emergency transfer to *a* local Medicare-participating hospital, or to a local, non-Medicare-participating hospital that meets the requirements for payment for emergency services by the Medicare program in accordance with 42 CFR 482.2. (See the interpretive guidelines for §482.2 in Appendix A of the State Operations Manual *concerning non-participating emergency hospitals*.)

A "local" hospital means the ASC is to consider the most appropriate facility to which the ASC will transport its patients in the event of an emergency. If the closest hospital could not accommodate the patient population or the predominant medical emergencies associated with the type of surgeries performed by the ASC, *another hospital that is able to do so and which is closer than other comparable hospitals would* meet the "local" definition. *For example, if there is a long term care hospital within five miles of the ASC, and a short-term acute care hospital providing emergency services within fifteen miles of the ASC, the ASC would be expected to transfer patients to the short-term acute care hospital.*

*Patient-specific circumstances play a role in determining the appropriate local hospital at the time of an emergency. For example, if the patient had a heart attack during surgery at the ASC and needs an interventional cardiac catheterization, and the closest hospital does not offer this service, it is expected that the ASC would transfer the patient to a farther hospital with the cardiac catheterization capability.*

*If there are multiple hospitals with comparable capabilities that are roughly the same distance from the ASC, i.e., there are only a few miles difference among them in their*

*distance from the ASC, then the ASC may make the transfer to any one of these hospitals. For example, if there are three comparable, appropriate hospitals within a ten mile radius of the ASC, transfer to any one would be acceptable.  Likewise, for another example, if the ASC is in a more rural area and there are two appropriate hospitals that are each about 40 miles distant from the ASC, but in opposite directions, each of those hospitals would be considered a "local" hospital for the ASC.*

*On the other hand, for example, if there is an appropriate hospital eight miles from the ASC, and another hospital with similar capabilities twenty miles from the ASC, the further hospital would not be considered a local hospital for ASC emergency transfer purposes, unless the closer hospital lacks capacity at the time of the transfer.*

A State-specific definition of what constitutes a "local" hospital for ASC transfer purposes does not override the Medicare requirement to use the hospital nearest to the ASC with the appropriate capabilities.

*CMS expects that, absent the specific types of circumstances described above, emergency transfers will ordinarily be made to a hospital with which the ASC has an arrangement(s) to meet the requirements of §416.41(b)(2) and (3).*   Regardless of any business issues that may arise between ASCs and their local hospital(s), the ASC is required to *have an effective procedure  to immediately* transfer its emergency cases to the nearest, most appropriate local hospital, since a delay in transfer could affect the patient's health. (See 72 FR 50472, August 31, 2007 and 73 FR 68714, November 18, 2008.)

**(3)  Transfer Agreement or Hospital Privileges**

The ASC is required to:

- Have a  written transfer agreement that is in force with a hospital that meets the requirements at §416.41(b)(2); or

- Ensure that every physician performing surgery at the ASC has admitting privileges at a hospital that meets the requirements of §416.41(b)(2).

A transfer agreement is a written agreement, signed by authorized representatives of the ASC and the hospital, in which the hospital agrees to accept the transfer of the ASC's patients who need inpatient hospital care, including emergency care.  Generally transfer agreements establish the respective responsibilities of each party to the agreement, such as the process for arranging a transfer, etc.   A transfer agreement may have an expiration date, or it may have terms stating that it remains in effect until and unless one of the parties has terminated the transfer agreement.  An ASC's transfer agreement must be reviewed to determine whether it is in force at the time of the survey.

If the ASC does not have a transfer agreement, then it must maintain documentation of the current admitting privileges of all physicians who perform surgery at the ASC at local hospitals that satisfy the regulatory requirements in §416.41(b)(2) .  (Even if the ASC has a transfer agreement, such documentation would be a good idea.  However, it is required under the regulations only if there is no transfer agreement.)  If there is more than one

local hospital that meets the regulatory requirement for an appropriate local transfer destination, the ASC may satisfy the requirement at §416.41(b)(3) when its operating physicians each have admitting privileges at one of the eligible hospitals; it is not necessary that they all have privileges in the same hospital.  The physician who performed the surgery on the patient requiring an emergency transfer is expected to arrange the hospital admission of the patient, unless there is a compelling clinical reason to transfer the patient to a different local hospital where the physician does not have admitting privileges.

*In some circumstances*, a transfer agreement *between the ASC and a local hospital* or the possession of hospital admitting privileges by the ASC's operating physicians *will* not guarantee that a hospital will accept a specific transfer, since the hospital may lack the capacity to provide the required service at the time an emergency transfer request is made.  ASCs should have alternative plans to address such contingencies. While it is true that the local hospital, if it is a Medicare-participating hospital that has an emergency department, would be obligated under the Emergency Medical Treatment and Labor Act (EMTALA), once the patient arrives on the hospital's property, to provide a medical screening examination, as well as stabilizing treatment to an individual with an emergency medical condition, an ASC may not satisfy its transfer requirements by simply relying upon a*n expectation that* hospitals *fulfill their* EMTALA obligations. An ASC may call 911 to arrange emergency transport, but it must also take steps to arrange the *transfer* of the patient *to* a local hospital.

**Survey Procedures:  §416.41(b)**

- *Before going on the survey, determine which hospital(s) in the vicinity of the ASC might meet the regulatory requirement of being a local hospital.*

- *Determine whether the ASC has a transfer agreement with an appropriate local hospital that meets the regulatory requirements.  If it does, ask to see the transfer agreement.  Look for an expiration date.  If there is no expiration date, ask the ASC whether the transfer agreement has been terminated by either party.  If there is doubt about the transfer agreement being in effect, a surveyor may contact the hospital to ask it whether it has a current transfer agreement with the ASC.*

- *If the ASC does not have a transfer agreement with an appropriate local hospital, ask for documentation that each physician who has privileges to perform surgery in the ASC has admitting privileges in an appropriate local hospital.  Ask the ASC how it ensures that its information is up-to-date.*

- Ask to see the ASC's policy and procedures for emergency transfer of patients.  Review the document to determine whether it addresses the essential elements.

- How is this protocol communicated to the clinical staff of the ASC?

- Ask the clinical staff how they would handle a medical emergency of an ASC patient that could not be managed within the ASC.  Do they know the ASC's

policies and procedures for emergency transfer?  Do they know how to arrange emergency transport?

- Ask if the ASC has had any emergency transfers of patients in the previous 12 months.  If it has, review the medical records of patients transferred to hospitals to determine whether they were transferred to hospitals that meet the regulatory requirements for a local hospital.  *If the ASC transfers emergency cases to hospital(s) other than local one(s), ask for the rationale supporting these alternative transfers.*

- Determine whether the ASC had a transfer agreement, or a physician with admitting privileges, at each hospital to which a patient was transferred.

- Does the medical record give any indication that the ASC took steps to arrange the transfer, beyond calling 911?

## Q-0043

**(Rev.56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.41(c)  Standard:  Disaster Preparedness Plan

> **(1)  The ASC must maintain a written disaster preparedness plan that provides for the emergency care of patients, staff and others in the facility in the event of fire, natural disaster, functional failure of equipment, or other unexpected events or circumstances that are likely to threaten the health and safety of those in the ASC.**

> **(2)  The ASC coordinates the plan with State and local authorities, as appropriate.**

> **(3) The ASC conducts drills, at least annually, to test the plan's effectiveness. The ASC must complete a written evaluation of each drill and promptly implement any corrections to the plan.**

**Interpretive Guidelines:  §416.41(c)**

**Disaster Preparedness Plan.**  The intent of this regulation is for an ASC to have in place a disaster preparedness plan to care for patients, staff and other individuals who are on the ASC's premises when a major disruptive event occurs.  The governing body of the ASC is responsible for the development of this plan.

A wide range of events could occur, such as fire, flood, mass release of a biochemical hazard, electrical failure, failure of the water supply, failure of key equipment needed to sustain the operations of the ASC, etc.  The ASC must take an all-hazards approach when developing its plan, identifying hazards that are specific to the operating environment of an ASC as well as hazards that may affect the community in which the ASC operates,

including the ASC.

Comprehensive emergency management includes the following phases, which should be taken into account in the development of the ASC's disaster preparedness plan:

**Hazard Identification:** ASCs should make every effort to include any potential hazards that could affect the facility directly and indirectly for the particular area in which it is located. Indirect hazards could affect the community but not the ASC, and as a result interrupt necessary utilities, supplies, or staffing.

**Hazard Mitigation:** Hazard mitigation consists of those activities taken to eliminate or reduce the probability of the event, or reduce the event's severity or consequences, either prior to or following a disaster or emergency.

The emergency plan should include mitigation processes for patients, staff and others present in the facility at the time of the disaster or emergency. Mitigation details should address provision of needed care for the ASC's patients being prepared for procedures, undergoing procedures, or recovering from procedures, as well as how the ASC will educate staff in protecting themselves and others present in the ASC in the event of an emergency. Comprehensive hazard mitigation efforts, including staff education, will aid in reducing staffs' vulnerability to potential hazards. These activities precede any imminent or post-impact timeframe, and are considered part of the response.

**Preparedness:** Preparedness includes developing a plan to address how the ASC will meet the needs of patients, staff, and others present in the ASC if essential services break down as a result of a disaster. It will be the product of a review of the basic facility information, the hazard analysis, and an analysis of the ASC's ability to continue providing care and services during an emergency. It also includes training staff on their role in the emergency plan, testing the plan, and revising the plan as needed.

**Response**: Activities taken immediately before (for an impending threat), during and after a disaster/emergency event to address the immediate and short-term effects of the emergency.

**Recovery**: Activities and programs that are implemented during and after the ASC's response that are designed to return the ASC to its usual state or a "new normal."

Resources for providers and suppliers on effective healthcare emergency preparedness may be found on CMS' Web site at http://www.cms.hhs.gov/SurveyCertEmergPrep/03_HealthCareProviderGuidance.asp#Top OfPage

**Coordination of the Plan.** The regulation requires that the ASC must coordinate its disaster preparedness plan with State and local authorities that have responsibility for emergency management within the State. Coordination should take place in addressing threats that either extend beyond the premises of the ASC, e.g., floods, earthquakes, or biochemical releases, etc., or threats within the ASC that require response from a

community agency, e.g., fire department.

Coordination assists in overall emergency management planning efforts within the area where the ASC is located, for example by ensuring that the facility's plans are consistent with the larger community approach to similar hazards.  It also makes known to both the ASC and to the State and local authorities the assets and capabilities that each has available during an emergency.

The regulation does not require that ASCs be integrated into State and local emergency preparedness plans to address threats that extend beyond the premises of the ASC, since it will ultimately be the decision of the State and local officials whether and how they might utilize ASCs in a response to an emergency event.  ASCs must, however, document that they have made efforts to communicate with their State and local emergency preparedness officials to inquire about potential coordination.

**Testing, Evaluating, and Updating the Plan.**  At least once every year the ASC must conduct a drill to test the plan's effectiveness.  A drill that is conducted in concert with State or local authorities would qualify as an annual test.  While the drill does not have to test the response to every identified hazard, it is expected to test a significant portion of the plan.  For example, a fire drill does not qualify on its own as a sufficient annual drill of the ASC's plan.

The ASC must prepare a written evaluation of each annual drill, identifying problems that arose as well as methods to address those problems.  The disaster preparedness plan must be promptly updated to reflect the lessons learned from the drill and the needed changes identified in the evaluation.

**Survey Procedures:  §416.41(c)**

- Ask the ASC's leadership to show you the facility's emergency preparedness plan.  Ask them to summarize the plan briefly for you, explaining how it addresses protecting patients, staff, and others present in the ASC at the time of a disaster or emergency.

- Ask the ASC's leadership how staff are informed of the plan, including their roles and responsibilities.  Interview some ASC staff members, including physicians, to determine whether they are aware of the plan and its contents.

- Ask for evidence of coordination with State or local emergency management agencies.  The degree to which State or local authorities engage in coordinated planning with local healthcare facilities, especially ones that are not hospitals, may vary among localities and States.  At a minimum, the ASC must have documentation that it has identified appropriate State and local agencies, and that the ASC has made these agencies aware of the ASC's interest in coordination.

- Ask for documentation of the annual drill (in the case of new ASCs undergoing an initial survey, they must have evidence of having conducted at least one drill).  Ask the ASC's leadership to describe how the drill was conducted, and what

features of the plan it is designed to test. Ask some ASC staff, including physicians, if they have participated in a drill to test the emergency preparedness plan.

- Ask to see the written evaluation of the drill. Determine whether the evaluation reviews the drill in detail and makes assessments of whether the plan features that were tested in the drill performed as expected. If problems during the drill were noted, does the evaluation indicate what changes are needed to address those problems? If the evaluation calls for changes, verify that the plan was revised accordingly and that the changes were implemented.

## Q-0060
*(Rev. 137, Issued: 04-01-15, Effective: 03-27-15, Implementation: 03-27-15)*

## §416.42 Condition for Coverage: Surgical Services

**Surgical procedures must be performed in a safe manner by qualified physicians who have been granted clinical privileges by the governing body of the ASC in accordance with approved policies and procedures of the ASC.**

**Interpretive Guidelines: §416.42**

*The standard level tag for §416.42 (Q-0064) provides more detailed guidance on the requirements for performing surgical services in a safe manner, by qualified physicians. It permits standard-level citations for identified deficiencies.*

*The manner and degree of noncompliance identified in relation to the standard level tags for §416.42 may result in substantial noncompliance with this CoP, requiring citation at the condition level.*

## Q-0061
(Rev.71, Issued: 05-13-11, Effective: 5-13-11-Implementation: 05-13-11)

## §416.42(a) Standard:  Anesthetic Risk and Evaluation

**(1)  A physician must examine the patient immediately before surgery to evaluate the risk of anesthesia and of the procedure to be performed.**

**Interpretive Guidelines:  §416.42(a)(1)**

The purpose of the exam immediately before surgery is to evaluate, based on the patient's current condition, whether the risks associated with the anesthesia that will be administered and with the surgical procedure that will be performed fall within an acceptable range for a patient having that procedure in an ASC, given that the ASC does not provide services to patients requiring hospitalization.  The assessment must be specific to each patient; it is not acceptable for an ASC to assume, for example, that coverage of a specific procedure by Medicare or an insurance company in an ASC setting

is a sufficient basis to conclude that the risks of the anesthesia and surgery are acceptable generically for every ASC patient. The requirement for a physician to examine the patient immediately before surgery is not to be confused with the separate requirement at 42 CFR 416.52(a)(1) for a history and physical assessment performed by a physician, although it is expected that the physician will review the materials from such pre-admission examination as part of the evaluation. Nevertheless, this requirement does constitute one component of the requirement at 42 CFR 416.52(a)(2) for a pre-surgical assessment upon admission. In those cases, however, where the comprehensive history and physical assessment is performed in the ASC on the same day as the surgical procedure, the assessment of the patient's procedure/anesthesia risk must be conducted separately from the history and physical, including any update assessment incorporated into that history and physical. See the interpretive guidelines for §§416.52(a)(1) & (2).

The ASC must have approved policies and procedures to assure that the assessment of anesthesia-related and procedural risks is completed just prior to every surgical procedure. (Ideally, the ASC would conduct such an assessment prior to the patient's admission as well as immediately prior to surgery, but this is not specifically required by the regulations.)

The ASC's policies must address the basis or criteria used within the ASC in conducting these risk assessments, and must assure consistency among assessments.

The regulations do not specify the content or methodology to be employed in such assessments. As an illustrative example, an ASC might choose to incorporate consideration of a patient's ASA Physical Classification into its criteria. Although the American Society of Anesthesiologists did not create its ASA Physical Status Classification System for the purpose of predicting operative risk, this system has nevertheless been found to be useful in predicting morbidity and mortality in surgical patients[1] and has been used by surgical facilities as a standard tool. This system classifies patients' physical status in 6 levels:

> ASA PS I – Normal healthy patient;
> ASA PS II – Patient with mild systemic disease;
> ASA PS III – Patient with severe systemic disease;
> ASA PS IV – Patient with severe systemic disease that is a constant threat to life;
> ASA PS V – Moribund patient who is not expected to survive without the operation; and
> ASA PS VI – Declared brain-dead patient whose organs are being removed for donor purposes.

As the ASA PS level of a patient increases, the range of acceptable risk associated with a specific procedure or type of anesthesia in an ambulatory setting may narrow. An ASC that employed this classification system in its assessment of its patients might then consider, taking into account the nature of the procedures it performs and the anesthesia used, whether it will accept for admission patients who would have a classification of ASA PS IV or higher. For many patients classified as ASA PS level III, an ASC may also not be an appropriate setting, depending upon the procedure and anesthesia.

If a State establishes licensure limitations on the types of procedures an ASC may perform that are based on patient classifications and would permit ASCs to perform fewer procedures than they would under the CfCs, then the ASC must conform to those State requirements.  However, State requirements that would expand the types of procedures an ASC may offer beyond what is permitted under the CfCs are superseded by the Federal CfC requirements.

**Endnotes for Standard:  Anesthetic Risk and Evaluation**

[1]P. 636, Davenport et al., "National Surgical Quality Improvement Program Risk Factors Can

      Be Used to Validate American Society of Anesthesiologists Physical Status Classification Levels," Annals of Surgery, Vol. 243, No. 5, May 2006

**Survey Procedures:  §416.42(a)(1)**

- Verify that there is evidence for every medical record in the survey sample of an assessment by a physician of the patient's risk for the planned surgery and anesthesia.

- Ask the ASC to provide you with its policies and procedures for assessment of anesthesia and procedural risk.  Check to determine that the policies include the criteria the ASC's physicians are to use in making the assessments.

- Ask the ASC's leadership to demonstrate how they assure a consistent approach in the assessment.

- Ask the ASC's leadership whether they can point to any cases where an assessment resulted in a decision not to proceed with the surgery.  If there are no such cases, ask the ASC to explain how its patient selection criteria assure that there is an acceptable level of anesthesia and procedural risk for every patient scheduled for surgery in the ASC – for example, do they use patient admission criteria that exclude higher risk patients?  If so, ask to see those criteria.

- The survey sample should include cases where a patient died or needed to be transferred to a hospital; discuss the pre-surgical assessment of the patient in those cases, preferably with the physician who conducted the assessments, to explore the basis on which the patient was found to be suitable for the surgery and anesthesia.

## Q-0062
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.42(a) - Standard: Anesthetic Risk and Evaluation

**(2)  Before discharge from the ASC, each patient must be evaluated by a physician or by an anesthetist as defined at §410.69(b) of this chapter, in accordance with applicable State health and safety laws, standards of practice, and ASC policy, for proper anesthesia recovery.**

**Interpretive Guidelines:  §416.42(a)(2)**

An evaluation of the patient's recovery from anesthesia, to determine whether the patient is recovering appropriately, must be completed and documented before the patient is discharged from the ASC.  The American Society of Anesthesiology (ASA) guidelines do not define moderate or conscious sedation as anesthesia. While current practice dictates that the patient receiving conscious sedation be monitored and evaluated before, during, and after the procedure by trained practitioners, a postanesthesia evaluation is not required.

The evaluation must be completed and documented by a physician or anesthetist, as

defined at 42 CFR 410.69(b), i.e., a certified registered nurse anesthetist (CRNA) or an anesthesiologist's assistant. See the discussion at §416.42(b) for more discussion of CRNA and anesthesiologist's assistant requirements.

ASCs would be well advised in developing their policies and procedures for postanesthesia care to consult recognized guidelines. For example, Practice Guidelines for Postanesthetic Care, Anesthesiology, Vol 96, No 3, March, 2002, provides the recommendations of the American Society of Anesthesiologists for routine postanesthesia assessment and monitoring, including monitoring/assessment of:

- Respiratory function, including respiratory rate, airway patency, and oxygen saturation;

- Cardiovascular function, including pulse rate and blood pressure;

- Mental status;

- Temperature;

- Pain;

- Nausea and vomiting; and

- Postoperative hydration.

Depending on the specific surgery or procedure performed, additional types of monitoring and assessment may be necessary.

**Survey Procedures: §416.42(a)(2)**

- Review the ASC's policies and procedures regarding postanesthesia recovery and evaluation to determine if they are consistent with the regulatory requirement. Determine whether the ASC is following its own policy.

- Review a sample of medical records for patients who had surgery or a procedure requiring anesthesia to determine whether a postanesthesia evaluation was conducted for each patient.

- Determine whether the evaluation was conducted by a practitioner who is qualified to administer anesthesia.

- Determine whether the evaluation was performed prior to the patient's discharge.

## Q-0063
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.42(b) - Standard: Administration of Anesthesia

**Anesthetics must be administered by only-**

**(1)     A qualified anesthesiologist, or**

**(2)     A physician qualified to administer anesthesia, a certified registered nurse anesthetist (CRNA) or an anesthesiologist's assistant as defined in §410.69(b) of this chapter, or a supervised trainee in an approved educational program. In those cases in which a non-physician administers the anesthesia, unless exempted in accordance with paragraph (c) of this section, the anesthetist must be under the supervision of the operating physician, and in the case of an anesthesiologist's assistant, under the supervision of an anesthesiologist.**

## §416.42(c) - Standard:  State Exemption

**(1)     An ASC may be exempted from the requirement for physician supervision of CRNAs as described in paragraph (b)(2) of this section, if the State in which the ASC is located submits a letter to CMS signed by the Governor, following consultation with the State's Boards of Medicine and Nursing, requesting exemption from physician supervision of CRNAs.  The letter from the Governor must attest that he or she has consulted with State Boards of Medicine and Nursing about issues related to access to and the quality of anesthesia services in the State and has concluded that it is in the best interests of the State's citizens to opt-out of the current physician supervision requirement, and that the opt-out is consistent with State law.**

**(2)     The request for exemption and recognition of State laws, and the withdrawal of the request may be submitted at any time, and is effective upon submission.**

**Interpretive Guidelines:  §416.42(b) & (c)**

The ASC's policies and procedures must include criteria, consistent with State law governing scope of professional practice and other applicable State law, for determining the anesthesia privileges to be granted by the governing body to an eligible individual practitioner and a procedure for applying the criteria to individuals requesting privileges. The ASC must specify the anesthesia privileges for each practitioner who administers anesthesia, or who supervises the administration of anesthesia by another practitioner. The privileges granted must be in accordance with State law and the ASC's policy.  The type and complexity of procedures for which the practitioner may administer anesthesia, or supervise another practitioner supervising anesthesia, must be specified in the privileges granted to the individual practitioner.

When granting anesthesia privileges to a physician who is not an anesthesiologist, the ASC's governing body must consider the practitioner's scope of practice, State law, the individual competencies, education, and training of the practitioner and the practitioner's compliance with the ASC's other criteria for granting physician privileges.

When an ASC permits operating physicians to supervise CRNAs administering anesthesia, the governing body must adopt written policies that explicitly provide for this.

A CRNA is defined at §410.69(b) as a "…registered nurse who:

(1)     is licensed as a registered professional nurse by the State in which the nurse practices;

(2)     meets any licensure requirements the State imposes with respect to non-physician anesthetists;

(3)     has graduated from a nurse anesthesia educational program that meets the standards of the Council on Accreditation of Nurse Anesthesia Programs, or such other accreditation organization as may be designated by the Secretary; and

(4)     meets the following criteria:

(i)     has passed a certification examination of the Council on Certification of Nurse Anesthetists, or any other certification organization that may be designated by the Secretary; or

(ii)    is a graduate of a program described in paragraph (3) of this definition and within 24 months after that graduation meets the requirements of paragraph (4)(i) of this definition." A CRNA may administer anesthesia in an ASC when under the supervision of the operating physician.

If the ASC is located in a State where the Governor has submitted a letter to CMS attesting that he or she has consulted with State Boards of Medicine and Nursing about issues related to access to and the quality of anesthesia services in the State, and has concluded that it is in the best interests of the State's citizens to opt-out of the current physician supervision requirement, and that the opt-out is consistent with State law, then a CRNA may administer anesthesia without physician supervision.

An anesthesiologist's assistant is defined at §410.69(b) as a "…person who – (1) works under the direction of an anesthesiologist; (2) is in compliance with all applicable requirements of State law, including any licensure requirements the State imposes on nonphysician anesthetists; and (3) is a graduate of a medical school-based anesthesiologist's assistant education program that – (A) is accredited by the Committee on Allied Health Education and Accreditation; and (B) includes approximately two years of specialized basic science and clinical education in anesthesia at a level that builds on a premedical undergraduate science background." An anesthesiologist's assistant may administer anesthesia when under the direct supervision of an anesthesiologist. The anesthesiologist must be immediately available if needed, meaning the anesthesiologist is:

- Physically present in the ASC; and

- Prepared to immediately conduct hands-on intervention if needed.

A trainee who is a physician in training to be an anesthesiologist in a recognized graduate medical education program, or a student in a recognized nurse anesthesia or anesthesiologist's assistance educational program may administer anesthesia in an ASC when supervised by the operating physician, in the case of a nurse anesthetist trainee, or by an anesthesiologist, in the case of a physician trainee or an anesthesiologist's assistant trainee.

**Survey Procedures: §§482.42(b) and (c)**

- Prior to the survey, determine whether the State has exercised its CRNA physician supervision opt-out option.

- Review the qualifications of individuals authorized to deliver anesthesia in the ASC, to determine whether they are consistent with the regulatory requirements.

- Determine that there is documentation of current licensure or current certification status for all persons administering anesthesia.

- If the ASC uses CRNAs, anesthesiologist's assistants or trainees, interview the ASC's leadership to determine how they are supervised. Do the medical records indicate that required physician supervision is provided?

- When observing a procedure, look for evidence of appropriately trained practitioners with supervision as required by the regulations.

*Q-0064*
*(Rev. 137, Issued: 04-01-15, Effective: 03-27-15, Implementation: 03-27-15)*

*Standard level tag for*

*§416.42  Condition for Coverage:  Surgical Services*

*Surgical procedures must be performed in a safe manner by qualified physicians who have been granted clinical privileges by the governing body of the ASC in accordance with approved policies and procedures of the ASC.*

**Interpretive Guidelines:  §416.42**

**Qualified Physician:**  Surgery in an ASC may only be performed by a qualified physician.  With respect to ASCs, a physician is defined in accordance with §1861(r) of the Social Security Act to include a doctor of medicine or osteopathy, a doctor of dental surgery or dental medicine, and a doctor of podiatric medicine.  In all cases, the physician must be licensed in the State in which the ASC is located and practicing within the scope of his/her license.

In addition, the regulation requires that each physician who performs surgery in the ASC has been determined qualified and granted privileges for the specific surgical procedures he/she performs in the ASC. The ASC's governing body is responsible for reviewing the qualifications of all physicians who have been recommended by qualified medical personnel and granting surgical privileges as the governing body determines appropriate.

The ASC must have written policies and procedures that address the criteria for clinical staff privileges in the ASC and the process that the governing body uses when reviewing physician credentials and determining whether to grant privileges and the scope of the privileges for each physician. See the interpretive guidelines for §416.45(a), Medical Staff Membership and Clinical Privileges for further guidance.

**Safe Manner:** The surgical procedures that take place in the ASC must be performed in a "safe manner." "In a safe manner" means primarily that physicians and other clinical staff follow acceptable surgical standards of practice in all phases of a surgical procedure, beginning with the pre-operative preparation of the patient, through to the post-operative recovery and discharge. Acceptable standards of practice include maintaining compliance with applicable Federal and State laws, regulations and guidelines governing surgical services, as well as, any standards and recommendations promoted by or established by nationally recognized professional organizations (e.g., the American Medical Association, American College of Surgeons, Association of Operating Room Nurses, Association for Professionals in Infection Control and Epidemiology, etc.).

In addition, acceptable standards of practice include the use of standard procedures to ensure proper identification of the patient and surgical site, in order to avoid wrong site/wrong person/wrong procedure errors. Generally accepted procedures to avoid such surgical errors require:

- A pre-procedure verification process to make sure all relevant documents (including the patient's signed informed consent) and related information are available, correctly identified, match the patient, and are consistent with the procedure the patient and the ASC's clinical staff expect to be performed;

- Marking of the intended procedure site by the physician who will perform the procedure or another member of the surgical team so that it is unambiguously clear; and

- A "time out" before starting the procedure to confirm that the correct patient, site and procedure have been identified, and that all required documents and equipment are available and ready for use.

Conducting surgery in a safe manner also requires appropriate use of liquid germicides in the operating or procedure room. It is estimated that approximately 100 surgical fires occur each year in the United States, resulting in roughly 20 serious patient injuries, including one to two deaths annually. Fires occur when an ignition source, a fuel source, and an

oxidizer come together[1].  Heat-producing devices are potential ignition sources, while alcohol-based skin preparations provide fuel.  Procedures involving electro-surgery or the use of cautery or lasers involve heat-producing devices.  There is concern that an alcohol-based skin preparation, combined with the oxygen-rich environment of an anesthetizing location, could ignite when exposed to a heat-producing device in an operating room.  Specifically, if the alcohol-based skin preparation is improperly applied, the solution may wick into the patient's hair and linens or pool on the patient's skin, resulting in prolonged drying time.  Then, if the patient is draped before the solution is completely dry, the alcohol vapors can become trapped under the surgical drapes and channeled to the surgical site.

On the other hand, surgical site infections (SSI) also pose significant risk to patients; according to the Centers for Disease Control and Prevention (CDC)[2], such infections are the third most commonly reported healthcare associated infections.   Although the CDC has stated that there are no definitive studies comparing the effectiveness of the different types of skin antiseptics in preventing SSI, it also states that "Alcohol is readily available, inexpensive, and remains the most effective and rapid-acting skin antiseptic."[3]  Hence, in light of alcohol's effectiveness as a skin antiseptic, there is a need to balance the risks of fire related to use of alcohol-based skin preparations with the risk of surgical site infection.

The use of an alcohol-based skin preparation in ASCs is not considered safe, unless appropriate fire risk reduction measures are taken, preferably as part of a systematic approach by the ASC to preventing surgery-related fires.  A review of recommendations produced by various expert organizations concerning use of alcohol-based skin preparations in anesthetizing locations indicates there is general consensus that the following fire risk reduction measures are appropriate:

- Using skin prep solutions that are: 1) packaged to ensure controlled delivery to the patient in unit dose applicators, swabs, or other similar applicators; and 2) provide clear and explicit manufacturer/supplier instructions and warnings.  These instructions for use should be carefully followed;

- Ensuring that the alcohol-based skin prep solution does not soak into the patient's hair or linens.  Sterile towels should be placed to absorb drips and runs during application and should then be removed from the anesthetizing location prior to draping the patient;

- Ensuring that the alcohol-based skin prep solution is completely dry prior to draping.  This may take a few minutes or more, depending on the

---

[1] Tentative Interim Amendment (TIA 05-02) to (National Fire Protection Association) NFPA 99, 2005 edition, 13.4.1.2.2. Germicides and Antiseptics, issued July 29, 2005 and effective August 18, 2005.  See also AORN Guidance Statement: Fire Prevention in the Operating Room; and Patient Safety Advisory June 2005 (Vol. 2 No. 2) 14, Prepared by ECRI for the Pennsylvania Patient Safety Reporting System.
[2] CDC Hospital Infection Control Practices Advisory Committee, "Guideline for Prevention of Surgical Site Infection, 1999," Infection Control and Hospital Epidemiology April 1999 (Vol. 20 No. 4) 251.
3 Ibid, p. 257

amount and location of the solution. The prepped area should be inspected to confirm it is dry prior to draping; and

- Verifying that all of the above has occurred prior to initiating the surgical procedure. This can be done, for example, as part of a standardized pre-operative "time out" used to verify other essential information to minimize the risk of medical errors during the procedure.

ASCs that employ alcohol-based skin preparations in ORs or procedure rooms should establish appropriate policies and procedures to reduce the associated risk of fire. They should also document the implementation of these policies and procedures in the patient's medical record.

Failure by an ASC to develop and implement appropriate measures to reduce the risk of fires associated with the use of alcohol-based skin preparations in ORs or procedure rooms is cited as condition-level noncompliance with §416.44.

Requirements addressed in other ASC Conditions for Coverage are important components of the provision of surgical services in a "safe manner," and condition-level deficiencies in these other areas may also constitute condition-level noncompliance with the Surgical Services Condition. These other pertinent ASC regulatory requirements include:

- §416.44(a)(1), concerning operating room design and equipment – for example:

  - The surgical equipment and supplies are sufficient so that the type of surgery conducted can be performed in a manner that will not endanger the health and safety of the patient;

  - Surgical devices and equipment are monitored, inspected, tested, and maintained by the ASC in accordance with Federal and State law, regulations and guideline, and manufacturer's recommendations; and that

  - Access to the operative and recovery area is limited to authorized personnel and that the traffic flow pattern adheres to accepted standards of practice;

- §416.44(a)(2), concerning a separate recovery room;

- §416.44(a)(3) and §416.51, concerning infection control, for example:

  - The conformance to aseptic and, when applicable, sterile technique by all individuals in the surgical area;

  - That there is appropriate cleaning between surgical cases and appropriate terminal cleaning applied;

  - That operating room attire is suitable for the kind of surgical case

performed;

- That equipment is available for rapid "emergency" high-level disinfection or, as applicable, sterilization of operating room materials;

- That sterilized materials are packaged, handled, labeled, and stored in a manner that ensures sterility e.g., in a moisture- and dust-controlled environment, and policies and procedures for expiration dates have been developed and are followed in accordance with accepted standards of practice.

- That, as applicable, temperature and humidity are monitored and maintained within accepted standards of practice; and

- §416.44(c) & (d), concerning emergency equipment and personnel – for example:

  - That surgical staff are trained in the use of emergency equipment.

**Survey Procedures:  §416.42**

- Determine whether the ASC has policies and procedures that establish the criteria and process the governing body uses when granting surgical privileges to a physician. Ask for documentation that the governing body approved these policies and procedures.

- Ask the ASC to identify each physician who currently has surgical privileges or has had surgical privileges within the previous 6 months. Ask the ASC for documentation of the governing body's action to grant privileges to each of these physicians.  Conduct this review in conjunction with the review of compliance with §§416.45(a)&(b).

- For each surgical case record that is reviewed as part of the survey team's medical record review, verify that the individual performing the surgery was a physician who had been granted privileges by the ASC's governing body.

- Observe at least one surgical case from the pre-operative phase through to the recovery room and discharge phase in order to determine whether standard procedures are followed to avoid wrong site/procedure/patient surgical errors, and that the requirements described above are met.

- Determine whether the ASC employs appropriate measures to reduce the risk of surgical fires.

- Ask the ASC whether it has ever had a surgical fire, and if so, what follow-up actions did it take to prevent the recurrence of surgical fires.

## Q-0080
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

**§416.43  Condition for Coverage:  Quality Assessment and Performance Improvement**

**The ASC must develop, implement and maintain an ongoing, data-driven quality assessment and performance improvement (QAPI) program.**

Interpretive Guidelines:  §416.43

The QAPI CfC requires an ASC to take a proactive, comprehensive and ongoing approach to improving the quality and safety of the surgical services it delivers. The QAPI CfC presumes that ASCs employ a systems approach to evaluating their systems and processes, identifying problems that have occurred or that potentially might result from the ASC's practices and getting to root causes of problems rather than just superficially addressing one problem at a time.

From a survey perspective, the focus of the QAPI condition is not on whether an ASC has any deficient practices, but rather on whether it has an effective, ongoing system in place for identifying problematic events, policies, or practices and taking actions to remedy them, and then following up on these remedial actions to determine if they were effective in improving performance and quality.  QAPI programs work best in an environment that fixes problems rather than assigning blame.

For surveyors this can sometimes pose difficult challenges, because it requires a balancing act.  ASCs are not relieved of their obligation to comply with all Medicare CfCs, and surveyors are obligated when they find evidence of violations of a CfC to cite accordingly.  However, surveyors generally should avoid using the ASC's own QAPI program data and analyses as evidence of violations of other CfCs.  For example, an ASC that identifies problems with infection control through its QAPI program and takes effective actions to reduce the potential for transmission of infection would be taking actions consistent with the QAPI CfC.  Absent evidence independently collected by the surveyors of current noncompliance with the infection control CfC, it would not be appropriate for surveyors to use the infection control information in the ASC's QAPI program as evidence of violations of the infection control CfC.  There can be egregious cases under investigation where it might be appropriate to use QAPI program information as evidence of a deficiency, but these cases should be the exception rather than the rule.

CMS does not prescribe a particular QAPI program; it provides each ASC with the flexibility to develop its own program.  Each program must, however, satisfy the regulatory criteria:

- Ongoing – i.e., the program is a continuing one, not just a one-time effort. Evidence of this would include, but is not limited to, things like collection by the ASC of quality data at regular intervals; analysis of the updated data at regular intervals; and updated records of actions taken to address quality problems

identified in the analyses, as well as new data collection to determine if the corrective actions were effective.

- Data-driven – i.e., the program must identify in a systematic manner what data it will collect to measure various aspects of quality of care; the frequency of data collection; how the data will be collected and analyzed; and evidence that the program uses the data collected to assess quality and stimulate performance improvement.

**Survey Procedures: §416.43**

When there is a team surveying the ASC, survey of the QAPI Condition should be coordinated by one surveyor.

# Q-0081

**(Rev.56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.43(a) & §416.43(c)(1)

## §416.43(a) Standard:  Program Scope

**(1)    The program must include, but not be limited to, an ongoing program that demonstrates measurable improvement in patient health outcomes, and improves patient safety by using quality indicators or performance measures associated with improved health outcomes and by the identification and reduction of medical errors.**

**(2)    The ASC must measure, analyze, and track quality indicators, adverse patient events, infection control and other aspects of performance that includes care and services furnished in the ASC.**

## §416.43(c) Standard: Program Activities

**(1)    The ASC must set priorities for its performance improvement activities that –**

**(i)     Focus on high risk, high volume, and problem-prone areas.**
**(ii)    Consider incidence, prevalence and severity of problems in those areas.**
**(iii)   Affect health outcomes, patient safety and quality of care.**

**Interpretive Guidelines:  §416.43(a) & §416.43(c)(1)**

There are a variety of types of indicators that are currently in use for measuring and improving quality of healthcare.  This is also a rapidly changing field, as interest and research in patient safety and healthcare quality measurement grows.  As a result of a recommendation of a 1998 Presidential Advisory Commission, the National Quality

Forum (NQF), a public-private not-for-profit membership organization, was created in 1999 to develop and implement a national strategy for healthcare quality measurement and reporting. Since then NQF has developed detailed recommendations for ways to promote and measure quality and patient safety, including in ASCs. The federal Agency for Healthcare Quality and Research (AHRQ) supports research assessing the effectiveness of care practices and procedures. A number of other organizations are also active in the field of healthcare quality improvement and patient safety. As a result, ASCs have many choices of indicators to use.

Indicators can be broken down into several types:

- **Outcomes Indicators** measure results of care; typical outcomes measures include risk-adjusted mortality rates, complication rates, healthcare-associated infection rates, length of stay, readmission rates, etc. In the ASC setting, outcomes measures might focus on things like complication rates, healthcare-associated infection rates, cases exceeding 24 hours, transfers to hospitals, wrong site surgeries, etc.

- **Process of Care Indicators** measure how often the standard of care was met for patients with a diagnosis related to that standard. For example, in the ASC setting, measures might focus on the administration and time of prophylactic antibiotics.

- **Patient Perception Indicators** measure a patient's experience of the care he/she received in the ASC. AHRQ sponsored development of one patient experience of care instrument, H-CAHPS, that CMS now uses in reporting on hospital quality. There may be similar patient survey instruments that could be used in the ASC setting.

The regulation at **§416.43(a)** requires that an ASC's QAPI program must improve both patient health outcomes and patient safety in the ASC. In order to achieve these goals, the ASC's QAPI program must:

1. Be ongoing – i.e., the program is a continuing one, not just a one-time effort or occasional effort. Evidence that the ASC's program is ongoing would include, for example, collection by the ASC of quality data at regular intervals; analysis of the updated data at regular intervals; and updated records of actions taken to address quality problems identified in the analyses, as well as new data collection to determine if the corrective actions were effective.

2. Use quality indicators or performance measures associated with improved health outcomes in a surgical setting. The quality and safety indicators available differ in terms of the weight and type of evidence for their effectiveness in measuring quality. For some indicators there is compelling peer-reviewed research of an association with improved health outcomes. For others, typically process of care indicators, consensus among experts in the field suggests a strong association with improved quality of care. Indicators also differ in terms of how the data is collected, and how frequently the data should be collected.

   For example, measures of how quickly an ASC produces error-free billing claims,

while relevant to the ASC's financial performance and of interest to ASC governing bodies, have no direct relationship to the quality of care the ASC provides. On the other hand, a measure of the frequency with which the ASC administers antibiotic prophylaxis consistent with generally accepted standards of care would be related to improved health outcomes, i.e., prevention of surgical site infections. Likewise, an ASC could choose to collect data measuring its compliance with applicable National Quality Forum Safe Practices, or with applicable Centers for Disease Control and Prevention (CDC) infection control guidelines, or with guidelines issued by national professional societies, such as the American College of Surgeons, or with recommended practices developed by national accreditation organizations or other organizations specializing in healthcare quality improvement, such as the Institute for Healthcare Improvement. CMS does not prescribe a certain set of indicators/measures for ASCs to use, but ASCs must be able to demonstrate that the indicators they are tracking will enable them to improve outcomes for ASC patients.

The regulations at §416.43(c)(1) also require the ASC to set priorities in choosing its quality indicators/measures, because what is measured will determine where the ASC focuses its efforts to make changes that improve performance. For example, if the ASC does not track measures related to infection control, it will not be in a position to determine whether or not its infection control program is working well or poorly, and thus will not be in a position to improve it.

The ASC is required to focus on high risk, high volume, and problem-prone areas. It is required to consider, when selecting the measures/indicators that will shape its improvement activities in these areas, the following:

- The incidence, i.e., the rate or frequency at which problems occur in the ASC related to area measured by the indicator. "Incidence" is a technical term used in epidemiology, referring to the frequency with which something, such as a disease, appears in a particular population or area. In disease epidemiology, the incidence is the number of newly diagnosed cases during a specific time period. Applying this concept in the ASC setting, as an example, the annual incidence of surgical site infections in an ASC would be the rate that results when dividing the number of such infections that occurred in a calendar year by the total number of surgical cases in the ASC during that same year. Likewise, the annual incidence of emergency transfers to a hospital would be the rate that results when dividing the number of such transfers by the total number of surgical cases during the same year;

- The prevalence, i.e., how widespread something is in an ASC at a given point in time. "Prevalence" is also a technical term used in epidemiology, and is a statistical concept referring to the number of cases of a disease that are present in a particular population at a given time. In an ASC setting, for example, it would make little sense to employ measures related to prevalence of pressure ulcers among ASC patients, since the limited amount of time a patient typically spends in an ASC makes it unlikely that the ASC's care processes contributes to pressure ulcers. On the other hand a more appropriate measure might be periodic

observation of the hand hygiene practices of all staff providing direct patient care, in order to assess the prevalence of good versus deficient practices; and

- The severity of problems. For example, any single instance of a transfer of a patient to a hospital represents a serious adverse, unplanned outcome of the surgical procedure, and it would be appropriate for an ASC to track and evaluate all such cases, due to their severity, even if they are low volume incidents.

Once having identified the quality indicators it will use, the ASC must collect and analyze data on these indicators.

3. Identify and reduce medical errors/adverse patient events. Although there is no single, standard definition of a medical error or adverse event, the Institute of Medicine created a series of definitions related to patient safety that are helpful in understanding the regulatory requirement:

"An **error** is defined as the failure of a planned action to be completed as intended (i.e., error of execution) or the use of a wrong plan to achieve an aim (i.e., error of planning)."

"An **adverse event** is an injury caused by medical management rather than the underlying condition of the patient."

"An adverse event attributable to error is a **preventable adverse event**."[1]

Using these definitions, if an ASC performing orthopedic procedures operates on the right shoulder of a patient with a left shoulder rotator cuff injury requiring surgery, then the ASC has committed an error. The patient suffered an adverse event – i.e., the harm to the patient of undergoing surgery on the wrong shoulder, and presumably having to undergo yet another surgery on the correct shoulder. Because the ASC's error resulted in the adverse event, it is a preventable adverse event that could and should have been avoided.

Not every adverse event is the result of an error. For example, the standard of practice might call for use of a particular medication when certain indications are present. A patient might have an allergy to that medication that is unknown to the patient and the patient's physicians. The patient develops an allergic reaction to the medication, requiring further medical intervention to counteract the reaction. Due to the unknown nature of the patient's allergy, there was no error, even though there was an injury resulting from medical management. On the other hand, if the allergy had been documented in the patient's medical record and the medication had been administered anyway, this would constitute an error.

Not every error results in an adverse event; for example, an ASC with two operating rooms might mix up the records of two ASC patients scheduled to have the same orthopedic procedure, e.g., foot surgery, on the same date, but on the opposite feet. This is an error. But the ASC employs a time-out procedure to verify the identity of the patients and site of the surgery and recognizes the error

before surgery begins. The error did not result in an adverse event, but it was a near miss.

ASCs must track all patient adverse events, in order to determine through subsequent analysis whether they were the result of errors that should have been preventable, to reduce the likelihood of such events in the future. ASCs are also expected to identify errors that result in near misses, since such errors have the potential to cause future adverse events.

ASCs seeking initial enrollment in the Medicare program are unlikely to have collected extensive data for their QAPI program indicators, since they likely have been in operation for a relatively brief period of time. Nevertheless, these initial applicants must have a QAPI program in place, and must be able to describe how the program functions, including which indicators/measures are being tracked, at what intervals, and how the information will be used by the ASC to improve quality and safety.

**Examples of ASC Quality/Patient Safety Indicators**

The following information is based on the National Quality Forum's (NQF) consensus standards for ASCs, and is provided only as an illustration of several types of measures an ASC might choose to include in its QAPI program. An ASC is free to use different measures, so long as the measures it chooses meets the regulatory criteria. ASCs are also expected to develop additional measures related to infection control, for example to enable it to comply with the requirement at §416.51(b)(2) for its infection control program to be integrated into its QAPI program, and at §416.44(a)(3) to have a program to identify healthcare associated infections and report diseases as required under State law. Depending on the individual characteristics of the ASC, including problems it had experienced in the past, it may be necessary to track other additional indicators as well.

More information on these and other NQF ASC measures is available at:
**http://www.qualityforum.org/pdf/ambulatory/tbAMBALLMeasuresendorsed%2012-10-07.pdf**

- **Patient Burn** – Percentage of ASC admissions experiencing a burn prior to discharge. Approximately 100 surgical fires occur each year nationally, in all surgical settings, with about 20 resulting in serious injuries to patients.

- **Prophylactic Intravenous Antibiotic Timing** – Percentage of ASC patients who received appropriate antibiotics ordered for surgical site infection prophylaxis on time.

- **Hospital Transfer/Admission** – Percentage of ASC admissions requiring a hospital transfer or hospital admission prior to being discharged from the ASC.

- **Patient Fall** – Percentage of ASC admissions experiencing a fall in the ASC.

- **Wrong Site, Wrong Side, Wrong Patient, Wrong Procedure, Wrong Implant**

- Percentage of ASC admissions experiencing a wrong site, wrong side, wrong patient, wrong procedure, or wrong implant.

**Survey Procedures:  §416.43(a)**

- Ask the ASC's leadership to describe the QAPI program, including staff responsibilities for QAPI and the quality/safety indicators being tracked.

- Ask what the rationale is for the particular indicators that the ASC has chosen to track.  Are they based on nationally-recognized recommendations?  If not, what evidence does the ASC have that the indicators it has chosen are associated with improvement in patient health outcomes and safety?

    - At a minimum, do the indicators include cases of patients transferred from the ASC to a hospital?
    - At a minimum, do the indicators include measures appropriate for surgery and infection control measures?

    - At a minimum, does the ASC have a system for tracking adverse patient events?

- Ask the staff responsible for QAPI what the method and frequency is for data collection for each QAPI program indicator.

[1]P. 28, ToErr is Human, Institute of Medicine, November, 1999.

# Q-0082
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

# §416.43(b) and §416.43(c)(2) & (3)

## §416.43(b) Standard: Program Data

 **(1)  The program must incorporate quality indicator data, including patient care and other relevant data regarding services furnished in the ASC.**

 **(2)  The ASC must use the data collected to –**

   **(i)    Monitor the effectiveness and safety of its services, and quality of its care.**

   **(ii)   Identify opportunities that could lead to improvements and changes in its patient care.**

## §416.43(c) Standard:  Program Activities

**(2)    Performance improvement activities must track adverse patient events, examine their causes, implement improvements, and ensure that**

**improvements are sustained over time.**

**(3)** **The ASC must implement preventive strategies throughout the facility targeting adverse patient events and ensure that all staff are familiar with these strategies.**

**Interpretive Guidelines:  §416.43(b)& §416.43(c)(2) & (3)**

**Active Data Collection**

The ASC must not only have identified a number of indicators or measures of quality and patient safety, but it must actively collect data related to those measures at the intervals called for by its QAPI program.   Staff responsible for collection of the data should be trained in appropriate techniques to collect and maintain the data.

**Data Analysis**

Once having collected the data, the ASC must analyze it to monitor ASC performance, i.e., to determine what the data suggests about the ASC's quality of care and the effectiveness and safety of its services.  Analysis must take place at regular intervals, in order to avoid too much time elapsing before the ASC is able to detect problem areas.  In the case of data related to adverse events, the ASC must use the data to analyze the cause(s) of the adverse events.  Data collection and analysis must be conducted by personnel with appropriate qualifications to collect and interpret quantitative data.  CMS does not expect ASCs to engage in sophisticated statistical modeling of data, but calculation of incidence rates should be within the skill set of individual(s) conducting the analysis.  On the other hand, CMS does expect ASCs to conduct thorough analyses that focus on systemic issues.  For example, if the ASC's adverse event tracking system identifies a medication error that resulted in serious injury to a patient, the ASC would not be taking the type of systems approach mandated under the QAPI regulations if it states that the event was caused by the staff member who administered the medication incorrectly, and that its method for improving performance was to fire that staff member. An acceptable analysis would look at the root causes that facilitated the error by the staff member:  Were medications stored in a manner that increased the possibility of error?  Were the physician's orders clearly written?  Was the staff member appropriately trained?  Is there any evidence of similar errors made by other staff members, including errors that did not result in adverse events?  There are probably additional issues that should be investigated in order to fully understand the causes of the adverse event.  Once there is a thorough analysis of these causes, the ASC would then be in a better position to identify improvement strategies that are appropriately designed to address the underlying causes.

The ASC may choose to use contractors for technical aspects of the QAPI program, including analysis of data, but the ASC is also expected to actively involve ASC staff in the program and the ASC's leadership retains the responsibility for the ongoing management of the program, even when a contractor is used.

Analysis of the monitoring data must be used to identify areas where there is room for

improvement in the ASC's performance, as well as follow-up actions taken to improve performance. A good monitoring system, even in a good ASC surgical program, is likely to always find some areas of performance that are weaker than others. These identified areas of weakness present opportunities for the ASC to make changes in its systems, policies or procedures that result in improved patient care.

**Implement Improvements/Preventive Strategies**

Once the ASC's analysis of its data has identified opportunities for improvement, the ASC must develop specific changes in its policies, procedures, equipment, etc., as applicable, to accomplish improvements in the identified areas of weakness. In particular, an ASC must implement preventive strategies designed to reduce the likelihood of adverse events throughout the ASC. For example, if an ASC has three operating or procedure rooms, and it has an adverse event in a case in one of these rooms that is attributable in part to a confusing storage of emergency medications, the ASC should review the set up in each of the rooms to ensure that the same problem does not occur elsewhere.

**Sustaining Improvements**

The ASC must also have a method to ensure that the improvements it makes are sustained over time. For example, if an ASC's QAPI program identifies problems with hand hygiene in ASC staff providing care to patients, the ASC must be able to demonstrate that whatever solution it adopted to address this problem continues to work over time. Generally this means that the ASC must collect data on indicators that measure staff hand hygiene on an ongoing basis.

**Staff Training**

The ASC is required to make all staff aware of the strategies it has adopted for prevention of adverse events. For example, all staff who are involved in the preparation of a patient for the surgical procedure, as well as in the conduct of the surgical procedure, must be familiar with the ASC's strategies for avoiding wrong patient, wrong site, wrong side, wrong procedure, wrong implant, and adverse surgical events. All staff involved in the preparation and administration of injectable medications should be aware of standard safe injection practices designed to avoid the transmission of infectious disease. Staff should be encouraged to ask questions when they observe a practice, or receive an order, etc. that they believe might compromise patient safety or quality of care in the ASC.

**Prospective ASC's Applying for Initial Certification in Medicare**

A facility seeking initial certification as an ASC may not have been in operation long enough to demonstrate extensive data collection or the identification of opportunities for improvement based on the monitoring data. However, it must be able to show that it has an active data collection and analysis infrastructure in place as well as to indicate when it expects to have sufficient data to begin analysis and what procedures it has put in place to consider the results of QAPI program analyses.

**Survey Procedures:  §416.43(b)**

- Ask the ASC to show you examples of quality and adverse event data it is collecting.  Is the ASC collecting data on all of the indicators/measures it identified for its QAPI program?  Is it collecting the data at the frequency specified in its QAPI program?

- Ask the ASC who is responsible for the data collection and analysis, and what their qualifications are?  In particular, ask the ASC how it determines the causes of adverse events – does the ASC stop with the immediate cause (staff error, equipment failure, etc.) or does it probe to discover the underlying root causes of the adverse events?

- If ASC staff handle these duties, do they have education or training that equips them to conduct analyses of the data?

- Ask the ASC to provide examples of instances where it used QAPI data to identify opportunities for improving processes for providing care.  Ask how it evaluated whether the improvements were effective and sustained.

- Ask the ASC how it trains staff on ways to prevent adverse events from occurring.

- Ask ASC staff what they know about the ASC's QAPI program, focusing in particular on staff awareness of policies and procedures for preventing adverse events.

## Q-0083
**(Rev.56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.43(d) Standard:  Performance Improvement Projects.

**(1)     The number and scope of distinct improvement projects conducted annually must reflect the scope and complexity of the ASC's services and operations.**

**(2)     The ASC must document the projects that are being conducted.  The documentation, at a minimum, must include the reason(s) for implementing the project, and a description of the project's results.**

**Interpretive Guidelines:  §416.43(d)**

Every ASC must undertake one or more specific quality improvement projects each year.  Larger ASCs with multiple ORs or procedure rooms, multiple types of surgical procedures offered, or high volume of cases are expected to undertake more or more complex projects.  Furthermore, a highly complex improvement project might be of such scope that it could reasonably be the only project an ASC undertakes in a given year.

CMS does not specify particular projects that each ASC must undertake, but instead expects the projects to be based on the types of services the ASC furnishes, as well as other aspects of the ASC's operations. The requirement for annual projects does not mean that an ASC may not undertake a complex project that is expected to require more than 1 year in order to be completed.

The ASC must keep records on its performance improvement projects. Each project must, at a minimum, include an explanation of why the project was undertaken. The explanation must indicate what data collected in the ASC or based on recommendations of nationally recognized organizations leads the ASC to believe that the project's activities will actually result in improvements in patient health outcomes and safety in the ASC. For projects that are still underway, the ASC must be able to explain what activities the project entails, and how the impact of the project is being monitored. Unless the project has just begun, the ASC must be able to provide evidence that it is collecting data that will enable it to assess the project's effectiveness. For projects that are completed, the ASC must be able to show documentation that explains what the results of the project were, and what actions, if any, the ASC took in response to those results.

**Survey Procedures: §416.43(d)**

- Ask the ASC to show you documentation for performance improvement projects currently underway, as well as those completed in the prior year.

- If a large, complex, or high volume ASC has only one project underway, is the scope of that project such that it is likely to have a significant impact on the ASC's quality of care or patient safety?

- Does the ASC's documentation indicate the rationale for undertaking each project? Does the ASC have data indicating it had a problem in the area targeted for improvement, or could the ASC point to recommendations from a nationally recognized expert organization suggesting the activities?

- Does the documentation for the completed project(s) include the project's results? If a project was unsuccessful, ask the ASC what actions it took as a result of that information. If the project was successful, ask the ASC how it is sustaining the improvement.

# Q-0084
**(Rev.56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.43(e) Governing body responsibilities.

**The governing body must ensure that the QAPI program –**

**(1)   Is defined, implemented, and maintained by the ASC.**

**(2)   Addresses the ASC's priorities and that all improvements are evaluated for effectiveness.**

**(3)   Specifies data collection methods, frequency, and details.**

**(4)   Clearly establishes its expectations for safety.**

**(5)   Adequately allocates sufficient staff, time, information systems and training to implement the QAPI program.**

**Interpretive Guidelines:  §416.43(e)**

An ongoing, successful QAPI program requires the support and direction of the ASC's leadership.  This regulation makes clear CMS' expectations that the ASC's governing body must assume responsibility for all aspects of the design and and implementation of every phase of the QAPI program.  The governing body must assure that the ASC's QAPI program:

- Is defined, in writing, for example in the minutes of a meeting where the governing body established the program;

- Is actually implemented, with written evidence of this implementation, as well as evidence of knowledge of the program by the ASC's staff;

- Is implemented on an ongoing basis;

- Employs quality and patient safety indicators that reflect appropriate prioritization, as required by §416.43(c);

- Describes in detail the indicator data to be collected, how it will be collected, how frequently it will be collected;

- Uses the data collected and analyzed to improve the ASC's performance;

- Evaluates changes designed to improve the ASC's performance to determine whether they are effective, and takes appropriate actions to make further changes as needed;

- Is designed to establish clearly the governing body's expectations that patient safety is a priority, not only by the tracking of all adverse events, but also by the program's processes for analyzing and making changes in ASC operations to prevent future such events; and

- Has sufficient resources, i.e., the ASC's governing body must allocate sufficient and qualified staff (including consultants)**,** staff time, information systems and training to support the program.  Given the great variety in size and complexity among ASCs, the extent of resources required will vary as well.  However, the resources dedicated to the QAPI program must be commensurate with the ASC's

overall scope and complexity. The ASC must also be able to identify in detail the resources that it dedicates to the QAPI program.

**Survey Procedures: §416.43(e)**

- Does the ASC's QAPI program include all of the essential elements described above?

- Ask the ASC's leadership to explain how the governing body is involved in the QAPI program. Does the ASC's leadership display ready knowledge of the program's structure and activities. If a contractor is used for some portions of the program, does the ASC's leadership monitor closely the contractor's activities?

- Is there evidence of a governing body review of all elements of the QAPI program, e.g., meeting minutes?

- Ask the ASC's leadership how it uses the program to improve performance. Ask for evidence of changes made as a result of QAPI program activities.

- Ask the ASC's leadership for documentation of the details of the resources that are dedicated to the QAPI program. Is there evidence that these resources were actually made available as planned? For example, interview staff identified as having a role in the QAPI program to determine whether they actually perform QAPI functions, and for what percentage of their time. Is there evidence that planned data collections and analyses actually took place?

## Q-0100
**(Rev.56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.44  Condition for Coverage:  Environment

**The ASC must have a safe and sanitary environment, properly constructed, equipped, and maintained to protect the health and safety of patients.**

**Interpretive Guidelines:  §416.44**

The ASC must comply with requirements governing the construction and maintenance of a safe and sanitary physical plant, safety from fire, emergency equipment and emergency personnel.

**Survey Procedures:  §416.44**

A surveyor trained in surveying for the applicable Life Safety Code standards must survey for compliance with the Safety from Fire Standard; the rest of the standards under this Condition are surveyed by Health surveyors.

## Q-0101
*(Rev. 137, Issued: 04-01-15, Effective: 03-27-15, Implementation: 03-27-15)*

## §416.44(a) Standard: Physical Environment

**The ASC must provide a functional and sanitary environment for the provision of surgical services.**

**(1) Each operating room must be designed and equipped so that the types of surgery conducted can be performed in a manner that protects the lives and assures the physical safety of all individuals in the area.**

**Interpretive Guidelines: §416.44(a)(1)**

State Agencies may wish to assign surveyors who are trained in evaluating healthcare facility design and construction assist in evaluating compliance with this standard. "Operating room" *(OR)* in an ASC includes *not only traditional ORs, but also* procedure rooms, *including those where surgical procedures that do not require a sterile environment are performed*.

*ORs* must be designed in accordance with industry standards for the types of surgical procedures performed in the room, *including whether the OR is used for sterile and/or non-sterile procedures. Existing ORs must meet the standards in force at the time they were constructed, while new or reconstructed ORs must meet current standards. Although the term "OR" includes both traditional ORs and procedure rooms, this does not mean that procedure rooms must meet the same design and equipment standards as traditional operating rooms. In all cases, the OR design and equipment must be appropriate to the types of surgical procedures performed in it.*

National organizations, such as the Facilities Guidelines Institute, may be used as a source of guidance to evaluate OR design and construction in an ASC. If a State's licensure requirements include specifications for OR design and construction, the ASC must, in accordance with §416.40, comply with those State requirements.

The location of the OR within the ASC and the access to it must conform to accepted standards of practice, particularly for infection control, with respect to the movement of people, equipment and supplies in and out of the OR. The movement of staff and patients on stretchers must proceed safely, uninhibited by obstructions.

*The OR must also be appropriately equipped for the types of surgery performed in the ASC. Equipment includes both facility equipment (e.g., lighting, generators or other back-up power, air handlers, medical gas systems, air compressors, vacuum systems, etc.) and medical equipment (e.g., biomedical equipment, radiological equipment if applicable, OR tables, stretchers, IV infusion equipment, ventilators, etc.). Medical equipment for the OR includes the appropriate type and volume of surgical and anesthesia equipment, including surgical instruments. Surgical instruments must be available in a quantity that is commensurate with the ASC's expected daily procedure*

*volume, taking into consideration the time required for appropriate cleaning and, if applicable, sterilization. In addition, emergency equipment determined to be necessary in accordance with §416.44(c) must be either in or immediately available to the OR.*

The OR equipment must be inspected, tested and maintained appropriately by the ASC, in accordance with Federal and State law (including regulations) and manufacturers' recommendations.

Temperature, humidity and airflow in ORs must be maintained within acceptable standards to inhibit microbial growth, reduce risk of infection, control odor, and promote patient comfort. ASCs must maintain records that demonstrate they have maintained acceptable standards.

An example of an acceptable humidity standard for ORs is the American Society for Heating, Refrigerating, and Air Conditioning Engineers (ASHRAE) Standard 170, Ventilation of Health Care Facilities. Addendum D of the ASHRAE standard requires RH in ORs to be maintained between 20 - 60 percent. In addition, this ASHRAE standard has been incorporated into the Facility Guidelines Institute (FGI) 2010 Guidelines for Design and Construction of Health Care Facilities, and has been approved by the American Society for Healthcare Engineering of the American Hospital Association and the American National Standards Institute. *ASCs must also ensure, however, that the OR humidity level is appropriate for all of their surgical and anesthesia equipment, and that supplies which require a different level of humidity than that in the OR are appropriately stored until used.*

Each operating room should have separate temperature control. Acceptable standards for OR temperature, such as those recommended by the Association of Operating Room Nurses (AORN) or the FGI, should be incorporated into the ASC's policy. Equipment for rapid emergency sterilization of OR equipment/materials whose sterility has been compromised must be available on-site. However, an ASC that routinely uses sterilization procedures intended for emergency use only as its standard method of sterilization between cases, in order to reuse surgical instruments, must be cited for violating §§416.44(a)(1) & (3) and the Infection Control Condition at §416.51.

It is not necessary for the ASC to have equipment for routine sterilization of equipment and supplies on-site, so long as this service is provided to the ASC under arrangement.

**Survey Procedures: §416.44(a)**

- Verify the ASC's ORs meet applicable design standards.

- Verify the ASC has the right kind of equipment in the ORs for the types of surgery it performs.

- Verify the ASC has enough equipment, including surgical instrument sets, for the volume of procedures it typically performs.

- Verify the ASC has evidence, such as logs on each piece of electrical or mechanical equipment, indicating that it routinely inspects, tests, and maintains the equipment.

- Verify who within the ASC is responsible for equipment testing and maintenance.

- Considering the size of the OR and the amount and size of OR equipment, verify there is sufficient space for the unobstructed movement of patients and staff.

- Review the ASC's *temperature and humidity* records for ORs*,* to ensure that appropriate levels are maintained and that, if monitoring determined temperature or humidity levels were not within acceptable parameters, that corrective actions were performed in a timely manner to achieve acceptable levels.

## Q-0102
**(Rev.56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.44(a) Standard:  Physical Environment

## [The ASC must provide a functional and sanitary environment for the provision of surgical services.]

(2) **The ASC must have a separate recovery room and waiting area**.

**Interpretive Guidelines:  §416.44(a)(2)**

The ASC is required to have both a waiting area and a recovery room, which must be separate from each other as well as other parts of the ASC.  They may not be shared with another healthcare facility or physician office.  (See the interpretive guidelines for §416.2 concerning sharing of physical space by an ASC and another entity.)

There must be a room within the ASC where patients recover immediately after surgery. A "room" consists of an area with at least semi-permanent walls from floor to ceiling separating it from other areas of the ASC.  The recovery room must be equipped to allow appropriate monitoring of the patient's recovery.  The type of equipment required depends on the type(s) of surgery performed in the ASC.  The size of the recovery room must be commensurate with the number of ORs in the ASC and the expected volume of patients who will be in recovery simultaneously.

The recovery room may also be used for preoperative preparation of patients as well as for post-operative recovery, consistent with accepted standards of practice.  Under no circumstances, however, may the recovery room also be used as a general waiting area for patients awaiting preoperative preparation or for people who accompany patients. Likewise, patients recovering from surgery may not be placed in a waiting room or area,

unless they have already been discharged from the ASC and are, for example, waiting briefly while the adult who accompanied them brings a car to the ASC's entrance.

Consistent with accepted standards of practice, including infection control standards, and protection of patients' rights to privacy and confidentiality of their clinical information the ASC may permit individuals who accompany patients to be present in the recovery room during the patient's recovery from surgery.

**Survey Procedures: §416.44(a)(2)**

- Observe whether there is a separate room in which patients recover from their surgery, and whether it is appropriately equipped.

- Observe whether there is a separate waiting area for visitors and patients who have not yet begun preoperative preparation.

## Q-0104
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

## §416.44(b)  Standard: Safety From Fire

(1)     Except as otherwise provided in this section, the ASC must meet the provisions applicable to Ambulatory Healthcare Centers of the 2000 edition of the Life Safety Code of the National Fire Protection Association, regardless of the number of patients served.  The Director of the Office of the Federal Register has approved the NFPA 101® 2000 edition of the Life Safety Code, issued January 14, 2000, for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51.  A copy of the Code is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD and at the National Archives and Records Administration (NARA).  For information on the availability of this material at NARA, call 202-741-6030, or go to http://www.archives.gov/federal register/code_of_federal_regulations/ibr_locations.html.  Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269.  If any changes in this edition of the Code are incorporated by reference, CMS will publish notice in the Federal Register to announce the changes.

(2)     In consideration of a recommendation by the State survey agency, CMS may waive, for periods deemed appropriate, specific provisions of the Life Safety Code which, if rigidly applied, would result in unreasonable hardship upon an ASC, but only if the waiver will not adversely affect the health and safety of the patients.

(3)     The provisions of the Life Safety Code do not apply in a State if CMS finds that a fire and safety code imposed by State law adequately protects patients in an ASC.

(4)     An ASC must be in compliance with Chapter 21.2.9.1, Emergency Lighting, beginning on March 13, 2006.

(5)     Notwithstanding any provisions of the 2000 edition of the Life Safety Code to the contrary, an ASC may place alcohol-based hand rub dispensers in its facility if-

    (i)     Use of alcohol-based hand rub dispensers does not conflict with any State or local codes that prohibit or otherwise restrict the placement of alcohol-based hand rub dispensers in healthcare facilities;

    (ii)    The dispensers are installed in a manner that minimizes leaks and spills that could lead to falls;

    (iii)   The dispensers are installed in a manner that adequately protects against inappropriate access; and

    (iv)    The dispensers are installed in accordance with the following provisions:

        (A)  Where dispensers are installed in a corridor, the corridor shall have a minimum width of 6 ft (1.8m);

        (B)  The maximum individual dispenser fluid capacity shall be:

            (1)  0.3 gallons (1.2 liters) for dispensers in rooms, corridors, and areas open to corridors.

            (2)  0.5 gallons (2.0 liters) for dispensers in suites of rooms;

        (C)  The dispensers shall have a minimum horizontal spacing of 4 feet (1.2m) from each other;

        (D)  Not more than an aggregate of 10 gallons (37.8 liters) of ABHR solution shall be in use in a single smoke compartment outside of a storage cabinet;

        (E)  Storage of quantities greater than 5 gallons (18.9 liters) in a single smoke compartment shall meet the requirements of NFPA 30, Flammable and Combustible Liquids Code;

        (F)  The dispensers shall not be installed over or directly adjacent to an ignition source;

        (G)  In locations with carpeted floor coverings, dispensers installed directly over carpeted surfaces shall be permitted only in sprinklered smoke compartments; and

    (v)  The dispensers are maintained in accordance with dispenser manufacturer guidelines.

**Interpretive Guidelines: §416.44(b)**

Because ASCs are not permitted to provide care to patients exceeding 24 hours, they are, for purposes of compliance with National Fire Protection Association (NFPA) Life Safety Code (LSC) requirements, subject to a combination of healthcare and business occupancy requirements. They are, therefore, unlike hospitals and other facilities that keep patients more than 24 hours, which are considered healthcare occupancies.

Compliance with LSC requirements for an ASC is assessed by a surveyor trained in the application of NFPA LSC standards.

The provisions of the NFPA LSC (2000 edition), Chapter 20, New Ambulatory Health Care Occupancies, apply as of January 10, 2003, the date when CMS adopted the NFPA 2000 edition for ASCs, to any new buildings used for an ASC, alterations to existing ASCs, and alterations to existing buildings for new occupation by an ASC. The chapter includes: general requirements regarding structure and applicability; means of egress requirements; requirements related to protection from hazards, alarms and other emergency requirements, and subdivision of space; building services; and operating features. For older ASCs that have not undergone renovations, the provisions of chapter 21, Existing Ambulatory Health Care Occupancies apply.

**Emergency Power**

The NFPA 2000 LSC requires that when general anesthesia or life support equipment is used, the ambulatory health care facility (ambulatory surgical center) shall be provided with an essential electrical system in accordance with NFPA 99, Health Care Facilities, 1999 edition. For ASCs newly constructed or renovated after January 10, 2003, a Type 1 essential electrical system shall be installed which may include a generator as the source of back-up electrical power. Existing ASCs may continue to use a Type 3 electrical system and may continue to use batteries as the source of back-up electrical power. Existing ASCs that change procedures that include the use of general anesthesia or life support equipment not previously required will be required to upgrade their existing electrical system to a Type 1 system including a generator back-up electrical source of power. In all cases, ASCs are expected to have a reliable source of back-up power that enables them to protect patients and staff when power is lost, including proceeding with the surgical procedure until such point as it is safe to either terminate or complete it.

**Use of Alcohol-based Skin Preparations**

See the interpretive guidelines for §416.42 related to use of alcohol-based skin preparations in anesthetizing locations. In light of alcohol's effectiveness as a skin antiseptic, there is a need to balance the risks of fire related to use of alcohol-based skin preparations with the risk of surgical site infection by:

- Using skin prep solutions that are: 1) packaged to ensure controlled delivery to the patient in unit dose applicators, swabs, or other similar applicators; and 2) provide clear and explicit manufacturer/supplier instructions and warnings;

- Ensuring that the alcohol-based skin prep solutions do not soak into the patient's hair or linens. Sterile towels should be placed to absorb drips and runs during application and should then be removed from the anesthetizing location;

- Ensuring that the alcohol-based skin prep solution is completely dry prior to draping. This may take a few minutes or more, depending on the amount and location of the solution. The prepped area should be inspected to confirm it is dry prior to draping;

- Verifying that all of the above has occurred prior to initiating the surgical procedure. This can be done, for example, as part of a standardized preoperative "time out" to minimize the risk of medical errors during the procedure such as verifying that the patient is receiving the correct surgery.

Failure to take these measures to reduce the risk of surgical fire when an alcohol-based skin preparation is used must be cited as a condition-level violation of §416.44.

**State Code in Lieu of LSC**

The process by which CMS reviews a State's request to use of its State Code in lieu of the NFPA LSC is addressed in Survey and Certification policy memorandum S&C-08-34, September 5, 2008. CMS will advise any SA when and if it approves a State application to use the State Code in lieu of the LSC.

**Survey Procedures:  §416.44(b)**

- States vary as to the type of personnel who conduct surveys for compliance with LSC requirements. Some States use fire authority personnel, while others use architects, engineers, or healthcare professionals with LSC training. In all cases, however, the surveyors must have training in the application of the NFPA's LSC Standards to ASCs and must follow the guidance in Appendix I.

- Health surveyors observing ASC surgical case(s) should determine whether the ASC employs appropriate measures to reduce the risk of surgical fire when alcohol-based skin preparations are used.

## Q-0105
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

## §416.44(c) Standard: Emergency Equipment

**The ASC medical staff and governing body of the ASC coordinates, develops, and revises ASC policies and procedures to specify the types of emergency equipment required for use in the ASC's operating room.  The equipment must meet the following requirements:**

(1) Be immediately available for use during emergency situations.

(2) Be appropriate for the facility's patient population.

(3) Be maintained by appropriate personnel.

**Interpretive Guidelines §416.44(c)**

The ASC's medical staff and governing body must adopt written policies and procedures that address the specific types of emergency equipment that must be available for use in the ASC's operating room. No specific list of emergency equipment is specified in the rule, but the ASC is expected to maintain a comprehensive, current and appropriate set of emergency equipment, supplies and medications that meet current standards of practice and are necessary to respond to a patient emergency in the ASC.

The ASC must conduct periodic assessments of its policies and procedures in order to anticipate the emergency equipment, supplies and medications that may be needed to address any likely emergencies, taking into consideration the types of patients the ASC serves and the types of procedures performed in the ASC.

The ASC must provide the appropriate emergency equipment and supplies and qualified personnel necessary to meet the emergency needs of the ASC's entire patient population in accordance with acceptable standards of practice in the ASC industry. Acceptable standards of practice include adhering to State laws as well as standards or guidelines issued by nationally recognized professional organizations, etc. The ASC's policies and procedures must be written and ensure the emergency equipment is immediately available for use during emergency situations; be appropriate for the facility's patient population; and be maintained by appropriate personnel.

**Immediately available for use**

The ASC must have an adequate supply of emergency equipment and supplies immediately available to the operating room(s) (OR). The equipment and supplies must be in working condition. The ASC's policies must address whether the equipment and supplies must be present in each OR, or in what quantity and locations they will be available to all ORs as needed.

In the case of an ASC with more than one OR, the medical staff should adopt a policy, in writing, that addresses:

- The type and quantity of emergency equipment and supplies that must be present in each OR; and

- For equipment not present in each OR, how many items must be available and in which locations so that the equipment is immediately available when needed in each OR.

The ASC must have qualified personnel capable of using all emergency equipment as necessary. Personnel must be able to utilize the emergency equipment in accordance

with their scope of practice. There is no requirement for all ASC clinical personnel to be able to use all emergency equipment; however, whenever there is a patient in the OR, there must always be staff present capable of using the emergency equipment.

Although the regulation addresses availability of emergency equipment to the OR specifically, a prudent ASC should also make emergency equipment, supplies and medications available for patients in the recovery room.

**Appropriate for the ASC's patient population**

The policies and procedures must incorporate the emergency equipment, supplies, and medications that are most suitable for the potential emergencies associated with the procedures performed in the ASC and the population the ASC serves. The ASC's policies must take into account the ASC's patient population, particularly, any risks or co-morbidities prevalent among that patient population. The ASC must consider the types of procedures performed as well as the risks and types of emergencies that the ASC may face based on those types of procedures. For example, if an ASC routinely provides care to pediatric patients, it must ensure that it has equipment and supplies that are the appropriate size for pediatric patients.

The ASC would also need to take into account the types of anesthesia used for the procedures performed. It would be expected that an ASC using general anesthesia is doing more complicated procedures that may have a higher risk of emergent complications, in addition to the risks associated with the use of general anesthesia. The ASC would be expected to have a more extensive supply of emergency equipment, supplies and medications than an ASC which only uses local anesthesia to perform low-risk procedures. For example, if an ASC uses anesthetics that carry a risk for malignant hyperthermia, then the ASC is expected to have supplies of medications required to treat this emergency condition. The amount of medication that must be immediately available is to be based on available information on the frequency with which malignant hyperthermia may occur, as well as ASC patient characteristics, since the dosage for the emergency medication is weight-based. An ASC that performs bariatric procedures on obese patients would need to have more emergency medications available than would an ASC that specializes in pediatric procedures.

**Maintained by appropriate personnel**

The ASC must ensure that mechanical and electrical equipment must be regularly inspected, tested, and maintained to assure their availability when needed. Emergency supplies and medications must be regularly monitored and replaced when they are removed for use or expire. The ASC must use qualified personnel to maintain emergency equipment, supplies and medications. The ASC may use contracted personnel to perform these functions.

**Survey Procedures: §416.44(c)**

- Ask to see the ASC's policies and procedures on emergency equipment and supplies. Has the ASC identified supplies and equipment that are likely to be

needed in emergency situations?

- Ask the ASC how it determined that the specified emergency equipment, supplies and medications meet the emergency needs of the ASC's patients, taking into account the patient population and types of procedures performed and anesthesia used.

- For ASCs with multiple ORs, does the policy clearly identify the quantity of equipment, supplies and medications required and their location?

- Determine whether the designated emergency equipment is immediately available to the OR(s) if needed.

- Interview ASC clinical staff to determine if they know where the emergency equipment is located.

- Verify that there are sufficient clinical personnel qualified to utilize the emergency equipment, medications and supplies.

- Ask the ASC how it would handle simultaneous emergencies, e.g., an emergency in more than one OR, or an emergency in the OR and another one in the recovery room.

- Is there evidence that mechanical or electrical equipment is regularly inspected, tested, and maintained by qualified personnel?

- Are emergency supplies and medications current or expired?

## Q-0106
**(Rev.56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.44(d)  Standard:  Emergency Personnel

**Personnel trained in the use of emergency equipment and in cardiopulmonary resuscitation must be available whenever there is a patient in the ASC.**

**Interpretive Guidelines: §416.44(d)**

Whenever there is a patient who has been registered in the reception area and not yet discharged from the ASC, including patients in the waiting area, in pre-operative preparation, in surgery, or in the recovery room, the ASC must also have clinical personnel present who have appropriate training and competence in the use of the requirement emergency equipment and supplies.  It is not necessary for the ASC to have

one person who knows how to use all the equipment/supplies, so long as for each type of equipment/supply there is always some staff member present who is competent to use it. For example, performing a tracheostomy is outside the scope of practice of a registered nurse and must be performed by a physician. On the other hand, use of an ambu-bag is within the RN's scope of practice.

There must also be staff present in the ASC who are trained in cardiopulmonary resuscitation (CPR) techniques. Although the regulation does not require that staff must be trained in advanced cardiac life support (ACLS) techniques, an ASC would be well-advised to consider having staff trained in ACLS, depending on the types of surgery performed and the characteristics of the ASC's patient population.

For ASCs that perform multiple procedures simultaneously, or have multiple persons in the recovery room simultaneously, there must be sufficient trained personnel to deal with multiple simultaneous emergencies.

**Survey Procedures: §416.44(d)**

- Request documentation that confirms the ASC has staff with the requisite training and competence to use all required emergency equipment and supplies, and in cardiopulmonary resuscitation.

- Ask for evidence that someone trained in the use of the emergency equipment/supplies is available whenever there is a patient in the ASC.

- Interview staff identified as having emergency responsibilities to determine if they are aware of their role in handling an emergency. Do they know where the emergency equipment/suppliers are kept?

- Ask staff with emergency responsibilities what the ASC's procedures are when a staff member designated to handle emergencies is participating in a procedure on another patient? What type of back-up system is available?

# Q-0120
**(Rev.56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.45  Condition for Coverage:  Medical Staff

**The medical staff of the ASC must be accountable to the governing body.**

**Interpretive Guidelines  §416.45**

The organization of the medical staff is left to the discretion of the governing body, but however the staff is organized, the ASC must have an explicit, written policy that indicates how the medical staff is held accountable by the governing body. The policy must address all requirements in this condition. Medical staff privileges may be granted both to physician and non-physician practitioners, consistent with their permitted scope

of practice in the State, as well as their training and clinical experience.

It is possible for an ASC to be owned and operated by one physician, who could be both the sole member of the governing body and also the sole member of the ASC's medical staff. In such cases the physician owner must nevertheless implement a formal process for complying with all medical staff regulatory requirements.

**Survey Procedures §416.45**

**Ask the ASC's leadership for its policy detailing how the governing body holds the medical staff accountable.**

# Q-0121
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

**§416.45(a) Standard: Membership and Clinical Privileges**

**Members of the medical staff must be legally and professionally qualified for the positions to which they are appointed and for the performance of privileges granted. The ASC grants privileges in accordance with recommendations from qualified medical personnel.**

**Interpretive Guidelines §416.45(a)**

All members of the ASC's medical staff and all clinicians granted medical staff privileges must be appointed to their position within the ASC by the ASC's governing body. They must be granted privileges by the governing body, in writing, that specify in detail the types of procedures they may perform within the ASC. It is not sufficient for the governing body to grant privileges to "perform surgery" or even to perform "orthopedic surgery." For example, an ASC that specializes in orthopedic surgery of various types must specify which types of procedures each surgeon is privileged to perform.

The ASC's governing body must assure that medical staff privileges are granted only to legally and professionally qualified practitioners.

"Legally qualified" means the practitioner has a current license to practice within the State where the ASC is located, and that the privileges to be granted fall within that State's permitted scope of practice. The ASC must verify that each practitioner has a current professional license and document the license in the practitioner's file.

"Professionally qualified" means that the practitioner has demonstrated competence in the area for which privileges are sought. Competence is demonstrated through evidence of specialized training and experience, e.g., certification by a nationally recognized professional board.

The governing body is also required to solicit the opinion of qualified medical personnel on the competence of applicants for privileges. The recommendation provided must be in

writing, and should include a supporting rationale. The qualified medical personnel may be current members of the ASC's medical staff, but may also be physicians not practicing in the ASC. ASCs should consider seeking the recommendations of qualified outside physicians when they do not have appropriate expertise in-house to evaluate the competency of an applicant for privileges. This is particularly advisable when the ASC's governing body consists of one physician owner who is also the sole member of the medical staff. The ASC's governing body is not required to accept the recommendation provided by the qualified medical personnel to grant, deny, or restrict privileges to a practitioner. However, when the ASC's governing body makes a decision contrary to the recommendation, it is expected to document its rationale for doing so.

The ASC should document the process by which the governing body grants medical staff privileges, including the documentation, or credentials, it reviews for each candidate, the criteria it uses in evaluating the candidate, how it selects the qualified medical personnel who make recommendations on the practitioner's qualifications, and whether and under what circumstances the governing body may make a privileging decision contrary to the recommendation of the qualified medical staff.

**Survey Procedures: §416.45(a)**

Ask the ASC's leadership to explain its process for granting clinical privileges.

Review the personnel records for all medical staff that have been granted clinical privileges.

There must at a minimum be documentation of:

- State licensure, registration, or state certification, as applicable;
- Certification by a specialty organization, as appropriate;

- Other training or pertinent experience;

- Evidence of a recommendation by qualified medical personnel concerning the practitioner's competence;

- The scope of the privileges granted to the practitioner; and

- If the governing body granted privileges against the recommendation of the qualified medical personnel, its rationale for doing so.

Does the review of each practitioner's record provide evidence that they are legally and professionally qualified to exercise the privileges granted them by the ASC?

# Q-0122
*(Rev. 137, Issued: 04-01-15, Effective: 03-27-15, Implementation: 03-27-15)*

# §416.45(b)  Standard: Reappraisals

**Medical staff privileges must be periodically reappraised by the ASC. The scope of procedures performed in the ASC must be periodically reviewed and amended as appropriate.**

**Interpretive Guidelines: §416.45(b)**

The ASC's governing body must have a process reappraising the medical staff privileges granted to each practitioner. CMS recommends a reappraisal at least every 24 months. The reappraisal must include:

- Review of the practitioner's current credentials; and

- The practitioner's ASC-specific case record, including measures employed in the ASC's quality assurance/performance improvement program, such as emergency transfers to hospitals, post-surgical infection rates, other surgical complications, etc.

The ASC's governing body should use a similar process, including the recommendation of qualified medical personnel, for the periodic reappraisal as it used when initially granting privileges.

Based on the evidence, the ASC's governing body must decide whether to continue the practitioner's current privileges without change, or to amend those privileges by contracting or expanding them, or by withdrawal of the practitioner's privileges entirely.

The ASC must also reappraise a practitioner any time the practitioner seeks to perform procedures outside the scope of previously granted procedures.

The ASC should also develop triggers for reappraisal of privileges outside the periodic reappraisal schedule.

In the case of an ASC whose sole member of the governing body is also a member of the ASC's medical staff, it would be advisable to seek the recommendation of outside qualified medical personnel who review not only the physician's credentials, but also evidence of the physician's performance in the ASC.

**Survey Procedures: §416.45(b)**

- Does the ASC periodically reappraise all practitioners granted clinical privileges?

- Ask the ASC's leadership how it re-evaluates the professional qualifications of practitioners with privileges to practice in the ASC?

- Review the personnel records for all practitioners with privileges to practice in the ASC to determine whether they have been reappraised

within the timeframe specific in the medical staff policy.

- Do the reappraisals include evidence that data on the practitioner's practice within the ASC is considered along with the practitioner's credentials?

## Q-0123
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

**§416.45(c)  Standard:  Other Practitioners**

**If the ASC assigns patient care responsibilities to practitioners other than physicians, it must have established policies and procedures, approved by the governing body, for overseeing and evaluating their clinical activities.**

**Interpretive Guidelines:  §416.45(c)**

Patient care responsibilities (which may or may not include formal medical staff privileges, but excluding nursing care services) may be assigned to licensed practitioners not meeting the definition of physician in §1861(r) of the Act.  "Physician" is defined in §1861(r) of the Social Security Act as:

- Doctor of medicine or osteopathy;

- Doctor of dental surgery or of dental medicine;

- Doctor of podiatric medicine;

- Doctor of optometry with respect to services legally authorized to be performed in the State; and

- Chiropractor with respect to treatment by manual manipulation of the spine (to correct subluxation diagnosed by x-ray).

When an ASC uses licensed practitioners to provide patient care, other than nursing care, the ASC's governing body must approve written policies and procedures that establish a system for overseeing and evaluating the quality of the clinical services provided by other practitioners.  The policies must address:

- The specific types of clinical activities that each class of practitioner, e.g., Nurse Practitioner, Physician's Assistant, CRNA, will be eligible to perform.  The ASC may not permit performance of any activities that are outside the licensed practitioner's permitted scope of practice under applicable State law;

- The process by which the ASC exercises oversight over each class of practitioner. Depending on the practitioner's scope of practice, physician supervision of the practitioner may be required; in other cases oversight through collaborative practice with a physician or some other means may suffice;

- The process and criteria for reviewing the qualifications of each individual practitioner before he/she is permitted to provide patient care; and

- The process, criteria and frequency for evaluating the performance in providing clinical services by practitioners other than physicians. Evaluations must take place at regular intervals specified in the ASC's policy.

**Survey Procedures:  §416.45(c)**

- Determine whether the ASC uses licensed practitioners other than physicians to provide care, other than nursing care, within the ASC. If it does:

  - Ask to see the ASC's policy governing the oversight and evaluation of practitioners other than physicians. Does the policy address all required issues?

  - Review the personnel files for each licensed practitioner who is not a physician providing patient care in the ASC. Does each file contain evidence of the practitioner's qualifications, consistent with the ASC's policy? Does each file contain evidence of periodic evaluation of the practitioner's performance?

## Q-0140
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

**§416.46  Condition for Coverage:  Nursing Service**

**The nursing services of the ASC must be directed and staffed to assure that the nursing needs of all patients are met.**

**Interpretive Guidelines:  §416.46**

The ASC must ensure that the nursing service is directed under the leadership of an RN. The ASC must have documentation that it has designated an RN to direct nursing services.

There must be sufficient nursing staff with the appropriate qualifications to assure the nursing needs of all ASC patients are met. This implies that there is ongoing assessment of patients' needs for nursing care, and that identified needs are addressed. The number and types of nursing staff needed will depend on the volume and types of surgery the ASC performs.

**Survey Procedures:  §416.46**

- Ask the ASC's leadership to identify the person responsible for the direction of nursing services within the ASC. Is that person an RN?

- Review the staffing available for patients undergoing surgery during the survey; is there sufficient staff to address each patient's nursing needs?

Do nursing staff have the appropriate qualifications for the tasks they are asked to perform?

## Q-0141
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

**§416.46(a)  Standard:  Organization and Staffing**

**Patient care responsibilities must be delineated for all nursing service personnel. Nursing services must be provided in accordance with recognized standards of practice.  There must be a registered nurse available for emergency treatment whenever there is a patient in the ASC.**

**Interpretive Guidelines:  §416.46(a)**

Every nurse in the ASC must have clearly delineated assigned responsibilities for providing nursing care to patients.  These assignments must be in writing; job descriptions would suffice for a general articulation of the responsibilities for each nurse. Individual patient assignments on a given day must be documented clearly in the assignment sheet.

The ASC's nursing services must be consistent with recognized standards of practice. "Recognized standards of practice" means that the services provided are consistent with State laws governing nursing scope of practice, as well as with nationally recognized standards or guidelines for nursing care issued by organizations such as the American Nurses Association, the Association of Operating Room Nurses, etc.

An RN with specialized training or experience in emergency care must be available to provide emergency treatment whenever there is a patient in the ASC.  "Available" means on the premises and sufficiently free from other duties that the nurse is able to respond rapidly to emergency situations.  In accordance with the requirements at §416.44(d), the ASC must have personnel present who are trained in the use of the required emergency equipment specified at §416.44(c) and in cardiopulmonary resuscitation whenever there is a patient in the ASC.  The RN(s) designated to provide emergency treatment must be able to use any of the required equipment, so long as such use falls within an RN's scope of practice.  ASC's would be well advised to assure that the RN(s) designated to provide emergency treatment have training in advanced cardiac life support interventions.

**Survey Procedures:  §416.46(a)**

- Are the general responsibilities for each ASC nurse for providing patient care clearly documented?

- Ask the nursing staff to explain what their duties for the day of the survey are; can they articulate clearly what their patient care responsibilities are?

- Ask the ASC to explain how it evaluates the nursing care provided in the ASC for conformance to acceptable standards of practice.

- Ask the ASC to identify the RN(s) who are available for emergency treatment. Is there documentation of their qualifications to provide emergency treatment? Do staff in the ASC know which RN(s) (as well as medical staff) to call when a patient develops an emergency?

- Ask the ASC for evidence that one or more RN(s) are readily available to provide emergency treatment. How do they assure that an RN can leave their current task to respond to the emergency without putting another patient at risk of harm?

## Q-0160
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

## §416.47  Condition for Coverage:  Medical Records

**The ASC must maintain complete, comprehensive, and accurate medical records to ensure adequate patient care.**

**Interpretive Guidelines:  §416.47**

The ASC must have a complete, comprehensive and accurate medical record for each patient. Material required under other Conditions, such as the history and physical examination or documentation of allergies to drugs and biologicals required under §416.52, must be incorporated into the medical record in a timely fashion. The ASC must use the information contained in each medical record in order to assure that adequate care is delivered to each ASC patient. In accordance with the provisions of the Patients' Rights Condition at §416.50(g), the ASC must ensure the confidentiality of each patient's medical record.

**Survey Procedures:  §416.47**

Review a sample of active and closed medical records for completeness and accuracy in accordance with Federal and State laws and regulations and ASC policy. If patient records are not collected in a systematic manner for easy access, annotate this on the survey report form.

## Q-0161
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

**§416.47(a)  Standard:  Organization.  The ASC must develop and maintain a system for the proper collection, storage, and use of patient records.**

**Interpretive Guidelines:  §416.47(a)**

The ASC must have a documented system that enables it to systematically develop a unique medical record for each patient, permit timely access to the medical record to support the delivery of care, and to store records.  Records may exist in hard copy, electronic format, or a combination of the two media.

The regulation does not prescribe how long a closed record is to be maintained by the ASC, but many States have laws governing retention of medical records.

**Survey Procedures:  §416.47(a)**

- Review the ASC's medical record policy and interview the person responsible for the medical records to ascertain that the system is structured appropriately.

- If the ASC employs a fully or partially electronic medical record system, ask clinical personnel to demonstrate how they use the system in order to determine whether they are able to make entries and access needed information in order to support the provision of care.

- Determine that closed records are retained in accordance with applicable State law.

- Review a sample of active and closed medical records for completeness and accuracy in accordance with Federal and State laws and regulations and ASC policy. If patient records are not collected in a systematic manner for easy access, annotate this on the survey report form.

## Q-0162
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

**§416.47(b)  Standard:  Form and Content of Record**

**The ASC must maintain a medical record for each patient.  Every record must be accurate, legible, and promptly completed.  Medical records must include at least the following:**

**(1)    Patient identification;**

(2)    Significant medical history and results of physical examination;

(3)    Pre-operative diagnostic studies (entered before surgery), if performed;

(4)    Findings and techniques of the operation including a pathologist's report on all tissues removed during surgery, except those exempted by the governing body;

(5)    Any allergies and abnormal drug reactions;

(6)     Entries related to anesthesia administration;

(7)     Documentation of properly executed informed patient consent; and

(8)     Discharge diagnosis.

**Interpretive Guidelines:  §416.47(b)**

The medical record must contain all of the required elements listed in the regulation. Specifically:

- The identity of the patient must be clear through use of identifiers such as name, date of birth, social security number, etc.

- A comprehensive medical history and physical assessment (H&P), completed and entered into the medical record in accordance with the requirements at §416.52, as well as the results of the pre-surgical assessments specified at §416.42 and §416.52.

- If pre-operative diagnostic studies were performed, they must be included in the medical record prior to the start of surgery.

- An operative report that describes the surgical techniques and findings.  A pathologist's report on all tissues removed during surgery must also be included, unless the governing body has adopted a written policy exempting certain types of removed tissue from this requirement.  Depending on the type of surgery performed in the ASC, tissue may or may not routinely be removed during surgery; no pathologist's report is required when no tissue has been removed. The governing body's policy on exemption should provide the clinical rationale supporting the exemption decision.  For example, an ASC that performs cataract removal and implantation of an artificial lens might exempt from the pathologist's report requirement the ocular lens removed in routine procedures where there is no indication suggesting the presence of other disease for which a pathology analysis should be required.  On the other hand, it generally would not be reasonable to exempt intestinal polyps removed during a colonoscopy, since a pathologist's analysis of the tissue would be required to confirm whether or not the polyp(s) were malignant growths.

- The patient's history of allergies or abnormal drug reactions prior to the surgery, as well as any allergies or abnormal drug reactions that occurred during or after the surgery prior to discharge.

- Information related to the administration of anesthesia during the procedure and the patient's recovery from anesthesia after the procedure.

- Documentation of a properly executed informed patient consent.  A well-designed

informed consent process would most likely include a discussion of the following elements:

- A description of the proposed surgery, including the anesthesia to be used;

- The indications for the proposed surgery;

- Material risks and benefits for the patient related to the surgery and anesthesia, including the likelihood of each, based on the available clinical evidence, as informed by the responsible practitioner's clinical judgment. Material risks could include risks with a high degree of likelihood, but a low degree of severity, as well as those with a very low degree of likelihood, but a high degree of severity;

- Treatment alternatives, including the attendant material risks and benefits;

- Who will conduct the surgical intervention and administer the anesthesia;

- Whether physicians other than the operating practitioner will be performing important tasks related to the surgery. Important surgical tasks include: opening and closing, dissecting tissue, removing tissue, harvesting grafts, transplanting tissue, administering anesthesia, implanting devices and placing invasive lines; and

- Whether, as permitted by State law, qualified medical practitioners who are not physicians will perform important parts of the surgery or administer the anesthesia, and if so, the types of tasks each type of practitioner will carry out; and that such practitioners will be performing only tasks within their scope of practice for which they have been granted privileges by the ASC.

- Documentation of the patient's discharge diagnosis. The record should also include the patient's disposition, i.e., whether the patient was discharged to home (including to a nursing home for patients already resident in a nursing home at the time of surgery), or transfer to another healthcare facility, including emergent transfers to a hospital.

Survey Procedures: §416.47(b)

- Evaluate the sample of open and closed records selected for review to determine whether they contain all of the required elements. For open records of patients whose surgery has not yet begun, focus on the elements that must be present before surgery, e.g., H&P, immediate pre-surgical assessment, informed consent, etc. The absence of any required element must be cited as standard-level noncompliance. The absence of a number of elements from a number of medical records might warrant citation of condition-level noncompliance. Likewise the absence of one element from a number of medical records – e.g., lack of informed consent to surgery – should warrant citation of condition-level noncompliance.

- Ask the ASC's leadership if the ASC removes tissue during surgery and, if so, does it exempt any or all classes of tissue removed from the requirement for analysis by a pathologist? If yes, ask to see the policy and its rationale, to determine whether it was adopted by the governing body and whether the clinical rationale for the exemption is reasonable.

## Q-0180
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.48  Condition for Coverage:  Pharmaceutical Services

**The ASC must provide drugs and biologicals in a safe and effective manner, in accordance with accepted professional practice, and under the direction of an individual designated responsible for pharmaceutical services.**

**Interpretive Guidelines:  §416.48**

Drugs and biologicals used within the ASC must be provided safely and in an effective manner, consistent with generally accepted professional standards of pharmaceutical practice and with the requirements specified in the Standards within this Condition.

The ASC must designate a specific licensed healthcare professional to provide direction to the ASC's pharmaceutical service.  That individual must be routinely present when the ASC is open for business, but continuous presence is not required, particularly when the ASC is open for longer periods of time to accommodate the recovery of patients for up to 24 hours.  Ideally the ASC should have available a pharmacist who provides oversight or consultation on the ASC's pharmaceutical services, but this is not required by the regulation, unless the ASC is performing activities which under State law may only be performed by a licensed pharmacist.

**Survey Procedures:  §416.48**

- Ask the ASC's leadership for evidence that a qualified individual has been designated to direct pharmaceutical services in the ASC.

- Ask how often and for how long this individual is on-site at the ASC.  Determine whether there is any documentation indicating that the individual is providing active direction and oversight to the program.

## Q-0181
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.48(a)  Standard:  Administration of Drugs

**Drugs must be prepared and administered according to established policies and acceptable standards of practice**

**Interpretive Guidelines:  §416.48(a)**

Drugs and biologicals used within the ASC must be administered to patients in accordance with formal policies the ASC has adopted, and those policies and the ASC's actual practices must conform to acceptable standards of practice for medication administration.

"**Accepted professional practice**" and **"acceptable standards of practice"** mean that drugs and biologicals are handled and provided in the ASC in accordance with applicable State and Federal laws as well as with standards established by organizations with nationally recognized expertise in the clinical use of drugs and biologicals.  This would include organizations such as the National Association of Boards of Pharmacy, the Institute for Safe Medication Practices, the American Society of Health-System Pharmacists, etc.

The ASC must have policies and procedures designed to promote medication administration consistent with acceptable standards of practice.  The policies and procedures should address issues including, but not limited to:

- A physician or other qualified member of the medical staff acting within their scope of practice must issue an order for all drugs or biologicals administered in the ASC. The administration of the drugs or biologicals must be by, or under the supervision of, nursing or other personnel in accordance with applicable laws, standards of practice and the ASC's policies.

- Following the manufacturer's label, including storing drugs and biologicals as directed; disposing of expired medications in a timely manner; using single-dose vials of medication for one ASC patient only; etc.
- Avoiding preparation of medications too far in advance of their use.  For example, while it may appear efficient to pre-draw the evening before all medications that will be used for surgeries scheduled the following day, this practice may, depending on the particular drug or biological, promote loss of integrity, stability or security of the medication.

- Any pre-filled syringes must be initialed by the person who draws it, dated and timed to indicate when they were drawn, and labeled as to both content and expiration date.

- Employing standard infection control practices when using injectable medications.

There must be records of receipt and disposition of all drugs listed in Schedules II, III, IV, and V of the Comprehensive Drug Abuse Prevention and Control Act of 1970, if the ASC uses any such scheduled drugs.  The ASC's policies and procedures should also address the following:

- Accountability procedures to ensure control of the distribution, use, and

disposition of all scheduled drugs.

- Records of the receipt and disposition of all scheduled drugs must be current and must be accurate.

- Records to trace the movement of scheduled drugs throughout the ASC.

- The licensed health care professional who has been designated responsible for the ASC's pharmaceutical services is responsible for determining that all drug records are in order and that an account of all scheduled drugs is maintained and reconciled.

- The record system, delineated in policies and procedures, tracks movement of all scheduled drugs from the point of entry into the ASC to the point of departure, either through administration to the patient, destruction, or return to the manufacturer. This system provides documentation on scheduled drugs in a readily retrievable manner to facilitate reconciliation of the receipt and disposition of all scheduled drugs.

- All drug records are in order and an account of all scheduled drugs is maintained and any discrepancies in count are reconciled promptly.

- The ASC's system is capable of readily identifying loss or diversion of all controlled substances in such a manner as to minimize the time frame between the actual loss or diversion to the time of detection and determination of the extent of loss or diversion?

### Survey Procedures: §416.48(a)

- Is there evidence in the medical records reviewed that there is an order, signed by a physician or other qualified practitioner, for every drug or biological administered to the patient?
- Are drugs or biologicals administered only by nurses or other qualified individuals, or under the supervision of nurses or other qualified individuals, as permitted under Federal or State law and the ASC's policy?

- Determine whether medications are properly labeled, stored, and have not expired.

- Using the infection control survey tool, determine whether the ASC employs safe injection practices.

- If the ASC uses scheduled drugs:

    - Determine if there is a record system in place that provides information on controlled substances in a readily retrievable manner.

- Review the records to determine that they trace the movement of scheduled drugs throughout the ASC.

- Determine if there is a system, delineated in policies and procedures, that tracks movement of all scheduled drugs from the point of entry into the ASC to the point of departure, either through administration to the patient, destruction or return to the manufacturer.  Determine if this system provides documentation on scheduled drugs in a readily retrievable manner to facilitate reconciliation of the receipt and disposition of all scheduled drugs.

- Determine if the licensed health care professional who is in charge of the ASC's pharmaceutical services is responsible for determining that all drug records are in order and that an account of all scheduled drugs is maintained and periodically reconciled.

- Is the ASC's system capable of readily identifying loss or diversion of all controlled substances in such a manner as to minimize the time between the actual losses or diversion to the time of detection and determination of the extent of loss or diversion?

- Determine if facility policy and procedures minimize scheduled drug diversion.

## Q-0182
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.48(a) Standard:  Administration of Drugs

**(1)  Adverse reactions must be reported to the physician responsible for the patient and must be documented in the record.**

**Interpretive Guidelines:  §416.48(a)(1)**

Every adverse reaction to a drug or biological that a patient experiences while in the ASC must be reported promptly to the physician on the ASC's medical staff who is responsible for that patient.  This permits that physician to assess the patient in a timely manner and determine whether additional treatment is required in order to counteract the adverse reaction.

All adverse drug reactions experienced by patients while in the ASC must be documented in the patient's medical record.

The ASC's policies and procedures must incorporate these requirements and ASC staff must be aware of and comply with them.

**Survey Procedures:  §416.48(a)(1)**

- Interview clinical staff to ask them what steps they would take if a patient experiences an adverse reaction to a drug?  Are staff aware of the requirement to promptly report this information to the physician on the ASC's medical staff who is responsible for the patient?

- Look for documentation of adverse drug reactions in the sample of records selected for review.  If no adverse drug reactions are noted, ask ASC staff whether they recall any patients having adverse drug reactions, and if so, whether they could pull a medical record containing documentation of an adverse drug reaction.

- Determine whether the ASC's policies and procedures address adverse drug reactions and are consistent with the regulatory requirements.

## Q-0183
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.48(a) Standard:  Administration of Drugs

**(2)   Blood and blood products must be administered only by physicians or registered nurses.**

**Interpretive Guidelines:  §416.48(a)(2)**

If the ASC ever administers blood or blood products to patients, it may permit only a physician on the ASC's medical staff or an RN working in the ASC to administer blood and blood products.  The ASC's policies and procedures must specifically address this requirement, unless the ASC does not keep blood or blood products on hand and never administers such products to ASC patients.

**Survey Procedures:  §416.48(a)(2)**

- Determine whether the ASC administers blood or blood products to patients.  If yes,

  - Determine from the record review whether anyone other than a physician on the ASC's medical staff or an ASC RN administered the blood or blood product.

  - Determine whether the ASC's policies specifically restrict administration of blood and blood products to a physician or RN.

## Q-0184
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.48(a) Standard:  Administration of Drugs

**(3)  Orders given orally for drugs and biologicals must be followed by a written order and signed by the prescribing physician.**

**Interpretive Guidelines:  §416.48(a)(3)**

Orders for drugs and biologicals that are transmitted as oral, spoken communications between the prescribing physician and the ASC's nursing staff, delivered either face-to-face or via telephone, commonly called "verbal orders," must be followed by a written order that is signed by the prescribing physician.

CMS expects ASC policies and procedures for verbal orders to include a read-back and verification process whereby the nurse receiving the order repeats it back to the prescribing physician, who verifies that it is correct.  When administering a drug or biological per a verbal order, the nurse should include in the medical record entry covering the administration of the drug or biological a note that it was prescribed orally, indicating the name of the prescribing physician.

The prescribing physician must sign, date, and time the written order in the patient's medical record confirming the verbal order.  This should be done as soon as possible after the verbal order is issued.

In the ASC setting medications prescribed for patients in recovery present a particular area of vulnerability in terms of the potential failure to follow-up a verbal order with a written order signed by the prescribing physician.  Careful attention must be given to compliance with the regulatory requirement for medications administered during recovery room.

**Survey Procedures:  §416.48(a)(3)**

- Does the ASC have policies and procedures addressing verbal orders?  Does it require the prescribing practitioner to sign, date, and time a written order as soon as possible after issuing the verbal order?

- Do the ASC's policies and procedures for verbal orders include a "read back and verify" process where the nurse who receives the order repeats it back to the prescribing physician to verify that the order was understood accurately?

- Ask ASC nursing staff how they handle verbal orders.  Does their practice conform to the regulatory requirements?  Do they use a read-back and verify process?

- Is there evidence in the medical records reviewed that each verbal order was followed by a written order signed by the prescribing physician?

## Q-0200
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.49  Condition for Coverage:  Laboratory and Radiologic Services

**Interpretive Guidelines:  §416.49(a)**

**Lack of substantial compliance with either the laboratory or the radiologic standard within this condition could provide a basis for citing a condition-level deficiency.**

## Q-0201
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

### §416.49(a) Standard:  Laboratory Services

**If the ASC performs laboratory services, it must meet the requirements of part 493 of this chapter.  If the ASC does not provide its own laboratory services, it must have procedures for obtaining routine and emergency laboratory services from a certified laboratory in accordance with Part 493 of this chapter. The referral laboratory must be certified in the appropriate specialties and subspecialties of service to perform the referred tests in accordance with the requirements of Part 493 of this chapter.**

**Interpretive Guidelines:  §416.49(a)**

ASC policies and procedures should list the kinds of laboratory services that are provided directly by the facility, and services that are provided through a contractual agreement. Review the contractual agreements and determine if the referral laboratory is a CLIA-approved laboratory.  The ASC procedures must include the following:

- A well-defined arrangement (need not be contractual) with outside services;

- Laboratory services that are provided by the ASC;

- Routine  procedures for requesting lab tests; and

- Language that requires the incorporation of lab/radiological reports into patient records.

When laboratory tests are performed prior to admission, the results should be readily available to the attending physician in the ASC.

## Q-0202
*(Rev. 137, Issued: 04-01-15, Effective: 03-27-15, Implementation: 03-27-15)*

### §416.49(b) Standard:  Radiologic Services.

*(1)    Radiologic services may only be provided when integral to procedures offered by the ASC …*

**Interpretive Guidelines:  §416.49(b)*(1)***

*An* ASC *may only provide* radiological services as an integral part of the surgical

procedures it performs. Radiological services integral to the procedure itself are those imaging services performed immediately before, during or after the procedure that are medically necessary to the completion of the procedure.

If the ASC does not provide these radiological services directly, i.e., utilizing its own staff, then it must obtain them via a contract or other formal arrangement.
*Survey Procedures: §416.49(b)(1)*

- *Does the ASC provide, either directly or under arrangement, radiologic services? If yes, verify that it performs only those radiologic services that are integral to its surgical services?*

### Q-0203
*(Rev. 137, Issued: 04-01-15, Effective: 03-27-15, Implementation: 03-27-15)*

### §416.49(b)(1) [Radiologic services…]

*. . . must meet the requirements specified in § 482.26(b), (c)(2), and (d)(2) of this chapter.*

*Interpretive Guidelines §416.49(b)(1)*

*The scope and complexity of radiological services provided within the ASC, either directly or under arrangement, as an integral part of the ASC's surgical services must be specified in writing and approved by the governing body. The ASC must also ensure that the provision of radiological services in the ASC complies with the hospital radiologic services requirements at § 482.26(b), (c)(2), and (d)(2), regardless of whether the service is provided directly by the ASC or under arrangement.*

*The interpretive guidelines for § 482.26(b), (c)(2), and (d)(2) in Appendix A, Survey Protocol, Regulations and Interpretive Guidelines for Hospitals of the State Operations Manual, provide the following guidance in determining compliance:*

## §482.26(b) Standard: Safety for Patients and Personnel

The radiologic services, particularly ionizing radiology procedures, must be free from hazards for patients and personnel.

### Interpretive Guidelines §482.26(b)

The hospital must adopt and implement policies and procedures that provide safety for patients and personnel.

### Survey Procedures §482.26(b)

Observe locations where radiological services are provided. Are they safe for patients and personnel? Are any hazards to patients or personnel observed?

**§482.26(b)(1) Proper safety precautions must be maintained against radiation hazards. This includes adequate shielding for patients, personnel, and facilities, as well as appropriate storage, use and disposal of radioactive materials.**

**Interpretive Guidelines §482.26(b)(1)**

The hospital policies must contain safety standards for at least:

- Adequate shielding for patients, personnel and facilities;

- Labeling of radioactive materials, waste, and hazardous areas;

- Transportation of radioactive materials between locations within the hospital;

- Security of radioactive materials, including determining who may have access to radioactive materials and controlling access to radioactive materials;

- Testing of equipment for radiation hazards;

- Maintenance of personal radiation monitoring devices;

- Proper storage of radiation monitoring badges when not in use;

- Storage of radio nuclides and radio pharmaceuticals as well as radioactive waste; and

- Disposal of radio nuclides, unused radio pharmaceuticals, and radioactive waste.

- Methods of identifying pregnant patients.

The hospital must implement and ensure compliance with its established safety standards.

**Survey Procedures §482.26(b)(1)**

- Verify that patient shielding (aprons, etc.) are properly maintained and routinely inspected by the hospital.

- Verify that hazardous materials are stored properly in a safe manner.

- Observe areas where testing is done for violations in safety precautions.

**§482.26(b)(2) Periodic inspection of equipment must be made and hazards identified**

**must be properly corrected.**

**Interpretive Guidelines §482.26(b)(2)**

The hospital must have policies and procedures in place to ensure that periodic inspections of radiology equipment are conducted, current and that problems identified are corrected in a timely manner. The hospital must ensure that equipment is inspected in accordance with manufacturer's instructions, Federal and State laws, regulations, and guidelines, and hospital policy. The hospital must have a system in place, qualified employees or contracts, to correct hazards. The hospital must be able to demonstrate current inspection and proper correction of all hazards.

**Survey Procedures §482.26(b)(2)**

- Review the inspection records (logs) to verify that periodic inspections are conducted in accordance with manufacturer's instructions, Federal and State laws, regulations, and guidelines and hospital policy.

- Determine that any problems identified are properly corrected in a timely manner.

**§482.26(b)(3) Radiation workers must be checked periodically, by the use of exposure meters or badge tests, for amount of radiation exposure.**

**Interpretive Guidelines §482.26(b)(3)**

The requirement that "radiation workers must be checked periodically, by use of exposure meters or badge tests, for amount of radiation exposure" would include radiological services personnel, as well as, other hospital employees who may be regularly exposed to radiation due to working near radiation sources. This could include personnel such as certain nursing and maintenance staff.

**Survey Procedures §482.26(b)(3)**

- Verify that the hospital requires periodic checks on all radiology personnel and any other hospital staff exposed to radiation and that the personnel are knowledgeable about radiation exposure for month, year, and cumulative/entire working life.

- Observe that appropriate staff have a radiation-detecting device and that they appropriately wear their radiation detecting device.

- Review records to verify that periodic tests of radiology personnel by exposure meters or test badges are performed.

**§482.26(b)(4) Radiologic services must be provided only on the order of practitioners with clinical privileges or, consistent with State law, of other**

**practitioners authorized by the medical staff and the governing body to order the services.**

**Survey Procedures §482.26(b)(4)**

Review medical records to determine that radiological services are provided only on the orders of practitioners with clinical privileges and to practitioners outside the hospital who have been authorized by the medical staff and the governing body to order radiological services, consistent with State law.

**§482.26(c)(2) Only personnel designated as qualified by the medical staff may use the radiologic equipment and administer procedures.**

**Interpretive Guidelines §482.26(c)(2)**

There should be written policies, developed and approved by the medical staff, consistent with State law, to designate which personnel are qualified to use the radiological equipment and administer procedures.

**Survey Procedures §482.26(c)(2)**

Determine which staff are using differing pieces of radiological equipment and/or administering patient procedures.  Review their personnel folders to determine they meet the qualifications established by the medical staff for the tasks they perform.

**§482.26(d)(2) The hospital must maintain the following for at least 5 years:**

**(i)      Copies of reports and printouts**

**(ii)     Films, scans, and other image records, as appropriate.**

**Interpretive Guidelines §482.26(d)(2)**

Patient radiology records are a type of patient medical record.  The hospital must maintain radiology records in compliance with the medical records CoP and this CoP.  Medical records, including radiology records, must be maintained for 5 years.

**Survey Procedures §482.26(d)(2)**

- Verify that the hospital maintains records for at least 5 years.

- Verify that radiology records are maintained in the manner required by the Medical Records…." [CfC].

**Survey Procedures:  §416.49(b)(1)**

- *If the ASC provides radiologic services as an integral part of surgical*

*procedures, does it* comply with the requirements of §482.26*(b), (c)(2), and (d)(2) in its provision of those services,* using the hospital radiologic services interpretive guidelines cited above*?*

- *Interview the individual designated responsible for assuring compliance with this CfC and review related documentation to assess how these responsibilities have been implemented in the ASC. For example, is there evidence that this individual monitors and/or oversees the monitoring of compliance with all of the requirements in §482.26(b), (c)(2), and (d)(2)? What steps are available to this individual to remedy the situation if there is evidence of noncompliance with any of the requirements?*

## Q-0204
**(Rev. 137, Issued: 04-01-15, Effective: 03-27-15, Implementation: 03-27-15)**

**§416.49(b)(2) If radiologic services are utilized, the governing body must appoint an individual qualified in accordance with State law and ASC policies who is responsible for assuring all radiologic services are provided in accordance with the requirements of this section.**

**Interpretive Guidelines: §416.49(b)(2)**

*If the ASC provides radiologic services, the ASC's governing body must appoint an individual who has appropriate qualifications, in accordance with State law and Federal regulations, to provide oversight of these services. The appointed individual is responsible for assuring the ASC's compliance with §§482.26(b), (c)(2), and (d)(2). In order to assure compliance with these requirements the individual is expected to be qualified, through training and/or experience, to oversee areas including, but not limited to: use of safety precautions (shielding, and appropriate storage, use and disposal of radioactive materials) against radiation hazards; regular equipment inspection and hazard correction; regular review of radiation worker radiation exposure; assuring use of radiologic equipment only by qualified personnel; and maintenance of imaging results or records. The person appointed to oversee radiologic services could be someone already working in the ASC who is qualified in accordance with State law and Federal regulations. Under the medical staff credentialing and privileging requirements at §416.45, the ASC's governing body will continue to be required to ensure that the operating surgeon is competent both to perform the surgical procedures for which privileges have been issued by the ASC and to appropriately and safely use the imaging modalit(ies) that are integral to the procedures s/he performs.*

**Survey Procedures: §416.49(b)(2)**

- *Can the ASC demonstrate that the individual responsible for assuring all radiologic services are provided in accordance with the requirements of this section:*

  - *Is qualified for this role in accordance with State and/or Federal*

*law and regulations and ASC policies?*
o   *Was appointed by the ASC's governing body?*

## Q-0219
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

## §416.50  Condition for Coverage - Patient Rights

**The ASC must inform the patient or the patient's representative or surrogate of the patient's rights and must protect and promote the exercise of these rights, as set forth in this section.  The ASC must also post the written notice of patient rights in a place or places within the ASC likely to be noticed by patients waiting for treatment or by the patient's representative or surrogate, if applicable.**

**Interpretive Guidelines:  §416.50**

The ASC must inform each of its patients, or the patient's representative or surrogate in the case of minor patients or other situations where there is a designated representative for the patient, of their rights as an ASC patient.  Further, all of the ASC's policies, procedures and actions must be consistent with the protection of the patients' rights articulated in this Condition.  Further, the ASC must actively promote the patient's exercise of their rights.

In addition, the ASC must ensure that the written notice of patient rights is posted in one or more places where it is likely to be seen by patients waiting for treatment, or the patient's representative or surrogate, if applicable.  Such areas include, but are not limited to, waiting rooms or pre-operative preparation areas where patients are awaiting care.  Notices must be posted in at least one area.  Whether the ASC must post more than one notice depends on the size and physical layout of the areas where notices are posted.  The determining factor is whether the notice(s) are posted in a manner that all patients (or their representatives or surrogates, as applicable) are likely to see the notice.

The patient's representative or surrogate is an individual designated by the patient, in accordance with applicable State law, to make health care decisions on behalf of the individual or to otherwise assist the patient during his/her stay in the ASC.  Designation may be in writing, as in an advance directive or medical power of attorney, or may be oral (verbal).  Written designation may occur before the patient presents to the ASC, or during the ASC registration process.  Oral designation may take place at any time during the patient's visit in the ASC.  The patient's representative or surrogate includes, but is not limited to, an individual who could be a family member or friend who accompanies the patient.  Depending on the designation the patient has made, the patient's representative or surrogate may make all health care decisions for the patient during his/her ASC visit, or may act in a more limited role, for example, as a liaison between the patient and the ASC to help the patient communicate, understand, remember, and cope with the interactions that take place during the visit, and explain any instructions to the patient that are delivered by the ASC staff.  If a patient is unable to fully communicate directly with the ASC staff, then the ASC may give patient rights information to the

patient's representative or surrogate.

**Survey Procedures: §416.50**

When there is a team surveying the ASC, survey of the Patients' Rights Condition should be coordinated by one surveyor. However, each surveyor, as he or she conducts his/her survey assignments, should assess the ASC's compliance with the Patient's Rights regulatory requirements. It is particularly important for the surveyor who will be following one or more patients from the start of their case to discharge to be observing how the ASC's actions protect and promote those patients' exercise of their rights.

- Determine whether the ASC provides patients (or their representatives or surrogates, as applicable), with notice of their rights, consistent with the standards under this condition.

- Determine whether the ASC promotes the patients' exercise of their rights (or their representatives or surrogates, as applicable), consistent with the standards under this condition.

Review posted notices to determine if they contain the same information as the individual written notice provided to patients or their representatives/surrogates, as required under §416.50(a). Deficiencies related to posting of the notice are to be cited using tag -Q0219.

## Q-0220
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

**§416.50…. The ASC must also post the written notice of patient rights in a place or places within the ASC likely to be noticed by patients waiting for treatment or by the patient's representative or surrogate, if applicable.**

**Interpretive Guidelines: §416.50 (standard-level citation only)**

Since the condition concerning posting the written notice does not have a counterpart in a standard within the patient rights condition, a second tag is provided for this portion of the condition for citations at the standard level. Deficiencies related solely to posting of the notice must be cited at the standard level, using tag Q-0220. The condition-level tag, Q-0219, must be cited whenever the manner and degree of noncompliance on the part of an ASC represents substantial noncompliance.

**Survey Procedures: §416.50(standard-level citation only)**

Observe waiting rooms and pre-operative areas where patients await care to see if notice of patient rights is posted in a manner where all patients awaiting care are likely to see a notice. Ensure that the notices are posted in conspicuous locations in the waiting rooms, pre-operative preparation areas, recovery rooms, or other common areas. If only one notice is posted, verify that it is conspicuously located in an area use by every ASC patient. Deficiencies related to posting of the notice are to be cited using tag -Q0219.

**Q-0221**
*(Rev. 137, Issued: 04-01-15, Effective: 03-27-15, Implementation: 03-27-15)*

### §416.50(a) Standard:  Notice of Rights

**An ASC must, prior to the start of the surgical procedure, provide the patient, or the patient's representative, or the patient's surrogate with verbal and written notice of the patient's rights in a language and manner that ensures the patient, the representative, or the surrogate understand all of the patient's rights as set forth in this section.  The ASC's notice of rights must include the address and telephone number of the State agency to which patients may report complaints, as well as the Web site for the Office of the Medicare Beneficiary Ombudsman.**

**Interpretive Guidelines:  §416.50(a)**

The ASC must inform each patient, or the patient's representative or surrogate of the patient's rights.  This notice must be provided both verbally and in writing prior to the start of the surgical procedure, i.e., prior to the patient's movement out of the pre-operative area, and, if applicable, before the patient is medicated with a drug(s) that suppresses the patient's consciousness.  It is not acceptable for the ASC to provide the notice when the patient has already been moved into the operating room (including procedure room) or has been medicated in such a manner that he or she is not able to follow or remember the provision of notice.

This regulation does not require that in every instance notice be delivered just prior to the start of the surgical procedure.  Instead, the regulation indicates the latest acceptable time for delivery of the notice.  It would be acceptable for the ASC to mail or e-mail the notice of patient rights in advance of the date of the scheduled procedure, or at the time the patient appears in the registration area on the date of the procedure.  CMS recommends that ASCs provide patients notice of their rights as soon as possible after the procedure is scheduled, but so long as notice is provided prior to the start of the surgical procedure, the ASC is in compliance with the regulation.

Notice must be provided regardless of the type of procedure scheduled to be performed.

The regulation does not require a specific form or wording for the written notice, so it is acceptable for the ASC to develop a generic, pre-printed notice for use with all of its patients, as long as the notice includes all of the patient rights established under the regulation.

The notice must include the address and telephone number of the appropriate State agency to which patients may report complaints about the ASC.  If available, an e-mail or web address for submission of complaints to the State agency should also be provided.

The notice must also include, with respect to ASC patients who are Medicare beneficiaries, the Web site for the Office of the Medicare Beneficiary Ombudsman:

http://www.medicare.gov/*claims-and-appeals/medicare-rights/get-help/ombudsman.html*

Patients who are Medicare beneficiaries, or their representative or surrogates, should be informed that the role of the Medicare Beneficiary Ombudsman is to ensure that Medicare beneficiaries receive the information and help they need to understand their Medicare options and to apply their Medicare rights and protections. These Medicare rights are in addition to the rights available to all ASC patients under this CfC.

The notice must:

- Address all of the patient's rights under this Condition.

- Be provided and explained in a language and manner that the patient or the patient's representative or surrogate understands, including patients who do not speak English or with limited communication skills. The patient has the choice of using an interpreter of his or her own, or one supplied by the ASC. A professional interpreter is not considered to be a patient's representative or surrogate. Rather, it is the professional interpreter's role to pass information from the ASC to the patient. In following translation practices, CMS recommends, but does not require, that a written translation be provided in languages that non-English speaking patients can read, particularly for languages that are most commonly used by non-English-speaking patients of the ASC. We note that there are many hundreds of languages (not all written) that are used by one or more residents of the United State, but that in most geographic areas the most common non-English language generally is Spanish. We note there are other applicable legal requirements, most notably, those under title VI of the Civil Rights Act of 1964. The Department of Health and Human Services' (HHS) guidance related to Title VI of the Civil Rights Act of 1964, ''Guidance to Federal Financial Assistance Recipients Regarding Title VI Prohibition Against National Origin Discrimination Affecting Limited English Proficient Persons'' (68 FR 47311, Aug. 8, 2003) applies to those entities that receive federal financial assistance from HHS, including ASCs. This guidance may assist ASCs in ensuring that patient rights information is provided in a language and manner the patient understands. The regulation at §416.50(a) is compatible with guidance on Title VI.

**Survey Procedures: §416.50(a)**

- Determine what the ASC's policy and procedures are for providing all patients and/or their representatives or surrogates notice of their rights prior to the start of the surgical procedure. Are the policies and procedures consistent with the regulatory requirements?

- Determine whether the information provided in the written notice to the patients and/or their representatives or surrogates by the ASC is complete and accurate:

  o Does the notice address all of the patients' rights listed in this Condition?

o  Does the notice provide the required information about where to file complaints or how to contact the Medicare Ombudsman?

• Is the staff who are responsible for advising patients of their rights aware of the ASC's policies and procedures for providing such notice, including to those patients with special communication needs?

• Review records, interview staff, and observe staff/patient interaction to examine how the ASC communicates information about patient rights to diverse patients, including patients who need assistive devices or translation services.

  • Does the ASC provide all patients with verbal and written notice of their rights prior to the start of the surgical procedure?

  • Does the ASC have a significant number of patients with limited English proficiency?  If so, are there written notice materials available for patients who have a primary language other than English?  If not, does the ASC have translators available to provide verbal notice of their rights to ASC patients?

• Ask patients to tell you how, when and what the ASC has told them about their rights.

## Q-0222
*(Rev. 137, Issued: 04-01-15, Effective: 03-27-15, Implementation: 03-27-15)*

## §416.50(a) Standard:  Notice of rights

## (1)[…] In addition, the ASC must –

**(i)      Post written notice of patient rights in a place or places within the ASC likely to be noticed by patients (or their representatives, if applicable) waiting for treatment.  The ASC's notice of rights must include the name, address, and telephone number of a representative in the State agency to whom patients can report complaints, as well as the Web site for the Office of the Medicare Beneficiary Ombudsman.**

**Interpretive Guidelines:  §416.50(a)(1)(i)**

The ASC must ensure that a written notice of patient rights is posted in one or more places where they are likely to be noticed.  This would include waiting rooms, recovery rooms, or any other areas where patients and/or their representatives are likely to be.  Notices must be posted in at least one area.  Posting in more than one area increases the likelihood that patients will see the notice, but an ASC may post only one notice and comply with the requirement, so long as the notice  is posted in an area used by every

ASC patient and where it is likely to be noticed.

The notice must include the name, address, and telephone number of a representative in the State survey agency to whom patients and/or their representatives can report complaints. Because there can be staff turnover in the State survey agency, creating a burden for both States and ASCs to keep current the names of State staff, it is sufficient if the notice provides the title of the individual in the State survey agency to whom complaints may be reported, as well as the address and telephone number.

The notice must also include, with respect to ASC patients who are Medicare beneficiaries, the Web site for the Office of the Medicare Beneficiary Ombudsman: http://www.*medicare.gov/claims-and-appeals/medicare-rights/get-help/*ombudsman*.html*

Patients who are Medicare beneficiaries, or their representative, should be informed that the role of the Medicare Beneficiary Ombudsman is to ensure that Medicare beneficiaries receive the information and help they need to understand their Medicare options and to apply their Medicare rights and protections. These Medicare rights are in addition to the rights available to all ASC patients under this CfC.

**Survey Procedures: §416.50(a)(1)(i)**

- Observe waiting rooms, recovery rooms, and other common areas used by patients to see if one or more notices of patient rights are posted. Ensure that the notices are posted in conspicuous locations in the waiting rooms, recovery rooms, or other common areas. If only one notice is posted, verify that it is conspicuously located in an area used by every ASC patient.

- Observe notices to see that each notice contains all required information.

# Q-0223
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

# §416.50(b) Standard: Disclosure of physician financial interest or ownership

**The ASC must disclose, in accordance with Part 420 of this subchapter, and where applicable, provide a list of physicians who have financial interest or ownership in the ASC facility. Disclosure of information must be in writing.**

**Interpretive Guidelines: §416.50(b)**

An ASC that has physician owners or investors must provide written notice to the patient, the patient's representative or surrogate, prior to the start of the surgical procedure, that the ASC has physician-owners or physicians with a financial interest in the ASC. CMS considers the disclosure of physician financial interest or ownership to be part of the overall "patient rights information" that is now required to be given prior to the start of

the procedure. 42 CFR Part 420 provides definitions and requirements concerning ownership and control of Medicare-participating providers and suppliers. Surveyors are not expected to have expert knowledge of what constitutes ownership and control, but ASCs are required to comply with the provisions of Part 420. ASCs that meet the physician ownership and control threshold specified in 42 CFR Part 420 must disclose their physician ownership to patients and provide them with a list of physicians who have a financial interest or ownership in the ASC. The intent of this disclosure requirement is to assist the patient in making an informed decision about his or her care by making the patient, or the patient's representative or surrogate, aware when physicians who refer their patients to the ASC for procedures, or physicians who perform procedures in an ASC also have an ownership or financial interest in the ASC.

The written notice must disclose, in a manner designed to be understood by all patients, that physicians have an ownership or financial interest in the ASC. Information should be provided in a manner that is not only technically correct, but also easily understood by persons not familiar with financial statements, legal documents or technical language. The ASC should also be aware of the age and the cognitive abilities of its patients in developing its written notice. (72 FR 50475, August 31, 2007)

**Survey Procedures: §416.50(b)**

- Ask the ASC whether it is has reported in accordance with 42 CFR Part 420 to the Medicare program whether the ASC has any physicians with ownership/financial interests. (Surveyors are not required to make an independent determination regarding whether an ASC has physicians with ownership or financial interests.) If the answer is yes, then the ASC is required to comply with the requirement for disclosure to patients. If the ASC's response is no, then the ASC has no disclosure requirement and the surveyor does not have to investigate further.

- If the ASC indicates it has physicians with ownership/financial interests in the ASC:

    - Does the ASC have policies and procedures in place to make the required disclosures to patients? Are the policies and procedures consistent with the regulatory requirements?

    - Does the ASC provide a written notice of disclosure to all patients prior to the start of the surgical procedure, including a list of physicians with financial interests or ownership in the ASC?

- Interview ASC staff to assess their knowledge and understanding of the physician ownership notice requirements, including the ASC's process for delivering the notice.

- Interview patients to ask them whether they were aware that the ASC has physician owners/investors. Ask them if they recall getting a written notice about this prior to the start of their surgical procedure.

## Q-0224
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

## §416.50(c) Standard:  Advance Directives

The ASC must comply with the following requirements:

(1)      Provide the patient or, as appropriate, the patient's representative with written information concerning its policies on advance directives, including a description of applicable State health and safety laws and, if requested, official State advance directive forms.

(2)      Inform the patient or, as appropriate, the patient's representative of the patient's rights to make informed decisions regarding the patient's care.

(3)      Document in a prominent part of the patient's current medical record, whether or not the individual has executed an advance directive.

**Interpretive Guidelines:  §416.50(c)**

**Information on Advance Directives**

An advance directive is a written instruction, such as a living will or durable power of attorney for healthcare, recognized under State law (whether statutory or as recognized by the courts of the State), relating to the provision of healthcare when the individual who has issued the directive is incapacitated. (See 42 CFR 489.100.)

Each ASC patient has the right to formulate an advance directive consistent with applicable State law and to have ASC staff implement and comply with the advance directive, subject to the ASC's limitations on the basis of conscience.  To the degree permitted by State law, and to the maximum extent practicable, the ASC must respect the patient's wishes and follow that process.

The facility must provide the patient or the patient's representative, as appropriate, the following information in writing, prior to the start of the surgical procedure:

- Information on the ASC's policies on advance directives;

- A description of the applicable State health and safety laws.  (Note that CMS does not determine whether this description is accurate.  State Survey Agencies are responsible for making this accuracy determination.);  and

- If requested, official State advance directive forms, if such exist.

The ASC must include in the information concerning its advance directive policies a clear and precise statement of limitation if the ASC cannot implement an advance directive on the basis of conscience or any other specific reason that is permitted under

State law.  A blanket statement of refusal by the ASC to comply with any patient advance directives is not permissible.  However, if and to the extent permitted under State law, the ASC may decline to implement elements of an advance directive  on the basis of conscience or any other reason permitted under State law if it includes in the information concerning its advance directive policies a clear and precise statement of limitation.  A statement of limitation must:

- Clarify any differences between ASC-wide conscience objections and those that may be raised by individual ASC staff;

- Identify the state legal authority permitting such objection; and

- Describe the range of medical conditions and procedures affected by the objection

For example, the ASC's notice of limitation could, if permitted by State law, indicate that it would always attempt to resuscitate a patient and transfer that patient to a hospital in the event of deterioration.

The patient may wish to delegate his/her right to make informed decisions to another person, even though the patient is not incapacitated.  To the extent permitted by State law, the ASC must respect such delegation.  In some cases, the patient may be unconscious or otherwise incapacitated.  If the patient is unable to make a decision, the ASC must consult the patient's advance directives, medical power of attorney, or patient representative or surrogate, if any of these are available.  In the advance directive or the medical power of attorney, the patient may provide guidance as to his or her wishes in certain situations, or may delegate decision-making to another individual as permitted by State law.  If such an individual has been selected by the patient, or if a person willing and able under applicable State law is available to make treatment decisions, relevant information should be provided to the representative or surrogate, so that informed healthcare decisions can be made for the patient.  However, as soon as the patient is able to be informed of his or her rights, the ASC should also provide that information to the patient.

The right to make informed decisions presumes that the patient, or the patient's representative or surrogate, has been provided information about the patient's health status, diagnosis and prognosis.  It includes providing consent to the surgical procedure(s) to be performed in the ASC.  The patient, or the patient's representative or surrogate, must receive adequate information, provided in a manner that the patient or the patient's representative or surrogate can understand, to assure that the patient can effectively exercise the right to make informed decisions about care in the ASC.  In many cases, the informed consent may take place in a physician office outside the ASC and prior to the patient's visit to the ASC.  Nevertheless, the ASC is responsible for ensuring an informed process is in place for each patient.   (See discussion of fully informing the patient under §416.50(e)(iii).)

**Documentation of Advance Directives**

The ASC must document in the patient's current medical record, i.e., the record for the

current ASC visit, whether or not the patient has executed an advance directive. This documentation must be placed in a prominent part of the medical record where it will be readily noticeable by any ASC staff providing clinical services to the patient. The documentation requirement applies, even if the ASC is unable to comply with the patient's advance directive on the basis of conscience or a State law limitation.

If the patient with an advance directive is transferred from the ASC to another healthcare facility, e.g., if there is an emergency transfer to a hospital, the ASC must ensure that a copy of the patient's advance directive is provided with the medical record when the patient is transferred.

The ASC should provide education to its staff concerning the facility's policies and procedures on advance directives.

**Survey Procedures: §416.50(c)**

- Review the ASC's policies and procedures related to the advance directive requirements. Do they conform to the regulatory requirements?

- Ask to see a copy of the written notice of the ASC's advance directive policies and applicable State law. Does it contain all required information? If there is a statement of limitations based on conscience or State law, does it include all required information?

- If the State has an official advance directive form, ask the ASC to demonstrate how it provides these forms upon request to patients.

- Ask the ASC how it documents that required advance directive information is provided to the patient prior to the start of the surgical procedure. Review each record in the survey sample to determine if there is evidence that the information was provided to the patient or the patient's representative prior to the start of the surgical procedure.
- Review each record in the survey sample to determine if advance directive information was provided prior to the start of the surgical procedure.

- Does the ASC advise patients, or the patient's representative or surrogate, of their right to make informed decisions about their care in the ASC?

- Review each record in the survey sample to determine if information is prominently displayed as to whether or not there is an advance directive in effect for the patient. Is the information displayed in a manner such that patients with advance directives can be readily distinguished from patients without an advance directive?

- Determine to what extent the ASC educates its staff regarding advance directives and promoting informed decisions. Does the ASC have a training class or any educational materials available for the staff regarding advance directives and

informed patient decision-making?  Interview staff to determine their knowledge of the advance directives of the patients in their care.

## Q-0225
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

## §416.50(d) Standard:  Submission and investigation of grievances

The ASC must establish a grievance procedure for documenting the existence, submission, investigation, and disposition of a patient's written or verbal grievance to the ASC.  The following criteria must be met:

\*\*\*

(4) The grievance process must specify timeframes for review of the grievance and the provisions of a response.

(5) The ASC, in responding to the grievance, must investigate all grievances made by a patient, the patient's representative, or the patient's surrogate regarding treatment or care that is (or fails to be) furnished.

(6) The ASC must document how the grievance was addressed, as well as provide the patient, the patient's representative, or the patient's surrogate with written notice of its decision.  The decision must contain the name of an ASC contact person, the steps taken to investigate the grievance, the result of the grievance process and the date the grievance process was completed.

**Interpretive Guidelines:  §§416.50(d)(4), (5), & (6)**

**What is a Grievance?**

A "patient grievance" is a formal or informal written or verbal complaint that is made to the ASC by a patient or a patient's representative or surrogate, regarding a patient's care (when such complaint is not resolved at the time of the complaint by the staff present), abuse, neglect, or ASC compliance issues.

- A complaint from someone other than a patient or a patient's representative or surrogate is not a grievance.

- A complaint that is presented to the ASC's staff and resolved at that time is not considered a grievance; the grievance process requirements do not apply to such complaints.  For example, a complaint that discharge instructions are unclear may be resolved relatively quickly before the patient is discharged, and would not usually be considered a "grievance."

If a patient care complaint cannot be resolved at the time of the complaint by the staff present, is postponed for later resolution, is referred to other staff for later resolution, requires an investigation, and/or requires additional actions for resolution, the complaint

is then considered a grievance for purposes of these requirements.

Billing issues are not usually considered grievances for the purposes of this grievance requirement.

Although complaints may be both written and verbal, a written complaint is always considered a grievance. This includes written complaints from a current patient, a released/discharged patient, or a patient's representative or surrogate regarding the patient care provided, abuse or neglect, or the ASC's compliance with the CfCs. For the purposes of this requirement, an email or fax is considered written.

Information obtained from patient satisfaction surveys conducted by the ASC usually is not considered a grievance. However, if an identified patient writes or attaches a written complaint on the survey and requests resolution, the complaint must be treated as a grievance. If an identified patient writes or attaches a complaint to the survey, but does not request resolution, the ASC should treat this as a grievance if the ASC would usually treat such a complaint as a grievance.

Patient complaints that are considered grievances also include situations where a patient or a patient's representative or surrogate telephones the ASC with a complaint regarding the patient's care or with an allegation of abuse or neglect, or a failure of the ASC to comply with one or more of the CfCs.

Whenever the patient or the patient's representative or surrogate requests that his or her complaint be handled as a formal complaint or grievance, or when the patient requests a response from the ASC, the complaint is considered a grievance and all the grievance requirements apply.

**Grievance Process**

The ASC must have an established procedure in place for documenting the existence, submission, investigation, and disposition of a grievance.

As part of its obligation to notify patients of their rights, the ASC must inform the patient and/or the patient's representative or surrogate of the ASC's grievance process, including how to file a grievance.

All grievances submitted to any ASC staff member, whether verbally or in writing, must be reported by the staff to an ASC official who has authority to address grievances. The ASC's grievance policies and procedures must identify the person(s) in the ASC who have the authority to respond to grievances. The ASC is expected to educate staff on their obligation to report all grievances, including whom they should report the grievance to.

All grievances must be investigated, but the regulation stresses this in particular for grievances related to treatment or care that the ASC provided or allegedly failed to provide. In its investigation the ASC should not only respond to the substance of the grievance, but should also use the grievance to determine if there are systemic problems

indicated by the grievance that require resolution. An ASC would be well-advised to integrate its grievance process into its overall quality assessment and performance improvement program.

The ASC's grievance process must include a timeframe for the completion of the ASC's review of the grievance allegations, as well as for the ASC to provide a response to the person filing the grievance. The timeframe must be reasonable, i.e., allowing the ASC sufficient but not excessive time to conduct its review and issue its response. CMS does not mandate a particular timeframe. The application of the ASC's timeframe begins with the date of the receipt of the grievance by the ASC.

The ASC must document for each grievance how it was addressed. The ASC must also notify the patient or the patient's representative or surrogate, in writing, of the ASC's decision regarding each grievance.

The ASC may use additional methods to resolve a grievance, such as meeting with the patient's family. There are no restrictions on the ASC's use of additional effective methods to handle a patient's grievance. However, in all cases, the ASC must provide a written notice of its decision on each patient's grievance. The written notice must include the name of an ASC contact person, the steps the ASC took to investigate the grievance, the results of the grievance process, and the date the process was completed.

When a patient communicates a grievance to the ASC via email, the ASC may respond to the patient via email, pursuant to the ASC's policy. (Some ASC may have policies prohibiting communication to patients via email.) If the patient requests a response via email, the ASC may respond via email. If the email response contains the name of an ASC contact person, the steps taken to investigate the grievance, the results of the grievance process, and the date the process was completed, the email meets the requirements for a written response.
In its written response to any grievance, the ASC is not required to include statements that could be used in a legal action against the ASC, but the ASC should provide adequate information to address the specific grievance. A form letter with generic statements about grievance process steps and results is not acceptable.

**Survey Procedures: §§416.50(d)(4)(5), & (6):**

- Determine whether the ASC has a written policy addressing the grievance process. Does the process specifically address how grievances are documented, how they are to be submitted, how they are to be investigated, and how the findings are to be used to dispose of the grievance? Does the policy comply with the regulatory requirements concerning reporting of grievances,, timeframe, and notice of disposition?

- Ask the ASC how many grievances it received during the past year. Ask how it documents the existence of grievances. Ask what the disposition was of grievances processed during that period. Ask to see a sample of grievance files. If this is a complaint survey concerning a grievance, ask to see grievances submitted at the time of the grievance that triggered the complaint survey.

- Review a sample of grievance files to determine if grievances are properly documented and handled in accordance with the ASC's policy and the regulatory requirements.

- Interview staff to see if staff is aware of the ASC's grievance policies.  Do staff know the difference between a complaint handled on the spot and a grievance?

- Interview patients and/or representatives or surrogates to determine if they know how to file a grievance and who to contact if they have a complaint/grievance.

- Interview staff and patients to see how staff and patients are educated regarding to whom grievances and allegations should be reported.

## Q-0226
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

## §416.50(d) Standard:  Submission and investigation of grievances

…. The following criteria must be met:

*(1)* All alleged violations/grievances relating, but not limited to, mistreatment, neglect, verbal, mental, sexual, or physical abuse, must be fully documented.

*(2)* All allegations must be immediately reported to a person in authority in the ASC.

*(3)* Only substantiated allegations must be reported to the State authority or the local authority, or both.

**Interpretive Guidelines:  §§416.50(d)(1), (2), & (3)**

Grievances making allegations related to mistreatment; neglect; verbal, mental, sexual or physical abuse; or other serious allegations of harm must be fully documented.  This means that all pertinent details of the allegation must be recorded and retained in the ASC's files.  Documentation of the allegation should include, at a minimum, the date and time of the alleged occurrence, the location, the names of all individuals involved, and a description of the behavior that is alleged to have occurred within the ASC and to have constituted mistreatment, neglect or abuse or other serious harm.

The ASC regulation does define the terms "mistreatment," "neglect," or "abuse." However, the following definitions from long term care regulations may be helpful in making common sense judgments about whether an allegation fits into one of these categories:

- Neglect - Failure to provide goods and services necessary to avoid physical harm, mental anguish, or mental illness (42 CFR 488.301).

- Abuse - The willful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain or mental anguish (42 CFR 488.301).

In addition, according to the Merriam Webster dictionary, "mistreatment" means to treat badly. It is also a synonym for abuse.

Finally, if there is applicable State law defining mistreatment, neglect or abuse in a healthcare facility, including ASCs, those definitions will apply.

All grievances alleging mistreatment, neglect or abuse that are submitted to any ASC staff member, whether verbally or in writing, must be reported immediately, i.e., as soon as possible, and at least on the same day, by the staff member to an ASC official who has authority to address grievances. The ASC's grievance policies and procedures must identify the person(s) in the ASC who have the authority to respond to grievances. The ASC is expected to educate staff on their obligation to immediately report all grievances alleging mistreatment, neglect or abuse, including whom they should report the grievance to.

Grievances alleging mistreatment, neglect, abuse or other behavior that endangers a patient should be investigated as soon as possible, given the seriousness of the allegations and the potential for harm to patients. The ASC must conduct a careful investigation, balancing the need for speedy resolution with the need to ascertain all pertinent facts.

If the ASC confirms that the alleged mistreatment, abuse, neglect or other serious harm took place, then the ASC is obligated to report the event to the appropriate local or State authority, or even both. Depending on the specifics of the case and State or local law, the appropriate authority(ies) might include the local police, a State healthcare professional licensing board, a State agency that licenses the ASC, a State ombudsman, etc. The ASC should contact the appropriate authority promptly after it concludes its investigation of the grievance.

**Survey Procedures: §§416.50(d)(1)(2), & (3)**

- Do the ASC's grievance policies and procedures separately address the process for investigating grievances alleging mistreatment, abuse, neglect or other serious harm? Do the policies and procedures conform to the regulatory requirement?

- Interview staff to determine how they would handle a grievance alleging mistreatment, abuse, neglect or other serious harm? Do they know who to report the grievance to? Do they know that it should be reported immediately?

- Ask the ASC who is the person authorized to handle such grievances. Interview that person to determine if he/she understands the requirements to fully document the allegation, conduct a prompt investigation, and to report substantiated grievances to the proper authority.

- Ask the person authorized to handle such grievances if the ASC has had any grievances alleging mistreatment, neglect, abuse or other serious harm?  If the answer is yes, ask to review the files for one or more such grievances.  If such grievances were substantiated, verify whether there is documentation that the findings were reported to the appropriate authority.

## Q-0227
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

## §416.50(e) Standard:  Exercise of rights and respect for property and person.

(1)  The patient has the right to the following:

(i) Be free from any act of discrimination or reprisal.

**Interpretive Guidelines:  §416.50(e)(1)(i)**

The ASC may not take punitive action as a reprisal or discriminate against a patient.  This includes reprisals or discrimination against a patient merely because he or she has exercised her rights.  The ASC's patients' rights policies and procedures must indicate that the ASC does not engage in reprisals or discriminatory behavior.

**Survey Procedures:  §416.50(e)(1)(i)**

- Interview staff to determine whether they are aware that the ASC may not discriminate against patients, or take punitive actions against any patient as a reprisal for some act on the patient's part.

- Review the ASC's policies and procedures to determine whether it is clear that patients, or their representatives, or surrogates may exercise their rights without fear of reprisal.

- Interview staff about how a patient who has filed a grievance or otherwise exercises his/her rights is treated.  Is staff aware that they should not treat patients differently if the patient files a grievance?

## Q-0228
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

## §416.50(e) Standard:  Exercise of rights and respect for property and person.

[(1)  The patient has the right to the following: ]

(ii)  Voice grievances regarding treatment or care that is (or fails to be) provided.

**Interpretive Guidelines: §416.50(e) (1)(ii)**

This requirement complements the requirement for the ASC to have a grievance system. Patients have the right to express a grievance regarding the treatment or care they receive in the ASC.

The patient, or the patient's representative or surrogate, as appropriate, may file a grievance, verbally or in writing, before the date of the scheduled procedure, on the date of the procedure, or after the date of the procedure. The regulation does not prescribe any limitation as to when a patient may submit a grievance. However, it is understood that, if a substantial amount of time has passed since the care episode addressed in the grievance, e.g., several years, that it may, depending on the nature of the grievance, be harder for the ASC to investigate the grievance and ascertain the pertinent facts.

**Survey Procedures: §416.50(e) (1)(ii)**

- Interview ASC staff to determine if they are aware of the patient's right to file a grievance.

- If the survey is related to a complaint alleging that an ASC ignored a patient's grievance, include that medical record in the sample and review it to determine if there is any evidence of a grievance as well as of action to respond to the grievance.

## Q-0229
*(Rev. 137, Issued: 04-01-15, Effective: 03-27-15, Implementation: 03-27-15)*

## §416.50(e) Standard:  Exercise of rights and respect for property and person.

[(1)  The patient has the right to the following:]

(iii)  Be fully informed about a treatment or procedure and the expected outcome before it is performed.

**Interpretive Guidelines: §416.50(e)(1)(iii)**

As in the case of advance directives, the patient has the right to make an informed decision regarding his/her care in the ASC. The right to make informed decisions means that the patient or patient's representative or surrogate is given the information needed in order to make "informed" decisions regarding his/her care. The right to make informed decisions regarding care presumes that the patient has been provided information about his/her health status, diagnosis, and prognosis. Furthermore, it includes the patient's participation in the development of their plan of care, including providing consent to, or refusal of, medical or surgical interventions, and in planning for care after discharge from the ASC. The patient or the patient's representative or surrogate should receive adequate

information, provided in a manner that the patient or the patient's representative or surrogate can understand, to assure that the patient can effectively exercise the right to make informed decisions.

ASCs must utilize an informed consent process that assures patients or their representatives or surrogates are given the information and disclosures needed to make an informed decision about whether to consent to a surgical procedure in the ASC. The primary purpose of the informed consent process in the ASC is to ensure that the patient, or the patient's representative or surrogate, is provided information necessary to enable him/her to evaluate a proposed surgery before agreeing to the surgery. Typically, this information would include potential short- and longer-term risks and benefits to the patient of the proposed intervention, including the likelihood of each, based on the available clinical evidence, as informed by the responsible physician's professional judgment. Informed consent must be obtained and the informed consent form must be *signed by the patient, or as appropriate, the patient's representative, and* placed in the patient's medical record, prior to surgery. It would be acceptable if the ASC required the physician(s) who perform procedures in the ASC to obtain the patient's informed consent outside of the ASC, prior to the date of the surgery, since this might allow more time for discussion between the patient and physician than would be feasible on the date of the surgery. In such cases, the physician must follow the ASC's informed consent process. In all cases, the ASC must ensure that the patient's informed consent is secured prior to the start of the surgical procedure, and that this consent is documented in the patient's medical record. (See the interpretive guidelines for §416.47(b)(7) concerning documentation in the medical record of informed consent.)

Given that ASC surgical procedures generally entail use of some form of anesthesia, and that there are risks as well as benefits associated with the use of anesthesia, ASCs should assure that their informed consent process provides the patient with information on anesthesia risks and benefits as well as the risks and benefits of the surgical procedure. The ASC's surgical informed consent policy should describe the following:

- Who may obtain the patient's informed consent;

- The circumstances when a patient's representative, rather than the patient, may give informed consent for a surgery (see guidance for §416.50(e)(2) & (3);

- The content of the informed consent form and instructions for completing it;

- The process used to obtain informed consent, including how informed consent is to be documented in the medical record;
- Mechanisms that ensure that the informed consent form is properly executed and is in the patient's medical record prior to the surgery; and

- If the informed consent process and informed consent form are obtained outside the ASC, how the properly executed informed consent form is

incorporated into the patient's medical record prior to the surgery.

If there are additional requirements under State law for informed consent, the ASC must comply with those requirements.

**Example of a Well-Designed Informed Consent Process**

A well-designed informed consent process would include discussion of the following elements:

- A description of the proposed surgery, including the anesthesia to be used;

- The indications for the proposed surgery;

- Material risks and benefits for the patient related to the surgery and anesthesia, including the likelihood of each, based on the available clinical evidence, as informed by the responsible practitioner's clinical judgment. Material risks could include risks with a high degree of likelihood but a low degree of severity, as well as those with a very low degree of likelihood but high degree of severity;

- Treatment alternatives, including the attendant material risks and benefits;

- The probable consequences of declining recommended or alternative therapies;

- Who will conduct the surgical intervention and administer the anesthesia;

- Whether physicians other than the operating practitioner will be performing important tasks related to the surgery, in accordance with the ASC's policies. Important surgical tasks include: opening and closing, dissecting tissue, removing tissue, harvesting grafts, transplanting tissue, administering anesthesia, implanting devices and placing invasive lines;

- Whether, as permitted by State law, qualified medical practitioners who are not physicians will perform important parts of the surgery or administer the anesthesia, and if so, the types of tasks each type of practitioner will carry out; and that such practitioners will be performing only tasks within their scope of practice for which they have been granted privileges by the ASC.

**Survey Procedures: §416.50(e)(1)(iii)**

- Determine whether the ASC has an informed consent policy that meets the regulatory requirements.

- Verify in the survey sample of medical records that there is documentation

that informed consent was given prior to the surgical procedure. *Was the consent signed by the patient or as appropriate, the patient's representative?*

- As part of the process of following one or more cases from start to finish, determine whether there is an informed consent that was executed prior to the surgery date on file, and if not, observe whether the ASC obtains informed consent.

- Check the records of patients who are in recovery on the date(s) of the survey to verify that there is documentation of informed consent.

- Interview patients to determine whether they recall being asked to consent to the procedure, and whether the risks and benefits were discussed with them at that time.

## Q-0230
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

**§416.50(e) Standard: Exercise of rights and respect for property and person.**

(2) If a patient is adjudged incompetent under applicable State laws by a court of proper jurisdiction, the rights of the patient are exercised by the person appointed under State law to act on the patient's behalf.

(3) If a State court has not adjudged a patient incompetent, any legal representative or surrogate designated by the patient in accordance with State law may exercise the patient's rights to the extent allowed by State law.

**Interpretive Guidelines: §§416.50(e)(2 )& (3)**

A patient who has been determined to be incompetent under a State legal process is not capable of exercising his or her rights independently. For such patients, the person appointed under State law to act on the patient's behalf may exercise any and all of the rights afforded to any ASC patient.

In addition, a competent patient may wish to delegate his/her right to make informed decisions to another person. To the degree permitted by State law, and to the maximum extent practicable, the ASC must respect the patient's wishes and follow that process. In some cases, the patient may be unconscious or otherwise incapacitated, for example, if a complication requiring a treatment decision arises during a procedure. If the patient is unable to make a decision, the ASC must consult the patient's advance directives, medical power of attorney or patient representative or surrogate, if any of these are available. In the advance directive or the medical power of attorney, the patient may provide guidance as to his/her wishes in certain situations, or may delegate decision-making to another individual as permitted by State law. If such an individual has been selected by the patient, or if a person willing and able under applicable State law is

available to make treatment decisions, relevant information should be provided to the representative or surrogate so that informed healthcare decisions can be made for the patient.

**Survey Procedures: §§416.50(e)(2) &(3)**

- Verify that there is a policy addressing the exercise of rights on behalf of a patient judged legally incompetent.

- Verify that there is a policy addressing the delegation by a patient of the exercise of rights to a representative.

# Q-0231
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

## §416.50(f) Standard:  Privacy and Safety.

## The patient has the right to –

**(1)  Personal privacy.**

**Interpretive Guidelines:  §416.50(f)(1)**

The underlying principle of this requirement is the patient's basic right to respect, dignity, and comfort.  "The right to personal privacy" includes at a minimum, that patients have privacy during personal hygiene activities (e.g., toileting, dressing), during medical/surgical treatments, and when requested as appropriate.

People not involved in the care of the patient should not be present without the patient's consent while the patient is being examined or treated.  Video or other electronic monitoring or recording methods should not be used when the patient is being examined without the patient's consent.  If a patient requires assistance during toileting and other personal hygiene activities, staff should assist, giving the utmost attention to the patient's need for privacy.  Privacy should also be afforded when staff visits the patient to discuss clinical care issues or conduct any examination.

A patient's right to privacy may be limited in situations where a person must be continuously observed, such as when there is an emergency and transfer to a hospital is pending.

In most situations, security cameras in non-patient care areas such as stairwells, public waiting areas, outdoor areas, entrances, etc. are not generally affected by this requirement.

**Survey Procedures:  §416.50(f)(1)**

- Observe whether patients are provided privacy during examinations, activities

concerning personal hygiene, and discussions regarding the patient's health status or healthcare, and any other appropriate situations.

## Q-0232
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

## §416.50(f) Standard:  Privacy and Safety.

**The patient has the right to –**

**(2)  Receive care in a safe setting.**

**Interpretive Guidelines:  §416.50(f)(2)**

Each patient should receive care in an environment that a reasonable person would consider to be safe.  The ASC staff should follow current standards of practice for patient environmental safety, infection control, and security.  The ASC staff should also provide protection for the patient's emotional health and safety as well as the patient's physical safety.  Respect, dignity, and comfort would be components of an emotionally safe environment.

**Survey Procedures:  §416.50(f)(2)**

- Review and analyze patient and staff incident and accident reports to identify any incidents or patterns of incidents concerning a safe environment.  Expand your review if you suspect a problem with safe environment in the ASC.

- Review safety, infection control and security documentation to determine if the ASC is identifying problems, evaluating those problems, and taking steps to ensure a safe patient environment.

- Observe the environment where care and treatment are provided.

- Review policy and procedures to see what steps the facility takes to curtail unwanted visitors and/or contaminated materials.

- Interview staff and patients to see if either have any concerns about the safety of the setting.

## Q-0233
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

## §416.50(f) Standard:  Privacy and Safety.

## The patient has the right to –

**(3)  Be free from all forms of abuse or harassment.**

**Interpretive Guidelines: §416.50(f)(3)**

An ASC must prohibit all forms of abuse, neglect (as a form of abuse), and harassment from staff, other patients, or visitors. The ASC must have mechanisms/methods in place ensure that patients are free from all forms of abuse, neglect, or harassment.

As discussed in the guidance for §416.50(d), abuse is the willful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical harm, pain or mental anguish or mental illness and neglect is the failure to provide goods and services necessary to avoid physical harm, mental anguish, or mental illness. The Merriam Webster Dictionary defines "harassment" as creating an unpleasant or hostile situation, especially by uninvited and unwelcome verbal or physical conduct.

The following components are suggested as necessary for effective protection from abuse, neglect or harassment:

**Prevent -** Persons with a record of abuse or neglect should not be hired or retained as employees. It is recommended that the ASC have a process in place to screen all applicants for employment or privileges to practice in the ASC.

**Identify -** The ASC should create and maintain a proactive approach to identify events and occurrences that may constitute or contribute to abuse and neglect.
**Train -** The ASC, during its orientation program, and through an on-going training program, should provide all employees with information regarding patient abuse and neglect, including who in the ASC is authorized to receive and handle allegations of abuse and neglect.

**Investigate -** The ASC ensures, in a timely and thorough manner, an objective investigation of all allegations of abuse, neglect, or mistreatment. This includes investigation not only of grievances from patients or their representatives, for which the grievance process prescribed in §416.50(d) must be used, but also allegations from any other source.

**Respond -** The ASC should assure that any and all incidents of abuse, neglect, or harassment are reported and analyzed, and the appropriate corrective, remedial or disciplinary action occurs, in accordance with the applicable local, State, or Federal law.

**Survey Procedures: §416.50(f)(3)**

Examine the extent to which the ASC has a system in place to protect patients from abuse, neglect, and harassment of all forms, whether from staff, other patients, visitors, or other persons. In particular, determine the extent to which the ASC addresses the following issues:

- Does the ASC have policies and procedures for investigating allegations of abuse and neglect in addition to the required grievance process that applies to allegations from patients or their representatives?

- Does the ASC use the same process as for grievances alleging abuse and neglect? If not, what is the ASC's policy and process, including the process for training staff?

- Interview staff to determine if staff members know what to do if they witness abuse and neglect.

- Ask the ASC if it has had any allegations of patient abuse or neglect from any source during the past year? If it has, ask the ASC to provide the files and to describe how the matter was handled.

- Review the records to see if the appropriate agencies were notified in accordance with State and Federal laws regarding incidents of substantiated abuse and neglect?

## Q-0234
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

## §416.50(g) Standard:  Confidentiality of Clinical Records

**The ASC must comply with the Department's rules for the privacy and security of individually identifiable health information, as specified at 45 CFR Parts 160 and 164.**
**Interpretive Guidelines:  §416.50(g)**

Section 45 CFR Parts 160 and 164, generally known as the Health Insurance Portability and Accountability Act (HIPAA) Privacy and Security rules, establish standards for health care providers and suppliers that conduct covered electronic transactions, such as ASCs, among others, for the privacy of protected health information (phi), as well as for the security of electronic phi (ephi).

> **45 CFR 160.103** defines "Protected health information" as "individually identifiable health information" with specified exceptions and limitations.

> **45 CFR 160.103** defines "Individually identifiable health information" as "information that is a subset of health information, including demographic information collected from an individual, and:

> > (1) Is created or received by a healthcare provider, health plan, employer, or healthcare clearinghouse; and

> > (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of healthcare to an individual; or the past, present, or future payment for the provision of healthcare to an individual; and

(i) That identifies the individual; or

(ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual."

**Privacy Rule**

Individually identifiable health information that is held by HIPAA Covered Entities is protected under the Privacy Rule. Such information held by the "business associates" of Covered Entities is protected through contractual requirements in their contracts with the Covered Entities.

The Privacy Rule requires ASCs that are HIPAA Covered Entities to engage in activities such as:

- Notifying patients about their privacy rights and how their information can be used;

- Adopting and implementing privacy procedures for the ASC;

- Training employees so that they understand the privacy procedures;

- Designating an individual to be responsible for seeing that the privacy procedures are adopted and followed within the ASC; and

- Securing patient records containing individually identifiable health information so that they are not readily available to those who do not need them.

To ease the burden of complying with these requirements, the Privacy Rule gives needed flexibility for ASCs to create their own privacy procedures, tailored to fit their size and needs. This scalability provides a more efficient and appropriate means of safeguarding protected health information than would any single standard. For example:

- The privacy official at a small ASC may be the office manager, who will have other non-privacy related duties; the privacy official at a very large, high volume ASC may be a full-time position.

- The training requirement may be satisfied by a small ASC's providing each new member of the workforce with a copy of its privacy policies and documenting that new members have reviewed the policies; whereas a very large ASC may provide training through live instruction, video presentations, or interactive software programs.
- The policies and procedures of small ASCs may be more limited under the Rule than those of a very large ASC, based on the volume of health information maintained and the number of interactions with those within and outside of the healthcare system.

The Department of Health and Human Services Office of Civil Rights, which is charged

with responsibility for enforcing the Privacy Rule, provides more detailed information at the following website: http://www.hhs.gov/ocr/privacy/hipaa/understanding/index.html A summary of the Privacy Rule's requirements may be found at: http://www.hhs.gov/ocr/privacy/hipaa/understanding/summary/index.html

**Security Rule**

The Department of Health and Human Services (HHS), Office of Civil Rights, also established standards, as required under HIPAA, for the security of health information. The Security Rule specifies a series of administrative, technical, and physical security standards with which covered entities must comply to ensure the confidentiality, integrity, and availability of all ephi that the covered entity creates, receives, maintains, or transmits. The standards include required and addressable implementation specifications. Unlike the Privacy Rule, which applies to protected health information in both electronic and non-electronic forms, the Security Rule only applies to phi in electronic form. More information on the Security Rule may be found at the following Web site: http://www.hhs.gov/ocr/privacy/hipaa/administrative/securityrule/securityruleguidance.html

**Expectations for Surveyors**

Surveyors are not expected to have detailed knowledge of the requirements of the Privacy and Security Rules, but instead are to focus on the steps the ASC takes to protect the confidentiality of clinical records, as well as to assure a patient's access to his/her own clinical record. If broader violations of the Privacy Rule are suspected, the case may be referred to the Regional Office, which may in turn forward the information to the Office of Civil Rights.

The ASC must have sufficient safeguards to ensure that access to all clinical records is limited to those individuals designated by law, regulation, and policy, or duly authorized by the patient to have access. No unauthorized access or dissemination of clinical records is permitted. Clinical records must be kept secure and only viewed when necessary by those persons participating in some aspect in the patient's care.
The right to the confidentiality of clinical records means safeguarding the content of information, including patient paper records, video, audio, and/or computer-stored information from unauthorized disclosure without the specific informed consent of the patient or patient's representative.

Confidentiality applies to both central storage of the closed clinical records and to open clinical records in use throughout the ASC.

**Survey Procedures: §416.50(g)**

- What policies and procedures does the ASC have in place to prevent the release or disclosure of individually identifiable patient information?

- Observe whether patient information is visible in areas where it can be viewed by

visitors or other patients?  How likely is it that an unauthorized individual could read and/or remove a patient's medical record?

- What security measures are in place to protect the patient's medical records?

## Q-0240
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.51 Condition for Coverage – Infection control

**The ASC must maintain an infection control program that seeks to minimize infections and communicable diseases.**

**Interpretive Guidelines:  §416.51**

This regulation requires the ASC to maintain an active program for the minimization of infections and communicable diseases.  The National Institute of Allergy and Infectious Diseases (NIAID) defines an infectious disease as a change from a state of health to a state in which part or all of a host's body cannot function normally because of the presence of an infectious agent or its product.   An infectious agent is defined by the NIAID as a living or quasi-living organism or particle that causes an infectious disease, and includes bacteria, viruses, fungi, protozoa, helminthes, and prions.  NIAID defines a communicable disease as a disease associated with an agent that can be transmitted from one host to another.  (See NIAID website glossary)

The ASC's infection control program must:

- Provide a functional and sanitary environment for surgical services, to avoid sources and transmission of infections and communicable diseases;
- Be based on nationally recognized infection control guidelines;
- Be directed by a designated health care professional with training in infection control;
- Be integrated into the ASC's QAPI program;
- Be ongoing;
- Include actions to prevent, identify and manage infections and communicable diseases; and
- Include a mechanism to immediately implement corrective actions and preventive measures that improve the control of infection within the ASC.

The ambulatory care setting, such as an ASC, presents unique challenges for infection control, because:  patients remain in common areas, often for prolonged periods of time; surgical prep, recovery rooms and ORs are turned around quickly; patients with infections/communicable diseases may not be identified; and there is a risk of infection at the surgical site.  Furthermore, due to the short period of time patients are in an ASC, the follow-up process to identify infections associated with the ASC requires gathering information after the patient's discharge rather than directly.  It is essential that ASCs have a comprehensive and effective infection control program, because the consequences

of poor infection control can be very serious. In recent years, for example, poor infection control practices related to injections of medications, saline or other infusates in some ASCs have resulted in the transmission of communicable diseases, such as hepatitis C, from one patient infected with the disease prior to his/her ASC visit to other ASC patients, and a requirement to notify thousands of other ASC patients of their potential exposure.

**Survey Procedures: §416.51**

One surveyor is responsible for completion of the Infection Control Surveyor Worksheet, Exhibit 351, which is used to facilitate assessment of compliance with this Condition. However, each member of the survey team, as he or she conducts his/her survey assignments, should assess the ASC's compliance with the Infection Control regulatory requirements.

# Q-0241
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.51(a) Standard: Sanitary Environment

**The ASC must provide a functional and sanitary environment for the provision of surgical services by adhering to professionally acceptable standards of practice.**

**Interpretive Guidelines: §416.51(a)**

The ASC must provide and maintain a functional and sanitary environment for surgical services, to avoid sources and transmission of infections and communicable diseases. All areas of the ASC must be clean and sanitary. This includes the waiting area(s), the pre-surgical prep area(s), the recovery room(s), and the operating or procedure rooms. The ASC must appropriately monitor housekeeping, maintenance (including repair, renovation, and construction activities), and other activities to ensure a functional and sanitary environment. Policies and procedures for a sanitary and functional environment should address the following:

- Ventilation and water quality control issues, including measures taken to maintain a safe environment during internal or external construction/renovation;
- Maintaining safe air handling systems in areas of special ventilation, such as operating rooms;
- Techniques for food sanitation if employee food storage and eating areas are provided;
- Techniques for cleaning and disinfecting environmental surfaces, carpeting, and furniture;
- Techniques for disposal of regulated and non-regulated waste; and
- Techniques for pest control.

These activities must be conducted in accordance with professionally recognized standards of infection control practice. Examples of national organizations that

promulgate nationally recognized infection and communicable disease control guidelines, and/or recommendations include: the Centers for Disease Control and Prevention (CDC), the Association for Professionals in Infection Control and Epidemiology (APIC), the Society for Healthcare Epidemiology of America (SHEA), and the Association of periOperative Registered Nurses (AORN).

**Survey Procedures:  §416.51(a)**

Using the specific questions on the infection control survey worksheet related to environmental infection control to guide you:

- Observe throughout the ASC the cleanliness of the waiting area(s), the recovery room(s), the OR/procedure rooms, floors, horizontal surfaces, patient equipment, air inlets, mechanical rooms, supply, storage areas, etc.

- Interview staff to determine whether cleaning/disinfection takes place at the appropriate frequencies, using suitable EPA-registered agents.  Ask for supporting documentation to confirm what staff say in interviews.

- Determine whether the ASC has a procedure for decontamination after gross spills of blood or other bodily fluids.

- Determine whether used sharps are disposed of properly.

- Determine whether the ASC re-uses devices marketed for single use, and if so, does it send them to an FDA-approved vendor for reprocessing?

# Q-0242
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.51(b) Standard: Infection control program.

**The ASC must maintain an ongoing program designed to prevent, control, and investigate infections and communicable diseases.  In addition, the infection control and prevention program must include documentation that the ASC has considered, selected, and implemented nationally recognized infection control guidelines. [ …]**

**Interpretive Guidelines:  §416.51(b)**

The ASC must maintain an ongoing program to prevent, control, and investigate infections and communicable diseases.  As part of this ongoing program, the ASC must have an active surveillance component that covers both ASC patients and personnel working in the facility.  Surveillance includes infection detection through ongoing data collection and analysis.

The ongoing program must be based on nationally recognized infection control guidelines that the ASC has selected, after a deliberative process. Examples of national

organizations that promulgate nationally recognized infection and communicable disease control guidelines, and/or recommendations include: the Centers for Disease Control and Prevention (CDC), the Association for Professionals in Infection Control and Epidemiology (APIC), the Society for Healthcare Epidemiology of America (SHEA), and the Association of periOperative Registered Nurses (AORN).

The ASC should select one or more sets of guidelines that enable it to address the following key functions of an effective infection control program:

- Maintenance of a sanitary ASC environment (see requirements of §416.51(a));

- Development and implementation of infection control activities related to ASC personnel, which, for infection control purposes, includes all ASC medical staff, employees, and on-site contract workers (e.g., nursing staff employed by associated physician practice who also work in the ASC, housekeeping staff, etc);

- Mitigation of risks associated healthcare-associated infections:

- Identifying infections;

- Monitoring compliance with all policies, procedures, protocols and other infection control program requirements;

- Program evaluation and revision of the program, when indicated;

The following provides a more detailed overview of the types of activities related to these key functions.

**ASC staff-related activities:**

- Evaluating ASC staff immunization status for designated infectious diseases, for example, as recommended by the CDC and its Advisory Committee on Immunization Practices (ACIP);

- Policies articulating the authority and circumstances under which the ASC screens its staff for infections likely to cause significant infectious disease or other risk to the exposed individual, and for reportable diseases, as required under local, state, or federal public health authority;

- Policies articulating when infected ASC staff are restricted from providing direct patient care or required to remain away from the facility entirely;

- New employee and regular update training in preventing and controlling healthcare-associated infections and methods to prevent exposure to and transmission of infections and communicable diseases; and

- Methods to evaluate staff exposed to patients with infections and communicable

diseases.

**Mitigation of risks contributing to healthcare-associated infections (HAI):**

For the purposes of its surveillance activities in an acute care setting, the CDC defines an HAI as a localized or systemic condition resulting from an adverse reaction to the presence of an infectious agent(s) or its toxin(s). There must be no evidence that the infection was present or incubating at the time of admission to the ASC.

HAIs may be caused by infectious agents from endogenous or exogenous sources. Endogenous sources are body sites, such as the skin, nose, mouth, gastrointestinal (GI) tract, or vagina that are normally inhabited by microorganisms. Exogenous sources are those external to the patient, such as patient care personnel, visitors, patient care equipment, medical devices, or the health care environment.

HAI risk mitigation measures include:

Surgery-related infection risk mitigation measures:

- Implementing appropriate prophylaxis to prevent surgical site infection (SSI), such as protocol to assure that antibiotic prophylaxis to prevent SSI for appropriate procedures is administered at the appropriate time, done with an appropriate antibiotic, and discontinued appropriately after surgery; and

- Addressing aseptic technique practices used in surgery, including sterilization or high-level disinfection of instruments, as appropriate.

- Other ASC healthcare-associated infection risk mitigation measures:

- Promotion of hand hygiene among staff and employees, including utilization of alcohol-based hand sanitizers;

- Measures specific to the  prevention of infections caused by organisms that are antibiotic-resistant;

- Measures specific to safe practices for injecting medications and saline or other infusates;

- Requiring disinfectants and germicides to be used in accordance with the manufacturers' instructions;

- Appropriate use of facility and medical equipment, including air filtration equipment, UV lights, and other equipment used to control the spread of infectious agents;

- Educating patients, visitors, and staff, as appropriate, about infections and communicable diseases and methods to reduce transmission in the ASC and in the

community.

## Identifying Infections

The ASC must conduct monitoring activities throughout the entire facility in order to identify infection risks or communicable disease problems. The ASC should document its monitoring/tracking activities, including the measures selected for monitoring, and collection and analysis methods. Activities should be conducted in accordance with recognized infection control surveillance practices, such as, for example, those utilized by the CDC's National Healthcare Safety Net (NHSN). Monitoring includes follow-up of patients after discharge, in order to gather evidence of whether they have developed an infection associated with their stay in the ASC. See discussion of §416.44(a)(3).

The ASC must develop and implement appropriate infection control interventions to address issues identified through its detection activities, and then monitor the effectiveness of interventions through further data collection and analysis.

## Monitoring Compliance

It is not sufficient for the ASC to have detailed policies and procedures governing infection control; it must also take steps to determine whether the staff of the ASC adhere to these policies and procedures in practice. Are staff washing their hands prior to providing care to patients? Do personnel who prepare injections comply with all pertinent protocols? Is equipment properly sterilized or disinfected? Is the facility clean? The ASC must demonstrate that it has a process in place for regularly assessing infection control compliance.

## Program Evaluation

See the guidance for §416.51(b)(2), which requires that the infection control program must be an integral part of the ASC's quality assessment and performance improvement program.

An ASC presents different challenges for infection control as patients at varying levels of wellness are gathered in waiting or recovery areas, including the elderly, immuno-compromised patients, pre- and post-operative patients, and individuals with active or incubating infectious and communicable diseases. The length of stay for such individuals can range from brief to all day. Additionally, as ASCs are performing more invasive procedures, the level of risk for developing and transmitting infections and communicable diseases for patients and heath care workers increases. The ASC should design its infection control program with these challenges in mind. For instance, the ASC should take appropriate control measures for those individuals who may present risk for the transmission of infectious agents by the airborne or droplet route. When such individuals are identified, the ASC could, for example, implement such prevention measures that would include prompt physical separation, implementation of respiratory hygiene/cough etiquette protocols, and appropriate isolation precautions based on the routes of transmission of the suspected infection.

**Survey Procedures:  §416.51(b)**

- Use the infection control tool to assist in assessing compliance with this standard.

- Determine that there is an ongoing program for the prevention, control, and investigation of infections and communicable diseases among patients and ASC personnel, including contract workers and volunteers.

- Determine whether the policies and procedures of the program of the infection control program are implemented correctly.  Specifically, surveyors should determine whether the ASC:

- Mitigates risks contributing to healthcare-associated infections (for example, observe whether staff exhibit good hand hygiene);

- Performs monitoring/tracking activities to identify infections; and

- Monitors compliance with all infection control program requirements.

- Review the parameters of the program to determine whether it is consistent with nationally recognized infection control guidelines.  Is there documentation that the ASC has developed the procedures and policies of the program based on nationally recognized infection control guidelines?

## Q-0243
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.51(b) Standard: Infection control program.

## […] The program is –

**(1)  Under the direction of a designated and qualified professional who has training in infection control;**

**Interpretive Guidelines:  §416.51(b) (1)**

The ASC must designate in writing, a qualified licensed health care professional who will lead the facility's infection control program.  The ASC must determine that the individual has had training in the principles and methods of infection control.   Note that certification in infection control, such as that offered by the Certification Board of Infection Control and Epidemiology Inc. (CIBC), while highly desirable, is not required, so long as there is documentation that the individual has training that qualifies the individual to lead an infection control program.  The individual selected to lead the ASC's infection control program must maintain his/her qualifications through ongoing education and training, which can be demonstrated by participation in infection control courses, or in local and national meetings organized by recognized professional societies,

such as APIC and SHEA.

Although CMS does not specify the number of hours that the qualified individual must devote to the infection control program, resources must be adequate to accomplish the tasks required for the infection control program. The ASC should consider the type of surgical services offered at the facility as well as the patient population in determining the size and scope of the resources it commits to infection control. The CDC's HICPAC as well as professional infection control organizations, such as the APIC and the SHEA, publish studies and recommendations on resource allocation that ASCs may find useful.

**Survey Procedures: §416.51(b) (1)**

- Determine whether a qualified individual has been designated with the responsibility for leading the infection control program.

- Review the personnel file of the infection control individual to determine whether he/she is qualified through ongoing education, training, or certification to oversee the infection control program.

## Q-0244
**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.51(b) Standard: Infection Control Program.

## [...The program is –]

**(2) An integral part of the ASC's quality assessment and performance improvement program; and**

**Interpretive Guidelines: §416.51(b)(2)**

To reflect the importance of infection control the regulations specifically require that the ASC's infection control program must be integrated into its QAPI program. Among other things this means that infection control data and program activities are an ongoing component of the QAPI program, and that actions are taken in response to data analyses to improve the ASC's infection control performance. See the discussion related to §416.43, which articulates the ASC QAPI requirements.

**Survey Procedures: §416.51(b)(2)**

- Determine whether the ASC's quality assessment and performance program includes measures/indicators and activities related to infection control on an ongoing basis.

- Determine whether there is evidence that the QAPI infection control activities result in specific actions designed to improve infection control within the ASC.

## Q-0245
**(Rev. 95, Issued: 12-12-13, Effective: 06-07-13, Implementation: 06-07-13)**

## §416.51(b) Standard: Infection control program.

## The program is –]

**(3)  Responsible for providing a plan of action for preventing, identifying, and managing infections and communicable diseases and for immediately implementing corrective and preventive measures that result in improvement.**

**Interpretive Guidelines:  §416.51(b)(3)**

The ASC's infection control professional must develop and implement a comprehensive plan that includes actions to prevent, identify and manage infections and communicable diseases within the ASC.  The plan of action must include mechanisms that result in immediate action to take preventive or corrective measures that improve the ASC's infection control outcomes.  The plan should be specific to each particular area of the ASC, including, but not limited to, the waiting room(s), the recovery room(s), and the surgical areas.   The designated infection control professional must assure that the program's plan of action addresses the activities discussed in the interpretive guidelines for §416.51(b), i.e.,

- Maintenance of a sanitary environment; (See discussion of §416.51(a))

- Development and implementation of infection control measures related to ASC personnel;
- Mitigation of risks associated with patient infections present upon admission;

- Mitigation of risks contributing to healthcare-associated infections;

- Active surveillance;

- Monitoring compliance with all policies, procedures, protocols, and other infection control program requirements;

- Plan evaluation and revision of the plan, when indicated;

- Coordination as required by law with federal, state, and local emergency preparedness and health authorities to address communicable and infectious disease threats and outbreaks; and

- Compliance with reportable disease requirements of the local health authority. (See discussion of §416.44(a)(3))

ASCs are required to have a process to follow up on each patient after discharge, in order to identify and track infections associated with the patient's stay in the ASC.  An ASCs is

not expected to establish routine post-surgical laboratory testing for infectious diseases, but if it learns of an infection in the post-discharge period from the patient or patient's physician, the ASC might consider inquiring whether there is a lab confirmation of an infectious disease, and, if there are indications that the infection was associated with the patient's stay in the ASC. If the ASC learns of a disease that is reportable under State law (including regulations), they must report it to the appropriate State authorities.

ASCs may delegate portions of this follow-up responsibility to the physicians on the ASC's staff who will see the patients in their office post-discharge only if the ASC's process includes a mechanism for ensuring that the results of the follow-up are reported back to the ASC and documented in the patient's medical record.

**Survey Procedures: §416.51(b)(3)**

- Ask the infection control professional to describe actual examples of how, as a result of the action plan, infection control issues were identified and corrective or preventive actions were taken.

- Ask for documentation of how those actions were evaluated to assure that they resulted in improvement.

- Ask the infection control professional to review the ASC's infection control plan of action with you, explaining how it addresses the fundamental elements of an infection control program.

- Does the plan address all the basic elements of infection control?

- Ask the ASC's leadership how it tracks infections among patients and staff.

- Ask for documentation of this tracking – is there tracking of all patients?

- Ask the ASC's leadership what diseases are reportable to the State to verify the ASC's awareness of applicable reporting requirements.

- Ask the ASC if it has ever reported a reportable disease to the State. If yes, review the ASC's documentation of the case.

## Q-0260

**(Rev. 56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.52 Condition for coverage – Patient Admission, Assessment and Discharge

**The ASC must ensure each patient has the appropriate pre-surgical and post-surgical assessments completed and that all elements of the discharge requirements are completed.**

**Interpretive Guidelines §416.52**

The core objectives of this condition are to ensure that:

- The patient can tolerate a surgical experience;

- The patient's anesthesia risk and recovery are properly evaluated

- The patient's post-operative recovery is adequately evaluated;

- The patient received effective discharge planning; and

- The patient is successfully discharged from the ASC

(See 72 FR 50477, August 31, 2007.)

All elements of the specific requirements of this condition concerning pre- and post-surgical assessments, together with the patient assessment requirements in the surgical services CfC at§416.42(a) , must be met. Deficiencies related to §416.42(a), concerning the need for a physician to evaluate the patient for anesthesia risk and surgical procedure risk prior immediately before surgery, and for anesthesia recovery prior to discharge are to be considered when determining whether the requirements of this Condition have been met.

# Q-0261

**(Rev. 71, Issued: 05-13-11, Effective: 5-13-11-Implementation: 05-13-11)**

## §416.52(a) Standard:  Admission and Pre-surgical Assessment

**(1)  Not more than 30 days before the date of the scheduled surgery, each patient must have a comprehensive medical history and physical assessment completed by a physician (as defined in section 1861(r) of the Act) or other qualified practitioner in accordance with applicable State health and safety laws, standards of practice, and ASC policy.**

**Interpretive Guidelines §416.52(a)(1)**

The purpose of a comprehensive medical history and physical assessment (H&P) is to determine whether there is anything in the patient's overall condition that would affect the planned surgery, such as a medication allergy, or a new or existing co-morbid condition that requires additional interventions to reduce risk to the patient, or which may even indicate that an ASC setting might not be the appropriate setting for the patient's surgery. The H&P must be comprehensive in order to allow assessment of the patient's readiness for surgery and is required regardless of the type of surgical procedure.  The H&P should specifically indicate that the patient is cleared for surgery in an ambulatory setting.

The H&P must be completed and documented for each ASC patient no more than 30 calendar days prior to date the patient is scheduled for surgery in the ASC.

- In cases where the patient is scheduled for two surgeries in the ASC within a short period of time, the same H&P may be used so long is it completed no more than 30 calendar days before each surgery. For example, if a patient has two surgeries for cataracts scheduled, one eye on May 3rd, and the other eye on May 18th, and H&P performed on April 20th could be used for both surgeries.

- The H&P is still required in those cases where the patient is referred to the ASC for surgery on the same day as the referral and the referring physician has indicated it is medically necessary for the patient to have the surgery on the same date. The H&P may be performed by the referring physician, if the ASC's policies permit this, or qualified personnel in the ASC. If there are elements of the H&P that are essential to the performance of the physician assessment required under §416.42(a) or under this requirement at §416.52(a)(1), based on the type of procedure to be performed as well as applicable State health and safety laws, standards of practice, or ASC policy, and those elements cannot be completed prior to the scheduled time of the surgical procedure, then it is questionable whether the case is suitable for that ASC.

- The H&P may be performed on the same day as the surgical procedure, and may be performed in the ASC, as long as it is conducted by qualified personnel, is comprehensive, and the results of the H&P are placed in the patient's medical record prior to the surgical procedure (see §416.52(a)(3). It is not acceptable to conduct the H&P after the patient has been prepped and brought into the operating or procedure room, since the purpose of the H&P is to determine before the surgery whether there is anything in the patient's overall condition that would affect the conduct of the planned procedure, or which may even require cancellation of the procedure.

The medical history and physical examination must be completed and documented by a physician (as defined in Section 1861(r) of the Act) or other qualified licensed individual practitioner in accordance with State law, generally accepted standards of practice, and ASC policy.

Section 1861(r) defines a physician as a:

- doctor of medicine or osteopathy;

- doctor of dental surgery or of dental medicine;

- doctor of podiatric medicine;

- doctor of optometry; or a

- chiropractor.

In all cases the practitioners included in the definition of a physician must be legally authorized to practice within the State where the ASC is located and providing services within their authorized scope of practice.

Other qualified licensed individuals are those licensed practitioners who are authorized in accordance with their State scope of practice laws or regulations to perform an H&P and who are also formally authorized by the ASC to conduct an H&P. Other qualified licensed practitioners could include nurse practitioners and physician assistants.

More than one qualified practitioner can participate in performing, documenting, and authenticating an H&P for a single patient. When performance, documentation, and authentication are split among qualified practitioners, the practitioner who authenticates the H&P will be held responsible for its contents.

In the case of an ASC the H&P is typically completed by the patient's primary care practitioner rather than a member of the ASC's medical staff. The ASC's policy on H&Ps should address submission of an H&P prior to the patient's scheduled surgery date by a physician who is not a member of the ASC's medical staff and should indicate whether it will accept H&Ps performed by a qualified licensed individual who does not practice at the ASC but is acting within his/her scope of practice under State law or regulations.

**Survey Procedures: §416.52(a)(1)**

- Determine whether the ASC has a policy requiring that an H&P be performed for each patient no more than 30 days before each patient's scheduled surgery by a physician (as defined in Section 1861(r) of the Act), or other qualified licensed individual in accordance with State law and hospital policy.

- Does the ASC's policy address who may perform the H&P? If it permits acceptance of H&Ps by qualified licensed individuals who are not physicians, is it consistent with the State's scope of practice law or regulations?

- Review a sample of open and closed medical records to verify that:

- There is an H&P that was completed no more than 30 days before the patient's surgery date;

- For H&Ps performed in the ASC on the day of the surgery, that the H&P is comprehensive and performed prior to the patient's being moved into the OR or procedure room; and

- The H&P was performed by a physician, or other qualified licensed individual authorized in accordance with State law, standards of practice, and ASC policy.

## Q-0262

**(Rev. 71, Issued: 05-13-11, Effective: 5-13-11-Implementation: 05-13-11)**

## §416.52(a) Standard:  Admission and Pre-surgical Assessment

**(2)  Upon admission, each patient must have a pre-surgical assessment completed by a physician or other qualified practitioner in accordance with applicable State health and safety laws, standards of practice, and ASC policy that includes, at a minimum, an updated medical record entry documenting an examination for any changes in the patient's condition since completion of the most recently documented medical history and physical assessment, including documentation of any allergies to drugs and biologicals.**

**Interpretive Guidelines:  §416.52(a)(2)**

Each ASC patient upon admission to the ASC must have a pre-surgical assessment.  The requirement at §416.42(a)(1) for a physician to examine the patient immediately before surgery to evaluate the risk of the anesthesia and of the procedure for that patient is one component of the requirement at 42 CFR 416.52(a)(2).  This component must be conducted by a physician, immediately prior to surgery, and must be performed in a manner consistent with the requirements at §416.42(a)(1).  (See the interpretive guidelines for §416.42(a)(1).  Other elements of the assessment may be conducted by a licensed practitioner who is credentialed and privileged by the ASC to perform an H&P. In all cases, the update must take place prior to the surgery.

If the H&P required under §416.52(a)(1)is performed on the day of the surgical procedure in the ASC, some, but not all, elements of the pre-surgical assessment may be incorporated into the H&P. However, the assessment of the patient's risk for the procedure and anesthesia required under §416.42(a)(1) must still be conducted separately, by a physician and immediately prior to surgery.

The patient must be assessed for any changes in his/her condition since the patient's H&P was performed that might be significant for the planned surgery.  Patients may have had a change in health status after the H&P, but may not recognize the significance for their planned surgery.  Any changes in health and medication can have an impact on the patient's ability to tolerate the surgery or anesthesia, and the post-admission pre-surgical assessment is designed to identify these changes and take appropriate action, up to and including postponing or cancellation of the surgery.  In addition, the pre-surgical assessment must identify and document any allergies the patient may have to drugs and biologicals, or indicate that the patient has no known allergies to drugs and biologicals. Further, if the practitioner finds that the H&P done before admission is incomplete, inaccurate, or otherwise unacceptable, the practitioner reviewing the H&P, examining the patient, and completing the update may disregard the existing H&P, and conduct and document in the medical record a new H&P prior to the surgery.

The patient's medical record must include documentation that the patient was examined

prior to the commencement of surgery for changes since the H&P.   The physician or qualified licensed individual uses his/her clinical judgment, based upon his/her assessment of the patient's condition and co-morbidities, if any, in relation to the patient's planned surgery to decide the extent of the update assessment needed as well as the information to be included in the update note in the patient's medical record.

If, upon examination, the licensed practitioner finds no change in the patient's condition since the H&P was completed, he/she may indicate in the patient's medical record that the H&P was reviewed, the patient was examined, and that "no change" has occurred in the patient's condition since the H&P was completed. Likewise, any changes in the patient's condition must be documented by the practitioner in the update note prior to the start of surgery.

**Survey Procedures:  §416.52(a)(2)**

• Determine whether the ASC's policies require a pre-surgical assessment for all patients to update the findings of the H&P performed prior to the date of surgery.

• In the sample of medical records selected for review, verify that an updated medical record entry documenting an examination for any changes in the patient's condition was completed prior to the surgery.

• Verify that a physician performs those components of the pre-surgical assessment related to evaluation of anesthetic risk and procedural risk, as required by §416.42(a)(1).

a.  Verify that the pre-surgical assessment includes documentation in the medical record of the patient's allergies or lack of known allergies to drugs and biologicals.

# Q-0263

**(Rev.5 6, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.52(a) Standard:  Admission and Pre-surgical Assessment

**(3)      The patient's medical history and physical assessment must be placed in the patient's
medical record prior to the surgical procedure.**

**Interpretive Guidelines:  §416.52(a)(3)**

Ideally, the comprehensive H&P must be submitted to the ASC prior to the patient's scheduled surgery date, in order to allow sufficient time for review of the H&P by the ASC's medical staff and adjustments if necessary, including postponement or cancellation of the surgery.   At a minimum, the H&P must be placed in the patient's medical record prior to the pre-surgical assessment required under §416.52(a)(2), since that assessment must first consider the findings of the H&P before examining the patient for changes.  Both the H&P and the pre-surgical assessment must be placed in the

patient's medical record before the surgery.

**Survey Procedures: §416.52(a)(3)**

In the sample of medical records selected for review, verify that each record contains both the H&P and the updated pre-surgical assessment. Focus in particular on open records of patients scheduled for surgery during the on-site survey, to determine whether these documents are in the patients' records before the start of their surgical procedures.

# Q-0264

**(Rev.56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.52(b) Standard: Post-surgical Assessment.

**(1)    The patient's post-surgical condition must be assessed and documented in the medical
record by a physician, other qualified practitioner, or a registered nurse with, at a minimum, post-operative care experience in accordance with applicable State health and safety laws, standards of practice, and ASC policy.**

**(2)    Post-surgical needs must be addressed and included in the discharge notes.**

**Interpretive Guidelines: §416.52(b)**

Each patient must be assessed after the surgery is completed.  In accordance with the requirements of §416.42(a)(2), a physician or anesthetist must assess each patient for recovery from anesthesia after the surgery.  See the interpretive guidelines for §416.42(a)(2) for a discussion of the requirements for a post-anesthesia assessment.

In addition, each post-surgical patient's overall condition must be assessed and documented in the medical record, in order to determine how the patient's recovery is proceeding, what needs to be done to facilitate the patient's recovery, and whether the patient is ready for discharge or in need of further treatment or monitoring.

Except for the assessment of the patient's recovery from anesthesia, the assessment may be performed by a physician, another qualified practitioner, or a registered nurse with post-operative care experience who is permitted, under applicable State laws as well as general standards of practice and the ASC's clinical policy, to assess patients' post-operatively.
If the assessment identifies post-surgical patient needs that must be addressed in order for the patient to be safely discharged, or, in the case of patients who develop needs that exceed the capabilities of the ASC,  appropriately and timely transferred to a hospital for further care, the ASC must address those patient needs.  This must be documented in the discharge notes in the patient's medical record.

**Survey Procedures: §416.52(b)**

- Verify through observation of post-surgical patient care and through record review whether the ASC evaluates each patient after surgery, both for recovery from anesthesia, as required under §416.42(a)(2), and for his/her overall recovery from the surgery and suitability for discharge.

- Are the post-surgical assessments performed by qualified personnel, i.e., a physician or anesthetist assesses the recovery from anesthesia, while the overall assessment is performed by a physician, other licensed practitioner or RN with appropriate experience in post-operative care?  Where an RN performs an assessment, is there documentation of the RN's qualifications to do so?

- Does the ASC identify patient needs related to safe discharge, or, as applicable, does it identify patients who require transfer to a hospital for further treatment that exceeds the ASC's capabilities?  Do the records reflect actions by the ASC to address the needs it has identified?

- Do the medical records reflect the post-surgical assessment, needs identified, and actions taken by the ASC to address those needs in the medical record's discharge notes?

## Q-0265

**(Rev.56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.52(c) Standard:  Discharge.  The ASC must -

**(1)       Provide each patient with written discharge instructions and overnight supplies.  When
appropriate, make a follow-up appointment with the physician, and ensure that all patients are informed, either in advance of their surgical procedure or prior to leaving the ASC, of their prescriptions, post-operative instructions and physician contact information for follow-up care.**

**Interpretive Guidelines:  §416.52(c)(1)**

Each patient, or the adult who accompanies the patient upon discharge, must be provided with written discharge instructions.

Either before the surgery or before discharge each patient must be provided with:

- Prescriptions they will need to fill associated with their recovery from surgery;

- Written instructions that specify actions the individual should take in the immediate post-operative, post-discharge period to promote their recovery from the surgery; warning signs of complications to be alert for, etc.

- How to contact the physician who will provide follow-up care to the patient.  When

appropriate, the ASC must make an appointment with the physician for follow-up care.

The ASC must also provide supplies, such as gauze, bandages, etc., sufficient for the patient's needs through the first night after the surgery.

**Survey Procedures: §416.52(c)(1)**

• Determine whether there is a copy of the discharge instructions provided to the patient in the patient's medical record.

• Look at the discharge instructions in the sample of records under review, as well as for patients being discharged while the ASC is being surveyed. Do the discharge instructions include post-operative care instructions for the patient? Do they indicate if the patient was provided prescriptions, if applicable? Do they provide physician contact information?

• Ask the ASC when and how it schedules follow-up appointments with the physician for patients.

• Ask the ASC what types of supplies it typically provides to patients upon discharge. Observe whether patients being discharged during the survey are provided any supplies to cover their overnight needs.

## Q-0266
*(Rev. 137, Issued: 04-01-15, Effective: 03-27-15, Implementation: 03-27-15)*

## §416.52(c) Standard: Discharge.

*The ASC must -*

**(2) Ensure each patient has a discharge order, signed by the physician who performed the surgery or procedure in accordance with applicable State health and safety laws, standards of practice, and ASC policy.**

**Interpretive Guidelines: §416.52(c)(2)**

No patient may be discharged from the ASC unless the physician who performed the surgery or procedure signs a discharge order. The ASC must ensure that physicians follow applicable State laws as well as generally accepted standards of practice and ASC policy when determining that a patient has recovered sufficiently from surgery and may be discharged from the ASC, or, as applicable, that the patient must be transferred to another healthcare facility that can provide the ongoing treatment that the patient requires and that the ASC is unable to provide. *It is permissible for the operating physician to write a discharge order indicating "the patient may be discharged when stable." (73 FR 68721). In such cases there must be documentation of when patient was stable.* It is expected that a patient will actually leave the ASC within 15 – 30 minutes of the time

when the physician signs the discharge order *or when he or she was found to be stable, whichever happens later*.

**Survey Procedures:  §416.52(c)(2)**

- Determine whether there is a discharge order, signed by the physician who performed the surgery/procedure, in the sample of medical records being reviewed.

- Determine whether there is a discharge order signed by the physician for patients being discharged while the survey takes place.

# Q-0267

**(Rev.56, Issued: 12-30-09, Effective/Implementation: 12-30-09)**

## §416.52(c) Standard:  Discharge.

## The ASC must -

**(3)   Ensure all patients are discharged in the company of a responsible adult, except those patients exempted by the attending physician.**

**Interpretive Guidelines:  §416.52(c)(3)**

Unless the physician who is responsible for the patient's care in the ASC has exempted the patient, the ASC may not discharge any patient who is not accompanied by a responsible adult who will go with the patient after discharge.   ASCs would be well-advised to develop policies that address what criteria a physician should consider when deciding a patient does not need to be discharged in the company of a responsible adult. Exemptions must be specific to individual patients, not blanket exemptions to a whole class of patients.

**Survey Procedures:  §416.52(c)(3)**

- Do the medical records being review identify for each patient the responsible adult who will accompany the patient after discharge or, alternatively, a specific exemption or this patient from this requirement by the physician?

- Observe whether the ASC ensures an adult accompanies patients discharged while the survey is taking place, unless the patient has been specifically exempted from this requirement.

## Transmittals Issued for this Appendix

| Rev # | Issue Date | Subject | Impl Date | CR# |
|---|---|---|---|---|
| R137SOM | 04/01/2015 | Revisions to State Operations Manual (SOM) Appendices A, G, L and T related to Hospitals, Rural Health Clinics, Ambulatory Surgical Centers and Swing Beds | 03/27/2015 | N/A |
| R99SOM | 01/31/2014 | Revised State Operations Manual (SOM) Appendices A, I, L, and W | 01/31/2014 | N/A |
| R95SOM | 12/12/2013 | Revised Appendix A, Interpretive Guidelines for Hospitals, Appendix L, Interpretive Guidelines for Ambulatory Surgical Centers and Appendix W, Interpretive Guidelines for Critical Access Hospitals | 06/07/2013 | N/A |
| R89SOM | 08/30/2013 | Revised State Operations Manual (SOM) Appendices A, I, L, and W – Rescinded and replaced by Transmittal 99 | 08/30/2013 | N/A |
| R84SOM | 06/07/2013 | Revised Appendix A, Interpretive Guidelines for Hospitals, Appendix L, Interpretive Guidelines for Ambulatory Surgical Centers and Appendix W, Interpretive Guidelines for Critical Access Hospitals – Rescinded and replaced by Transmittal 95 | 06/07/2013 | N/A |
| R76SOM | 12/22/2011 | Clarifications to Appendix L, Ambulatory Surgical Center Interpretive Guidelines – Obtaining Consent Before Observing Surgical Procedures | 12/22/2011 | N/A |
| R71SOM | 05/13/2011 | Clarifications to Appendix L, Ambulatory Surgical Center Interpretive Guidelines – Comprehensive Medical History and Physical (H&P) Assessment and Anesthetic Risk and Evaluation | 05/13/2011 | N/A |
| R56SOM | 12/30/2009 | Revised Appendix L, "Interpretive Guidelines for Ambulatory Surgical Centers" | 12/30/2009 | N/A |
| R01SOM | 05/24/2004 | Initial Release of Pub 100-07 | N/A | N/A |

**EXHIBIT F**

From:26 East Same Day Surgery    312 726 3823    12/28/2015 14:53    #213 P.003/024

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 14C0001027 | A. BUILDING _____ | | 12/16/2015 |
| | | B. WING _____ | | |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| 25 EAST SAME DAY SURGERY CENTE | 25 E WASHINGTON ST<br>CHICAGO, IL 60602 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 000 | INITIAL COMMENTS | Q 000 | | |
| | A recertification survey was conducted. The Facility was not in compliance with the Condition for Coverage for Infection Control, 42 CFR 416.52, as evidenced by: | | | |
| | The life safety code portion of a recertification survey was conducted on December 16, 2015. The requirements of 42 CFR Subpart 416.44, Environment, are NOT MET as evidenced by the deficiencies cited under the K-tags. | | Q000,100,104<br>**Corrective Measure:**<br>All K-Tags associated with the Life safety inspection have been Answered separately on CMS form CMS-2567(02-99) | 1/4/16 |
| | Glossary<br>OR- Operating Room<br>ICO-Infection Control Officer<br>CL-Clinical Liaison<br>RN-Registered Nurse<br>ORT-Operating Room Technician | | **Responsible Party**<br>Administrator | 1/4/16 |
| Q 100 | 416.44 ENVIRONMENT | Q 100 | | |
| | The ASC must have a safe and sanitary environment, properly constructed, equipped, and maintained to protect the health and safety of patients. | | | |
| | This CONDITION is not met as evidenced by: Based on direct observation during the survey walk through, staff interview and document review during the Life Safety code portion of a recertification survey conducted on December 16, 2015, the surveyor finds that the facility failed to provide and maintain a safe environment for patients and staff.<br>This is evidenced by the number, severity and variety of Life Safety Code deficiencies that were found. Also see Q104. | | | |
| Q 104 | 416.44(b) SAFETY FROM FIRE | Q 104 | | |

| LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE | TITLE | (X6) DATE |
|---|---|---|
| | | 1/6/1 |

Any deficiency statement ending with an asterisk (*) denotes a deficiency which the institution may be excused from correcting providing it is determined that other safeguards provide sufficient protection to the patients. (See instructions.) Except for nursing homes, the findings stated above are disclosable 90 days following the date of survey whether or not a plan of correction is provided. For nursing homes, the above findings and plans of correction are disclosable 14 days following the date these documents are made available to the facility. If deficiencies are cited, an approved plan of correction is requisite to continued program participation.



EXHIBIT
F

From:26 East Same Day Surgery     012 726 3623          12/28/2015 14:53          #213 P.004/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 14C0001027 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 12/16/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

26 EAST SAME DAY SURGERY CENTE

STREET ADDRESS, CITY, STATE, ZIP CODE

25 E WASHINGTON ST
CHICAGO, IL 60602

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 104 | Continued From page 1 | Q 104 | | |
| | (1) Except as otherwise provided in this section, the ASC must meet the provisions applicable to Ambulatory Health Care Centers of the 2000 edition of the Life Safety Code of the National Fire Protection Association, regardless of the number of patients served. The Director of the Office of the Federal Register has approved the NFPA 101® 2000 edition of the Life Safety Code, issued January 14, 2000, for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the Code is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD and at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to http://www.archives.gov/federalregister/code_of_federal-regulations/ibr_locations.html. Copies may be obtained from the National Fire Protection Association, 1 Batterymarch Park, Quincy, MA 02269. If any changes in this edition of the Code are incorporated by reference, CMS will publish notice in the Federal Register to announce the changes. | | | |
| | (2) In consideration of a recommendation by the State survey agency, CMS may waive, for periods deemed appropriate, specific provisions of the Life Safety Code which, if rigidly applied, would result in unreasonable hardship upon an ASC, but only if the waiver will not adversely affect the health and safety of the patients. | | | |
| | (3) The provisions of the Life Safety Code do not apply in a State if CMS finds that a fire and safety code imposed by State law adequately protects patients in an ASC. | | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: EG4L11          Facility ID: IL46C3          If continuation sheet Page 2 of 16

From:25 East Same Day Surgery     312 726 3823     12/28/2015 14:54     #213 P.006/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | | A. BUILDING _____ | | |
| | 14C0001027 | B. WING _____ | | 12/16/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| 25 EAST SAME DAY SURGERY CENTE | 25 E WASHINGTON ST<br>CHICAGO, IL 60602 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 104 | Continued From page 2 | Q 104 | | |
| | (4) An ASC must be in compliance with Chapter 21.2.9.1, Emergency Lighting, beginning on March 13, 2006. | | | |
| | (5) Notwithstanding any provisions of the 2000 edition of the Life Safety Code to the contrary, an ASC may place alcohol-based hand rub dispensers in its facility if: | | | |
| | (I) Use of alcohol-based hand rub dispensers does not conflict with any State or local codes that prohibit or otherwise restrict the placement of alcohol-based hand rub dispensers in health care facilities; | | | |
| | (II) The dispensers are installed in a manner that minimizes leaks and spills that could lead to falls; | | | |
| | (iii) The dispensers are installed in a manner that adequately protects against inappropriate access; and | | | |
| | (iv) The dispensers are installed in accordance with the following provisions: | | | |
| | (A) Where dispensers are installed in a corridor, the corridor shall have a minimum width of 6 ft (1.8m); | | | |
| | (B) The maximum individual dispenser fluid capacity shall be: | | | |
| | (1) 0.3 gallons (1.2 liters) for dispensers in rooms, corridors, and areas open to corridors | | | |
| | (2) 0.5 gallons (2.0 liters) for dispensers in suites of rooms | | | |
| | (C) The dispensers shall have a minimum horizontal spacing of 4 feet (1.2m) from each other; | | | |
| | (D) Not more than an aggregate of 10 gallons (37.8 liters) of ABHR solution shall be in use in a single smoke compartment outside of a storage cabinet; | | | |

FORM CMS-2567(02-99) Previous Versions Obsolete     Event ID:EG4L11     Facility ID: IL46C3     If continuation sheet Page 3 of 16

From:25 East Same Day Surgery     312 726 3825     12/28/2015 14:55     #213 P.006/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 14C0001027 | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | | A. BUILDING _____ | |
| | | B. WING _____ | 12/16/2015 |

NAME OF PROVIDER OR SUPPLIER

25 EAST SAME DAY SURGERY CENTE

STREET ADDRESS, CITY, STATE, ZIP CODE

25 E WASHINGTON ST
CHICAGO, IL 60602

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 104 | Continued From page 3 | Q 104 | | |
| | (E) Storage of quantities greater than 5 gallons (18.9 liters) in a single smoke compartment shall meet the requirements of NFPA 30, Flammable and Combustible Liquids Code; | | | |
| | (F) The dispensers shall not be installed over or directly adjacent to an ignition source; | | | |
| | (G) In locations with carpeted floor coverings, dispensers installed directly over carpeted surfaces shall be permitted only in sprinklered smoke compartments; and | | | |
| | (v) The dispensers are maintained in accordance with dispenser manufacturer guidelines. | | Q141 1-5 Corrective Measure: The Director of Nursing for the facility is Kim Zidonis, RN who is responsible For the overall supervision of clinical services. | |
| | | | | 1/4/16 |
| | This STANDARD is not met as evidenced by: Based on direct observation during the survey walk through, staff interview and document review during the Life Safety code portion of a recertification survey conducted on December 16, 2015, the surveyor finds that the facility does not comply with the applicable provisions of the 2000 Edition of the NFPA 101 Life Safety Code. | | EXHIBIT A (Job Description) Monitoring: Annual reviews will review the current Job descriptions for compliance QI/PI Activity: Compliance will take place during the Annual review process and any issues Be reported to the Board. Responsible Party Administrator | 1/4/16 1/4/16 1/4/16 |
| | Refer to the Life Safety Code deficiencies identified with K-Tags on the CMS Form 2567. | | | |
| Q 141 | 416.46(a) ORGANIZATION AND STAFFING | Q 141 | | |
| | Patient care responsibilities must be delineated for all nursing service personnel. Nursing services must be provided in accordance with recognized standards of practice. There must be a registered nurse available for emergency treatment whenever there is a patient in the ASC. | | | |

FORM CMS-2567(02-99) Previous Versions Obsolete     Event ID:EG4L11     Facility ID: IL46C3     If continuation sheet Page 4 of 16

From:25 East Same Day Surgery          312 726 3623          12/28/2016 14:55          #213 P.007/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 14C0001027 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 12/16/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| 25 EAST SAME DAY SURGERY CENTE | 25 E WASHINGTON ST CHICAGO, IL 60602 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 141 | Continued From page 4 | Q 141 | | |
| | This STANDARD is not met as evidenced by: Based on document review and interview, it was determined that for 1 of 1 Operating Room Manager (E #9), the Facility failed to ensure the OR Manager was qualified for the position as required by the Facility job description. | | | |
| | Findings Include: | | | |
| | 1. The Facility's Job Description for the Facility OR Manager position, (undated) required "Is responsible for directing all patient care activities within the assigned location, including the performances of such activities by other RN's, LPN's, ORTs, and UAP according to established policies and practices... Knowledge/Skills/Abilities...B. Current Illinois License as a Registered Nurse. Awareness of Changing trends in nursing practice and ability to adapt, including knowledge of Illinois Nurse Practice Act." | | | |
| | 2. The "Governing Body bylaws Rules and Regulation" (rev 3/14) required, "the Organized nursing service of the facility shall be under the direction of a professional registered nurse, with a postgraduate education or experienced surgical nursing. All licensed practical nurse and other nursing personnel involved in patient care shall be under the direct supervision of a professional registered nurse. | | | |
| | 3. The Facility's staff Roster was reviewed on 12/8/15. The Roster listed E #9 as the OR Manager. | | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID:EG4L11          Facility ID: IL46C3          If continuation sheet Page 5 of 16

From 25 East Same Day Surgery    312 726 3823    12/28/2015 14:56    #215 P.008/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>14C0001027 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY COMPLETED<br><br>12/16/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>25 EAST SAME DAY SURGERY CENTE | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>25 E WASHINGTON ST<br>CHICAGO, IL 60602 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 141 | Continued From page 5<br><br>4. The Personnel file for E #9 was reviewed. E #9's file included a license as a Practical Nurse. The file included an annual evaluation dated 10/10/14 which documented E #9 as an "OR Tech/OR Manager."<br><br>5. The above findings were discussed with the OR Manager (E#9) and the Clinical Liaison/ICO on 12/10/15 at approximately 3:00 PM. E #9 stated she is an OR tech, a licensed practical nurse and has held the position of OR Manager close to 10 years. E #9 stated she was not aware of the RN requirements for the OR Manager position. | Q 141 | Q162<br>A 1-5<br>Corrective Measure:<br>Staff were inserviced on the importance Of making sure an H/P is on the chart And current prior to the start of a Procedure.<br>EXHIBIT B (STAFF MEETING)<br>A Memo was also posted to all Medical staff reminding them that The H/P form must be completely Filled out, including dates, in order to be compliant. | 1/4/16 |
| Q 162 | 416.47(b) FORM AND CONTENT OF RECORD<br><br>The ASC must maintain a medical record for each patient. Every record must be accurate, legible, and promptly completed. Medical records must include at least the following:<br><br>  (1) Patient identification.<br>  (2) Significant medical history and results of physical examination.<br>  (3) Pre-operative diagnostic studies (entered before surgery), if performed.<br>  (4) Findings and techniques of the operation, including a pathologist's report on all tissues removed during surgery, except those exempted by the governing     body.<br>  (5) Any allergies and abnormal drug reactions.<br>  (6) Entries related to anesthesia administration.<br>  (7) Documentation of properly executed informed patient consent.<br>  (8) Discharge diagnosis.<br>This STANDARD is not met as evidenced by: | Q 162 | EXHIBIT C (MEMO TO DOCTORS)<br>Monitoring:<br>Monthly medical record audits will be Done and H/P forms reviewed for Overall compliance. Any deficiencies Will be reported to the MAC/ Board<br>EXHIBIT D (MEDICAL RECORD AUDIT)<br>QI/PI Activity:<br>During Monthly medical record audits This will be reviewed for overall compliance. All data will Be reported to the QC Committee as Well as the MAC/Board.<br>Responsible Party<br>Administrator | 1/4/16<br><br>1/30/16<br><br><br>1/30/16<br><br>1/30/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete    Event ID: EG4L11    Facility ID: IL46C3    If continuation sheet Page 6 of 16

From:25 East Same Day Surgery     012 726 3823     12/28/2015 14:56     #213 P.009/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 14C0001027 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 12/16/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE ZIP CODE |
|---|---|
| 25 EAST SAME DAY SURGERY CENTE | 25 E WASHINGTON ST CHICAGO, IL 60602 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 162 | Continued From page 6 | Q 162 | | |
| | A. Based on document review and interview it was determined that for 2 (Pt #7 and #17) of 20 clinical records reviewed, the Facility failed to ensure clinical records contained a completed history and physical as required. | | Q162 B 1-3 Corrective Measure: Staff were inserviced on the importance Of making sure a discharge assessment is completed by Anesthesia prior to discharge of the patient. EXHIBIT B (STAFF MEETING) | 1/4/16 |
| | Finding Include: | | A Memo was also posted to all Anesthesia Staff reminding them that A discharge assessment must be completed in order to be compliant. EXHIBIT E (MEMO TO ANESTHESIA) Monitoring: | 1/4/16 |
| | 1. Policy entitled " History and Physical" (undated policy) indicated "A History and Physical will be present on all patient's medical record as specified by Rules and Regulations. The History and Physical (H&P), performed within 30 days of the scheduled date of surgery, will include a medical history taken from the patient, review of the systems, allergies and physical exams... Procedure  2. If one is not present, anesthesia will be notified and a history and physical will be done in writing and placed on the chart before transferring patient from pre-op to the operating room." | | Monthly medical record audits will be Done and H/P forms reviewed for Overall compliance. Any deficiencies Will be reported to the QC Committee As well as the MAC/ Board EXHIBIT D (MEDICAL RECORD AUDIT) QI/PI Activity: During Monthly medical record audits This will be reviewed for overall compliance. All data will Be reported to the QC Committee as Well as the MAC/Board. Responsible Party Administrator | 1/30/16 1/30/16 1/30/16 |
| | 2. Rules and Regulations of the Medical staff (Reviewed 3/2014) indicated " Article I Admission 1.4 (a) A "history and physical examination", shall be provided on all patients. 1.8...At a minimum, the medical record submitted by the attending practitioner shall include a history and physical examination (unless supplied on the day of the surgery)." | | | |
| | 3. On 12/9/15 the clinical record of Pt #7 was reviewed. Pt#7 was an 85 year old male admitted on 10/27/15 for cataract extraction and insertion of extraocular lens to the right eye. Pt #7's clinical record contained a preprinted form entitled "Short History and Physical (filled out by M.D.)", that was signed and dated by a physician | | | |

From:25 East Same Day Surgery          312 726 3823          12/28/2015 14:57          #213 P.010/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES                                   PRINTED: 12/22/2015
CENTERS FOR MEDICARE & MEDICAID SERVICES                                  FORM APPROVED
                                                                          OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 14C0001027 | A. BUILDING _____ | | |
| | | B. WING _____ | | 12/18/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| 25 EAST SAME DAY SURGERY CENTE | 25 E WASHINGTON ST |
| | CHICAGO, IL  60602 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 162 | Continued From page 7 | Q 162 | | |
| | on 10/27/15 (date of Pt #7's procedure). However the form was not filled out, thus there was no history and physical completed prior to Pt #7's surgery. | | | |
| | 4.  On 12/9/15 the clinical record of Pt #17 was reviewed. Pt#17 was a 43 year old female admitted on 12/8/15 for a cervical epidural steroid injection. Pt #17's record contained a preprinted form entitled "Short History and Physical (filled out by M.D.)" completed and signed by a physician, however the form lacked the date of when it was completed. | | | |
| | 5. On 12/10/15 at approximately 3:00 PM, the findings were discussed with the Clinical Liaison (E #10). E#10 reviewed Pt #17's clinical record and stated it did not appear to have a history and physical. E #10 stated the short H &P for Pt. #17 should have been dated. | | | |
| | B. Based on document review and interview, it was determined that for 1 (Pt #14) of 20 clinical records reviewed, the Facility failed to ensure a discharge assessment was completed by anesthesiologist as required by Facility Rules and Regulations. | | | |
| | Finding include: | | | |
| | 1.  The Facility Rules and Regulations of the Medical staff (Reviewed 3/2014) indicated "Article 4 Discharge 4.1 A descriptive discharge status summary shall be required from the anesthesiologist..." | | | |
| | 2. On 12/10/15 the clinical record of Pt #14 was reviewed. Pt #14 was a 48 year old male | | | |

FORM CMS-2537(02-99) Previous Versions Obsolete          Event ID: EG4L11          Facility ID: IL46C3          If continuation sheet Page 8 of 16

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 14C0001027 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 12/16/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| 25 EAST SAME DAY SURGERY CENTE | 25 E WASHINGTON ST CHICAGO, IL 60602 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 162 | Continued From page 8 | Q 162 | | |
| | admitted on 8/18/15 for a cervical epidural steroid injection performed at C7-T 1. Pt #14's clinical record contained a form entitled " Anesthesia Record" dated 8/18/15. On this form the section "Discharge Assessment" was not completed. | | Q181 A1-3 Corrective Measure: Staff were inserviced on the centers Policy regarding labeling of medications In syringes. EXHIBIT B (STAFF MEETING) A Memo was also posted to all Medical staff/residents reminding them Of the centers policy regarding labeling Of syringes and not storing them in their Pockets. | 1/4/16 |
| | 3. On 12/10/15 at approximately 3:00 PM the findings were discussed with the Clinical Liaison (E #10). E #10 stated the anesthesiologist should have completed the discharge assessment. | | EXHIBIT C (MEMO TO DOCTORS) Monitoring: | 1/4/16 |
| Q 181 | 416.48(a) ADMINISTRATION OF DRUGS | Q 181 | Initially a nurse will perform weekly audits to verify compliance with this policy. When tha process is stable, this will then be completed during the monthly mediation audits. Any deficiencies will be reported to the QC Committee. EXHIBIT D (MEDICATION AUDIT) QI/PI Activity: | 1/30/16 |
| | Drugs must be prepared and administered according to established policies and acceptable standards of practice. | | | |
| | This STANDARD is not met as evidenced by: A. Based on document review, observation and interview, it was determined that for 1 of 1 policy, and 2 of 2 (E #5 and #7) personnel, the Facility failed to ensure the medications preparation policy included labeling of pre-filled/drawn injectable medication and appropriate storage of pre-drawn syringes. | | During weekly and monthly medication audits this will be reviewed for overall compliance. All data will Be reported to the QC Committee as Well as the MAC/Board. Responsible Party | 1/30/16 |
| | | | Administrator | 1/30/16 |
| | Findings include: | | | |
| | 1. The Facility policy titled, "Safe Preparation & Administration of Medications" (rev 11/15) required, 'The prescribing, preparing and administering medications used in the Center will being accordance with the applicable state and Federal laws...The staff member use clean or sterile techniques and maintain clean, | | | |

From:25 East Same Day Surgery          312 726 3823                12/28/2015 14:58        #213 P.012/024

| DEPARTMENT OF HEALTH AND HUMAN SERVICES CENTERS FOR MEDICARE & MEDICAID SERVICES | | | | PRINTED: 12/22/2015 FORM APPROVED OMB NO. 0938-0391 |
|---|---|---|---|---|
| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 14C0001027 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | | (X3) DATE SURVEY COMPLETED 12/16/2015 |

| NAME OF PROVIDER OR SUPPLIER 25 EAST SAME DAY SURGERY CENTE | STREET ADDRESS, CITY, STATE, ZIP CODE 25 E WASHINGTON ST CHICAGO, IL 60602 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 181 | Continued From page 9 uncluttered, and functionally separate areas for product preparation to avoid contamination." - The policy did not include labeling of pre-filled/drawn medication as to content, dosage, draw date, and or initials of individual preparing the medication. 2. The following observations of OR-B were made on 12/9/15: -At 9:30 AM E #7 was observed drawing medication with 2 different needles and syringes. The syringes were not labeled and then E #7 placed the pre-filled syringes in his scrub pocket. -At 9:45 AM E #5 (a physician) was observed retrieving a pre-filled syringe out of her scrub pocket and injected the patient's foot in OR-B. The syringe was unlabeled. -At 9:50 AM, E #7 (medical resident) retrieved unlabeled syringes from his scrub pocket and injected the patients foot in OR-B. 3. The above findings were discussed with the OR Manager and the CL/ICO during an interview on 12/9/15 at approximately 2:30 PM. When asked if the syringes should be labeled the Manager and CL stated that the policy did not include labeling of pre-filled syringes and "as long as the medications are in their hands it's ok". However when asked if the syringes should be kept in their pocket the ICO and the Manager were uncertain but acknowledged the potential cross contamination in keeping pre-drawn medication in the pocket existed. B. Based on document review, observation and | Q 181 | Q181 (continued) B1-4 Corrective Measure: Staff were inserviced on the centers Policy regarding storage of medications In locked cabinets. EXHIBIT B (STAFF MEETING) Keys were removed from the cabinets And given to one assigned nurse as "key control" for the day. Monitoring: Initially a nurse will perform weekly audits to verify compliance with policy. When the process is stable, this will then be completed during the monthly mediation audits. Any deficiencies will be reported to the QC Committee. EXHIBIT D (MEDICATION AUDIT) QI/PI Activity: During weekly and monthly medication audits this will be reviewed for overall compliance. All data will Be reported to the QC Committee as Well as the MAC/Board. Responsible Party Administrator | 1/4/16 1/4/16 1/30/16 1/30/16 1/30/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: EG4L11          Facility ID: IL46C3          If continuation sheet Page 10 of 18

From:25 East Same Day Surgery          312 726 8823          12/28/2015 14:59          #219 P.013/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 14C0001027 | A. BUILDING _____ B. WING _____ | | 12/16/2015 |

NAME OF PROVIDER OR SUPPLIER

25 EAST SAME DAY SURGERY CENTE

STREET ADDRESS, CITY, STATE, ZIP CODE
25 E WASHINGTON ST
CHICAGO, IL 60602

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 181 | Continued From page 10 | Q 181 | | |
| | Interview it was determined that the Facility failed to maintain the medication cabinet locked as required per policy. This potentially affected all 6 patients on census for 12/8/15. | | | |
| | 1. Policy entitled "Medication Purchasing and Storage" (Revised 11/2015) indicated "9. All medications are stored in locked cabinets or storage rooms to prevent unauthorized individuals from obtaining them." | | | |
| | 2. On 12/8/15 at approximately 10:20 AM during observational tour accompanied by staff nurse (E#1) the following was observed. | | | |
| | - in the unlocked storage room near the sterilization room there were two (2) unlocked cabinets that contained medication, with a key attached to one of the locks. The two doors that access this storage room are kept unlocked. | | | |
| | -in the unlocked "Anesthesia Room" there was an unlocked cabinet that contained medications and 2 set of keys. | | | |
| | 3. On 12/8/15 at approximately 10:22 AM the staff nurse (E #1) was interviewed. E#1 stated the unlocked medication cabinets located in the storage room, remains open until the end of the day. E #1 stated the cabinets are closed and the keys are placed in the cabinet located in the "Anesthesia Room" and double locked. E #1 stated all staff have access to these rooms. | | | |
| | 4. On 12/9/15 at approximately 2:30 PM the Operating Room Manager (E #9) was interviewed. E #9 stated the stocked medication cabinet is routinely left opened during the day. E | | | |

From:25 East Same Day Surgery          312 726 5823          12/28/2016 14:59          #213 P.014/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 14C0001027 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 12/16/2016 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| 25 EAST SAME DAY SURGERY CENTE | 25 E WASHINGTON ST CHICAGO, IL 60602 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 181 | Continued From page 11 | Q 181 | | |
| | #9 stated "I usually lock these cabinets at the end of the day." However the Facility policy indicated they should maintain locked. | | | |
| Q 240 | 416.51 INFECTION CONTROL | Q 240 | | |
| | The ASC must maintain an infection control program that seeks to minimize infections and communicable diseases. | | | |
| | This CONDITION is not met as evidenced by: Based on observation, document review, and interview, it was determined that the Facility failed to ensure adherence to Infection Control practices, potentially placing all 15 patients on census at risk for cross contamination infection. Therefore the Condition for Coverage 42 CFR 416.51, Infection Control was not met. | | | |
| | Findings include: | | | |
| | 1. The Facility failed to ensure all staff and physicians adhered to Facility policy on surgical attire. See deficiency cited at Q 242 A. | | | |
| | 2. The Facility failed to ensure peel pack instrument and supplies were not opened directly above the sterile field. See deficiency cited at Q 242 B. | | | |
| | 3. The Facility failed to ensure appropriate disposal of partially used or contaminated supplies. See deficiency cited at Q 242 C. | | | |
| Q 242 | 416.51(b) INFECTION CONTROL PROGRAM | Q 242 | | |
| | The ASC must maintain an ongoing program designed to prevent, control, and investigate infections and communicable diseases. In addition, the infection control and prevent | | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: 6C4L11          Facility ID: IL46C3          If continuation sheet Page 12 of 16

From:25 East Same Day Surgery    312 726 9823    12/28/2016 16:00    #213 P.018/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 14C0001027 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 12/16/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER 25 EAST SAME DAY SURGERY CENTE | STREET ADDRESS, CITY, STATE, ZIP CODE 25 E WASHINGTON ST CHICAGO, IL 60602 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 242 | Continued From page 12<br><br>program must include documentation that the ASC has considered, selected, and implemented nationally recognized infection control guidelines.<br><br>This STANDARD is not met as evidenced by:<br>A. Based on observation, document review and interview, it was determined that for 6 of 7 personnel (E #2, 3, 4, 5, 6, & 7) observed in the operating room (OR), the Facility failed to ensure all staff and physicians adhere to Facility policy on surgical attire.<br><br>Finding include:<br><br>1. Policy entitled "Surgical Dress Code" (Undated) Indicated "All hair is to be completely covered including beards and sideburns while in the OR Suite."<br><br>2. On 12/8/15 at approximately 10:40 AM the surgeon (E #2) was observed entering the OR, where the sterile field was open. E #2 had a surgical skull cap on, however approximately an inch and half of hair was exposed around the back of the head.<br><br>3. On 12/9/15 between 9:30 AM and 9:50 AM 5 of 6 (E #3, 4, 5, 6, & 7) personnel in the OR-B had hair exposed around their surgical/skull caps.<br><br>E #3, an RN, had hair exposed around the temple and the neck area.<br>E #4, a Surgeon, had hair exposed around the neck and temple area<br>E #5, a Physician had hair exposed around the | Q 242 | Q240 1-3<br>Q242 A1-3<br>Corrective Measure:<br>The staff were inserviced on the policy Requiring wearing appropriate attire EXHIBIT B (STAFF MEETING)<br>Monitoring:<br>Initially the infection control officer will perform weekly audits<br>to verify compliance with this policy. When the process is stable, this will then be completed during the quarterly Infection control audits. Any deficiencies will be reported to the QC Committee.<br>QI/PI Activity:<br>Any deficiencies noted during this Rounding will be reported via an Incident report.<br>All data will be reported to the QC Committee as well as the MAC/Board.<br>Responsible Party<br>Responsibility of the Infection Control Officer | 1/4/16<br><br><br><br><br>1/30/16<br><br><br><br>1/30/16<br><br>1/30/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete    Event ID:EG4L11    Facility ID:IL-8C3    If continuation sheet Page 13 of 16

From:25 East Same Day Surgery    312 726 3823    12/28/2015 15:01    #213 P.016/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 14C0001027 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED 12/16/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| 25 EAST SAME DAY SURGERY CENTE | 25 E WASHINGTON ST CHICAGO, IL 60602 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 242 | Continued From page 13<br><br>neck and ears.<br>E #6, the anesthesiologist, had hair exposed around the neck and temple.<br>E #7, a medical resident wearing a skull cap, had hair exposed around the neck.<br><br>3. The above findings were discussed with the OR Manager and the CL/ICO, during an interview on 12/9/15 at approximately 2:30 PM who each stated that all hair should be covered as required by policy.<br><br>B. Based on observation, document review and interview, it was determined that for 1 of 1 (E #8) OR tech observed during opening of sterile packs, the Facility failed to ensure, peel pack packages were not opened directly above the sterile field, thus potentially contaminating the sterile field. This potentially affected 1 patient scheduled to use the equipment and supplies that was opened.<br><br>Findings include:<br><br>1. During observation of OR-B on 12/9/15 between 9:30 AM and 9:50 AM the OR tech (E #7) opened peel packs directly over the sterile field and allowing the instrument/supply to fall into the sterile field, potentially contaminating the sterile field.<br><br>2. The Facility policy titled, "Opening of Sterile Supplies/Instruments" (rev. 1/2015), required, "A sterile peel-pack package may be opened by holding it in both hands, with the lips between the thumbs and fingers. Peel back the package at its side seams supporting the instruments from outside the package with one hand. Transfer the | Q 242 | Q240 1-3<br>Q242 B1-3<br>Corrective Measure:<br>The staff were inserviced on the policy Of opening of sterile supplies / instruments<br>EXHIBIT B (STAFF MEETING)<br>Monitoring:<br>Initially the Nursing Supervisor will perform weekly audits to verify compliance with this policy. When the process is stable, this will then be completed during the quarterly infection control audits. Any deficiencies will be reported to the QC Committee.<br>QI/PI Activity:<br>Any deficiencies noted during this Rounding will be reported via an Incident report.<br>All data will be reported to the QC Committee as well as the MAC/Board.<br>Responsible Party<br>Administrator | 1/4/16<br><br>1/30/16<br><br><br>1/30/16<br><br>1/30/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete    Event ID: EG4L11    Facility ID: IL46C3    If continuation sheet Page 14 of 16

From:25 East Same Day Surgery    312 726 8823    12/28/2015 16:01    #213 P.017/024

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**CENTERS FOR MEDICARE & MEDICAID SERVICES**

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 14C0001027 | A. BUILDING _____ B. WING _____ | | 12/16/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| 25 EAST SAME DAY SURGERY CENTE | 25 E WASHINGTON ST CHICAGO, IL 60602 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 242 | Continued From page 14<br><br>instrument to the sterile field by allowing it to slip from the package onto the field."<br><br>3. The above findings were discussed with the OR Manager and the CL/ICO, during an interview on 12/9/15 at approximately 2:30 PM who each stated and demonstrated that peel-pack supplies should be pre-opened away from the sterile field and then the supply or instrument is slipped on to the field.<br><br>C. Based on observation and interview, it was determined that for 1 of 1 circulating nurse (E #3), the Facility failed to ensure appropriate disposal of partially used or contaminated supply. This potentially affected 2 patients on census for OR-B on 12/9/15.<br><br>Findings include:<br><br>1. During observation of OR-B on 12/9/15 between 9:30 AM and 9:50 AM, after using a rolled gauze to wrap a patient's ankle, the excess gauze roll fell on the floor. The circulating RN (E #3) picked up the roll of gauze from the floor and placed on the blue chucks that were then used to cover the ankle with the tourniquet, in preparation for the surgery.<br><br>2. During observation of OR B on 12/9/15 at approximately 11:10 AM, after wrapping both ankles of the patients with 2 separate rolls of gauze, E #3 placed the 2 partially used roll of gauze in a box that contained rolls of adhesive tape and other supplies.<br><br>-At approximately 11:15 AM, two unopened Duraprep packs used for preoperative cleansing | Q 242 | Q240 1-3<br>Q242 C1-3<br>Corrective Measure:<br>The staff were inserviced on the policy Of opening of sterile supplies / instruments<br>EXHIBIT B (STAFF MEETING}<br>Monitoring:<br>Initially the Nursing Supervisor will perform weekly audits to verify compliance with this policy. When the process is stable, this will then be completed during the quarterly infection control audits. Any deficiencies will be reported to the QC Committee.<br>QI/PI Activity:<br>Any deficiencies noted during this Rounding will be reported via an Incident report.<br>All data will be reported to the QC Committee as well as the MAC/Board.<br>Responsible Party<br>Administrator | 1/4/16<br><br>1/30/16<br><br>1/30/16<br><br>1/30/16<br>1/30/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete    Event ID: EG4L11    Facility ID: IL45C3    If continuation sheet Page 15 of 16

From:25 East Same Day Surgery     312 726 3823     12/28/2015 16:02     #213 P.018/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|
| | 14C0001027 | A. BUILDING _____ <br> B. WING _____ | 12/16/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| 25 EAST SAME DAY SURGERY CENTE | 25 E WASHINGTON ST <br> CHICAGO, IL 60602 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| Q 242 | Continued From page 15 <br><br> fell, 1 to the floor and the other onto a trash bin. The Duraprep packs were picked up off the floor and trash bin and placed on top of the linen cart lid. <br><br> 3. The above findings were discussed with the OR Manager and the CL/ICO, during an interview on 12/9/15 at approximately 2:30 PM who each stated that the remaining gauze used on the patient and items picked up off the floor and trash bin should be discarded. | Q 242 | | |

FORM CMS-2567(02-09) Previous Versions Obsolete     Event ID EG4L11     Facility ID: IL46C3     If continuation sheet Page 16 of 16

From 25 East Same Day Surgery    312 726 3623    12/28/2015 16:02    #213 P.019/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER | | (X2) MULTIPLE CONSTRUCTION | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 14C0001027 | A. BUILDING 01 - MAIN BUILDING 01 | | |
| | | B. WING _____ | | 12/16/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| 25 EAST SAME DAY SURGERY CENTE | 25 E WASHINGTON ST CHICAGO, IL 60602 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| K 000 | INITIAL COMMENTS | K 000 | | |
| | On December 16, 2015, the life safety code portion of a recertification survey was completed. The surveyor was accompanied during the survey walk through by the following provider representatives: | | | |
| | Surgical Technician Administrator Facility Director | | K 000, 032 **Corrective Measure** The center has removed all supplies From this corridor. | 1/15/16 |
| | The facility is a tenant in a fully sprinklered 22 story building that was observed to be of Type I Fire Resistant construction. The tenant space is located on the third floor. | | **Monitoring** During monthly life safety rounds, the safety officer will Review this area for overall compliance | 1/15/16 |
| | The facility was surveyed as an Existing Ambulatory Health Care Occupancy under the 2000 Edition of the NFPA 101 Life Safety Code, including Chapter 21. | | **Responsible Party** Safety Officer | 1/15/16 |
| | Unless otherwise noted, those code sections listed herein that do not include a reference to a specific NFPA code and year of issue (such as NFPA 70 1999) are taken from the 2000 Edition of the NFPA 101 Life Safety Code. | | | |
| | Unless otherwise noted, all deficiencies cited herein were found through direct observation, staff interview, or document review. | | | |
| | The requirements of 42 CFR Subpart 416.44, Environment, are NOT MET as evidenced by the deficiencies cited under the following K-tags: | | | |
| K 032 | 416.44(b)(1) LIFE SAFETY CODE STANDARD | K 032 | | |
| | At least two exits, located remote from each other, are provided for each floor or fire section | | | |

| LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE | TITLE | (X6) DATE |
|---|---|---|
| [signature] | Facility Director | 1/29/16 |

Any deficiency statement ending with an asterisk (*) denotes a deficiency which the institution may be excused from correcting providing it is determined that other safeguards provide sufficient protection to the patients. (See instructions.) Except for nursing homes, the findings stated above are disclosable 90 days following the date of survey whether or not a plan of correction is provided. For nursing homes, the above findings and plans of correction are disclosable 14 days following the date these documents are made available to the facility. If deficiencies are cited, an approved plan of correction is requisite to continued program participation.

From 25 East Same Day Surgery     312 726 3029          12/28/2015 15:03          #213 P.020/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 14C0001027 | A. BUILDING 01 - MAIN BUILDING 01 B. WING _____ | | 12/16/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| 25 EAST SAME DAY SURGERY CENTE | 25 E WASHINGTON ST CHICAGO, IL 60602 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| K 032 | Continued From page 1 | K 032 | | |
| | of the building.   20.2 4.1, 21.2.4.1, 7.5.1.4 | | | |
| | This STANDARD is not met as evidenced by: During the survey walk through it was observed that not all paths of egress are maintained to be free of hazards. This deficiency could affect patients, staff, and visitors in the event of a fire or smoke spreading from the hazardous area and blocking the path of egress. | | | |
| | Findings include: | | | |
| | On 12/16/2015 at 2:18 PM, while accompanied by a Surgical Technician and the Administrator, the Decontamination Corridor, which is an exit access corridor from the surgery area, was observed to be used for storage of a sufficient quantity of supplies in combustible packaging to be considered hazardous. This does not comply with 39.2.5.1 and 7.5.1.7. | | | |
| K 051 | 416.44(b)(1) LIFE SAFETY CODE STANDARD | K 051 | | |
| | A manual fire alarm system, not a pre-signal type, is provided to automatically warn the building occupants. Fire alarm system has initiation notification and control function. The fire alarm system is arranged to automatically transmit an alarm to summon the fire department.   20.3.4.1, 21.3.4.1 | | | |
| | This STANDARD is not met as evidenced by: During the survey walk through it was observed that the fire alarm is not maintained in good operating condition. Failure of the fire alarm system to operate correctly will jeopardize all | | | |

FORM CMS-2567(02-99) Previous Versions Obsolete     Event ID: EG4L21     Facility ID: IL46C3     If continuation sheet Page 2 of 8

From:25 East Same Day Surgery          312 726 3623          12/28/2015 15:04          #213 P.021/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 14C0001027 | A. BUILDING 01 - MAIN BUILDING 01 | | |
| | | B. WING _____ | | 12/16/2015 |

| NAME OF PROVIDER OR SUPPLIER | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| 25 EAST SAME DAY SURGERY CENTE | 25 E WASHINGTON ST CHICAGO, IL 60602 |

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| K 051 | Continued From page 2 | K 051 | | |
| | occupants of the building during a fire emergency. | | | |
| | Findings Include: | | | |
| | On 12/16/15 at 3:18 PM, while accompanied by the Facility Director, the fire alarm control panel was observed to be located in a closet that is not continuously occupied and which is not provided with a smoke detector as required by NFPA 72 1999 1-5.6. | | K051 A1 Corrective Measure: The facility has a fire alarm panel that is located in the PACU area and is Continually monitored (EXHIBIT A – PHOTO OF PANEL) | 1/31/16 |
| K 114 | 416.44(b)(1) LIFE SAFETY CODE STANDARD | K 114 | | |
| | Ambulatory health care occupancies are separated from other tenants and occupancies by fire barriers with at least a 1 hour fire resistance rating. Doors in such barriers are solid bonded core wood of 1 3/4 inches or equivalent and are equipped with a positive latch and closing device. Vision panels, if provided in fire barriers or doors, are fixed fire window assemblies in accordance with 8.2.3.2.2. | | The facility will have a smoke detector Installed in the closet.

Monitoring: During quarterly Life safety Inspections, the Safety officer will check this room On an interim basis until the panel is Relocated. Responsible Party Administrator | 1/31/16

1/31/16 |
| | This STANDARD is not met as evidenced by: During the survey walk through it was observed that the facility failed to maintain a 1 hour rated separation between the facility and other building tenants. This deficiency could affect all patients, staff, and visitors in the event of a fire emergency in an adjoining tenant space. | | | |
| | Findings include: | | | |
| | On 12/16/15 at 3:35 PM, accompanied by the Facility Director, it was observed that the north 1 hour rated tenant separation wall located at the | | | |

From 25 East Same Day Surgery     312 726 3823     12/28/2015 16:04     #213 P 022/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 14C0001027 | (X2) MULTIPLE CONSTRUCTION A. BUILDING 01 - MAIN BUILDING 01 B. WING | (X3) DATE SURVEY COMPLETED 12/16/2015 |
|---|---|---|---|

NAME OF PROVIDER OR SUPPLIER

25 EAST SAME DAY SURGERY CENTE

STREET ADDRESS, CITY, STATE, ZIP CODE
25 E WASHINGTON ST
CHICAGO, IL 60602

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| K 114 | Continued From page 3<br><br>rear of the recovery bays has unsealed penetrations and is not sealed at the top with an assembly. The east 1 hour rated tenant separation wall located at the rear of the recovery bays is not sealed at the top with an assembly as required by 21.3.7.1. | K 114 | | |
| K 130 | NFPA 101 MISCELLANEOUS<br><br>OTHER LSC DEFICIENCY NOT ON 2786<br><br><br><br>This STANDARD is not met as evidenced by:<br>A. Due to the number, variety, and severity of the life safety deficiencies observed during the survey walk-through, the provider shall institute the appropriate Interim Life Safety Measures until all cited deficiencies are corrected. The provider shall include, as an attachment to its Plan<br>of Correction (PoC) and referenced therein, a detailed narrative and proposed schedule for all such measures. The narrative shall describe all measures to be implemented, as well as the frequency with which they are to be conducted, and shall indicate the manner in which the measures are to be documented. The narrative shall also include comments related to changes in the Interim Life Safety Measures to remain in place as work toward the completion of its PoC progresses.<br><br>B. The sprinkler system is not maintained as required. Failure of the sprinkler system to operate properly will jeopardize all occupants of the building during a fire emergency.<br><br>Findings include: | K 130 | K114<br>A<br>Corrective Measure:<br>The wall will be sealed with the appropriate 1 hour rating.<br>Monitoring:<br>The center will review work after completed by the contractor.<br>Responsible Party<br>Administrator | 1/31/16<br><br>1/31/16 |

From 25 East Same Day Surgery        312 796 3829        12/28/2015 15.06        #215 P.023/024
PRINTED 12/28/2015
FORM APPROVED
OMB NO. 0938-0391

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 14C0001027 | A. BUILDING 01 - MAIN BUILDING 01 B. WING | | 12/16/2015 |

NAME OF PROVIDER OR SUPPLIER

25 EAST SAME DAY SURGERY CENTE

STREET ADDRESS, CITY, STATE, ZIP CODE
25 E WASHINGTON ST
CHICAGO, IL 60602

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| K 130 | Continued From page 4 | K 130 | | |
| | 1. On 12/16/15 at 1:58 PM, while accompanied by the Surgical Technician, it was observed that several of the ceiling tiles have sagged and are no longer tight to the grid suspension system, thus exposing the non sprinklered interstitial space to the sprinklered occupied space. This does not comply with NFPA 13 1999 5-6.4.1.1. This was observed in the following locations:

a. The Women's Locker Room
b. The corridor outside of the locker rooms on the non sterile side
c. The Janitors' Closter near the recovery bays

2. On 12/16/15 at 4:10 PM, during document review, accompanied by the Facility Director, records documenting the weekly fire pump churn test required by NFPA 25 1998 5-1.1 were requested. The documents were not provided. | | K130
A1
Corrective Measure
A. Interim Life Safety Policies will be put into effect.
(EXHIBIT B– ILSM Policy and Watch)

The facility will perform a fire watch Once the deficiencies have been brought into compliance, then the watch will no Longer be performed. | 1/8/16 |
| K 145 | 416.44(b)(1) LIFE SAFETY CODE STANDARD

The Type I EES is divided into the critical branch, life safety branch and the emergency system in accordance with NFPA 99.   3.4.2.2.2

This STANDARD is not met as evidenced by: During the survey walk-through the surveyor observed that the facility is not provided with an essential electrical system that is properly split into life safety, critical, and equipment branches. This deficiency could affect patients, staff, and visitors in the event that the generator malfunctions during a power outage.

Findings include: | K 145 | B1
The ceiling tiles that were identified as sagging will be replaced

B2
The center will obtain the weekly Fire pump churn tests from the building

Responsible Party
Administrator | 1/31/16

1/31/16

1/31/16 |

From 25 East Same Day Surgery          312 726 3823          12/28/2015 15:06          #213 P.024/024

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 12/22/2015
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 14C0001027 | (X2) MULTIPLE CONSTRUCTION A. BUILDING 01 - MAIN BUILDING 01 B. WING | (X3) DATE SURVEY COMPLETED 12/16/2015 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER 25 EAST SAME DAY SURGERY CENTE | STREET ADDRESS, CITY, STATE, ZIP CODE 25 E WASHINGTON ST CHICAGO, IL 60602 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| K 145 | Continued From page 5 | K 145 | | |
| | On 12/16/15 at 3:20 PM, while accompanied by the Facility Director, it was observed that the facility has life safety and critical panels, but that blanket warmers and miscellaneous outlets are located on the life safety panel, which does not comply with NFPA 99 1999 13-3.3.2.2 and 3-4.2.2.2 | | K145 A Corrective Measure: The center will bring the panels into compliance with NFPA 99 1999 13-3.3.2.2 and 3-4.2.2.2. | 1/15/16 |
| K 147 | 416.44(b)(1) LIFE SAFETY CODE STANDARD | K 147 | UPDATE: Due to the scope of work, our contractor Has estimated the completion date es Shown in EXHIBIT C. | |
| | Electrical wiring and equipment are in accordance with NFPA 70, National Electrical Code 9.1.2, 20.5.1 | | EXHIBIT C- REX QUOTE) Responsible Party Administrator | 4/15/16 4/15/16 |
| | This STANDARD is not met as evidenced by: During the survey walk through it was observed that not all of the critical care areas within the facility are provided with power from two sources. This deficiency could affect patients and staff in the event of a generator failure. | | K147 A1a Corrective Measure: The operating rooms will be assessed On its current sources of emergency Power. Corrective measures will be Completed to bring these operating Rooms into compliance with NFPA 99 1999 3-3.2.1.2.(a)(1) | 1/31/16 |
| | Findings include: | | UPDATE: Due to the scope of work involved Our contractor has estimated the Completion date as shown in EXHIBITC. | 4/15/16 |
| | On 12/16/15 at 2:06 PM, while accompanied by the administrator, it was observed that the 4 operating rooms are provided with emergency power fed from the critical branch only and not with two sources of power as required by NFPA 99 1999 3-3.2.1.2.(a)(1) | | | |
| | | | Monitoring: The center will monitor after work Has been done by any contractor. Responsible Party Administrator | 4/15/16 |

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

# POST-CERTIFICATION REVISIT REPORT

| PROVIDER / SUPPLIER / CLIA / IDENTIFICATION NUMBER | MULTIPLE CONSTRUCTION | DATE OF REVISIT |
|---|---|---|
| 14C0001027 Y1 | A. Building<br>B. Wing Y2 | 1/21/2016 Y3 |

| NAME OF FACILITY | STREET ADDRESS, CITY, STATE, ZIP CODE |
|---|---|
| 25 EAST SAME DAY SURGERY CENTE | 25 E WASHINGTON ST<br>CHICAGO, IL 60602 |

This report is completed by a qualified State surveyor for the Medicare, Medicaid and/or Clinical Laboratory Improvement Amendments program, to show those deficiencies previously reported on the CMS-2567, Statement of Deficiencies and Plan of Correction, that have been corrected and the date such corrective action was accomplished. Each deficiency should be fully identified using either the regulation or LSC provision number and the identification prefix code previously shown on the CMS-2567 (prefix codes shown to the left of each requirement or the survey report form).

| ITEM<br>Y4 | DATE<br>Y5 | ITEM<br>Y4 | DATE<br>Y5 | ITEM<br>Y4 | DATE<br>Y5 |
|---|---|---|---|---|---|
| ID Prefix Q0162 | Correction | ID Prefix Q0181 | Correction | ID Prefix Q0240 | Correction |
| Reg. # 416.47(b) | Completed | Reg. # 416.48(a) | Completed | Reg. # 416.51 | Completed |
| LSC | 01/21/2016 | LSC | 01/21/2016 | LSC | 01/21/2016 |
| ID Prefix Q0242 | Correction | ID Prefix | Correction | ID Prefix | Correction |
| Reg. # 416.51(b) | Completed | Reg. # | Completed | Reg. # | Completed |
| LSC | 01/21/2016 | LSC | | LSC | |
| ID Prefix | Correction | ID Prefix | Correction | ID Prefix | Correction |
| Reg. # | Completed | Reg. # | Completed | Reg. # | Completed |
| LSC | | LSC | | LSC | |
| ID Prefix | Correction | ID Prefix | Correction | ID Prefix | Correction |
| Reg. # | Completed | Reg. # | Completed | Reg. # | Completed |
| LSC | | LSC | | LSC | |
| ID Prefix | Correction | ID Prefix | Correction | ID Prefix | Correction |
| Reg. # | Completed | Reg. # | Completed | Reg. # | Completed |
| LSC | | LSC | | LSC | |

| REVIEWED BY STATE AGENCY ☐ | REVIEWED BY (INITIALS) | DATE | SIGNATURE OF SURVEYOR | | DATE |
|---|---|---|---|---|---|
| REVIEWED BY CMS RO ☐ | REVIEWED BY (INITIALS) | DATE | TITLE | | DATE |

| FOLLOWUP TO SURVEY COMPLETED ON<br>12/16/2015 | ☐ CHECK FOR ANY UNCORRECTED DEFICIENCIES. WAS A SUMMARY OF UNCORRECTED DEFICIENCIES (CMS-2567) SENT TO THE FACILITY? ☐ YES ☐ NO |
|---|---|

From:28 East Same Day Surgery    312 726 3823    02/01/2016 08:26    #476 P.002/006

| DEPARTMENT OF HEALTH AND HUMAN SERVICES CENTERS FOR MEDICARE & MEDICAID SERVICES | | | PRINTED: 01/25/2016 FORM APPROVED OMB NO. 0938-0391 |
|---|---|---|---|

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 14C0001027 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | (X3) DATE SURVEY COMPLETED R 01/21/2016 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER 25 EAST SAME DAY SURGERY CENTE | STREET ADDRESS, CITY, STATE, ZIP CODE 25 E WASHINGTON ST CHICAGO, IL 60602 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| {Q 000} | INITIAL COMMENTS | {Q 000} | | |
| | A Post Complaint Visit was conducted on 1/21/16 for a recertification survey on 12/16/15. The Condition for Coverage for Infection Control, 42 CFR 416.51, is back in compliance. The life safety code portion of the 12/16/15 recertification survey was not conducted on 1/21/16 and the requirements of 42 CFR Subpart 416.44, Environment, under the K-tags, were not not returned to compliance. The Facility is not in compliance with Standards for Ambulatory Surgery Centers (42 CFR 416) as evidenced by: | | | |
| {Q 100} | 416.44 ENVIRONMENT | {Q 100} | | |
| | The ASC must have a safe and sanitary environment, properly constructed, equipped, and maintained to protect the health and safety of patients. This CONDITION is not met as evidenced by: | | | |
| {Q 104} | 416.44(b) SAFETY FROM FIRE | {Q 104} | | |
| | (1) Except as otherwise provided in this section, the ASC must meet the provisions applicable to Ambulatory Health Care Centers of the 2000 edition of the Life Safety Code of the National Fire Protection Association, regardless of the number of patients served. The Director of the Office of the Federal Register has approved the NFPA 101® 2000 edition of the Life Safety Code, issued January 14, 2000, for incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. A copy of the Code is available for inspection at the CMS Information Resource Center, 7500 Security Boulevard, Baltimore, MD and at the National Archives and Records Administration (NARA). For information on the | | Q000, 100 104 Corrective Measure: All K-tags associated with the Life Safety inspection have been answered separately on CMS form CMS-2567(02-99) Responsible Party Administrator | 1/4/16 |

| LABORATORY DIRECTOR'S OR PROVIDER/SUPPLIER REPRESENTATIVE'S SIGNATURE | TITLE | (X6) DATE 2/5/16 |
|---|---|---|

Any deficiency statement ending with an asterisk (*) denotes a deficiency which the institution may be excused from correcting providing it is determined that other safeguards provide sufficient protection to the patients. (See instructions.) Except for nursing homes, the findings stated above are disclosable 90 days following the date of survey whether or not a plan of correction is provided. For nursing homes, the above findings and plans of correction are disclosable 14 days following the date these documents are made available to the facility. If deficiencies are cited, an approved plan of correction is requisite to continued program participation.

FORM CMS-2567(02-99) Previous Versions Obsolete    Event ID: EG4L12    Facility ID: IL46C3    If continuation sheet Page 1 of 5

From:25 East Same Day Surgery        312 726 3825        02/01/2016 08:27        #476 P.003/006

| DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>CENTERS FOR MEDICARE & MEDICAID SERVICES | | | PRINTED: 01/25/2016<br>FORM APPROVED<br>OMB NO. 0938-0391 |
|---|---|---|---|

| STATEMENT OF DEFICIENCIES<br>AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA<br>IDENTIFICATION NUMBER:<br><br>14C0001027 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | (X3) DATE SURVEY<br>COMPLETED<br><br>R<br>01/21/2016 |
|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER<br><br>25 EAST SAME DAY SURGERY CENTE | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>25 E WASHINGTON ST<br>CHICAGO, IL 60602 |
|---|---|

| (X4) ID<br>PREFIX<br>TAG | SUMMARY STATEMENT OF DEFICIENCIES<br>(EACH DEFICIENCY MUST BE PRECEDED BY FULL<br>REGULATORY OR LSC IDENTIFYING INFORMATION) | ID<br>PREFIX<br>TAG | PROVIDER'S PLAN OF CORRECTION<br>(EACH CORRECTIVE ACTION SHOULD BE<br>CROSS-REFERENCED TO THE APPROPRIATE<br>DEFICIENCY) | (X5)<br>COMPLETION<br>DATE |
|---|---|---|---|---|
| (Q 104) | Continued From page 1<br>availability of this material at NARA, call<br>202-741-6030, or go to<br>http://www.archives.gov/federalregister/code_of_f<br>ederal-regulations/ibr_locations.html.<br>Copies may be obtained from the National Fire<br>Protection Association, 1 Batterymarch Park,<br>Quincy, MA 02269. If any changes in this edition<br>of the Code are incorporated by reference, CMS<br>will publish notice in the Federal Register to<br>announce the changes.<br><br>(2) In consideration of a recommendation by the<br>State survey agency, CMS may waive, for periods<br>deemed appropriate, specific provisions of the<br>Life Safety Code which, if rigidly applied, would<br>result in unreasonable hardship upon an ASC, but<br>only if the waiver will not adversely affect the<br>health and safety of the patients.<br><br>(3) The provisions of the Life Safety Code do not<br>apply in a State if CMS finds that a fire and safety<br>code imposed by State law adequately protects<br>patients in an ASC.<br><br>(4) An ASC must be in compliance with Chapter<br>21.2.9.1, Emergency Lighting, beginning on<br>March 13, 2006.<br><br>(5) Notwithstanding any provisions of the 2000<br>edition of the Life Safety Code to the contrary, an<br>ASC may place alcohol-based hand rub<br>dispensers in its facility if:<br>(i) Use of alcohol-based hand rub dispensers<br>does not conflict with any State or local codes that<br>prohibit or otherwise restrict the placement of<br>alcohol-based hand rub dispensers in health care<br>facilities;<br>(ii) The dispensers are installed in a manner | (Q 104) | | |

FORM CMS-2557(02-99) Previous Versions Obsolete        Event ID: EG4L12        Facility ID: IL46C3        If continuation sheet Page 2 of 5

From:25 East Same Day Surgery          312 726 3823          02/01/2016 08:28          #476 P.004/006

| DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>CENTERS FOR MEDICARE & MEDICAID SERVICES | | | | PRINTED: 01/25/2016<br>FORM APPROVED<br>OMB NO. 0938-0391 |
|---|---|---|---|---|
| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER:<br><br>14C0001027 | (X2) MULTIPLE CONSTRUCTION<br>A. BUILDING _____<br><br>B. WING _____ | | (X3) DATE SURVEY COMPLETED<br><br>R<br>01/21/2016 |

| NAME OF PROVIDER OR SUPPLIER<br><br>25 EAST SAME DAY SURGERY CENTE | STREET ADDRESS, CITY, STATE, ZIP CODE<br><br>25 E WASHINGTON ST<br>CHICAGO, IL 60602 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| {Q 104} | Continued From page 2<br><br>that minimizes leaks and spills that could lead to falls;<br>    (iii) The dispensers are installed in a manner that adequately protects against inappropriate access; and<br>    (iv) The dispensers are installed in accordance with the following provisions:<br>        (A) Where dispensers are installed in a corridor, the corridor shall have a minimum width of 6 ft (1.8m);<br>        (B) The maximum individual dispenser fluid capacity shall be:<br>            (1) 0.3 gallons (1.2 liters) for dispensers in rooms, corridors, and areas open to corridors<br>            (2) 0.5 gallons (2.0 liters) for dispensers in suites of rooms<br>        (C) The dispensers shall have a minimum horizontal spacing of 4 feet (1.2m) from each other;<br>        (D) Not more than an aggregate of 10 gallons (37.8 liters) of ABHR solution shall be in use in a single smoke compartment outside of a storage cabinet;<br>        (E) Storage of quantities greater than 5 gallons (18.9 liters) in a single smoke compartment shall meet the requirements of NFPA 30, Flammable and Combustible Liquids Code;<br>        (F) The dispensers shall not be installed over or directly adjacent to an ignition source;<br>        (G) In locations with carpeted floor coverings, dispensers installed directly over carpeted surfaces shall be permitted only in sprinklered smoke compartments; and<br>    (v) The dispensers are maintained in accordance with dispenser manufacturer guidelines. | {Q 104} | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: EG4L12          Facility ID: IL46C3          If continuation sheet Page 3 of 5

From:25 East Same Day Surgery          312 726 3823          02/01/2016 08:28          #476 P.005/006

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: 14C0001027 | (X2) MULTIPLE CONSTRUCTION A. BUILDING _____ B. WING _____ | | (X3) DATE SURVEY COMPLETED R 01/21/2016 |
|---|---|---|---|---|

| NAME OF PROVIDER OR SUPPLIER 25 EAST SAME DAY SURGERY CENTE | STREET ADDRESS, CITY, STATE, ZIP CODE 25 E WASHINGTON ST CHICAGO, IL 60602 |
|---|---|

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| {Q 104} | Continued From page 3 | {Q 104} | | |
| | This STANDARD is not met as evidenced by: | | | |
| {Q 141} | 416.46(a) ORGANIZATION AND STAFFING | {Q 141} | | |
| | Patient care responsibilities must be delineated for all nursing service personnel. Nursing services must be provided in accordance with recognized standards of practice. There must be a registered nurse available for emergency treatment whenever there is a patient in the ASC. | | Q141 1-4 Corrective Measure: A newly appointed nurse manager has been identified to oversee the patient care operations of the surgery center. The nurse manager is a registered nurse with 25 years of nursing experience including experience in clinical management. She holds a current State of IL license as a Registered Nurse. EXHIBIT A (Job description and competency review) Initial review completed with Administrator. Annual reviews will be completed for compliance and competency. Responsible Party: Administrator | |
| | This STANDARD is not met as evidenced by: Based on document review and interview, it was determined, for 1 of 1 Operating Room (OR) Manager (E #2), the Facility failed to ensure the OR Manager was qualified for the position as required by the Facility job description. | | | |
| | Findings include: | | | |
| | 1. On 1/21/16 at 11:00 AM, the Facility's job description for the OR Manager position, (undated) was reviewed. The job description required "Supervisory Responsibilities. Is responsible for directing all patient care activities within the assigned location, including the performances of such activities by other RN's, LPN's, ORT's, and UAP according to established policies and practices... Education and/or Experience: Requires BS degree in nursing from an accredited nursing school, with current RN License (Masters Degree Preferred), clinical management and/or training, or equivalent | | | 2/3/16 |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID: EG4L12          Facility ID: IL16C3          If continuation sheet Page 4 of 5

From:25 East Same Day Surgery          312 726 3823          02/01/2016 08:29     #476 P.006/006

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

PRINTED: 01/25/2016
FORM APPROVED
OMB NO. 0938-0391

| STATEMENT OF DEFICIENCIES AND PLAN OF CORRECTION | (X1) PROVIDER/SUPPLIER/CLIA IDENTIFICATION NUMBER: | (X2) MULTIPLE CONSTRUCTION | | (X3) DATE SURVEY COMPLETED |
|---|---|---|---|---|
| | 14C0001027 | A. BUILDING _____ <br> B. WING _____ | | R <br> 01/21/2016 |

NAME OF PROVIDER OR SUPPLIER

**25 EAST SAME DAY SURGERY CENTE**

STREET ADDRESS, CITY, STATE, ZIP CODE

**25 E WASHINGTON ST
CHICAGO, IL 60602**

| (X4) ID PREFIX TAG | SUMMARY STATEMENT OF DEFICIENCIES (EACH DEFICIENCY MUST BE PRECEDED BY FULL REGULATORY OR LSC IDENTIFYING INFORMATION) | ID PREFIX TAG | PROVIDER'S PLAN OF CORRECTION (EACH CORRECTIVE ACTION SHOULD BE CROSS-REFERENCED TO THE APPROPRIATE DEFICIENCY) | (X5) COMPLETION DATE |
|---|---|---|---|---|
| {Q 141} | Continued From page 4 <br><br> combination of education and experience..." <br><br> 2. On 1/21/16 at 11:20 AM, the personnel file for E #2 was reviewed. E #2's file included a license as a Licensed Practical Nurse (LPN). There was no RN license. An annual evaluation dated 10/10/14, included E #2 was the OR Manager. E #2 was evaluated as "exceeds standards" by the Facility Administrator / Director of Nursing (E #1), including "9. The Nurse Manager serves as the expert resource to other nurse... in the utilization of the nursing process in all aspects of the delivery of patient care. There was no documentation in E #2's file E #2 met the equivalent education of an RN. <br><br> 3. On 1/21/16 at approximately 10:40 AM, an interview was conducted with E #2. E #2 stated she was the OR Manager, an Operating Room Technician (ORT), and a LPN, but not an RN. <br><br> 4. On 1/21/16 at approximately 10:50 AM, an interview was conducted with E #1. E #1 stated E #2 reported to her (E #1). E #1 was available to advise E #2 and the other Facility RN's in areas of clinical practice. | {Q 141} | | |

FORM CMS-2567(02-99) Previous Versions Obsolete          Event ID:EG4L12          Facility ID IL46C3          If continuation sheet Page 5 of 5

EXHIBIT G

**From:** Carlson, Katie
**Sent:** Thursday, September 14, 2017 4:47 PM
**To:** Garrison, Bill; Cullotta, Don
**Subject:** 25 East Renovation

Good Afternoon,
Dr.'s Garelick, Kraff, Rubinstein, Rao, Eernisse, Kaz, Guo, Murtaza and Chen all emphatically agree that it would be best to move the project 7 weeks out until January. They feel the 4th Quarter will very busy and they don't want to lose any surgical time if it is avoidable. Dr. Levi is the only one who slightly objected, he said he is fine with moving the project to January but also wants to do Total Joints asap. My concerns on why it is prudent to move the project to January:

- We still don't have the permits. The Architect said we should have them in 3 weeks but we don't have in hand.
- The building management prefers this renovation to be done in January and said extending the use of TI funds is a not an issue.
- The contractor agreed to an October 26th start, but said the more time they had to get all of their ducks in a row the smoother the project would go. I am concerned if there was an issue/unforeseen complication that it would extend the closure during the 4th Quarter.
- Dr. Altman, our primary Anesthesia MD and our Anesthesia Champion for Total Joint cases, is leaving MAP and 25 East in 2 weeks. MAP had not yet been able to give us a replacement for him. Our other surgeons also feel our Anesthesia group, MAP, is not meeting expectations. I have met with several other anesthesia groups and have narrowed it down to one that is doing Total Joints in the ambulatory setting and appears to meet our upcoming needs. This transition to a new anesthesia group will take about 60 days. This is why I am not that worried about pushing for Total Joints in November.
- We are 157 cases over YTD so far in 2017 and the trend seems to be continuing through the 4th Quarter. Q4 2016 was our strongest last year. I don't want to lose any cases.

Please let me know your thoughts and if we can make this our final decision. Thank you.

Katie Carlson RN, CASC
Administratror 25 East Same Day Surgery
kcarlson@uspi.com
Office # 312-726-3329


EXHIBIT
G
Blumberg No. 5208

EXHIBIT H

| | |
|---|---|
| **From:** | Hensley, Julia |
| **Sent:** | Thursday, September 7, 2017 8:45 AM |
| **To:** | Lambert-Gale, Anita |
| **Cc:** | Cullotta, Don |
| **Subject:** | Hinsdale adding Endo |
| **Attachments:** | Document (285).pdf |

Hinsdale wants to add GI. The only room they may be able to use is the Storage/Future OR. Please look at this rough drawing I did. Do you think the flow would be OK? We want to have the Endo room about 250 SF and see if the 2 instrument processing rooms would fit in the rest of the space. They don't have room in Decontam and Sterilization to clean the scopes.

Just wanted your opinion before we spent money on the Architect.

**Julia Hensley, RN**
United Surgical Partners Intl.
Development Project Director
Cell-615-934-9248
jhensley@uspi.com



| | |
|---|---|
| **From:** | Garrison, Bill |
| **Sent:** | Tuesday, September 12, 2017 11:10 AM |
| **To:** | Cullotta, Don |
| **Cc:** | Fazio, Brenna |
| **Subject:** | Hinsdale renovation for GI |

Don,
What are your thoughts on getting someone to do a quick estimate for renovation at Hinsdale to allow us to do GI cases. I'd like to get an initial estimate as soon as possible.
Thanks,
Bill

| | |
|---|---|
| **From:** | Fazio, Brenna |
| **Sent:** | Tuesday, September 26, 2017 9:39 AM |
| **To:** | Hensley, Julia |
| **Cc:** | Cullotta, Don |
| **Subject:** | Hinsdale Surgical Center GI room |

Good morning Julia,

I wanted to seek your guidance in the GI project we are doing here at Hinsdale. We had a call with the architect and construction company last week and had a concern and/or question about the involvement of IDPH. Currently we have a documented procedure room on our plans and adjacent to that a storage room that we would turn into the scope cleaning room. The question is would we need to notify and get approval from IDPH to turn the "storage" room into the scope room? Obviously if we need to involve the state it would turn an 8 week project into a 4-5 month project. Please let me know your thoughts and how we should proceed.

Thank you Julia!

*Brenna Fazio*
Administrator
Hinsdale Surgical Center
10 Salt Creek Lane
Hinsdale, IL 60521
Office: (630) 325-5035
Fax: (630) 214-2848

EXHIBIT I



# Employee Handbook



EXHIBIT
I

It is and shall continue to be the policy of USPI and its facilities that all persons are entitled to equal employment opportunity regardless of age, sex, color, race, national origin, religion, genetic information, sexual orientation, gender identity or expression, veteran status or any other legally protected status, as required by state and federal law. In compliance with the provisions of all applicable state and federal civil rights laws, every effort will be made to employ the individuals whose qualifications best meet the needs of open positions, without regard to the above factors. Additionally, it is and shall continue to be our policy to provide promotion and advancement opportunities in a nondiscriminatory fashion.

We are committed to providing you a comfortable work environment. We do not and will not permit employees to engage in unlawful discriminatory practices or harassment involving patients, visitors or their co-workers. We expect you to be customer oriented, professional and friendly. We expect you to represent the Company and your facility consistently and in good faith. In return, we commit to providing you a comfortable and rewarding environment and periodic updates regarding the Company, its expectations and your performance.

Thank you for being part of United Surgical Partners International.

Sincerely yours,


William H. Wilcox
 Chief Executive Officer

# What You Can Expect From USPI

## USPI's Employee Support Philosophy

USPI's Mission is to provide first-class surgical services to the local community in a safe, comfortable and welcoming environment; one in which we would be happy to treat our own families. USPI employees are relied upon and empowered to deliver this Mission.

USPI's leadership strives to provide a work environment that supports our Mission. We believe that employees should benefit from frequent, open, two-way communication, fair and consistent treatment, strong teams and the resources needed to do their jobs well in a safe environment. Just as direct communication with our patients and their families is critical to the service and care that they receive at our facilities, we believe that management's ability to communicate directly with its employees is critical to our ability to maintain a culture of excellence in patient care and safety.

Our success is also predicated and dependent upon the relationships between our management and employees, management and partners, employees and patients and our facilities and the communities they operate in every day. Direct communication is the key to these relationships.

USPI believes that a direct relationship with our employees is the best way to respond to their needs and suggestions. We believe that a third party, or a union, is an unnecessary intermediary in this relationship. Being able to communicate and exchange ideas directly with you allows us to effectively meet the needs of all of our key customers: our patients and their families, our physicians, health system partners, payors and employees.

## Employee Expectations

We believe the following standards of support to our employees are of the utmost importance:

USPI employees can expect to be treated in accordance with USPI's Corporate Compliance Program, including the Code of Conduct, which includes our commitment to the following:

- To treat others with dignity and respect.
- To maintain each employee's privacy while addressing his or her concerns.
- To address concerns promptly, professionally and to the best of our ability.
- To never allow harassment, intimidation or discrimination against our employees.
- To assure employees a formal grievance process for addressing any potential problems or concerns that may arise in the workplace.

In addition, USPI employees can expect:

- To receive a competitive wage and benefits package.
- To be encouraged and given the opportunity to better themselves professionally.
- To be encouraged to seek certifications and additional training that supports their current and prospective roles.
- To be given formal feedback on their performance. Each employee's performance is evaluated at least annually.

USPI employees can expect the following from their work environment:

- Culture of Safety: We believe every USPI employee is empowered and responsible for ensuring the safety of every patient and delivering the highest quality of care.

Case: 1:19-cv-06490 Document #: 1 Filed: 09/30/19 Page 240 of 275 PageID #:240

- Good working conditions: USPI strives to provide a healthy, safe, professional, rewarding, comfortable and pleasant working environment.
- Teamwork: We believe in having every employee actively engaged in patient care and feeling ownership of the patient's experience and outcome at the facility.
- Diversity: We believe that an inclusive culture drives our ability to provide the best care possible to our patients and their families.

USPI employees can expect managers to:

- Provide fair and equitable treatment to all employees.
- Communicate regularly with all employees.
- Apply policies and procedures consistently.
- Show no favoritism among employees.
- Not tolerate inappropriate treatment of employees by anyone within the workplace.
- Select people on the basis of skill, training, ability, attitude and character without discrimination with regard to age, sex, color, race, national origin, religious persuasion, military status, political belief or disability that does not prohibit performance of essential job functions.
- Make promotions or fill vacancies from within USPI whenever possible.
- Not allow unacceptable behavior at any USPI facility.

If a USPI employee has a work-related concern, he or she should:

- First, communicate openly with his/her direct supervisor.
- If you do not feel like your concern is addressed satisfactorily, or if you do not feel comfortable addressing the concern with your direct supervisor, you are encouraged to contact your supervisor's manager or any senior leader at the Home Office.
- If you believe there is a threat to patient, physician or employee safety or any violation of USPI's policies and procedures or federal or state law, you may also contact USPI's confidential and independently managed Compliance Hotline Toll-free at 1-888-784-3873.

In order to meet the needs of all of our key customers, USPI will also:

- Pay all employees according to their effort and contribution to the success of our business.
- Review wages, employee benefits and working conditions regularly with the objective of providing maximum benefits in these areas, consistent with sound business practices.
- Provide paid time off, health, disability, retirement and other benefits to all *eligible* employees.
- Dedicate ourselves to USPI's EDGE™ and customer focus.
- Keep all employees informed of the company's goals and performance.
- Do all of the above in a spirit of friendliness and cooperation, so that USPI and its facilities will continue to be known as "a great place to work."
- Have fun!

## Customer Focus

The success of USPI depends upon the quality of the relationships between USPI, our employees, our customers, our suppliers and the general public. Our customers' impression of USPI and their interest and willingness to select our facilities is greatly formed by the people who serve them. Regardless of your position, you are USPI's ambassador. The more goodwill you promote, the more our customers will respect and appreciate you and the services your facility provides.

Here are several things you can do to help give customers a good impression of USPI:

1. Understand and follow USPI's EDGE™.

2. Act competently and deal with customers in a courteous and respectful manner.

3. Communicate pleasantly and respectfully with other employees at all times.

4. Follow up on assignments and questions promptly, provide businesslike replies to inquiries and requests, and perform all duties in an orderly manner.

5. Take great pride in your work and enjoy doing your very best.

## Equal Employment Opportunity

USPI provides equal employment opportunity to all employees and applicants for employment regardless of age, sex (including pregnancy), color, race, national origin, religion, genetic information, sexual orientation, gender identity or expression, political belief, disability, veteran status or any other legally protected status that does not prohibit performance of essential job functions. This is reflected in all USPI practices and policies regarding hiring, training, promotions, transfers, rates of pay, layoff and other forms of compensation. All matters relating to employment are based upon ability to perform the job, as well as dependability and reliability once hired. USPI will make reasonable accommodations for qualified individuals with disabilities unless doing so would result in an undue hardship.

## Ethics

All employees share in the responsibility of observing USPI's Corporate Compliance Program and Code of Conduct, which requires truthfulness, honesty and integrity in all activities. You should receive a copy of the Corporate Compliance Program and Code of Conduct at the commencement of your employment with USPI, and copies are available at all times via the USPInSite page. If you have not received copies of the Corporate Compliance Program and Code of Conduct at the commencement of your employment, it is your responsibility to immediately contact your supervisor, who will assist you in obtaining copies.

In addition, an employee's conduct should be consistent with the responsible image that the facility wants to project to our surgeons, payers, patients, visitors and general community.

## Grievances and Suggestions

An efficient, successful operation and satisfied employees go hand-in-hand.

In order to provide for prompt and efficient evaluation of and response to grievances and suggestions, USPI has established a grievance and suggestion procedure for all employees. It will always be USPI's policy to give full consideration to every employee's opinion. We will not allow any discrimination or

retaliation against or toward anyone for his or her part in presenting grievances and suggestions in good faith.

Under this procedure, a grievance is defined as any event, condition, rule or practice the employee believes violates his or her civil rights, treats him or her unfairly or is offensive. This covers a wide range of circumstances, everything from the workplace, the environment and other working conditions to policies or practices that interfere with or hinder his or her performance.

Talking things over usually helps. When you have a grievance or other problem, the person you report to is the person to see first. If this does not settle the matter, or if you are not comfortable addressing the matter with your immediate supervisor, you are entitled to go to his or her immediate manager to see what can be done. Even if you are upset, please never leave your work area without notifying your manager first.

The grievance and suggestion procedure is as follows:

**1. See Your Manager First.**

If something is bothering you, or if you have a suggestion, we would like to hear about it. If you feel that any working condition, policy, practice or action by USPI or by any member of management is unjust, it is important that you tell your manager. Establish an appropriate time and place to discuss your concern confidentially and in private. If for some reason your manager fails to offer you the opportunity to discuss the matter, if the discussion does not lead to a satisfactory conclusion or if you are not comfortable working through your issues or expressing ideas to your manager, feel free to approach any USPI manager whom you feel is a logical and comfortable alternative.

**2. Put It In Writing.**

It makes a difference when you put your grievance and suggestion in writing, and employees are encouraged to do so at all levels of the process. A standard form may be posted at your facility. Whether or not you used the provided form, please explain the present situation, the desired condition and your proposed solution and suggestion.

**3. Grievance/Suggestion Conference.**

Your manager's immediate supervisor will review the grievance and suggestion and may call you in for a scheduled conference. This may be, at his or her discretion, with or without the presence of your immediate manager. At this conference, you should feel free to openly discuss your complaint and substantiate your reasons for feeling the way you do; management will consider your input and decide as how best to remedy the issue. She/he will take appropriate action, and his/her decision is final and binding.

The sole purpose of this grievance and suggestion procedure is to give each employee and USPI a chance to resolve any problem, complaint, friction or grievance and to evaluate employee suggestions. In order for this policy to work, each employee and each member of management must be willing to do whatever it takes to make it work.

# Retaliation

Retaliation is any reprisal or adverse employment action taken against an employee as a result of his or her utilizing any of USPI's internal grievance procedures or otherwise reasonably exercising any of his or her rights as an employee. Prohibited retaliation includes any retaliation in connection with reporting ethical concerns or other unlawful conduct to Human Resources, Facility/Hospital Compliance Officer, the Ethics Action Line or to management, supporting an internal audit, investigation, filing a Fair

Case: 1:19-cv-06490 Document #: 1 Filed: 09/30/19 Page 243 of 275 PageID #:243

Treatment claim or other type of grievance, or generally accessing Human Resources, Ethics and Compliance, or Management in connection with a patient safety concern, patient occurrence or other reasonable concern with company policies or practices or compliance with legal obligations.

Retaliation of any kind is considered a serious violation of USPI's Standards of Conduct and may be a violation of law. All USPI employees, including supervisors and managers, have a responsibility to create a work environment where concerns can be raised, openly discussed and reported without fear of retaliation.

Allegations of retaliation will be promptly investigated and if supported, will result in disciplinary action, up to and including, termination of employment of the individual responsible for the retaliation. It is the responsibility of management to make sure that retaliation of any kind is not tolerated

## Harassment

USPI intends to provide a work environment that is pleasant, healthful, comfortable and free from intimidation, hostility or other offenses that might interfere with work performance. Harassment of any sort — verbal, physical or visual — will not be tolerated. This policy shall apply without regard to gender and without regard to sexual orientation.

### What Is Harassment?

Harassment can take many forms. It generally occurs when an employee is made uncomfortable by words, signs, jokes, pranks, intimidation, physical contact or violence. Harassment is not necessarily sexual in nature.

Sexual harassment may include unwelcome sexual advances, requests for sexual favors, other verbal or physical contact of a sexual nature when such conduct creates an intimidating environment, prevents an individual from effectively performing the duties of their position, or when such conduct is made a condition of employment or compensation, either implicitly or explicitly.

### Responsibility

As a USPI employee, you are responsible for keeping our work environment free of harassment. Any employee, who becomes aware of an incident of harassment, whether by witnessing the incident or being told of it, should report it to your manager or any officer of USPI with whom you feel comfortable. When USPI becomes aware that harassment might exist, it will take prompt and appropriate action.

### Reporting

If you feel that you have experienced harassment, report the incident immediately to your manager or any officer of USPI with whom you feel comfortable. If you do not feel comfortable reporting the incident to your manager or any USPI officer or other manager, you may contact USPI's confidential and independently managed **Compliance Hotline** at **1-888-784-3873**. Appropriate investigation and disciplinary action will be taken. All reports will be promptly investigated with due regard for the privacy of everyone involved. Any employee found to have harassed a fellow employee or subordinate will be subject to severe disciplinary action or termination of employment.

## Introductory Period

Your first ninety (90) days of employment at USPI are considered an introductory period. This introductory period will be a time for getting to know your fellow employees, your manager and the tasks involved in your job position, as well as becoming familiar with USPI's services. Your manager will work closely with you to help you understand the needs and processes of your job.

USPI Employee Handbook – September 2016                                    15

EXHIBIT J



# If You Have a Concern,

## SEE IT. SAY IT. FIX IT.



**Speak up if you see something** that violates USPI's Code of Conduct.

**Tell your manager**, your HR representative, USPI's Compliance Officer or the hotline. USPI will support you and retaliation will not be tolerated.

**Work together** with USPI to help resolve concerns.



**Tiffany Thompson**
USPI's Chief
Compliance Officer



**Howard Hacker**
Tenet's Chief
Compliance Officer

**If you have any concerns** that cannot be resolved with your manager, contact the hotline at 1-800-8Ethics.



EXHIBIT

EXHIBIT K

**From:** Cullotta, Don
**Sent:** Tuesday, January 2, 2018 1:04 PM
**To:** JKozlowski@Reedcorp.com
**Cc:** Hensley, Julia; Garrison, Bill; mariamitchell2704@gmail.com
**Subject:** Continued HVAC problems

Hello Joe,

I'm sending this email with great concern about what's going on at the facility. Basically we've had issues with temperature or humidity since the facility was given to us. This morning was by far the worst. If we had cases scheduled they would need to be canceled leaving us with angry patients and doctors. But this is not only an HVAC problem. It is a hazardous and unsafe facility at the moment. Attached you will see pictures of some of the things I seen this morning. Frozen fire sprinkler heads, frost buildup within the light fixtures are just a couple. The frost on the fire sprinkler head indicates the possibility of a pipe burst which could flood the entire center. The frost buildup around the light fixtures and other places where there is electricity is obviously a fire hazard. I won't list every single thing I seen but obviously you understand where I'm going with this.

I've expressed my concerns to Kyle at the hospital. Going forward I think it's a good idea to include me on any meetings in regard to this problem or any other serious issues at the facility. As of now we still do not have control system that alerts us to problems like this. This is actually the only facility I have that does not have ability to send alarms when the temperature drops or humidity is not within range. I'm not sure how this didn't get installed with the control system but after all this we need to have it ASAP. At very least they will give us the ability to be proactive. This morning when I woke up at 5 AM I checked my email and noticed I had 15 percent humidity at my Hinsdale location. Within 15 minutes I had the humidity in the 30s by simply remoting in and closing the outside damper just a smidge.

Honestly, from the pictures below there seems to be much more than an HVAC issue. Based on the leaks we are seeing when it rains and the frost buildup in areas that should not have frost I have to question insulation.



EXHIBIT
K













# Humidity sensors do not look calibrated it all







**From:** Cullotta, Don
**Sent:** Tuesday, March 6, 2018 11:01 AM
**To:** Cullotta, Don
**Subject:** FW: Safety conditions at Silver Cross

-----Original Message-----
From: Garrison, Bill
Sent: Tuesday, January 02, 2018 1:17 PM
To: Cullotta, Don <DCullotta@uspi.com>
Subject: FW: Safety conditions at Silver Cross

Thanks Don. This is concerning. If you haven't already, please give Maria Mitchell a call to coordinate next steps.

-----Original Message-----
From: Cullotta, Don
Sent: Tuesday, January 02, 2018 1:11 PM
To: Garrison, Bill <wgarrison@uspi.com>
Subject: Safety conditions at Silver Cross

Hey Bill,

Just little while ago I sent an email to reconstruction and copied you. Right now the facility is not safe at all. There are possibilities of fire, flood as well as other hazardous conditions right now the facility is not safe at all. There are possibilities of fire, flood as well as other hazardous conditions. This is been going on for the better part of a month and I've asked if anyone needed help. I seen what the problems were from a mile away but I am not being included in any discussions to help bring light or facilitate a solution. The last thing I need right now is more work, especially with joint commission and all the construction going on. But I've asked to be included on these discussions going forward before something terrible happens. I'm not sure how the hospital or reconstruction handles this but it might be a good idea to make sure they got that message.

On a sidenote it was soaking wet inside the facility while it was freezing this morning. I imagine every exposed piece of surgical instruments now needs to be re-sterilized. Anything metal exposed to 80 percent humidity and 30° temperatures spells bacteria growth.

DC

EXHIBIT L

## Matt Custardo

**From:** Cullotta, Don
**Sent:** Tuesday, March 6, 2018 11:01 AM
**To:** Cullotta, Don
**Subject:** FW: Safety conditions at Silver Cross

-----Original Message-----
From: Garrison, Bill
Sent: Tuesday, January 02, 2018 1:17 PM
To: Cullotta, Don <DCullotta@uspi.com>
Subject: FW: Safety conditions at Silver Cross

Thanks Don. This is concerning. If you haven't already, please give Maria Mitchell a call to coordinate next steps.

-----Original Message-----
From: Cullotta, Don
Sent: Tuesday, January 02, 2018 1:11 PM
To: Garrison, Bill <wgarrison@uspi.com>
Subject: Safety conditions at Silver Cross

Hey Bill,

Just little while ago I sent an email to reconstruction and copied you. Right now the facility is not safe at all. There are possibilities of fire, flood as well as other hazardous conditions right now the facility is not safe at all. There are possibilities of fire, flood as well as other hazardous conditions. This is been going on for the better part of a month and I've asked if anyone needed help. I seen what the problems were from a mile away but I am not being included in any discussions to help bring light or facilitate a solution. The last thing I need right now is more work, especially with joint commission and all the construction going on. But I've asked to be included on these discussions going forward before something terrible happens. I'm not sure how the hospital or reconstruction handles this but it might be a good idea to make sure they got that message.

On a sidenote it was soaking wet inside the facility while it was freezing this morning. I imagine every exposed piece of surgical instruments now needs to be re-sterilized. Anything metal exposed to 80 percent humidity and 30° temperatures spells bacteria growth.

DC



EXHIBIT M

**From:** Cullotta, Don
**Sent:** Monday, January 29, 2018 3:24 PM
**To:** Ridgway, Corey
**Cc:** Lambert-Gale, Anita; Hensley, Julia
**Subject:** 25E report - HVAC
**Attachments:** 25E HVAC FINAL.docx

Corey,
attached is a document I prepared that explains the current status of HVAC problem at 25E and possible challenges. currently working on solutions to resolve but the information attached may want to be reviewed. Since Bill will be leaving soon I thought it may be a good idea to have as many people in the loop as possible.
Don



25 East Washington SameDay Surgery Summary Report

This summary was populated using the data collected by testing reports, speaking to engineers on-site and the appearance of the equipment. I also talked to our HVAC contractor as well as the architect. They confirm the AHU is unable to make its design capacity and will not be able to regardless of any repairs performed. According to the mechanical company simply adding a control system will not correct the problem. We currently have a pneumatic system with a programmable front end no one can access. The manufacture is Johnson Controls who I was able to get onsite. They explained the system is antiquated and they no longer have anyone with knowledge of it. They had only 2 engineers who have long since retired. The problem I see began with the city, But ends with us having to submit to the state and Joint Commission. They require a passing test and balance report for the areas we service with our AHU and the building as well. Joint Commission just cited the facility for deficiencies in these same areas. Below are the concerns, past history and challenges we could have to deal with.

**The age of the facility and its mechanical equipment** – attached you will see the some pictures that show the age of the mechanical equipment. The facility was opened in 1986 and the mechanical equipment is still all original. It is very aged as you can see from the photos. The air handler is barely able to produce half its design capacity. It is running at maximum (60HZ) and cannot be pushed any harder. The facility has no control system so the unit never has the opportunity to go into "unoccupied mode" during evening and weekends. It runs continuously and decreases its ability for demand and increases power consumption and wear. A control system will help automate, provide alarms, show trends but will not solve the problem of lack of CFM from the air handler itself.

**Facility is located in a high-rise building in downtown Chicago** – hosting an ASC in a building in this location has never been easy. Parking, street shut downs, public events are bad enough but performing major construction is particularly difficult in this area. Some of the HVAC uses the sides of the building but the AHU is on the floor with us. Increasing the tonnage of the unit could mean relocating to the roof. The current mechanical room is already impossible to navigate as the room is too small for what's in it now.

**Buildings age is almost 100 years old** – so besides our own equipment we still have to deal with the structural and equipment issues throughout the building. While the building is very beautiful inside its structure and mechanical equipment are very old. They historically have 108 degree water flowing through many cold water pipes. This was found during the STERIS installation of the new washer. And they have a dielectric issue in the water so it corrodes our copper pipes as fast we repair and replace them. 25 east is somehow connected to Macys across the street which makes it difficult to secure any reports the State or Joint Commission may require. For example: the building utilizes 2 fire pumps at the MACYS store across the street to sprinkle the building in the event of a fire. They do not maintain the systems properly, test them accordingly to NFPA guidelines or allow inspectors to see the spaces during our inspections. The state requires churn tests (weekly) and the building only does quarterly if that.

Any and all work that is required by the state and not the city of Chicago in the building will be our expense based on the verbiage of the lease.

This includes:

- Any work regardless of the floor we are on. For example, we had to replace every non-rated fire door at the old Hinsdale Surgical center. I am referring to doors that were **NOT** in our suite or even on our floor. Almost 100K to provide safe exit in the event of a fire on any floor under us. We also had to completely modify a fire exit that was an additional 40K expense. This is the same for the high-rise. The attached test report shows the common spaces all failing air flow. The building will most likely put this cost on us to correct since they do not need to follow strict pressure guidelines. If the mechanical equipment they have can even provide it.

- Work that is performed either at our expense or the building that is major would make us reasonable for such things as:
    1. 24 hour fire watch using the building engineers
    2. Any and all work performed by the buildings preferred Union contactors (more costly)
    3. Performing any work the building deems loud or unsafe during off hours or weekends Which leads to massive OT
    4. Working around the schedule of the tenants. Unable to complete repairs the timeline projected. We've seen this many times before in the market and recently during the SPD project at 25E.
    5. Major work at these buildings normally have the owner(s) have us pay for an engineer and architect to modify the building for larger air handlers, generators etc... this can be quite expensive. I had to recruit an electrical engineering firm when River North was cited by IDPH in regards to critical power and mixing it within panels. the designs alone cost the center 63K
    6. Paying for legal review of plans, space changes and even changes in the lease. Again this was seen just a couple years ago in Chicago.

These are all things we've seen during IDPH corrections, Joint commission or renovations. Things like this can happen with a problem like this being located where we are. Basically why I took the time to prepare this document and provide a status. I hope it helps shed some light on what we are dealing with and how to correct in the best way possible. I've taken the report supplied by Aero, the testing company and highlighted accordingly. The report looked much worse until I brought the 2 exhaust fans back up before the last city inspection. But as you can see we still don't pass in several areas nor do we have proper air exchanges. The document highlighted is only for the construction matrix and does not reference the ORs. I have attached a full report that does show the ORs which explains why joint commission cited the facility. It's important to remember a test and balance can only be successful if you have the capacity to achieve the desired numbers for the space. Anyone involved in this problem so far believes the unit **cannot** supply what is desired.

I currently have 2 contractors looking at this problem aggressively and provide next steps. These vendors are having in-house engineers look at the report as well as visual inspections of the equipment and past history. We still need to provide a POC to joint commission and a passing T&B report to IDPH for construction competition. Katie the administrator is working with the building in regards to the common space air issues and is in the loop about the more difficult issues we are trying to correct.

In conclusion this problem has been coming and has been discussed several times. The new construction did bring some attention to this along with the recent Joint Commission visit. the Architect from Anderson was not a good fit for this project in my opinion. He had extremely terrible communication responding to Katie's questions since he was recruited for this project. He poorly answered any questions the GC had and didn't review the test and balance report correctly before releasing the engineering designs. The fans found off should have been part of the project and weren't on for years. These fans were not even noted on the report to test and were critical to the project's success to produce passing final documentation.



State of Illinois
Illinois Department of Public Health

Air balancing matrix 4F

IDPH number _____

| Room number | Room use | To be completed by design engineer | | | | | To be completed by test and air balance technician | | | | | | |
| | | Space volume | Design CFM VAV Min/Max | | | | Actual CFM VAV min / max | | | Percent of Design | | | Actual # air changes per hour |
| | | | Supply | Return | Exhaust | Pressure relationship +0- | Supply | Return | Exhaust | Supply | Return | Exhaust | |
| 301 | WAITING | 4800 | 600 | 600 | | 0 | 440 | 0 | | 73.3% | 0.0% | | 5.50 |
| 302 | REGISTRY | 1320 | 230 | 230 | | 0 | 225 | 20 | | 97.8% | 8.6% | | 10.23 |
| 303 | WOMEN'S LOCKER | 2320 | 210 | | 350 | - | 225 | | 295 | 107.1% | | 84.3% | 7.63 |
| 304/305 | CORRIDOR/LOUNGE | 3000 | 275 | 275 | | 0 | 260 | 0 | | 94.5% | 0.0% | | 5.20 |
| 306 | DECONTAM | 880 | 180 | | 280 | - | 220 | | 240 | 122.2% | | 85.7% | 16.36 |
| 307 | CORRIDOR | 4080 | 300 | 275 | | + | 470 | 0 | | 156.6% | 0.0% | | 6.91 |
| 307a | EQUIPMENT ROOM | 200 | | | 100 | - | | | 85 | | | 85.0% | 25.50 |
| 308 | STERILE PREP | 1480 | 720 | 340 | 280 | + | 725 | 155 | 240 | 100.7% | 45.6% | 85.7% | 29.39 |
| 310 | CORRIDOR | 6240 | 630 | 740 | | - | 630 | 330 | | 100.0% | 44.6% | | 6.06 |
| 315 | STORAGE | 1240 | 85 | | | + | 85 | | | 100.0% | | | 4.11 |
| N/A | OFFICE | 760 | 100 | 100 | | 0 | 125 | 60 | | 125.0% | 60.0% | | 9.87 |
| N/A | ANESTESIA WORK ROOM | 760 | 130 | | 140 | - | 140 | | 50 | 107.7% | | 35.7% | 11.05 |
| N/A | MEN'S LOCKER | 1840 | 195 | | 350 | - | 200 | | 280 | 102.6% | | 80.0% | 9.13 |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Form # 482-0651-0720114F

Add Page

Page ___1___ of ___2___

State of Illinois
Illinois Department of Public Health

Air balance matrix 4F

IDPH number

| | | | To be completed by design engineer | | | | To be completed by test and air balance technician | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Space volume | Design CFM VAV Min/Max | | | Pressure relationship +0- | Actual CFM VAV min / max | | | Percent of Design | | | Actual # air changes per hour |
| Room no. | Room use | | Supply | Return | Exhaust | | Supply | Return | Exhaust | Supply | Return | Exhaust | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

*Pressurization
0 = Equal:      Within +/- 10% of design CFM supply and return/exhaust.
+ = Positive:   Exceeds 10% or 50 CFM (which ever is greater) supply CFM over return/exhaust CFM.
– = Negative:   Exceeds 10% or 50 CFM (which ever is greater) return/exhaust CFM over supply CFM.
  Actual values that are more than 10% departure from design values without clarification will not be accepted
I certify that the air conditioning and ventilation systems have been tested and balanced in accordance with the plans and specification, NFPA 90A/90B
and/or NFPA 99 ( for OR's, Labs, etc. ) and the Illinois Hospital Licensing Act.

Air balance technician name & company        Vladimir Rusakov - AERO

Signature        Kathy Sander — KATHY SANDER  PM          Date    1/19/2018

Comments

Form # 482-0651-0720114F                                        Page   2   of   2

---

Above is the report performed after the fans were corrected. As you can see the report was not passing. The architect is currently waiting for this docuent to submit to the State.

Below are pictures of the current visual condition of themechanical room and its equipment.



















