## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DONALD J. CULLOTTA,
                Plaintiff,
v.
UNITED SURGICAL PARTNERS
INTERNATIONAL, INC., *et al.,*
                Defendants.

_____

UNITED SURGICAL PARTNERS
INTERNATIONAL, INC.,
           Defendant/Counter-Plaintiff,
v.
DONALD J. CULLOTTA,
           Plaintiff/Counter-Defendant.

No. 19-cv-06490

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

This is an eleven-count employment discrimination/retaliation case brought by Plaintiff Donald Cullotta, a surgical facilities manager, against the Defendants, Plaintiff's former employer and two supervisors. Plaintiff says Defendants fired him on account of his mental health issues and because Plaintiff reported safety issues at Defendants' facilities. Defendants have moved to dismiss some, but not all, of Plaintiff's claims. Plaintiff, in turn, seeks to dismiss counterclaims alleging Plaintiff stole equipment he procured using Defendants' funds. For the reasons stated below, the Court grants Defendants' motion in full and grants Plaintiff's motion as to the fraud counterclaim but denies it as to all other counterclaims.

## I.      BACKGROUND

Plaintiff Donald Cullotta is a facilities management professional who has suffered from post-traumatic stress disorder, depression, anxiety, and disassociation

since at least 2007. (FAC ¶ 13.) Defendants are United Surgical Partners International ("USPI"), a company that runs medical facilities, and two of its managers, Catherine Weaver (Vice President of Operations for Chicago) and Christopher Hartshorn (Chicago Market President). (*Id*. ¶¶ 4-5.) In 1999, Plaintiff began working as Director for Information Technology for an entity that Defendant USPI acquired in 2004. (*Id*. ¶¶ 10-11.) Defendant USPI promoted Plaintiff to Director of Facilities Management for the Chicago market in 2008. (*Id*. ¶ 14.) Plaintiff held that position until March 9, 2018, when Defendant USPI demoted him back to IT Director. (*Id*. ¶ 67.) Then, on March 29, 2018, Defendant USPI fired Plaintiff. (*Id*. ¶ 85.)

Before Plaintiff was demoted and fired, Plaintiff had gone back and forth with Defendants regarding leaves of absence he said he needed because of his mental disabilities. (*E.g.*, *id*. ¶¶ 81-82.) Plaintiff and Defendants also quarreled over what Plaintiff perceived to be health and safety violations at USPI's facilities. (*E.g.*, *id*. ¶¶ 72-73.) Whether these issues in fact precipitated Plaintiff's firing, and to what extent it was lawful for Defendants to consider those issues in deciding to fire him, are the central issues in this litigation.

Plaintiff contends Defendants demoted and fired him for multiple illegal reasons, including (1) his mental disabilities, in violation of the Americans with Disabilities Act ("ADA"); (2) Plaintiff requested leave under the Family and Medical Leave Act ("FMLA"); (3) Plaintiff engaged in activity protected by the Fair Labor Standards Act ("FLSA"); (4) Plaintiff was a whistleblower regarding unsafe

conditions at Defendants' facilities, in violation of Illinois common law; and (5) Plaintiff's age, in violation of the Age Discrimination in Employment Act ("ADEA"). (*Id.* ¶¶ 110-155, ¶¶ 200-208.) Plaintiff also complains that Defendants underpaid him by failing to compensate him for paid time off he accrued during his tenure, in violation of the Illinois Wage Payment and Collection Act ("IWPCA"), Chicago Municipal Code ("CMC"), and Cook County Earned Sick Leave Ordinance ("CCESLO"). (*Id.* ¶¶ 163-199.) Plaintiff further contends that Defendants' conduct amount to intentional infliction of emotional distress ("IIED") under Illinois law. (*Id.* ¶¶ 156-162.) Defendant moves to dismiss the FAC in part. (Dkt. 17.)

Defendant USPI has also filed counterclaims for conversion, fraud, and unjust enrichment, alleging that Plaintiff misused Defendant USPI's funds to purchase items for his personal use and then stole those items when he left the company. (Dkt. 53, (the "Counterclaim").) Plaintiff moves to dismiss those claims for failure to state a claim. (Dkt. 58, ("Pltf. MTD").)

## II. LEGAL STANDARD

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal punctuation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of

a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Each complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although legal conclusions are not entitled to the assumption of truth, *Iqbal*, 556 U.S. at 678-79, the Court, in evaluating a motion to dismiss, must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiff's favor. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

In addition to the complaint, the Court reviews any exhibits attached to it. *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013). And "[w]hen an exhibit contradicts the allegations in the complaint, ruling against the non-moving party on a motion to dismiss is consistent with [the Court's] obligation to review all facts in the light most favorable to the non-moving party." *Id*.

## III.    DISCUSSION

### A.    Defendants' Motion to Dismiss

Defendants move to dismiss the following counts for failure to state a claim (1) the ADA claim (Count I); (2) the IIED claims (Count V); (3) the FLSA retaliation claim (Count VI); (4) the unpaid wages claims (Counts VIII, IX, and X); and (5) the ADEA claims as to the individual defendants (Count XI). (Dkt. 17, ("Def. MTD").) As explained below, the Court dismisses each of these claims.

### i.    Motion to Dismiss ADA Claim

Plaintiff alleges Defendants failed to provide a reasonable accommodation for his ADA-qualifying mental disabilities by refusing to allow him to take a leave of absence to seek treatment for his mental health issues. (FAC ¶¶ 110-124.) Specifically, on March 26, 2018, Plaintiff formally requested FMLA leave to attend outpatient treatment three days per week, eight hours per day through September 21, 2018. (*Id.* ¶ 79, Ex. BB.) In addition, Plaintiff required at least two days off per month to recover from "flare-ups." (*Id.*; Pltf. Resp. at 3.) Defendants initially approved the request. (FAC ¶ 79.) But then, on March 29, 2018, Defendants revoked Plaintiff's leave and fired him. (*Id.* ¶ 85.)

Defendants contend this is insufficient to state an ADA failure to accommodate claim because "[t]he FMLA protects employees temporarily unable to perform a job's essential functions, while the ADA protects employees who can perform those essential functions with or without a reasonable accommodation." (Def. MTD at 5 (citing *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017)).)

Accordingly, Defendants say, a request for FMLA leave "cannot be a request for a reasonable accommodation under the ADA." (*Id.* at 6.) Plaintiff responds that Defendants overstate the holding in *Severson*, noting that the Seventh Circuit "carved out room for intermittent leave to be considered an ADA accommodation." (Dkt. 37, ("Pltf. Am. Resp."[1]) at 2.)

To state an ADA failure to accommodate claim, Plaintiff must first allege that he is a "qualified individual"—*i.e.*, "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). It may be true, as Defendants claim, that a request for FMLA can never be a request for a reasonable accommodation under the ADA because an FMLA request must, by definition, contain an admission that the requestor is incapable of performing essential functions of the position. *See Smith v. Cook County*, 2019 WL 1515007, *5 (N.D. Ill, Apr. 8, 2019) ("The FMLA protects employees temporarily unable to perform a job's essential functions, while the ADA protects employees who can perform those essential functions with or without a reasonable accommodation"). But the Seventh Circuit, despite opportunities to do so—*e.g.*, *Severson*, 872 F.3d at 481; *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003)—has never held that the FMLA and ADA are mutually exclusive. Other circuits are split on the issue. *Contrast Acker v. GM, LLC*, 853 F.3d 784, 791-92 (5th Cir. 2017) ("An employee seeking FMLA leave by nature argues that he cannot perform the functions of the job, while an employee requesting

---

[1] Plaintiff amended his response to Defendants' motion to dismiss to correct certain citation errors. The Court therefore focuses its analysis on the corrected response.

a reasonable accommodation communicates that he can perform the essential functions of the job") *with Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 156–57 (3d Cir. 2017) ("FMLA leave may qualify, under certain circumstances, as a request for a reasonable accommodation under the ADA").

If this Court, following *Acker*, holds that a request for FMLA leave can never simultaneously act as an request for ADA accommodation, Plaintiff's ADA claim must be dismissed because there is no question that Plaintiff sought and received FMLA leave. (*See* FAC ¶¶ 127-129.) But the Court need not make a categorical holding that the FMLA and ADA are mutually exclusive to resolve Defendants' motion. Even if there are some situations where a request for leave can fit both the FMLA and ADA rubrics, Plaintiff did not request an ADA accommodation in this case.

Employers are "generally permitted to treat regular attendance as an essential job requirement." *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 489 (7th Cir. 2014); *see also Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000) ("Common sense dictates that regular attendance is usually an essential function in most every employment setting"). Consequently, employers are not required to accommodate disabled employees by excusing continuous absences. *See EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 949 (7th Cir. 2001) (en banc) ("no business is 'obligated to tolerate erratic, unreliable attendance' ") (quoting *Waggoner v. Olin Corp.*, 169 F.3d 481, 485 (7th Cir. 1999)); *cf. Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1004 (7th Cir. 1998) ("The ADA does not

7

require an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence").

To be sure, as Plaintiff points out, the Seventh Circuit panel in *Severson* "le[ft] open the possibility that a brief period of leave to deal with a medical condition could be a reasonable [ADA] accommodation in some circumstances." *Severson*, 872 F.3d at 481. The Court of Appeals specified, however, that a "brief period of leave" means "[i]ntermittent time off or a short leave of absence—say, a couple of days or even a couple of weeks—[which] may, in appropriate circumstances," be a reasonable ADA accommodation. *Id.*; *see also Oestringer v. Dillard Store Servs., Inc.*, 92 F. App'x 339, 341 (7th Cir. 2004) (non-precedential disposition) ("a request for medical leave is reasonable only if it is for a short amount of time"). Thus, although there is no "hard-and-fast rule that no absences from work need be tolerated," *Waggoner*, 169 F.3d at 484, the Court will look to see if "the excessive frequency of an employee's absences in relation to that employee's job responsibilities" render him unable to perform the duties of his job. *Haschmann v. Time Warner Entm't Co., L.P.*, 151 F.3d 591, 602 (7th Cir. 1998).

Plaintiff's requested leave of absence was excessive relative to his job responsibilities. Plaintiff did not request "a couple of days or even a couple of weeks" of leave. Plaintiff requested three days off per week for at least six months. (FAC Ex. BB at 3), plus another two (unpredictable) days per month for an indefinite period. (*Id.*) This was a substantial amount of time off given that Plaintiff's job required him to be available seven days a week to manage issues at Defendants' facilities as they

8

arose. (*See* FAC ¶ 19.) Plaintiff has not identified any case where a court held that a similar request for leave constituted a reasonable accommodation in the absence of an allegation that the job itself (or an available alternative position) allowed for that much time off. *See Gratzl v. Office of Chief Judges of 12th, 18th, 19th & 22nd Jud. Circuits*, 601 F.3d 674, 680 (7th Cir. 2010) (employers are not obligated to "create a new job or strip a current job of its principal duties to accommodate a disabled employee"). To the contrary, the Seventh Circuit has held that employers were not required to accommodate far more modest periods of absence in less demanding jobs. *See, e.g.*, *Jovanovic*, 201 F.3d at 899 (employer of tool and die maker not required to abide 24 absences in 12 months); *Byrne*, 328 F.3d at 381 (night-shift engineer's request for two months of leave was not reasonable).

Further, although the *Severson* panel noted that short periods of leave may qualify as a reasonable accommodation, it emphasized that "the ADA applies only to those who can do the job." *Severson*, 872 F.3d at 481 (quoting *Byrne*, 328 F.3d at 381 (limiting the term "reasonable accommodation" to those measures that will enable the employee to work and distinguishing those accommodations from employees who cannot perform the essential functions of their job and therefore are not "qualified individual[s]" under the ADA)). Plaintiff's request for leave form unambiguously states that he could not perform the essential functions of his job:

- Form: "Identify the job functions the employee is unable to perform:"
    - Response: "Any and all, not functionings [*sic*] . . . "

- Form: "Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave"
    - Response: "Unable to function . . . "

- Form: "Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? Is it medically necessary for the employee to be absent from work during the flare-ups? If so, explain:"
  - Response: "Yes" and "Yes" because "Becomes non-functional"

(FAC Ex. BB at 2-3.) The Complaint and attached exhibits therefore establish that Plaintiff was unable to perform the essential functions of his position, which precludes any ADA claim. *See Byrne*, 328 F.3d at 381 (Plaintiff's "[i]nability to work for a multi-month period removes [him] from the class protected by the ADA").

ii. <u>Motion to Dismiss IIED Claim</u>

Plaintiff alleges Defendant Weaver, his immediate supervisor, intentionally inflicted Plaintiff's emotional distress by berating him, ignoring his warnings regarding safety issues, and otherwise "making his job harder." (*See* Pltf. Resp. at 7.) Defendants move to dismiss Plaintiff's IIED claim because (1) it is preempted by the Illinois Workers' Compensation Act ("IWCA"), 820 ILCS 305/1 *et seq.*; and (2) Plaintiff has not, as he must, alleged Weaver's conduct was "extreme and outrageous." (Def. MTD at 7.)

As to the preemption issue, the IWCA "is the exclusive remedy for accidental injuries transpiring in the workplace." *Nischan v. Stratosphere Quality, LLC*, 865 F.3d 922, 934 (7th Cir. 2017). To avoid preemption, Plaintiff must demonstrate one of the following (1) the injury was not accidental; (2) the injury did not arise from his employment; (3) the injury was not received during the course of his employment; or (4) the injury is not compensable under the Act. *Meerbrey v. Marshall Field & Co.*, 564 N.E.2d 1222, 1226 (Ill. 1990). When a co-worker commits an intentional tort, the plaintiff's injury is accidental because "the injuries are unexpected and unforeseeable

10

from the injured employee's and the employer's point of view." *Watkins v. Woodlawn Cmty. Dev. Corp.*, No. 05 C 4051, 2006 WL 218163, at *3 (N.D. Ill. Jan. 25, 2006) (citing *Meerbrey*, 564 N.E.2d at 1226). This is only true, however, so long as (1) "the employer did not intentionally inflict the injury upon the employee," (2) the employer "did not command or expressly authorize the injury" and (3) the co-worker "was not acting as the alter ego of the employer." *Id.*

Plaintiff does not contend Defendant USPI intentionally inflicted, commanded, or expressly authorized Weaver's tortious conduct. The parties therefore agree that the IWCA preempts Plaintiff's IIED claim unless Weaver was acting "as an alter-ego of the company." (Def. MTD at 7; Pltf. Am. Resp. at 4.) In the seminal case regarding alter ego in the context of the IWCA, the Illinois Appellate Court held that an alter ego is more than "merely a foreman, supervisor, or manager"—it is someone who can be "genuinely characterized" as embodying the corporation such that the Court can rightly "attribut[e] moral responsibility for [his/her] conduct to the corporation." *Jablonski v. Multack*, 380 N.E.2d 924, 927 (Ill. App. Ct. 1978). In other words, "[s]tatus as a foreman, supervisor, or manager alone, without the authority to make decisions and set policy on behalf of an employer, will not suffice to render an intentional tortfeasor an alter ego." *Crissman v. Healthco Int'l, Inc.*, No. 89 C 8298, 1992 WL 223820, at *8 (N.D. Ill. Sept. 2, 1992) (cleaned up) (quoting *Jablonski*, 380 N.E.2d at 927).

Plaintiff relies on *Tolson v. HHL Financial Services, Inc.*, No. 94 C 5136, 1995 WL 461883 (N.D. Ill. Aug. 3, 1995) to contend that an employee is an alter ego of his

employer if she has the power to "promote, demote, fire, review employee practices, set performance goals and review employee performances." *Id*. at *3. Plaintiff says Defendant Weaver was acting as Defendant USPI's alter ego because she had all of powers identified in *Tolson*. (Pltf. Am. Resp. at 5 (Defendant Weaver "had the power to demote, fire, review employee practices, set performance goals, and review employee performances . . . specifically regarding [Plaintiff's] employment.") (citing FAC ¶¶ 20, 57, 66-67, 70-72, 77-78, 82, 85-86).) Defendants counter that Plaintiff's argument overstates the allegations of the FAC, which Defendants say does not include any allegation that Defendant Weaver had the type of authority *Tolson* recognized as sufficient to establish alter ego. (Dkt. 32, ("Def. Reply") at 5.)

Having reviewed the FAC, the Court finds that Plaintiff's allegations are insufficient to establish Defendant Weaver acted as Defendant USPI's alter ego. Plaintiff alleges that, as Plaintiff's supervisor, Defendant Weaver reviewed Plaintiff's performance and took certain job responsibilities away from him. (FAC ¶¶ 20, 57, 66, 70-71.) But Plaintiff alleges six other supervisors also reviewed his performance. (*Id*. ¶ 20.) And, although Plaintiff alleges that he was demoted and fired, he does not allege Defendant Weaver was solely (or even primarily) responsible for those decisions. (*Id*. ¶ 67 (noting Plaintiff was demoted without mentioning Weaver), ¶ 85 ("[Plaintiff] met with Weaver *and Hartshorn* and was informed that [Plaintiff] would be terminated *by USPI*" (emphasis added).) Moreover, the FAC is silent as to whether Defendant Weaver set policies for Defendant USPI, which goes to the heart of the alter ego analysis. *See Crissman*, 1992 WL 223820, at *8 (noting a key distinction

between a mere supervisor and an alter ego is whether the supervisor "set policy on behalf of [the] employer"). At bottom, Plaintiff's allegations regarding Defendant Weaver establish nothing more than a typical supervisor-supervisee relationship, which is not enough to establish Weaver acted as USPI's alter ego. *Id.* ("An employee with supervisory responsibility must be distinguished from 'a person who can genuinely be characterized as the alter ego of the corporation' ") (quoting *Jablonski*, 380 N.E.2d at 927).

Even if Plaintiff's IIED claim were not preempted, it would nevertheless fail because Plaintiff has not alleged Defendants' conduct was extreme and outrageous. To state a claim for IIED, Plaintiff must allege "(1) that the conduct was extreme and outrageous, (2) that the actor intended that his conduct inflict severe emotional distress or knew that there was a high probability that his conduct would inflict such distress, and, (3) that the conduct in fact caused severe emotional distress." *Bailey v. City of Chicago*, 779 F.3d 689, 696 (7th Cir. 2015) (applying Illinois law). Extreme and outrageous conduct is more than "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988) (quoting Restatement (Second) of Torts § 46, cmt. d (1965)). Rather, conduct is extreme and outrageous only if "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim: 'Outrageous!' " *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (quoting *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)) (cleaned up). Or, as courts sometimes put it, the defendant's

conduct "must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Swearnigen-El v. Cook Cty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010) (cleaned up).

Defendants argue the FAC describes a run-of-the-mill retaliatory discharge, which courts have held "is not egregious enough conduct to be considered extreme and outrageous." (Def. MTD at 9 (quoting *Alcazar-Anselmo v. City of Chicago*, No. 07 C 5246, 2008 WL 1805380, *3 (N.D. Ill. Apr. 18, 2008)).) Plaintiff responds that Defendants' conduct was extreme and outrageous because, in addition to retaliating against Plaintiff by firing him: (1) Defendants "ignored [Plaintiff's] emails that warned of life safety issues plaguing USPI's facilities, thereby making his job harder"; (2) Defendants "removed [Plaintiff] from work responsibilities . . . and later demoted him"; and (3) Defendant Weaver "berated" Plaintiff at a March 1, 2018 meeting. (Pltf. Am. Resp. at 7 (citing FAC ¶¶ 63-76, 83-84).)

These allegations do not describe extreme and outrageous conduct. First, Plaintiff does not cite, and the Court is not aware of, any authority that stands for the proposition that ignoring an employee's safety complaints is extreme and outrageous conduct when the safety issues complained of never actually harm the plaintiff (or anyone else for that matter). *Cf. Fries v. Antioch True Value Hardware, Inc.*, No. 06 C 6938, 2007 WL 9814740, at *1 (N.D. Ill. Aug. 13, 2007) ("Plaintiffs do not cite—and the court is unable to find—authority for the proposition that the act of ignoring complaints of sexual harassment by one's employees, or even allowing general 'humiliation' to occur without committing those acts, amounts to 'extreme

14

and outrageous conduct' under Illinois law") (citing *Miller v. Equitable Life Assur. Soc. of the U.S.*, 537 N.E.2d 887 (Ill. App. Ct. 1989) (plaintiff's allegations that she was a victim of sexual harassment, battery, and retaliatory discharge did not give rise to a cause of action for intentional infliction of emotional distress)). That Defendants' inaction in response to Plaintiff's complaints "ma[de] his job harder" (Pltf. Am. Resp. at 7) is precisely the type of "annoyance[], petty oppression[], or other trivialit[y][,]" *McGrath*, 533 N.E.2d at 809, that does not amount to extreme and outrageous conduct.

Second, Defendants' decision to strip Plaintiff of job responsibilities and demote him was not extreme and outrageous. As courts have repeatedly held, in the absence of any aggravating circumstances, adverse employment actions "do[] not rise to the level of extreme and outrageous." *Seung-Whan Choi v. Bd. of Tr. of Univ. of Ill.*, No. 16 C 11627, 2017 WL 3278823, at *4 (N.D. Ill. Aug. 2, 2017) (citing *Breneisen v. Motorola, Inc.*, 512 F.3d 972, 983 (7th Cir. 2008) (being passed over for raises or given reduced raises does not rise to the level of extreme and outrageous conduct); *Bannon v. Univ. of Chicago*, 503 F.3d 623, 630 (7th Cir. 2007) (finding no extreme and outrageous conduct where plaintiff was, among other things, excluded from meetings and denied certain responsibilities); *Petrovic v. Am. Airlines, Inc.*, No. 13 C 246, 2014 WL 683640, at *2 (N.D. Ill. Feb. 21, 2014) (finding that "courts hold consistently that false accusations, even as part of a larger pattern of alleged employer misconduct, are not extreme and outrageous"); *Alcazar-Anselmo*, 2008 WL 1805380, at *3 (collecting cases and holding that denying an employee's request for

15

leave is not egregious enough conduct to be considered extreme and outrageous); *Welsh v. Commonwealth Edison Co.*, 713 N.E. 2d 679 (Ill. App. Ct. 1999) (demoting, transferring, and forcing employees to perform undesirable and humiliating tasks is not outrageous). In accordance with these holdings, this Court cannot conclude—even at the liberal pleadings stage—that Plaintiff's loss of job responsibilities and demotion "go[es] beyond all possible bounds of decency" such as "to be regarded as intolerable in a civilized community." *Swearnigen-El*, 602 F.3d at 864.

Finally, the March 1, 2018 conversation between Plaintiff and Defendant Weaver is insufficient to sustain Plaintiff's IIED claim. The FAC describes the incident as follows:

> WEAVER stated to CULLOTTA that, "No one knows what you [CULLOTTA] do around here," and proceeded to personally and directly attack CULLOTTA verbally, questioning his job duties at USPI, and insinuating that there was personal animosity towards CULLOTTA by WEAVER. When CULLOTTA indicated that it felt like WEAVER had minimized the last eighteen (18) years of CULLOTTA'S life and that WEAVER'S manner and tone were very aggressive in their meeting, WEAVER stated: "That's how I roll, Don."

(FAC ¶ 63.) Based solely on these allegations, the Court would not, as Plaintiff does in his response brief (Pltf. Am. Resp. at 7) characterize Defendant Weaver as having "berated" Plaintiff. *See* BERATE, Merriam-Webster Dictionary Online, (defining "berate" as "to scold or condemn vehemently and at length"), *available at* https://www.merriam-webster.com/dictionary/berate (last visited 7/20/2021). Even accepting Plaintiff's characterization, however, Defendant Weaver's conduct was not extreme and outrageous. Illinois courts have held that even "constant berating" over a period of years does not amount to extreme and outrageous conduct. *See Tabora v.*

*Gottlieb Mem'l Hosp.*, 664 N.E.2d 267, 275 (Ill. App. Ct. 1996) ("constant berating" over a five-year period did not "rise to the level of extreme and outrageous conduct and severe emotional distress"). Certainly, a single berating is not sufficient to support an IIED claim. *Cf. McGrath*, 533 N.E.2d at 809 (the "intensity and duration of the distress" are important to assessing its severity).

To avoid this result, Plaintiff contends this Court should hold that certain otherwise non-actionable conduct be considered extreme and outrageous in his particular case. (Pltf. Am. Resp. at 6.) To be sure, whether conduct is extreme and outrageous may, in some cases, depend on the plaintiff. *See, e.g., Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010) (conduct that would otherwise not be extreme and outrageous could be so when "the defendant's improper use of a position of power [ ] gives him the ability to adversely affect the plaintiff's interests"); *Cairel v. Alderden*, 821 F.3d 823, 836 (7th Cir. 2016) (conduct was extreme and outrageous in part because "the defendant knew the plaintiff was particularly susceptible to emotional distress and acted inappropriately despite that knowledge").

But, even considering the power disparities between the parties, as well as Plaintiff's unique susceptibility to emotional distress, the FAC does not plausibly allege extreme and outrageous conduct. As an initial matter, Plaintiff does not offer any reason why the power disparities between Plaintiff and Defendants are any different than the power disparities between any other employer and employee. The employment cases cited above thus apply to Plaintiff's case. As for his "particular[] susceptibility to emotional distress"—*i.e.*, his mental health conditions—Defendants

17

could not have been aware of those until at least March 15, 2018, when Plaintiff made his first informal request for FMLA leave. (FAC ¶ 74.) Defendant Weaver was therefore unaware of Plaintiff's condition during the March 1, 2018 incident, which leaves only the ignored warnings, loss of job responsibilities, and demotion. None of those actions was extreme and outrageous simply because Plaintiff happened to suffer mental health issues when Defendants decided to demote and fire him. *See Matthews v. Commonwealth Edison Co.*, 941 F. Supp. 721, 727 (N.D. Ill. 1996) (employers are not prohibited from "using neutral criteria to lay off disabled employees"), *aff'd*, 128 F.3d 1194 (7th Cir. 1997). Because Plaintiff does not adequately allege Defendants engaged in extreme and outrageous conduct, Plaintiff's IIED claim must be dismissed.

      iii.   <u>Motion to Dismiss FLSA Claim</u>

Plaintiff alleges Defendants violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, when Defendants (1) underpaid Plaintiff on his last paycheck by failing to compensate him "for all paid time off, extended sick leave, and vacation time" that Plaintiff had accrued, in violation of 29 USC § 211(c) (FAC ¶ 174); and (2) retaliated against him for reporting Defendants' FLSA violations, in violation of 29 USC § 215(a)(3) (*id*. ¶¶ 163-173). In his response brief, Plaintiff admits that he did not report any FLSA violation and therefore has not stated an FLSA retaliation claim. (Pltf. Am. Resp. at 8.) Accordingly, Plaintiff's FLSA retaliation claim is dismissed.

Plaintiff does, however, believe that he has stated an FLSA claim because "his last paycheck did not accurately reflect nor fully compensate him for all . . . paid time

off, extended sick leave, and vacation time he had earned while employed at USPI."
(Pltf. Am. Resp. at 8.) Plaintiff says this violated 29 U.S.C. § 215(a)(5), which provides
that it is unlawful "to make any statement, report, or record filed or kept pursuant to
the provisions of such section or of any regulation or order thereunder, knowing such
statement, report, or record to be false in a material respect." (*Id.*) Defendant
contends this claim should be dismissed because (1) the FAC includes only an FLSA
retaliation claim, not a claim for inadequate recordkeeping or underpayment; and
(2) even if Plaintiff alleged inadequate recordkeeping and failure to compensate paid
time off, the FLSA does not create a cause of action for those violations. (Def. Reply
at 8-9.)

Defendants are half-right. Contrary to Defendants' position that the FAC's
FMLA claims are limited to retaliation, the FAC does contain allegations that
Defendants violated the FLSA by failing to "fully compensate [Plaintiff] for all paid
time off, extended sick leave, and vacation time that [Plaintiff] had accrued and
earned while employed at USPI." (FAC ¶ 174.) But, as Defendants correctly observe,
the FAC never links that undercompensation to inadequate recordkeeping. To the
contrary, Plaintiff seems to know exactly how much paid time off he has accrued over
the years. (*See id*. ¶ 97.) The Court thus rejects Plaintiff's contention that he has
alleged Defendants violated 29 U.S.C. § 215(a)(5)'s recordkeeping requirements.[2]

---

[2] Defendants contend "no private cause of action exists for record-keeping violations."
(Def. Reply at 9.) The only case Defendants cite for that proposition is *Victoria v. Alex Car,
Inc.*, No. 11 C 9204, 2012 WL 1068759 (N.D. Ill. Mar. 29, 2012). But there, the Court expressly
stated that it was *not* reaching whether the FLSA creates a private right of action for
recordkeeping violations. *Id*. at n. 1 ("Defendants contend . . . no private cause of action exists
for record-keeping violations. The Plaintiffs clarified in their response, however, that they

The question remains whether the FLSA provides a cause of action for Defendants' alleged failure to pay Plaintiff for paid time off he accrued. Defendants aver that "claims for unpaid sick leave or paid time off are not actionable under the FLSA." (Def. Reply at 9.) Defendants do cite any legal authority for this proposition, but it is true that "the FLSA does not require payment for time not worked, such as vacations, sick leave or federal or other holidays." *Holmes v. Brennan*, No. 17 C 7944, 2019 WL 11254747, at *2 (N.D. Ill. Jan. 29, 2019); *see also Wince v. CBRE, Inc.*, No. 19-CV-01546, 2020 WL 6273479, at *9 (N.D. Ill. Oct. 26, 2020) ("the FLSA does not require payment for time *not* worked"); *DeBraska v. City of Milwaukee*, 189 F.3d 650, 652 (7th Cir. 1999) (sick leave is generally not compensable time under the FLSA because "sick and injured [employees] are not fit to work, are not 'engaged to wait' at home for work, and therefore are not working") (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944)). Because the FLSA does not require employers to pay their employees for time they spend not working and because Plaintiff's only claim for undercompensation stems from Defendants' failure to compensate him for paid time off, Plaintiff's FLSA claims are dismissed.

iv.    Motion to Dismiss IWPCA Claim

Plaintiff alleges Defendants violated the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*, because Defendant USPI "failed to pay [Plaintiff] his full final compensation, including but not limited to all paid time off,

---

are not pursuing such a claim, so the court need not address this issue"). In any case, because Plaintiff has not adequately alleged a recordkeeping violation, the Court need not address whether the FLSA provides a cause of action for such violations.

extended sick leave, and vacation time that [Plaintiff] had accrued and earned while employed at USPI." (FAC ¶ 176.) Defendants Weaver and Hartshorn move to dismiss Plaintiff's IWPCA claims as applied to them as individuals because "Plaintiff does not allege that Weaver or Hartshorn had knowledge of the compensation arrangement or had final decision-making authority regarding employee compensation, which is required to establish personal liability under the IWPCA." (Def. MTD at 12.) Plaintiff responds that he has alleged an IWPCA claim against Defendants Weaver and Hartshorn because they "were authorized officers at USPI who sanctioned [Plaintiff's] termination and presented him with a severance package." (Pltf. Am. Resp. at 10 (citing FAC ¶¶ 85-89, Ex. GG).)

Plaintiff's allegations are insufficient to state an IWPCA claim against Defendants Weaver and Hartshorn. The Illinois Supreme Court has held that personal IWPCA liability is reserved for individual decisionmakers who "knowingly permit[]" an IWPCA violation. *Andrews v. Kowa Printing Corp.*, 838 N.E.2d 894, 899-900 (Ill. 2005). This Court has since interpreted "knowingly permit[]" to mean "advise[,]" "consent[,]" "affect[,]" or "consult." *See Zwick v. Inteliquent, Inc.*, 83 F. Supp. 3d 804, 812 (N.D. Ill. 2015) (citing *Ziccarelli v. Phillips*, No. 12 C 9602, 2013 WL 5387864, at *12 (N.D. Ill. Sept. 25, 2013)); *Corso v. Suburban Bank & Trust Co.*, No. 03 C 9424, 2006 WL 418655 (N.D. Ill. Feb. 16, 2006)). Plaintiff alleges an IWPCA violation based on Defendants' failure to compensate Plaintiff for paid time off. (FAC ¶ 176.) Plaintiff does not allege Defendants Weaver and Hartshorn knew of and permitted Defendant USPI to issue him a final paycheck that did not include

compensation for his accrued paid time off.[3] Rather, Plaintiff alleges Defendants Weaver and Hartshorn offered him a severance agreement that Plaintiff declined to sign (FAC ¶¶ 88-91), and then Ames Hutton, Defendant USPI's corporate counsel, reclassified his work hours to exclude paid time off from Plaintiff's final paycheck. (*Id.* ¶¶ 98-99, 101, 190, 198.) In the absence of any allegation that Defendants Weaver or Hartshorn consented to or otherwise participated in the decision to exclude paid time off in Plaintiff's final paycheck, the IWPCA claims against Defendants Weaver and Hartshorn must be dismissed.

     v.    <u>Motion to Dismiss CMC & CCESLO Claims</u>

Plaintiff alleges Defendants violated Chapter 1-24 of the Municipal Code of Chicago (the "CMC"), Article 3—Paid Sick Leave Rules, Rule 3.11(b) and the Cook County Earned Sick Leave Ordinance No. 16-4229 (the "CCESLO") by telling Plaintiff they would pay him for time off he had accrued if he agreed to sign a severance agreement. (FAC ¶ 189; ¶ 197.) Plaintiff further alleges that Defendants violated both the CMC and CCESLO by changing the classification of Plaintiff's work hours so that his final paycheck would not include compensation for paid time off he accrued. (*Id.* ¶ 190, ¶ 198.)

---

[3] The FAC includes an allegation that Defendant Hartshorn emailed Plaintiff regarding compensating Plaintiff for paid time off on April 18, 2019. (FAC ¶ 96.) Because that occurred five days after Plaintiff received his final paycheck on April 13, 2019 (*id.* ¶ 92) that allegation does not establish that Defendant Hartshorn knowingly permitted Defendant USPI to issue Plaintiff's final paycheck without including compensation for paid time off.

Neither of these allegations states a CMC/CCESLO violation. Assuming without deciding the CCESLO applies here,[4] that ordinance bars employers "paying [employees] not to take Earned Sick Leave." *See* CCESLO Rule 900.100(6). The FAC does not allege that Defendants paid Plaintiff to forgo sick leave. Indeed, the dominant theme of the FAC is that Plaintiff is aggrieved Defendants *failed* to pay him for sick leave and other time off. (*E.g.*, FAC ¶ 176, ¶ 190, ¶ 198.)

As for the CMC, that ordinance prohibits employers from asking their employers "to waive the right to take sick leave in exchange for receiving payment for unused sick leave." CMC Rule MW 3.11. Again, the FAC establishes there was no violation. Plaintiff alleges Defendants fired him on March 29, 2018. (FAC ¶ 85.) Yet Plaintiff does not allege that either he or Defendants raised the issue of compensating Plaintiff for paid time off until April 13, 2018. (*Id.* ¶ 92.) Plaintiff did not have the right to take sick leave after the course of his employment ended; thus, Plaintiff has not stated a claim that Defendants asked him "to waive *the right* to take sick leave in exchange for receiving payment for unused sick leave." CMC Rule MW 3.11 (emphasis added). Plaintiff's CMC and CCESLO claims are therefore dismissed.

vi.     Motion to Dismiss ADEA Claims

Plaintiff contends Defendants Weaver and Hartshorn are individually liable under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(d),

---

[4] The parties debate whether the CMC/CCESLO apply to Defendants. Because it is clear from the face of the FAC that Plaintiff has not stated a claim under either ordinance, the Court assumes without deciding that they both apply.

because they made the decision to determine him on the basis of his age.[5] (FAC ¶¶ 200-208.) Defendants move to dismiss Plaintiff's claim because the ADEA does not provide for individual liability. (Def. MTD at 14 (citing *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 610 (7th Cir. 2001) ("there is no individual liability under the ADEA")).) Plaintiff responds that "the viability of" *Horwitz* "is suspect" following the Supreme Court's decision in *Mt. Lemmon Fire Dist. v. Guido*, 139 S. Ct. 22 (2018), which "effectively overruled" those decisions. (Pltf. Am. Resp. at 13-14.) In *Mt. Lemmon*, the Supreme Court held the ADEA creates a cause of action against states or political subdivisions of states. *Mt. Lemmon*, 139 S. Ct. at 26. Plaintiff contends *Mt. Lemmon*'s analysis of the ADEA's definition of "employer" recognized not only states or political subdivisions of states as prospective defendants in ADEA cases, but also "agents" of private employers. (Pltf. Am. Resp. at 14.)

The Court declines to extend the holding in *Mt. Lemmon* to include individual agents of private employers. *Mt. Lemmon* focused solely on whether state entities could be sued under the ADEA. *Mt. Lemmon*, 139 S. Ct. at 25. Indeed, as Plaintiff admits, *Mt. Lemmon* does not mention, much less analyze, the issue of whether the ADEA provides a cause of action against individual "agents" of private employees. (Pltf. Am. Resp. at 14.) Nor has Plaintiff cited any case after *Mt. Lemmon* that has adopted Plaintiff's reading of that case. As it is, courts in this circuit have held for at least two-and-a-half decades that there is no individual liability under the ADEA. *See Horwitz*, 260 F.3d at 610; *Matthews v. Rollins Hudig Hall Co.*, 72 F.3d 50, 52 & n. 2

---

[5] Plaintiff does not say how old he is, but he does allege that he was over 40 at the time of his termination. (FAC ¶ 201.)

(7th Cir. 1995); *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 & n. 2 (7th Cir. 1995). In the absence of a decision of the Supreme Court or the Seventh Circuit decision expressly vacating or abrogating the holdings of the Court of Appeals in these cases, this Court is bound by precedent to dismiss ADEA claims brought against individual agents of private employers. *See Ross v. Univ. of Chicago*, No. 18-CV-4200, 2018 WL 6448464, at *10 (N.D. Ill. Dec. 10, 2018) (dismissing ADEA claim against individual "because a supervisor cannot be held individually liable for claims asserted under . . . the ADEA"); *Aku v. Chicago Bd. of Educ.*, 290 F. Supp. 3d 852, 861 (N.D. Ill. 2017) (same). Plaintiff's ADEA claims against Defendants Weaver and Hartshorn are therefore dismissed.

### B.    Plaintiff's Motion to Dismiss

Defendant USPI brings three counterclaims against Plaintiff (1) conversion; (2) fraud; and (3) unjust enrichment. (Dkt. 53, Counterclaim.) Plaintiff moves to dismiss all three for failure to state a claim.[6] Plaintiff's motion is denied as to the conversion and unjust enrichment claims but granted as to the fraud claim.

### i.    Motion to Dismiss Conversion Claim

Defendant USPI alleges Plaintiff purchased equipment on Defendant USPI's behalf using Defendant USPI's funds and then converted that property when he left the company. (Counterclaim ¶¶ 37-42.) Specifically, Defendant USPI alleges Plaintiff

---

[6] Plaintiff also moves to dismiss the Counterclaim as untimely. (Pltf. MTD at 12.) Because Defendant USPI filed the Counterclaim before the Court's deadline for amending pleadings, the Court will not dismiss the Counterclaim on this basis. *See Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLC*, 262 F. Supp. 3d 605, 610 (N.D. Ill. 2017) (deadline to amend pleadings is the deadline to file new counterclaims).

purchased "over $50,000 worth of equipment with USPI funds" from a vendor, but the equipment "never arrived at, nor were used by, any USPI facility." (*Id*. ¶ 17.) Defendant USPI further alleges that Plaintiff purchased "over $20,000 worth" of "wire cabling" as well as "phones, desktop computers, scanners, printers, and iPads on behalf of USPI" that he then converted for "personal use" and never returned. (*Id*. ¶¶ 19-22.) Plaintiff contends this is insufficient to state a claim for conversion because Defendant USPI (1) did not have "the right to possess the property *at all times*"; (2) does not allege Plaintiff acted willfully, rather than negligently; and (3) does not specify "what specific property was allegedly converted." (Pltf. MTD at 3-6 (citing *Zang v. All. Fin. Servs. of Ill., Ltd.*, 875 F.Supp.2d 865, 879 (N.D. Ill. 2012) (setting forth the elements of conversion under Illinois law)).)

Plaintiff is wrong on all three counts. First, Plaintiff's only basis for stating that Defendant USPI did not have the right to possess the converted property "*at all times*" is his assertion that "USPI does not own all its facilities outright; rather, it has a network of physician partners that it jointly runs its facilities with. These partners also own a share of any property bought in USPI's regular course of business." (Pltf. MTD at 3.) Plaintiff does not cite, and the Court was unable to find, any portion of the Counterclaim that alleges these facts. Because the Court confines its analysis to the allegations of the complaint at this stage of the case, the Court declines to dismiss Defendant USPI's conversion claim on this basis.

Moreover, contrary to Plaintiff's argument, Defendant USPI does allege Plaintiff acted intentionally and does specify the property he allegedly converted.

(*See, e.g.*, Counterclaim ¶ 17 ("Cullotta purchased over $50,000 worth of equipment with USPI funds from Micro Center that never arrived at, nor were used by, any USPI facility"); ¶ 19 ("Cullotta separately submitted over $20,000 worth of receipts for purchases of equipment that Cullotta represented to be for USPI facilities, but Cullotta converted for personal use"); ¶ 20 ("Cullotta purchased phones, desktop computers, scanners, printers, and iPads on behalf of USPI that USPI could never locate on its networks or at any of its facilities"); ¶ 22 ("Cullotta submitted extensive purchases for wire cabling, far beyond the amount necessary for the USPI facilities"); ¶ 23 ("Cullotta also purchased telephone equipment that cannot be found and was never placed into service at any USPI facility"); ¶ 24 ("Cullotta purchased at least 21 phones with USPI funds that are unaccounted for, resulting in a loss to USPI of at least $12,000"); ¶ 25 ("Cullotta also purchased laptops, scanners, printers, computer software, and other miscellaneous computer equipment with USPI funds, totaling over $4,000. These items also are missing from USPI facilities"); ¶ 41 ("Cullotta's continued possession of all equipment, materials, and goods purchased with USPI's money continues to be an unauthorized and wrongful assumption of control, dominion, and ownership over USPI's property"). Plaintiff has therefore failed to demonstrate the legal insufficiency of Defendant USPI's conversion claim.

> ii. Motion to Dismiss Fraud Claim

Defendant USPI alleges Plaintiff committed fraud when he (1) purchased IT equipment for personal use from an unapproved vender (Micro Center) and then "induced USPI to reimburse" him for those expenses by representing that they were "for USPI's benefit"; and (2) "induced USPI to enter into a contract with an

unapproved third-party vendor [Green Bee Technologies] and retained the only access to the unauthorized telephone system[.]" (Counterclaim ¶¶ 46-48.) Plaintiff argues Defendant USPI's fraud claims should be dismissed because they are not pleaded with the requisite particularity. (Pltf. MTD at 6-10.)

The elements of fraudulent inducement under Illinois law are "(1) a false statement of material fact; (2) knowledge or belief by [the defendant] that the statement was false; (3) an intention to induce [the plaintiff] to act; (4) reasonable reliance upon the truth of the statement by [the plaintiff]; and (5) damages." *Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 866 (7th Cir. 2020). A fraudulent inducement claim must be alleged with particularity. Fed. R. Civ. P. 9(b). The precise level of particularity required depends upon the facts of the case. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014). But the claimant is generally required to state "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to" the claimant. *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (quotations omitted).

Defendant USPI's fraud claim is not pleaded with the requisite particularity. Although the Counterclaim identifies Plaintiff as the alleged fraudster, it does not state the "time, place and content" of his misrepresentations or the "method by which the representation was communicated" to Defendant USPI. *Rocha*, 826 F.3d at 911. The Counterclaim broadly states that Plaintiff's "fraudulent scheme began in 2014, at the latest, and continued through the termination of his employment."

(Counterclaim ¶ 7.) It further alleges that Plaintiff "fraudulently represented to USPI that he purchased items with USPI's funds for USPI's benefit" when he sought reimbursement for those items. (*Id*. ¶ 44.)

This is not enough to meet Rule 9's particularity requirement. Courts in this district have rejected nearly identical claims that an employee fraudulently submitted expenses for reimbursement during his entire tenure with the employer. *See, e.g.*, *Gavin/Solmonese LLC. v. Kunkel*, No. 16-CV-1086, 2016 WL 3612123, at *10 (N.D. Ill. July 6, 2016) (dismissing business expense reimbursement fraud claim because "Plaintiff merely alleges the approximate begin and end dates of Defendant's overall employment, rather than dates drawn from the allegedly fraudulent expense reports submitted by Defendant over the relevant 17-month period"). Although Defendant USPI lists the value of the equipment it believes is missing, it does not allege, as it must, the dates on which Plaintiff submitted false reimbursement requests for that equipment or what false statements he made in each reimbursement request. All this information should be available to Defendant USPI without the need for any discovery.[7]

Defendant USPI contends that the Counterclaim adequately describes the method of fraud by alleging (1) Plaintiff "bypassed USPI's internal equipment procurement website and ordered IT equipment through third-party vendor, Micro

---

[7] Defendant USPI argues the Rule 9(b) requirements should be "relaxed" because Defendant USPI "does not have access to all the facts necessary to support" its claim. (Dkt. 60 ("Def. Resp.") at 9.) But Defendant USPI surely has access to, and was required to investigate in advance of filing a claim for fraud, the business records detailing Plaintiff's requests for reimbursement. There is no cause under these circumstances to relax Rule 9(b)'s requirements.

Center, who is not a preferred vendor"; and (2) Plaintiff fraudulently induced USPI "to enter into a contract with Green Bee Technologies that resulted in significant financial loss to USPI" even though Green Bee "is also not a preferred vendor[.]" (Def. Resp. at 8; Counterclaim ¶ 29.) With respect, it is not feasible to glean the method of fraud from either of these allegations. To effect his alleged fraud, did Plaintiff falsely represent that he bought equipment from a preferred vendor other than Micro Center and Green Bee? Or did Plaintiff falsely state that Micro Center and Green Bee were themselves preferred vendors? And, if Plaintiff did not make either of those false representations, why were his requests for reimbursement approved? Without a more fulsome statement of the "who, what, when, and how" of the alleged scheme, the Court cannot determine how Plaintiff is alleged to have committed fraud. Defendant USPI's fraud claim is dismissed.

### iii. Motion to Dismiss Unjust Enrichment Claim

Plaintiff argues Defendant USPI's unjust enrichment claim should be dismissed alongside Defendant USPI's conversion and fraud claims because unjust enrichment requires a predicate claim under Illinois law. (*See* Pltf. MTD at 10-11; Dkt. 62, Pltf. Reply at 12.) Because, as discussed above, Defendant USPI's conversion claim is allowed to proceed, its unjust enrichment claim cannot be dismissed on this basis.

## IV. CONCLUSION

For the above reasons, Defendants' partial motion to dismiss is granted. Plaintiff's motion to dismiss is granted as to Defendant's fraud claim and otherwise denied. All dismissals are without prejudice. Any party that wishes to replead a

dismissed claim must do so within 21 days of the entry of this order; otherwise, the dismissal automatically converts to one with prejudice.

SO ORDERED in No. 19-cv-06490.

Date:  August 3, 2021

_____

JOHN F. KNESS
United States District Judge